**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| EDWARD A. WILLIAMS, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | No. 17-2641 |
| | : | |
| WILLIAM P. BARR, Attorney General of the | : | |
| United States, THOMAS E. BRANDON, | : | |
| Deputy Director and Acting Director of the | : | |
| Bureau of Alcohol, Tobacco, Firearms and | : | |
| Explosives, CHRISTOPHER A. WRAY, | : | |
| Director of the Federal Bureau of Investigation, | : | |
| and UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

**ROBERT F. KELLY, Sr. J.**                                                    **APRIL 1, 2019**

Federal law generally prohibits the possession of firearms by individuals who have been convicted of a crime punishable by a term of imprisonment exceeding one year.  *See* 18 U.S.C. § 922(g)(1).  There is an exception from this prohibition for individuals who have been convicted of a state law misdemeanor that is punishable by a term of imprisonment of two years or fewer, 18 U.S.C. § 921(a)(20)(B), or those whose conviction has been expunged, set aside, or for which the individual has been pardoned, *id.* § 921(a)(20).

In 2005, Plaintiff Edward A. Williams ("Williams") was convicted in Pennsylvania of driving under the influence ("DUI") at the highest rate of intoxication with a prior offense, a first-degree misdemeanor punishable by a term of imprisonment of up to five years.  He brings this action against Defendants William P. Barr (Attorney General of the United States), Thomas E. Brandon (Deputy Director and Acting Director of the Bureau of Alcohol, Tobacco, Firearms

and Explosives), Christopher A. Wray (Director of the Federal Bureau of Investigation), and the United States of America (collectively, the "Government"), contending that § 922(g)(1) is unconstitutional as applied to him.[1]  Presently before the Court are the parties' Motions for Summary Judgment, along with numerous responses and replies to the respective motions.  For the reasons that follow, Williams' Motion for Summary Judgment is denied, and the Government's Motion for Summary Judgment is granted.

## I.  BACKGROUND

In April 2000, Williams was in State College, Pennsylvania, where he was pulled over, arrested, and charged with DUI based on his blood alcohol content ("BAC") being over .10%.[2] (Pl.'s Statement of Undisputed Material Facts ("Pl.'s SUMF") in Supp. Mot. Summ. J. ¶¶ 1, 3; Gov't's Statement of Undisputed Material Facts ("Gov't's SUMF") in Supp. Mot. Summ. J. ¶¶ 2-3.)  Williams entered into Pennsylvania's Accelerated Rehabilitative Disposition ("ARD") program and was sentenced to twelve months of probation, required alcohol and driver's safety classes, surrender of his driver's license, and payment of court costs.  (Pl.'s SUMF ¶ 4; Gov't's SUMF ¶ 4.)  Acceptance into the ARD program may be construed statutorily as a conviction for purposes of computing sentences on subsequent DUI convictions.[3]  *See* 75 Pa. Cons. Stat. § 3806(a)(1).

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted the current Attorney General of the United States, William P. Barr, in place of former Attorney General Jeff Sessions.  Likewise, the current Director of the FBI, Christopher A. Wray, has been substituted in place of former Director Andrew G. McCabe.

[2] The parties have filed the instant Motions for Summary Judgment under seal pursuant to the Privacy Stipulation and Order of Confidentiality.  (*See* Doc. No. 23.)  Williams' Brief in Support of his Motion for Summary Judgment (Doc. No. 29-4), along with his Statement of Undisputed Material Facts (Doc. No. 29-2), contain redactions about his April 2000 arrest and subsequent acceptance into Pennsylvania's ARD program.  However, the Court includes these facts in this Opinion because Williams has already provided them publicly in an unredacted format in his Complaint, (Compl. ¶¶ 8, 19-22), first Motion for Summary Judgment, (Doc. No. 9-1 ¶¶ 1-6), and first Statement of Undisputed Material Facts, (Doc. No. 9-2 at 2-3).

[3] A defendant may move for a court order dismissing the DUI charge when he or she has successfully completed the ARD program.  *See* Pa. R. Crim. P. 319.  When the judge orders dismissal of the charge, the judge must also order

In November 2001, Williams was arrested in Philadelphia for DUI. (Gov't's SUMF ¶ 5.) The charges were dismissed for unknown reasons. (*Id.* ¶ 8.)

On September 7, 2004, Williams was once again pulled over in Philadelphia for DUI. (*Id.* ¶ 9; Pl.'s SUMF ¶ 7.) He was arrested, charged, and subsequently found guilty at trial in 2005 of DUI at the highest rate of intoxication in violation of 75 Pa. Cons. Stat. § 3802(c). (Gov't's SUMF ¶ 15; Pl.'s SUMF ¶¶ 7-8.) Although Williams was arrested at approximately 2:00 a.m., a test conducted at 3:20 a.m. indicated his BAC to be .223%. (*See* Gov't's SUMF ¶ 15; *see also* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-00039.) He was sentenced on June 15, 2006 to ninety days to two years in prison; mandatory attendance at Alcohol Highway Safety School; a $1,500 fine, $180 in court costs, and a surcharge of $100; license suspension for eighteen months; and imposition of an ignition interlock. (*See* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000016, 000019.) The judge allowed Williams to serve his sentence on passive house arrest until electronic monitoring was available due to Williams' medical condition. (*See* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000019.) Because Williams' conviction was under 75 Pa. Cons. Stat. § 3802(c) and he had a prior offense, it was considered a first-degree misdemeanor. *See* 75 Pa. Cons. Stat. § 3803(b)(4). First-degree misdemeanors in Pennsylvania carry a maximum sentence of up to five years of imprisonment. *See* 18 Pa. Cons. Stat. § 106(b)(6). Accordingly, federal law disqualified him (and continues to do so) from possessing a firearm under § 922(g)(1).

Although Williams knew his license to carry a firearm had been revoked due to his 2005 DUI conviction, he continued to own approximately twenty firearms until 2014, including semi-automatic guns, revolvers, and shotguns. (Gov't's SUMF ¶¶ 19-21.) Further, between 1994 and

---

the expungement of the defendant's arrest record. *See* Pa. R. Crim. P. 320(a). Although Williams' April 2000 DUI charge was expunged, we will consider it his first DUI because it may be statutorily construed as such.

2010, he worked as a sales manager, firearms instructor, and range safety officer at a gun store and range called "Colosimo's."[4]  (*Id.* ¶ 22.)  During this period, some of which included his federal firearm and ammunition prohibition, Williams physically handled firearms and ammunition every day as part of his job responsibilities.  (*Id.* ¶¶ 24-25.)  As part of his employment, Williams also had the responsibility for ensuring that those who wished to purchase firearms at Colosimo's could do so under federal and state law.  (*Id.* ¶ 27.)  Additionally, he was responsible for understanding the paperwork that was needed to complete those purchases, such as the Pennsylvania state firearms application.  (*Id.* ¶ 28.)

Nevertheless, Williams in 2007 submitted an application to purchase a Glock-23.  (*Id.* ¶ 31.)  In paragraph thirty-two of the Pennsylvania State Police Application/Record of Sale, Williams checked the "no" box when asked, "Are you charged with, or have you ever been convicted of a crime punishable by imprisonment for a term exceeding one year?  This is the maximum sentence that you 'could have received,' not the actual sentence you did receive." (Gov't's SUMF ¶ 31, Ex. A ("Williams Dep."), Ex. 7.)  Williams successfully completed the purchase of the firearm based on his representations in the application.  (*Id.* ¶ 35.)

In December 2014, Williams attempted to obtain a license to carry firearms out of the desire to protect his family and himself in the home.  (Pl.'s SUMF ¶ 14.)  He was denied and subsequently submitted a challenge to the Pennsylvania State Police in January 2015.  (Gov't's SUMF ¶ 39.)  In his challenge form, Williams checked the "yes" boxes when asked whether he had ever been arrested in Pennsylvania and, if so, whether the arrest resulted in a conviction. (Williams Dep., Ex. 6 at 2.)  He wrote in the form, however, that his conviction was an ungraded misdemeanor.  (*Id.*)

---

[4] Colosimo's has since shut down after pleading guilty to federal criminal charges for falsifying ATF paperwork. (Gov't's SUMF ¶ 30.)

Williams has worked as a construction manager for the past twenty-five years. (Pl.'s SUMF ¶ 11.) He has managed numerous projects, including the Curran-Fromhold Correctional Facility, the Pennsylvania Convention Center, the "SEPTA Railworks Project," the Commodore Barry Bridge, and the Interstate 95 and New Jersey Transportation maintenance facilities. (*Id.* ¶ 12.) His job duties include the preparation of day-to-day monitoring of various construction projects in New Jersey, Pennsylvania, and Delaware; attending project meetings on a monthly basis; and assisting contractors with cost control, project management, scheduling, and "claims/time impact analysis as needed." (*Id.* ¶ 13.)

Williams filed suit in this Court on June 1, 2017, contending that § 922(g)(1) is unconstitutional as applied to him pursuant to the United States Court of Appeals for the Third Circuit's decision in *Binderup v. Att'y Gen. U.S. of Am.*, 836 F.3d 336 (3d Cir. 2016) (en banc). On September 14, 2017, the Government filed a motion to dismiss for failure to state a claim. On October 13, 2017, Williams filed a motion for summary judgment. In a series of Orders dated December 1, 2017, the Court denied the Government's motion to dismiss and denied Williams' motion for summary judgment as premature. After a period of discovery, the instant Motions for Summary Judgment followed.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court asks "whether the evidence presents a sufficient disagreement to require submission to the jury or whether . . . one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party has the initial burden of informing the court of the basis for the motion and

identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "A fact is material if it could affect the outcome of the suit after applying the substantive law. Further, a dispute over a material fact must be 'genuine,' i.e., the evidence must be such 'that a reasonable jury could return a verdict in favor of the non-moving party.'" *Compton v. Nat'l League of Prof'l Baseball Clubs*, 995 F. Supp. 554, 561 n.14 (E.D. Pa. 1998) (quoting *Liberty Lobby*, 477 U.S. at 255).

Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Once the moving party has produced evidence in support of summary judgment, the non-moving party must go beyond the allegations set forth in its pleadings and counter with evidence that presents "specific facts showing that there is a genuine issue for trial." *See Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362-63 (3d Cir. 1992). "More than a mere scintilla of evidence in its favor" must be presented by the non-moving party in order to overcome a summary judgment motion. *Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996). If the court determines there are no genuine disputes of material fact, then summary judgment will be granted. *Celotex*, 477 U.S. at 322.

## III.     DISCUSSION

### A.     As-Applied Second Amendment Challenges in the Third Circuit

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In the seminal decision of *District of Columbia v. Heller*, the Supreme Court of the United States held that the "core" of the Second Amendment is the right of "law-

abiding, responsible citizens to use arms in defense of hearth and home," 554 U.S. 570, 635

(2008), and that this right is "unconnected with militia service," *id.* at 582. The Supreme Court

recognized, however, that the individual right is "not unlimited." *Id.* at 626. The Court provided

a non-exhaustive list of "presumptively lawful regulatory measures," such as "longstanding

prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the

carrying of firearms in sensitive places such as schools and government buildings, or laws

imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626-27 & n.26.

The first precedential, post-*Heller* Third Circuit decision involving the Second

Amendment was *United States v. Marzzarella*, a case involving an as-applied challenge. 614

F.3d 85, 88 (3d Cir. 2010). In *Marzzarella*, the defendant argued that 18 U.S.C. § 922(k), which

bars the possession of any firearm with an obliterated serial number, violated his Second

Amendment right to keep and bear arms as recognized by *Heller*. *Marzzarella*, 614 F.3d at 88.

The court derived from *Heller* "a two-pronged approach to Second Amendment challenges." *Id.*

at 89. First, the court considers "whether the challenged law imposes a burden on conduct

falling within the scope of the Second Amendment's guarantee." *Id.* If it does not, the

challenged law stands. *Id.* If it does, then the law must be evaluated under intermediate

scrutiny. *Id.* at 89, 97. If the law passes muster under intermediate scrutiny, it is constitutional.

*Id.* at 89. If it fails intermediate scrutiny, the law is unconstitutional. *Id.* In *Marzzarella*, the

court ultimately held that even if § 922(k) burdened protected conduct, it withstood intermediate

scrutiny because the statute reasonably fit with the substantial government interest of "preserving

the ability of law enforcement to conduct serial number tracing."[5] *Id.* at 98.

---

[5] The court also stated that the law would survive strict scrutiny, which requires the law to "be 'narrowly tailored to serve a compelling state interest.'" *Marzzarella*, 614 F.3d at 99 (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 465 (2007)).

The Third Circuit next addressed the Second Amendment the following year in *United States v. Barton*, 633 F.3d 168 (3d Cir. 2011), *overruled in part by Binderup*, 836 F.3d at 349-50. In *Barton*, the defendant raised facial and as-applied challenges to 18 U.S.C. § 922(g)(1), the statute at issue in the instant case.[6]  633 F.3d at 172-73.  The court quickly disposed of the defendant's facial challenge, concluding that "because *Heller* requires that we 'presume,' under most circumstances, that felon dispossession statutes regulate conduct which is unprotected by the Second Amendment, Barton's facial challenge must fail." *Id.* at 172.  The court next confirmed the availability of as-applied challenges under the Second Amendment, *id.* at 173, and held that "[t]o raise a successful as-applied challenge, [the challenger] must present facts about himself and his background that distinguish his circumstances from those of persons historically barred from Second Amendment protections," *id.* at 174.  Because Barton's prior convictions— possession of cocaine with intent to distribute and receipt of a stolen firearm (along with his admissions to selling a firearm with an obliterated serial number to a confidential police informant that were at issue in the case at bar)—were closely related to violent crime, the court concluded he lacked Second Amendment rights. *Id.*

The Third Circuit next addressed the Second Amendment en banc in *Binderup*, a consolidated appeal that involved two as-applied challenges to § 922(g)(1).  One of the challengers, Daniel Binderup, was convicted in Pennsylvania state court of corrupting a minor, a misdemeanor subject to possible imprisonment of up to five years.  *Binderup*, 836 F.3d at 340. Julio Suarez, the other challenger, was convicted in Maryland state court of unlawfully carrying a handgun without a license, a misdemeanor subject to possible imprisonment of not fewer than

---

[6] A facial challenge asserts that "the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  "Unlike a facial challenge, an as-applied challenge 'does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.'" *Binderup*, 836 F.3d at 345 (quoting *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011)).

thirty days and not more than three years.  *Id.*  Eight years later, Suarez was convicted in

Maryland state court of DUI, but the conviction was not subject to § 922(g)(1).  *Binderup*, 836

F.3d at 340.

Both challenges succeeded, and the Third Circuit became the first federal Court of

Appeals to hold § 922(g)(1) unconstitutional in any of its applications.  *See Medina v. Whitaker*,

913 F.3d 152, 155 (D.C. Cir. 2019).  The en banc court split sharply on the reasoning, however,

with Judge Ambro writing a plurality opinion (joined by two other judges), Judge Hardiman

writing an opinion concurring in part and concurring in the judgments (joined by four other

judges), and Judge Fuentes writing an opinion concurring in part, dissenting in part, and

dissenting in the judgments (joined by six other judges).  After taking into account the votes of

concurring and dissenting judges, and that "when no single rationale explaining the result enjoys

the support of a majority of the Court, its holding 'may be viewed as that position taken by those

Members who concurred in the judgments on the narrowest grounds,'" Judge Ambro's opinion

controls the analysis of as-applied challenges in the Third Circuit.  *See Binderup*, 836 F.3d at

356-57; *Miller v. Sessions*, 356 F. Supp. 3d 472, 479 (E.D. Pa. 2019); *United States v. Brooks*,

341 F. Supp. 3d 566, 588 (W.D. Pa. 2018); *King v. Sessions*, No. 17-884, 2018 WL 3008527, at

*3 (E.D. Pa. June 15, 2018); *United States v. Brooks*, No. 17-250, 2018 WL 2388817, at *2

(W.D. Pa. May 24, 2018); *Gurten v. Sessions*, 295 F. Supp. 3d 511, 519 (E.D. Pa. 2018); *Keyes

v. Sessions*, 282 F. Supp. 3d 858, 869 (M.D. Pa. 2017); *Jefferies v. Sessions*, 278 F. Supp. 3d

831, 839 (E.D. Pa. 2017); *Zedonis v. Lynch*, 233 F. Supp. 3d 417, 424-25 (M.D. Pa. 2017).

Judge Ambro's opinion held that, when "[r]ead together, *Marzzarella* and *Barton* lay out

a framework for deciding as-applied challenges to gun regulations."  *Binderup*, 836 F.3d at 346.

The court synthesized *Marzzarella* and *Barton*, concluding that *Marzzarella*'s two-pronged

approach still applies, and that *Barton* identifies the "two hurdles" an individual must overcome at the first step of the *Marzzarella* framework. *Id.* at 346-47. At step one, a challenger must prove "that a presumptively lawful regulation burdens his Second Amendment rights." *Id.* To do so, per *Barton*, a challenger must "(1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class." *Id.* at 347 (internal citations omitted). The Third Circuit held that the burden is on the challenger at step one, and cautioned that the challenger's showing "must also be strong," which is "no small task." *Id.* If the challenger succeeds at step one, the second step of the *Marzzarella* analysis requires the Government to demonstrate that the regulation satisfies intermediate scrutiny. *Id.* at 347, 353.

At the first hurdle of step one of the *Marzzarella* framework, the challenger must first identify "the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights." *Id.* at 348. The Third Circuit explained that "the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'" *Id.* (citations omitted). Those who have committed or are likely to commit a violent offense (one in which actual or attempted violence is an element) "undoubtedly qualify as 'unvirtuous citizens' who lack Second Amendment rights." *Id.* (citations omitted). But because *Heller* did not confine the "presumptively lawful regulation" of felon dispossession statutes to only violent felons, the Third Circuit held that the category of "unvirtuous citizens" extends to "any person who has committed a serious criminal offense, violent or nonviolent." *Id.* That is, "persons who have committed serious crimes forfeit the right to possess firearms much the way they 'forfeit

other civil liberties, including fundamental constitutional rights.'" *Id.* at 349 (quoting *Barton*, 633 F.3d at 175).

The second hurdle of step one of the *Marzzarella* framework requires the challenger to distinguish himself from the historically barred class by demonstrating that he was not convicted of a "serious crime." *Id.* Although "there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights," the Third Circuit applied four factors for assessing the seriousness of an offense: (1) whether the state legislature enacted the crime as a misdemeanor or felony; (2) whether the offense was violent; (3) the actual punishment the challenger received; and (4) whether there is a cross-jurisdictional consensus regarding the seriousness of the crime. *Id.* at 351-53.

### B. Application to Williams

#### 1. *Step One: Whether § 922(g)(1) Burdens Williams' Second Amendment Rights*

Under § 922(g)(1), a person convicted of a crime punishable by more than one year of imprisonment is disqualified from possessing a firearm. *See* 18 U.S.C. § 922(g)(1). Williams' conviction was a first-degree misdemeanor punishable by a term of imprisonment of up to five years under Pennsylvania law, making him subject to the "presumptively lawful" firearm ban.[7] To overcome the presumption, step one of the *Marzzarella* framework requires him to make a strong showing that his second DUI at the highest rate of intoxication was not "serious."

---

[7] As we noted above, a state law misdemeanor that is punishable by two years of imprisonment or fewer is not federally prohibiting under § 922(g)(1). *See* 18 U.S.C. § 921(a)(20)(B). Because Williams' maximum sentence for his second DUI was up to five years' imprisonment, he does not get the carve-out of § 921(a)(20)(B). Further, Williams' disqualifying conviction has not been expunged or set aside, nor has he been pardoned. *See id.* § 921(a)(20).

### a.    The *Binderup* Factors

Turning to the first factor, the *Binderup* plaintiffs were convicted of state law misdemeanors. *See Binderup*, 836 F.3d at 351. The Third Circuit explained that "[m]isdemeanors are, and traditionally have been, considered less serious than felonies." *Id.* Indeed, "a state legislature's classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying." *Id.* And although some misdemeanors involve conduct more dangerous than felonies, "Congress may not overlook so generally the misdemeanor label, which, in the Second Amendment context, is also important." *Id.* at 351-52. In this case, because Williams' disqualifying offense was a misdemeanor, this factor weighs in his favor.[8]

The second factor requires the Court to consider whether violence was an element of the offense. *See id.* at 352. In doing so, "we look only to a crime's elements rather than the way it actually was committed." *Id.* at 352 n.4. Here, Williams was convicted of DUI at the highest rate of intoxication, an offense that contains no element of violence. *See* 75 Pa. Cons. Stat. § 3802(c).[9] Accordingly, this factor also weighs in his favor.[10]

---

[8] In support of its position that Williams cannot carry his burden at step one, the Government points to Pennsylvania legislative history indicating that the DUI laws are considered serious. (Gov't's Mem. Law Supp. Mot. Summ. J. 12.) The legislative history shows that the legislators believe Pennsylvania is "tough" on DUI offenders because of the potential sentences for the offenses. (*Id.*) However, the maximum sentence is not dispositive on the issue of whether an offense is serious, and the legislature did not see a repeat DUI offender at the highest rate of intoxication to be so serious as to label the conduct a felony. *See Binderup*, 836 F.3d at 352.

[9] 75 Pa. Cons. Stat. § 3802(c) provides that "[a]n individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is 0.16% or higher within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle."

[10] Given that the Third Circuit twice stated that those who have committed or are likely to commit a crime in which violence (actual or attempted) is an element are "undoubtedly" unvirtuous citizens who lack Second Amendment rights, *Binderup*, 836 F.3d at 348, 352, it is unclear why this is even a factor in determining the seriousness of the challenger's offense. In other words, it appears a crime of violence is per se disqualifying and that no further analysis would be necessary.

The parties significantly dispute the weight the Court should give to the third and fourth factors. The third factor looks to the actual sentence the challenger received for the offense. *See Binderup*, 836 F.3d at 352. In *Binderup*, Daniel Binderup was sentenced to three years of probation and a $300 fine, plus court costs and restitution. *Id.* Julio Suarez was given a suspended sentence of 180 days' imprisonment and a $500 fine. *Id.* The Third Circuit stated that both plaintiffs received a "minor sentence," as "severe punishments are typically reserved for serious crimes." *Id.* The court emphasized that the punishments reflected the sentencing judges' assessment of how minor the offenses were because neither plaintiff received a single day of jail time. *Id.*

Williams relies significantly on the United States District Court for the Middle District of Pennsylvania's decision in *Holloway v. Sessions*, 349 F. Supp. 3d 451 (M.D. Pa. 2018), a case that nearly mirrors the instant matter. Holloway, like Williams, was convicted of DUI at the highest rate of intoxication with a prior offense. *Id.* at 454. Holloway was sentenced to ninety days of imprisonment with work release, a fine of $1,500, completion of recommended drug and alcohol treatment, and sixty months' probation. *Id.* Through the work release program, Holloway reported for work each day but was otherwise confined to county prison for the remainder of the time. *Id.* at 455.

Despite the plaintiff in *Holloway* actually being sentenced to imprisonment, the court concluded that the sentence was "relatively minor." *Id.* at 457. The court reasoned that, unlike Julio Suarez's sentencing judge, who had the discretionary authority to give a suspended sentence of 180 days' imprisonment, Holloway's sentencing judge lacked such authority. *Id.* The court stated that Holloway's sentence was "relatively minor" as compared to the one-year threshold in § 922(g)(1) and the five-year maximum penalty he faced under Pennsylvania law.

*Holloway*, 349 F. Supp. 3d at 457. Additionally, the court reasoned that Holloway's assignment to the work release program showed the minor nature of his sentence because "the sentencing judge did not find Holloway to pose a significant risk to public safety." *Id.*

Williams compares his sentence to the *Binderup* and *Holloway* plaintiffs' sentences, arguing it was "hardly severe relative" to the others. (Pl.'s Br. Supp. Mot. Summ. J. 19.) He claims that his sentence of ninety days of passive house arrest was "in essence, probation." (*Id.*) The Government contends that Williams' sentence of ninety days to two years of imprisonment was severe. In particular, the Government claims that Williams would have served ninety days in jail if not for his medical condition. (Gov't's Resp. Opp'n Pl.'s Mot. Summ. J. 11.) Additionally, the Government argues that the maximum sentence of two years of imprisonment is probative of the sentencing judge's determination that Williams' offense was serious. (*Id.* at 11-12.)

Along with fines and other conditions, Williams was sentenced to ninety days to two years of imprisonment for his violation of 75 Pa. Cons. Stat. § 3804(c). We do not give much weight to the Government's characterization of Williams' sentence being two years, as the sentencing judge specifically noted that Williams was "[t]o be paroled after completing the minimum sentence without further order of the court." (Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000022.) That is, although the judge's split sentence gives a maximum two-year term of imprisonment, the judge effectively sentenced Williams to ninety days. Therefore, we believe ninety days is the relevant sentence term for our consideration of whether Williams' offense was "serious."

An added wrinkle is that the sentencing judge allowed Williams to serve the ninety days "on passive house arrest until electronic monitoring [was] available due to [a] medical

condition."[11] (*Id.*) Williams contends his sentence of house arrest shows that the judge did not believe his offense was worthy of any jail time. (Pl.'s Br. Supp. Mot. Summ. J. 19.) The Government, on the other hand, notes that Williams would have served his sentence in jail if not for his medical condition. (Gov't's Resp. Opp'n Pl.'s Mot. Summ. J. 11.)

We believe Williams' sentence falls in between the *Binderup* plaintiffs' sentences and the *Holloway* plaintiff's sentence. The *Binderup* plaintiffs respectively received probation and a suspended prison sentence, which the Third Circuit deemed to be "minor" due to the lack of jail time. The plaintiff in *Holloway* received a term of actual imprisonment for ninety days with participation in the work release program, meaning he was actually confined to county jail except when he reported to work. Even assuming Williams' sentence of ninety days of house arrest (as opposed to ninety days of imprisonment, as the Government argues) is the operative sentence for the Court to consider, it is certainly more severe than the sentences the plaintiffs received in *Binderup*. Because house arrest is a form of confinement, it seriously restricts an individual's liberty in a way that probation does not. *See McKenzie v. Att'y Gen. of U.S.*, 452 F. App'x 88, 90-91 (3d Cir. 2011) (stating that under the Immigration and Nationality Act, "home confinement [is] a serious restriction of [the plaintiff's] liberty and qualifie[s] as imprisonment"); *Beahm v. Burke*, 982 F. Supp. 2d 451, 461 (E.D. Pa. 2013) (stating that "while house arrest is not a prison sentence *per se*, it is considered 'confinement'"). Therefore, we cannot agree with Williams' characterization that ninety days of house arrest is equivalent to probation.

Williams' sentence is, however, less severe than the plaintiff's sentence in *Holloway*, a sentence which the court found to be "relatively minor." Nevertheless, we believe the severity of Williams' sentence leans slightly in favor of the Government. Although Williams was given the

---

[11] The sentencing judge could have sentenced Williams to house arrest even in the absence of a medical condition. *See* 42 Pa. Cons. Stat. §§ 9763, 9804; 37 Pa. Code § 451.52. The Government agrees with this as well. (*See* Gov't's Reply in Supp. Defs.' Mot. Summ. J. 2.)

minimum sentence under 75 Pa. Cons. Stat. § 3804(c)(2), the sentence still restricted his liberty due to its custodial nature. We simply cannot overlook the fact that the Pennsylvania legislature deemed a second DUI at the highest rate of intoxication to be so serious as to mandate a minimum ninety-day term of confinement. *See id.* Because Williams, unlike the plaintiffs in *Binderup*, received a custodial sentence for his second DUI at the highest rate of intoxication, this factor leans slightly in favor of the Government.

The fourth and final factor requires the Court to look to whether there is a cross-jurisdictional consensus regarding the seriousness of Williams' offense. In *Binderup*, one plaintiff was convicted of corrupting a minor, a crime that "some states treated . . . as serious crimes . . . but the vast majority of states [did] not." *Binderup*, 836 F.3d at 352. Additionally, the conduct "arguably would have been criminal in a few other states because his 17-year-old sexual partner was his employee, yet it still would have been legal in many states." *Id.* Regarding the other plaintiff in *Binderup*, who was convicted of carrying a handgun without a license, the court noted that although "some states punish the unlicensed carrying of a concealed weapon as a serious crime, more than half prescribe a maximum sentence that does not meet the threshold of a traditional felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon." *Id.*

After consideration of the fifty-state surveys the parties have submitted in connection with their Motions, we believe Williams has easily met his burden regarding the cross-jurisdictional analysis. Although all states criminalize DUI, there is no clear consensus among the states regarding the seriousness of Williams' offense. For instance, a second DUI at the BAC that Williams had (.223%) would result in only eleven other states punishing his conduct by a term of imprisonment exceeding one year (the traditional threshold for a felony). (*See* Gov't's

Mem. Law Supp. Mot. Summ. J., Ex. R ("Gov't's DUI Chart"); Pl.'s Br. Supp. Mot. Summ. J.,

Ex. C ("Pl.'s DUI Chart").)  Of those eleven states, four would classify the offense as a felony.

(*See* Gov't's DUI Chart; Pl.'s DUI Chart.)  Accordingly, given that Williams' conduct would

meet the traditional definition of a felony in only eleven other states, he has shown that there is

no consensus regarding the seriousness of his offense.  *See Binderup*, 836 F.3d at 352 (stating

that one of the challengers' offense was not serious because *more than half of the states* would

prescribe a maximum sentence that would not meet the traditional definition of a felony).

The Government attempts to stretch this factor to include states whose maximum

sentence for Williams' offense is prescribed at "*approximately* one year or more."  (Gov't's

Resp. Opp'n Pl.'s Mot. Summ. J. 13) (emphasis added).  The Government argues that 76% of

states establish a maximum possible punishment for an offense like Williams' at "about one year

or more."  (*Id.*)  Thus, the Government claims that 76% is clearly a consensus regarding the

seriousness of the offense at issue.

We reject the Government's invitation to extend the cross-jurisdictional analysis to

include offenses where the maximum possible punishment approaches one year.  In setting forth

this factor, the Third Circuit described the states criminalizing Julio Suarez's offense, noting that

"more than half prescribe a maximum sentence that does not meet the threshold of a traditional

felony."  *Binderup*, 836 F. 3d at 352.  Accordingly, when assessing the cross-jurisdictional

factor, it is appropriate for the Court to consider (1) the legality of the conduct in the various

states, and (2) the number of states that prescribe a maximum sentence that meets the definition

of a traditional felony (those offenses that are punishable by *more* than one year in prison).  *See*

*id.*  The Third Circuit has set the barometer for the second consideration of this factor at the

threshold of a traditional felony, and we do not accept the Government's argument to lower the bar.

To summarize, Williams' offense was a misdemeanor, a label that is "a state legislature's . . . powerful expression of its belief that the offense is not serious enough to be disqualifying." *Id.* at 351. Although Williams was sentenced to a form of confinement for ninety days (a factor that weighs slightly in favor of the Government), violence was not an element of the offense. Significantly, Williams has provided evidence that only eleven other states would punish his conduct by more than one year in prison, necessitating in the conclusion that there is a general consensus of the nonserious nature of the offense. Despite the maximum punishment, Williams has thus carried his high burden of showing that his misdemeanor was not serious. Accordingly, he has distinguished himself from those persons historically excluded from the right to bear arms.

**b.     Additional Arguments**

The Government makes the additional argument that Williams' post-conviction conduct makes him an "'unvirtuous citizen' who is no longer entitled to the Second Amendment's benefits." (Gov't Mem. Law Supp. Mot. Summ. J. 17.) In particular, the Government points to Williams' admissions during his deposition that he continued to own firearms through 2014 and handled them during his employment at a gun store, a time in which he was federally prohibited from doing so; his answer of "no" on a Pennsylvania State Police firearms application, where he was asked whether he had been convicted of a crime punishable by over one year of imprisonment or a misdemeanor punishable by over two years of imprisonment; and his notation that he had been convicted of an ungraded misdemeanor when he challenged his eligibility to carry a firearm in 2015. (*See id.* at 18.) This string of conduct, the Government

contends, "readily qualifies" Williams "as an 'unvirtuous citizen' who is not eligible for Second Amendment protection." (*Id.*)

We must reject the Government's argument, as the Third Circuit expressly stated that the only inquiry at step one of the *Marzzarella* framework is determining the seriousness of the disqualifying offense. *See Binderup*, 836 F.3d at 350 ("[T]he seriousness of the purportedly disqualifying offense is our sole focus throughout *Marzzarella*'s first step.), *id.* ("[O]nly the seriousness of the purportedly disqualifying offense determines the constitutional sweep of statutes like § 922(g)(1) at step one."), *id.* at 354 n.7 ("[E]vidence of how individuals have lived their lives since committing crimes is irrelevant under *Marzzarella*'s first step."). Indeed, after one of the *Binderup* plaintiffs' disqualifying offense, he was convicted eight years later of DUI. *Id.* at 340. Nevertheless, the fact that he had a subsequent conviction played no part in the Third Circuit's analysis at *Marzzarella*'s first step. Accordingly, Williams' post-conviction conduct is irrelevant at this juncture, and we reject the Government's position that any language to the contrary in *Binderup* is merely dicta.

### 2. Step Two: Intermediate Scrutiny

Now that Williams has succeeded at step one of the *Marzzarella* framework, the burden next shifts to the Government to demonstrate that the law satisfies intermediate scrutiny.[12] *See id.* at 347, 353. Under intermediate scrutiny, the Government "must assert a significant,

---

[12] Williams "acknowledges the Third Circuit's precedent in *Binderup*," but "respectfully calls into question" its two-pronged approach. (Pl.'s Br. Supp. Mot. Summ. J. 21.) Williams argues that, in light of the Supreme Court's decisions in *Heller* and *McDonald v. City of Chic.*, 561 U.S. 742 (2010), we should not apply any level of scrutiny at this point and the analysis should end (in other words, he prevails). If we deem a constitutional scrutiny test should apply, Williams contends it should be strict scrutiny rather than intermediate scrutiny.

We obviously reject Williams' arguments concerning whether part two of the *Marzzarella* framework should even exist and, if so, what level of scrutiny applies. The Third Circuit determined in *Marzzarella* that intermediate scrutiny was the appropriate form of means-end scrutiny for as-applied Second Amendment challenges, and it reaffirmed that holding in *Binderup*. It goes without saying that we will not apply a different framework from that which binding Third Circuit precedent requires. Moreover, counsel for Williams has made the identical argument in other cases, which has been soundly rejected. *See Miller*, 356 F. Supp. 3d at 483 n.13; *Holloway*, 349 F. Supp. 3d at 460 n.9.

substantial, or important interest; there must also be a reasonable fit between that asserted interest and the challenged law, such that the law does not burden more conduct than is reasonably necessary." *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 119 (3d Cir. 2018) (quoting *Drake v. Filko*, 724 F.3d 426, 436 (3d Cir. 2013)). The Third Circuit stated that there can be "[n]o doubt § 922(g)(1) is intended to further the government interest of promoting public safety by 'preventing armed mayhem,' an interest that is both important and compelling." *Binderup*, 836 F.3d at 353 (internal citation omitted) (citing *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010)). However, the Government must still prove "the appropriateness of the means it employs to further its interest." *Id.*

In *Binderup*, the Third Circuit held that the Government failed to satisfy its burden of intermediate scrutiny because the record contained "no evidence explaining why banning people like [the plaintiffs] (*i.e.*, people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety." *Id.* at 353-54. As a general matter, the government relied on studies that showed felons commit violent crimes more frequently than non-felons, and that the denial of handgun purchases to convicted felons showed a twenty to thirty percent reduction in the risk of later criminal activity. *Id.* at 354. Because the studies estimated the likelihood that incarcerated felons would reoffend after their release from prison, and the plaintiffs in *Binderup* were neither felons nor incarcerated, the Third Circuit held that no reasonable conclusions could be drawn "about the risk posed by their possession of firearms from such obviously distinguishable studies." *Id.*

The government also relied on studies that it contended were relevant to each plaintiff's situation. Regarding Daniel Binderup, the government cited studies from several states that would classify him as a sex offender due to his conduct. *Id.* The Third Circuit rejected the

government's position, stating that the "sex-offender specific studies focus on people who were incarcerated." *Id.* at 355. Therefore, it would not be helpful "to draw inferences about the usefulness of disarming Binderup from those off-point studies." *Id.* Regarding Julio Suarez, the government relied on a study "indicating that California handgun purchasers in 1977 'who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses,' were more likely than people with no criminal histories to be charged later with a violent crime." *Id.* (citation omitted). The Third Circuit stated that the study addressed the risk of recidivism only within fifteen years of a conviction for an unspecified nonviolent firearm-related offense. *Id.* Thus, this study was also off-point, as "[c]ommon sense tells us that recidivism rates would change with the passage of an additional 11 years (Suarez was convicted 26 years ago) and vary based on the circumstances of the prior conviction." *Id.*

In this case, the Government relies heavily on the expert report of Daniel Webster ("Dr. Webster"), ScD, a Professor of Health Policy and Management, Co-Director for Research at the Center for the Prevention of Youth Violence, and Director of the Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health.[13] (Gov't's Mem. Law Supp. Mot. Summ. J., Ex. S ("Webster Report") at 1.) Dr. Webster earned a Masters of Public Health from the University of Michigan in 1985 and a doctorate in Health Policy and Management from the Johns Hopkins School of Public Health in 1991. (*Id.* at 2.) In short, most of his academic teaching and scholarship since 1985 has focused on studies relevant to gun-related injuries and violence. (*See id.*)

---

[13] Williams "objects" separately to Dr. Webster's expert report, listing numerous objections in numbered paragraphs that can be described at best as scattershot. (*See* Doc. No. 29-6.) Williams has not technically moved to exclude Dr. Webster's report. Nevertheless, even construing his "objections" to be a motion, all of his contentions go to the weight the Court should give to the expert report, not the report's admissibility. Accordingly, Williams' objections to Dr. Webster's report are denied.

Dr. Webster ultimately opines that there is a reasonable fit between prohibiting DUI misdemeanants from possessing firearms and public safety.  Among other things, he states that individuals convicted of drunk driving, especially repeat offenders and those with high BACs at the time of their arrests, have higher rates of drug abuse, alcohol abuse, and psychiatric disorders, (*id.* at 4); that "[t]here is a large body of scientific evidence indicating that people who abuse alcohol are at a substantially increased risk of committing acts of violence" and suicidal behavior, (*id.* at 6-8); and that "[e]mpirical evidence shows that DUI/DWI offenders are more likely to commit violent or firearms-related offenses," (*id.* at 9).  The last of these opinions is relevant for our purposes.

Dr. Webster describes a study that Dr. Garen Wintemute led that is most relevant to the instant matter.  (*Id.*)  In that study, Dr. Wintemute drew upon data from a random sample of 5,923 persons under the age of fifty "who purchased a handgun from a licensed retail firearm dealer in California in 1977 and were stratified by whether or not the person had a prior adult (age 18 years and older) criminal history of any kind at the time the handgun was purchased." (*Id.*)  In an effort to examine the relationship between prior alcohol-related convictions and the risk of future arrests for crimes involving violence and/or firearms, Dr. Wintemute and his colleagues limited their analysis to 1,272 handgun purchasers with prior alcohol-related convictions (77.8% of whom had DUI/DWI convictions) and 2,794 handgun purchasers with no prior criminal history.  (*Id.*)  Importantly, follow-up on the sample was done in 1991.  Dr. Webster describes in his report that

> [t]he most relevant findings were the most straight-forward[:] 32.8% of handgun purchasers with prior alcohol convictions versus 5.8% of handgun purchasers with no criminal history were arrested for a crime involving violence and/or firearms – a 5.6-fold difference.  Those with a prior alcohol offense had a similar disproportionate risk for being arrested for the most serious crimes

> (FBI Index – murder, rape, robbery, aggravated assault), 15.9%
> versus 2.7% among those with no record of prior offenses. . . .
> Regression analysis conducted to control for other risk factors and
> generate estimates of independent effects indicated that having a
> history of even a single prior conviction for an alcohol-related
> crime was associated with a 4-fold increased risk of being arrested
> for a crime of violence or firearm-related crime.

(*Id.* at 9-10.)  Accordingly, he concludes that "DUI/DWI offenses are therefore robust predictors of future violent and firearms-related offenses."  (*Id.* at 15.)

The parties represent that the *Holloway* court had a nearly identical version of Dr. Webster's report before it.  (Pl.'s Br. Supp. Mot. Summ. J. 37; Gov't's Mem. Law Supp. Mot. Summ. J. 22.)  In *Holloway*, the court gave no weight to Dr. Webster's report.  *See Holloway*, 349 F. Supp. 3d at 461-62.  With respect to Dr. Webster's description of Dr. Wintemute and colleagues' study of California handgun purchasers in 1977 and follow-up in 1991, the court reasoned simply that "[w]ithout questioning the validity of the study's methodology, we find that this study alone does not adequately establish a substantial fit between Holloway's disarmament and the government's compelling interest in preventing armed mayhem."  *Id.* at 461.  The court nevertheless concluded that the government presented "*no* evidence indicating that individuals like" the plaintiff were so potentially irresponsible that they should be prohibited from possessing a firearm.  *Id.* at 462 (emphasis added).  Williams naturally argues that we should follow the court's reasoning in *Holloway*.

The *Holloway* court did not find that the study was off-point as the Third Circuit found the empirical evidence to be in *Binderup*, but apparently believed the government's evidence was not substantial enough.  The Third Circuit, however, expressly noted that "[p]arties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction."

*Binderup*, 836 F.3d at 355. The problem with the empirical evidence in *Binderup* was that the government's evidence did not contain reliable statistics that individuals with the plaintiffs' backgrounds were more likely "to misuse firearms or were otherwise irresponsible or dangerous." *Id.*

We must respectfully disagree with *Holloway* and conclude that the Government has met its burden of intermediate scrutiny. Dr. Wintemute's study shows that, as compared to individuals with no prior criminal record, there is a significant statistical increase in the likelihood that an individual will be arrested for a crime involving a firearm or violence when that person has an alcohol-related conviction.[14] (*See* Webster Report at 9) (citing Garen J. Wintemute et al., *Firearms, Alcohol and Crime: Convictions for Driving Under the Influence (DUI) and Other Alcohol-Related Crimes and Risk for Future Criminal Activity Among Authorised Purchasers of Handguns*, Injury Prevention, Vol. 24 at 68-72 (2018)). Indeed, the study found that 32.8% of handgun purchasers with a prior alcohol-related offense were arrested for a crime involving violence and/or a firearm, versus 5.8% of handgun purchasers with no prior criminal history. (*Id.*) When regression analysis was conducted to control for other risk factors, it showed that having a single prior conviction for an alcohol-related crime was associated with a four-fold increase in risk of being arrested for a crime of violence or firearm-related crime. (*Id.* at 9-10.) Importantly, these statistics pertain to a fourteen-year period between the handgun purchase in 1977 and the follow-up in 1991.

Unlike the off-point empirical evidence presented in *Binderup*, Williams falls squarely within Dr. Wintemute's study. For purposes of charging and sentencing, Williams' disqualifying offense was his second DUI. At the time he filed this action the conviction was only twelve

---

[14] We again reiterate that nearly 78% of the individuals in Dr. Wintemute's sample were convicted of DUI, the exact offense at issue here.

years old, and it is not even fourteen years old as of the date of this Opinion. Dr. Wintemute's study shows that individuals like Williams, who have been convicted of an alcohol-related offense within the past fourteen years, have a four to five-fold increase of being arrested for a subsequent crime of violence or one involving a firearm. We believe such statistics demonstrate a reasonable fit between Williams' disarmament and the important government interest of preventing armed mayhem. *See Marzzarella*, 614 F.3d at 98 (noting that the "fit between the challenged regulation and the asserted objective be reasonable, not perfect"). Accordingly, the Government has carried its burden of demonstrating that § 922(g)(1) survives intermediate scrutiny.

While we have already determined that the Government has satisfied its burden of intermediate scrutiny, we must address some of the parties' additional arguments. First, Williams counters Dr. Webster's expert report with the expert opinion of Robert M. Gordon, Ph.D., ABPP, who is board certified in clinical psychology and psychoanalysis.[15] (Pl.'s Br. Supp. Mot. Summ. J. 36-37, Ex. J ("Dr. Gordon Report") at 1.) Dr. Gordon performed an in-person clinical examination of Williams and ultimately recommends "that Mr. Williams be allowed to own, possess, carry, and use a firearm" and can do so "without risk to himself or any other person." (Dr. Gordon Report at 12.) Dr. Gordon also takes issue with Dr. Webster's expert report, noting that "[w]hile Dr. Webster presents some valid correlational research on groupings of individuals, it has a relatively small predictive value in generalizing to groups" and

---

[15] The Government contends that Dr. Gordon's expert report is unreviewable on summary judgment because it is unsworn. (Gov't's Resp. Opp'n Pl.'s Mot. Summ. J. 23-24) (citing *Jackson v. Egyptian Navigation Co.*, 222 F. Supp. 2d 700, 709 (E.D. Pa. 2002)). It is true that Dr. Gordon's original expert report was unsworn. However, several weeks after Williams filed his Motion for Summary Judgment, he supplemented the expert report with a declaration from Dr. Gordon that is sworn under the penalty of perjury. (*See* Doc. No. 40.) Because the Government fails to identify any prejudice associated with the original report being supplemented later with a sworn declaration, we will consider it at this stage of the litigation. *See Fowle v. C & C Cola, a Div. of ITT-Cont'l Baking Co.*, 868 F.2d 59, 67 (3d Cir. 1989) (stating that "evidence should not be excluded on summary judgment on hypertechnical grounds").

fails to predict the effect of numerous DUI convictions from fourteen to eighteen years ago. (*Id.* at 7.) Dr. Gordon also takes issue with, *inter alia*, some of Dr. Webster's report being premised on individuals who suffer from alcohol or abuse issues, as there is no evidence Williams suffers from any kind of dependency. (*See id.*)

We reject Dr. Gordon's opinion that Williams should be allowed to own, carry, and possess a firearm because he allegedly poses no risk to himself or others. The Government's burden at step two of the *Marzzarella* framework is not individualistic, but rather focuses on whether the Government can dispossess a class of people who have been convicted of certain crimes. *See Binderup*, 836 F.3d at 355 (stating that the "[p]arties may use statistics to show that *people who commit certain crimes* have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament. . . ." and that empirical studies could demonstrate an appropriate fit between the plaintiffs' disarmament and the promotion of public safety "if they contained reliable statistical evidence that *people with the [plaintiffs'] backgrounds* were more likely to misuse firearms or were otherwise irresponsible or dangerous") (emphasis added); *see also Skoien*, 614 F.3d at 641 ("[S]ome categorical disqualifications are permissible: Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court."). And while Dr. Gordon takes issue with some aspects of Dr. Webster's report, he in no way undermines the empirical evidence that individuals with alcohol-related convictions have a four to five-fold increase of being arrested for a crime of violence or firearm-related offense.

Williams also argues that the Government's prior history of granting relief from federal firearms disabilities undermines the Government's argument at step two of the *Marzzarella* framework. (Pl.'s Br. Supp. Mot. Summ. J. 28-35.) Under 18 U.S.C. § 925(c), the United States

Attorney General has the authority to grant relief from federal firearms disabilities if an individual establishes "that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." This provision has been rendered inoperative since 1993, however, as "Congress has repeatedly barred the Attorney General from using appropriated funds 'to investigate or act upon [relief] applications.'" *Logan v. United States*, 552 U.S. 23, 28 n.1 (2007) (alteration in original) (quoting *United States v. Bean*, 537 U.S. 71, 74-75 (2002)). Williams points to four individuals granted relief under § 925(c) who were convicted of crimes that he alleges were similar or more serious than his disqualifying offense.

Under § 925(c), federal law allows an individual to make an application to the Attorney General for relief from a federal firearm disability, which is evaluated on a case-by-case basis. However, examples of people who were granted relief under § 925(c) prior to its defunding are inapposite because, as we explained above, *Marzzarella*'s second prong does not call for an individualized assessment. While Williams might succeed in an application to the Attorney General under § 925(c) if Congress were to fund it, the fact remains that such evidence plays no role in the analysis that *Binderup* requires. Indeed, the argument Williams presents here is identical to the plaintiff's argument in *Holloway*, which the court found unpersuasive. *See Holloway*, 349 F. Supp. 3d at 462. Accordingly, the examples of individuals who were granted relief under § 925(c) are irrelevant.

We next move to the Government's additional argument concerning part two of the *Marzzarella* framework. The Government stresses that it satisfies intermediate scrutiny in this case, even in the absence of statistical evidence, because there is evidence in the record that

Williams "*has already* been engaging in crimes and has been irresponsible since his 2004 DUI conviction."[16] (Gov't's Mem. Law Supp. Mot. Summ. J. 20) (emphasis in original). In *Binderup*, the Third Circuit stated that step two looks to the "likelihood that the [plaintiff] will commit crimes in the future," 836 F.3d at 354 n.7, or whether the plaintiff "[is] more likely to misuse firearms or [is] otherwise irresponsible or dangerous," *id.* at 355. The Government once again points to the fact that Williams continued to own and possess firearms in his personal and employment capacities when he was federally prohibited from doing so; and allegedly made false representations on a 2007 application to purchase a firearm and a 2015 challenge to a denial of his eligibility to carry a firearm. (Gov't's Mem. Law Supp. Mot. Summ. J. 20-21.)

Several reasons give the Court concern in considering the Government's argument about Williams' conduct after his disqualifying conviction. First, the Government essentially asks the Court to find criminality in this civil matter. Williams has not been convicted of any charges due to the aforementioned conduct, nor do the parties represent that he has been charged. Thus, it would be inappropriate and unwise for the Court to find criminality in the absence of a criminal adjudicative process. Second, *Binderup* itself lends support for the principle that post-disqualifying convictions, which lack violence or are not firearm-related, play no role in *Marzzarella*'s second step. One of the *Binderup* plaintiffs was convicted of unlawfully carrying a handgun without a license, a disqualifying offense under § 922(g)(1). *Binderup*, 836 F.3d at 340. Eight years later he was convicted of DUI, but that offense was not disqualifying. *Id.* In detailing the analysis of part two of the *Marzzarella* framework, the Third Circuit neglected to even mention the subsequent DUI conviction; it played absolutely no role in the court's

---

[16] For clarity, we note that Williams was arrested in 2004, tried and convicted in 2005, and ultimately sentenced in 2006. (*See* Gov't's Mem. Law Supp. Mot. Summ. J., Ex. C at MCP-000019, 000020.)

reasoning.  Accordingly, even if Williams had non-disqualifying convictions after his disqualifying offense, it appears consideration of them would be misplaced.

## IV.     CONCLUSION

Section 922(g)(1) is constitutional as applied to Williams.  While we find that § 922(g)(1) burdens Williams' Second Amendment rights because his disqualifying conviction was not "serious," the law is constitutional as applied because the Government has satisfied its burden of intermediate scrutiny.  The statistical evidence shows that individuals convicted of an alcohol-related offense have a four to five-fold increase of being arrested for a crime of violence or firearm-related offense, as compared to individuals with no prior criminal history.  Therefore, we believe there is a reasonable fit between disarming individuals like Williams, who were convicted of DUI, and the important government interest of preventing armed mayhem.

For the reasons noted above, the Government's Motion for Summary Judgment is granted, and Williams' Motion for Summary Judgment is denied.

An appropriate Order follows.