## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| EDWARD A. WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> MERRICK B. GARLAND et al., <br><br> Defendants.[2] | Civil Action No. 17-CV-2641 |

### DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT

Defendants respectfully renew their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. In light of the text, history, and tradition of firearm regulation in the United States, as interpreted in the Third Circuit's recent, precedential decision in *Range v. Attorney General*, --- F.4th ----, 2022 WL 16955670 (3d Cir. Nov. 16, 2022) (per curiam), 18 U.S.C. § 922(g)(1) is consistent with the Second Amendment as applied to Plaintiff Edward A. Williams, who was convicted of a crime punishable by up to five years in prison.

Accordingly, for the reasons set forth in Defendants' filings, the Court should grant summary judgment in favor of Defendants.

Dated: December 6, 2022        Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        LESLEY FARBY
                                        Assistant Branch Director

---

[2] Hon. Merrick B. Garland, Steven M. Dettelbach, and Christopher Wray are automatically substituted as Defendants in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* ECF No. 55 at 1 n.1.

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
New York Bar No. 5859137
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-3786
Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDWARD A. WILLIAMS,

        Plaintiff,

        v.

MERRICK B. GARLAND et al.,

        Defendants.[3]

Civil Action No. 17-CV-2641

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

---

[3] Hon. Merrick B. Garland, Steven M. Dettelbach, and Christopher Wray are automatically substituted as Defendants in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* ECF No. 55 at 1 n.1.

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

I.       Factual Background .............................................................................................2

II.      Procedural Background .......................................................................................4

LEGAL STANDARDS ......................................................................................................6

ARGUMENT .....................................................................................................................7

I.       *Range* Squarely Forecloses Williams's Claim. ...............................................7

CONCLUSION ................................................................................................................16

## INTRODUCTION

Plaintiff Edward A. Williams has committed multiple driving-under-the-influence ("DUI") offenses, including at the highest statutory level of intoxication.  Because that offense is punishable by up to five years in prison under Pennsylvania law, Williams is prohibited from possessing firearms pursuant to the Gun Control Act of 1968, 18 U.S.C. § 922(g)(1) ("Section 922(g)(1)").  Williams contends that this "longstanding prohibition," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), as applied to him, violates the Second Amendment as interpreted in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).  In *Bruen*, the Supreme Court reiterated its statements in prior cases that the Second and Fourteenth Amendments protect the right of "ordinary, *law-abiding* citizen[s] . . . to carry a handgun for self-defense outside the home." *Id.* at 2122 (emphasis added).[4] Further, in the course of evaluating the "may issue" licensing regime at issue in *Bruen*, the Court clarified that "the standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Id.* at 2129-30.  The second prong of this standard "will often involve reasoning by analogy."  *Id.* at 2132.  For such purposes, only "a well-established and representative historical *analogue*," is required—"not a historical *twin*."  *Id.* at 2333.

---

[4] *See also id.* at 2131 ("The Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of *law-abiding*, responsible citizens to use arms' for self-defense." (emphasis altered) (quoting *Heller*, 554 U.S. at 635)); *id.* at 2133 (directing courts to inquire "how and why the regulations burden a *law-abiding* citizen's right to armed self-defense" (emphasis added)); *id.* at 2134 ("It is undisputed that [the] petitioners . . . —two ordinary, *law-abiding*, adult citizens—are part of 'the people' whom the Second Amendment protects." (emphasis added) (quoting *Heller*, 554 U.S. at 580)); *id.* at 2156 (holding that the challenged statute "violate[d] the Fourteenth Amendment in that it prevent[ed] *law-abiding* citizens with ordinary self-defense needs from exercising their right to keep and bear arms" (emphasis added)).

Williams's Second Amendment claim is foreclosed by the Third Circuit's recent decision in *Range v. Attorney General*, --- F.4th ----, 2022 WL 16955670 (3d Cir. Nov. 16, 2022) (per curiam). Applying *Bruen* and considering the text, history, and tradition of firearm regulation in this nation, the Third Circuit in *Range* held that a person who was convicted of "a felony or felony-equivalent offense"—generally meaning an offense punishable by a term of imprisonment exceeding one year, subject to exclusions not relevant here—"may be disarmed consistent with the Second Amendment." *Id.* at *16. With respect to the text, the Third Circuit held that "individuals convicted of [felony or] felony-equivalent crimes . . . fall outside 'the people' entitled to keep and bear arms" pursuant to the Second Amendment. *Id.* at *15. Moreover, the Third Circuit concluded that "our Nation's tradition of firearm regulation permits the disarmament of those who committed felony or felony-equivalent offenses." *Id.* at *16.

*Range* squarely controls this action and requires dismissal of Williams's claim. Accordingly, the Court should grant Defendants' motion for summary judgment.

## BACKGROUND

### I.      Factual Background

Williams's first known DUI arrest occurred in April 2000 in State College, Pennsylvania. *See* Defs.' Statement of Undisputed Material ("SMF") (filed under seal), ¶ 2; *Williams v. Barr*, 379 F. Supp. 3d 360, 365 (E.D. Pa. 2019), *aff'd sub nom. Williams v. Att'y Gen.*, No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022), *reh'g granted and opinion vacated*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022).[5] Following that arrest, Williams participated in an Accelerated Rehabilitative Disposition

---

[5] Pursuant to the Privacy Act of 1974, 5 U.S.C. § 552(a), and the Privacy Stipulation and Order of Confidentiality in this action, ECF No. 23, Defendants' Statement of Undisputed Material Facts was filed under seal. Because this brief exclusively describes and relies on facts that were included in the Court's prior opinion in this action, *Williams*, 379 F. Supp. 3d 360, all facts described and cited herein are matters of public record. Accordingly, Defendants file this brief on the public docket.

("ARD") program.  SMF ¶¶ 3-4; *Williams*, 379 F. Supp. 3d at 365.  Under Pennsylvania law, acceptance of ARD constitutes a conviction for purposes of computing sentences for subsequent DUI convictions.  *See* 75 Pa. Cons. Stat. § 3806(a)(1); *Williams*, 379 F. Supp. 3d at 365.

Williams's second known DUI arrest occurred less than two years later, in November 2001, in Philadelphia.  SMF ¶ 5; *Williams*, 379 F. Supp. 3d at 365.  The charges arising from that arrest ultimately were dismissed for reasons unknown to Defendants.  SMF ¶ 8; *Williams*, 379 F. Supp. 3d at 365.

Williams's third known DUI arrest—which led to his disqualifying conviction for purposes of Section 922(g)(1)—occurred on September 7, 2004, in Philadelphia.  SMF ¶ 9; *Williams*, 379 F. Supp. 3d at 365.  The evening of the 2004 DUI arrest, Williams's blood alcohol content was at least 0.223, according to a breathalyzer test that police administered.  *Id.* ¶¶ 11, 14; *Williams*, 379 F. Supp. 3d at 365.

In 2005, Williams was convicted after a trial of driving under the influence at the highest rate of intoxication, *id.* ¶ 15 (citing 75 Pa. Cons. Stat. § 3802(c)); *Williams*, 379 F. Supp. 3d at 365—under Pennsylvania law, a first-degree misdemeanor punishable by up to five years in prison where the perpetrator has a prior DUI offense, *see* 75 Pa. Cons. Stat. §§ 1104, 3802(c), 3803(b)(4), 3806(a).[6] Williams was sentenced to between ninety days and two years in prison, among other penalties, although the court permitted Williams to serve his custodial sentence under house arrest because of a medical condition from which he suffered.  SMF ¶ 16; *Williams*, 379 F. Supp. 3d at 365.

---

[6] Under Pennsylvania law, a crime punishable by a maximum of five years' imprisonment constitutes a misdemeanor of the first degree.  *See* 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).  In other jurisdictions—including under the federal criminal code—offenses punishable by incarceration of up to five years are labeled as felonies.  *See, e.g.,* 18 U.S.C. § 3559(a)(5) (specifying five-year maximum for class E felonies).

As a result of his conviction, Williams is prohibited from possessing firearms pursuant to Section 922(g)(1), which revokes the firearm rights of "any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year," subject to certain exceptions not relevant here.  18 U.S.C. § 922(g)(1); *see id.* § 921(a)(20) (defining scope of exceptions); *Williams*, 379 F. Supp. 3d at 366.

Williams previously held a license to carry a firearm, which he knew was terminated as a result of his 2004 DUI.  SMF ¶ 17; *Williams*, 379 F. Supp. 3d at 366.  Nevertheless, following that that termination, Williams continued both to own firearms and to work at a gun store and shooting range where he had been employed since 1994.  SMF ¶¶ 19-22; *Williams*, 379 F. Supp. 3d at 366.  In the course of that employment, Williams physically handled firearms and ammunition on a daily basis.  SMF ¶¶ 22, 24-25; *Williams*, 379 F. Supp. 3d at 366.  He also was responsible for ensuring that customers who attempted to purchase firearms at the gun store were legally permitted to possess firearms.  SMF ¶ 27; *Williams*, 379 F. Supp. 3d at 366.  Williams continued to work at that gun store and shooting range until 2010; the store ultimately shut down after pleading guilty to falsifying paperwork submitted to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF").  SMF ¶¶ 22, 30; *Williams*, 379 F. Supp. 3d at 366 & n.4.

In or around 2007, Williams purchased a Glock-23 firearm.  SMF ¶¶ 31, 35; *Williams*, 379 F. Supp. 3d at 366.  In connection with that purchase, he falsely checked a box on a Pennsylvania State Police application form indicating that he had never been convicted of "a crime punishable by imprisonment for a term exceeding one year."  SMF ¶¶ 32-33; *Williams*, 379 F. Supp. 3d at 366.  Williams subsequently made additional false statements regarding his criminal history in a challenge that he submitted to the Pennsylvania State Police regarding his eligibility to carry a firearm.  SMF ¶¶ 39-41; *Williams*, 379 F. Supp. 3d at 366.

## II.      Procedural Background

Williams filed this action on June 1, 2017.  *See* ECF No. 1.  He brings an as-applied Second Amendment challenge to Section 922(g)(1), which prohibits him from possessing firearms as a result of his 2005 DUI conviction.  *See id.* ¶¶ 36-37, 53-61.  Williams seeks declaratory and injunctive relief exempting him from criminal liability under Section 922(g)(1), "its derivative regulations, and all related laws, policies, and procedures that would impede or criminalize [his] exercise of his right to Keep and Bear Arms."  *See id.* at 17-18.

On September 14, 2017, Defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  *See* ECF No. 5.  Williams opposed and cross-moved for summary judgment.  *See* ECF Nos. 8-9.  On December 1, 2017, the Court denied both motions, holding that Williams had pleaded a *prima facie* as-applied Second Amendment claim under *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016), and that Defendants were entitled to discovery to oppose Williams's premature motion for summary judgment.  ECF No. 13, at 1 n.1; ECF No. 14, at 1 n.1.

Following discovery, the parties both moved for summary judgment on October 26, 2018.  *See* ECF Nos. 29-30.  On April 1, 2019, the Court granted Defendants' motion for summary judgment and denied Williams's.  *Williams*, 379 F. Supp. 3d at 364.  It held that, at the first step of the two-step framework established in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), Williams's DUI offense "was not serious," and, thus, that he had "distinguished himself from those persons historically excluded from the right to bear arms."  *Williams*, 379 F. Supp. 3d at 374.  At the second step of that framework, however, the Court concluded that "§ 922(g)(1) survive[d] intermediate scrutiny" as applied to Williams.  *Id.* at 378.

On appeal, the Third Circuit initially affirmed the Court's grant of summary judgment to Defendants, but on different grounds.  *See Williams v. Att'y Gen*, No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022), *reh'g granted and opinion vacated*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022).  Specifically, the Third Circuit affirmed under *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir.

2020), which was issued after this Court's decision on the parties' motions for summary judgment. *See Williams*, 2022 WL 1499279, at \*2. In *Holloway*, the Third Circuit held that a DUI offense under the identical Pennsylvania criminal provision that Williams was convicted of violating "constitute[d] a serious crime, placing [the challenger] within the class of 'persons historically excluded from Second Amendment protections.'" *Holloway*, 948 F.3d at 177 (quoting *Binderup*, 836 F.3d at 347). Accordingly, the Court held that the challenger's claim failed as a matter of law and had no occasion to proceed to the second step of the *Marzzarella* framework. *See id.*

On July 18, 2022, Williams filed a petition for rehearing en banc in light of *Bruen*, which was decided approximately six weeks after the Third Circuit had initially affirmed the dismissal of his challenge. *See* Pet. for Reh'g *En Banc*, *Williams v. Att'g Gen.*, No. 19-2694 (3d Cir. July 19, 2022), ECF No. 60. The Third Circuit granted panel rehearing, vacated the judgment of this Court and the opinion and judgment of the Third Circuit, and remanded to this Court for reconsideration in light of *Bruen*. *See Williams v. Att'y Gen.*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022); ECF No. 53.

On remand, the parties proposed and the Court entered a briefing schedule for renewed motions for summary judgment. *See* ECF No. 58. The Third Circuit then issued its precedential decision in *Range*—a development that, as discussed further below, squarely forecloses Williams's claim.

## LEGAL STANDARDS

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Although the Court must consider the evidence in the light most favorable to the nonmovant,

the nonmoving party must produce specific facts to demonstrate that a genuine issue exists for trial. *See Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

## ARGUMENT

### I.  *Range* Squarely Forecloses Williams's Claim.

In *Range*, the Third Circuit applied the test set forth by the Supreme Court in *Bruen* and held that a person who "was convicted of a felony or felony-equivalent offense . . . may be disarmed consistent with the Second Amendment." 2022 WL 16955670, at *16. The court reached that conclusion by surveying the history of firearms regulation from "English history dating from the late 1600s" and "American colonial views leading up to the founding." *Id.* at *7 (quoting *Bruen*, 142 S. Ct. at 2127). The Third Circuit determined that "the pertinent historical periods were replete with laws 'relevantly similar' to the modern prohibition on felon firearm possession because they categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Id.* at *6 (quoting *Bruen*, 142 S. Ct. at 2132); *see also id.* at *4 ("§ 922(g)(1) comports with legislatures' longstanding authority and discretion to disarm citizens unwilling to obey the government and its laws, whether or not they had demonstrated a propensity for violence.").

*Range* squarely forecloses Williams's claim that Section 922(g)(1) violates the Second Amendment as applied to him. It is undisputed that Williams's 2005 DUI conviction was a "felony-equivalent offense," as the Third Circuit defined that term in *Range*—namely, as "a crime punishable by imprisonment for a term exceeding one year," subject to exclusions not relevant here, which is "the definition of a felony under both federal law and traditional legal principles." *Id.* at *1 (citation omitted) (first quoting 18 U.S.C. § 3156(a)(3); and then citing *Felony*, BLACK'S LAW DICTIONARY (11th

ed. 2019)); *accord id.* at *16.[7]   Specifically, and as noted, Williams was convicted of a first-degree misdemeanor punishable by up to five years in prison.   Accordingly, under *Range*, his Second Amendment claim fails as a matter of law.   *Id.* at *16.

The Third Circuit rested its decision in *Range* on two grounds.   *See id.* at *16.   First, the court turned to "the text of the Second Amendment, which protects 'the right of the people to keep and bear Arms,'" to determine whether the challenger, "as a felon equivalent under 18 U.S.C. § 921(a)(20)(B), is among those protected by the Amendment."   *Id.* at *5 (quoting U.S. Const. amend. II); *see Bruen*, 142 S. Ct. at 2129-30.   The court ultimately concluded that "individuals convicted of [felony or] felony-equivalent crimes . . . fall outside 'the people' entitled to keep and bear arms."   *Range*, 2022 WL 16955670, at *15.   It reached this conclusion for several reasons.   First, "the [*Bruen*] majority characterized the holders of Second Amendment rights as 'law-abiding' citizens no fewer than fourteen times."   *Id.* at *5 (quoting *Bruen*, 142 S. Ct. at 2122, 2125, 2131, 2133–34, 2135 n.8, 2138 & n.9, 2150, 2156)).   Second, the Supreme Court in *Bruen* expressly approved of "shall-issue" licensing regimes, "which often require applicants to undergo a criminal background check and are designed to ensure only that those bearing arms in the jurisdiction are, in fact law-abiding, responsible citizens."   *Id.* at *6 (brackets and internal quotation marks omitted) (quoting *Bruen*, 142 S. Ct. 2138 at n.9).   As the Third Circuit noted, "shall-issue statutes typically disqualify any person 'prohibited from possessing a firearm under federal law,'" such as Section 922(g)(1).   *Id.* (collecting statutes).   Third, the Supreme Court has twice characterized "'prohibitions on the possession of firearms by felons' as both

---

[7] "In deference to state legislatures, Congress raised the bar for 'any State offense classified by the laws of the State as a misdemeanor' by excluding from [Section 922(g)(1)'s] prohibition those misdemeanors 'punishable by a term of imprisonment of two years or less.'"   *Id.* at *1.   The Third Circuit in *Range* "d[id] not address whether individuals convicted of misdemeanors carrying lesser punishments [than a maximum of two years' imprisonment] can be disarmed consistent with the Second Amendment."   *Id.* at *1 n.3.   But because Williams, like Range, was convicted of a crime punishable by imprisonment for up to five years, he is a "felon equivalent" who cannot benefit from that exclusion.   *See id.* at *1, *5, *16.

'longstanding' and 'presumptively lawful.'" *Id.* (quoting *Heller*, 554 U.S. at 626-27 & n.26; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)).  The majority opinion in *Bruen* implicitly reaffirmed those assurances in stating that "the right to keep and bear arms is 'subject to certain reasonable, well-defined restrictions.'" *Id.* (quoting *Bruen*, 142 S. Ct. at 2156).  And concurring opinions joined by three Justices in the *Bruen* majority reaffirmed the same assurances explicitly.  *Id.* (first citing *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring); and then citing *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring)).  For these reasons, the Third Circuit concluded that the text of the Second Amendment, as interpreted by the Supreme Court, excludes perpetrators of felonies and felony-equivalent offenses from "the people" whose right to keep and bear arms is constitutionally protected. *See id.* at *6.

    As further support for its holding, the Third Circuit also reviewed historical firearm regulations from the eras that the Supreme Court has deemed particularly pertinent to understanding the original meaning of the Second Amendment.  *Id.* at *7 (citing *Bruen*, 142 S. Ct. at 2127).  Upon surveying this history, the Third Circuit concluded that, even if perpetrators of felonies and felony-equivalent offenses were "covered by 'the Second Amendment's plain text,'" "our Nation's tradition of firearm regulation permits [their] disarmament." *Id.* at *16 (quoting *Bruen*, 142 S. Ct. at 2126).  That is because, during each relevant historical period, firearm regulations "categorically disqualified people from possessing firearms based on a judgment that certain individuals were untrustworthy parties to the nation's social compact." *Id.* at *6.  Thus, such historical regulations are "'relevantly similar' to the modern prohibition on felon firearm possession." *Id.* (quoting *Bruen*, 142 S. Ct. at 2132).

    The Third Circuit began its historical analysis with England's Restoration and the Glorious Revolution.  *See id.* at *7-8.  During the Stuart Restoration, "nonconformist (*i.e.*, non-Anglican) Protestants" were disarmed.  *Id.*  Because many nonconformists "refused to take mandatory oaths recognizing the King's sovereign authority over matters of religion," Anglicans "accused [them] of

believing that their faith exempted them from obedience to the law." *Id.* Thus, the Third Circuit held, "nonconformists as a group were disarmed because their religious status was viewed as a proxy for disobedience to the Crown's sovereign authority and disrespect for the law, placing them outside the civic community of law-abiding citizens." *Id.* Relatedly, the English Bill of Rights, enacted shortly after the Glorious Revolution of 1688, provided: "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." *Id.* at *8 (emphasis omitted) (quoting 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689)). The Third Circuit concluded that provision— which the Supreme Court has characterized as "the 'predecessor to our Second Amendment'"— demonstrates historical understanding that the legislature "had the power and discretion to determine who was sufficiently loyal and law-abiding to exercise the right to bear arms." *Id.* (quoting *Bruen*, S. Ct. at 2141). Further supporting that conclusion, the English Parliament enacted a law in 1689 that forbade Catholics who refused to take an oath renouncing their faith from owning firearms except as necessary for self-defense. *Id.* (citing An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688)). In part because such individuals could have their firearm rights restored by swearing to reject the tenets of Catholicism, the Third Circuit concluded that the basis for the regulation was Parliament's perception of Catholics as loyal to the foreign Pope over the Crown, *i.e.*, the head of the Church of England. *See id.* at *7-8. Stated differently, Parliament disarmed Catholics because they had demonstrated "a disregard for the legally binding decrees of the sovereign." *Id.* at *8.

Turning next to colonial America, the Third Circuit examined early laws that "prohibited Native Americans, Black people, and indentured servants from owning firearms"—that is, broad, status-based groups that were not characterized by an individual propensity toward violence. *Id.* at *8

& n.18.[8]  Additionally, in the late 1630s, Governor John Winthrop of Massachusetts accused preacher Anne Hutchinson and her followers "of being Antinomians," or "those who viewed their salvation as exempting them from the law." *Id.* at \*9.  Accordingly, Governor Winthrop disarmed at least fifty-eight of Hutchinson's supporters. *Id.*  The Third Circuit concluded that disarming them "served to shame colonists whose disavowal of the rule of law placed them outside the Puritan's civic community and obedience to the commands of the government." *Id.*  Additionally, American colonies confiscated firearms from Catholics who refused to take oaths of loyalty to the Crown during the Seven Years' War.  *Id.*  In line with its interpretation of English laws disarming Catholics, the Third Circuit concluded that the basis for these regulations was that "Protestant majorities in those colonies viewed Catholics as defying sovereign authority and communal values." *Id.*

Next, the Third Circuit considered firearm regulations in the Revolutionary War era, which reflected that the circumstances of the times required loyalty to the nascent American polity over the English Crown.  *See id.*  at \*10-11.  For example, Connecticut colonists passed multiple resolutions regarding loyalty, including a 1775 statute that disarmed "anyone who defamed resolutions of the Continental Congress." *Id.* at \*10.  And Pennsylvania enacted a statute in 1777 that disarmed white male inhabitants who refused to swear an oath of loyalty to "the commonwealth of Pennsylvania as a free and independent state"—which is "particularly instructive" because Pennsylvania's 1776 state constitution protected the people's right to bear arms. *Id.* (quoting Act of June 13, 1777, §§ 1, 3 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 111-13 (William Stanley Ray ed., 1903)).  The Third Circuit noted that the Pennsylvania statute could not have been predicated on the perceived

---

[8] The court also noted that, while the specific "status-based regulations of this period are repugnant (not to mention unconstitutional)," the regulations show that, with respect to the right to bear arms, it has long been established that "legislatures ha[ve] the power and discretion to use status as a basis for disarmament." *Id.* at \*8 n.18; *accord id.* at \*9 n.19.  Moreover, "status-based bans did not historically distinguish between violent and non-violent members of disarmed groups." *Id.* at \*8 n.18.

dangerousness of non-oath-takers, because the statute "deprived sizable numbers of pacifists" of the right to bear arms. *Id.*; *see also id.* (noting that "Quakers opposed the use of arms . . . for any violent purpose whatsoever" (quoting *Heller*, 554 U.S. at 590)). Rather, the evident justification for the prohibition was that the "refusal to swear allegiance" demonstrated a refusal to "submit to communal judgments embodied in law when it conflicted with personal conviction." *Id.* at *11. The same was true, the court held, of Virginia's loyalty oath statute, which "still required disarmed individuals to attend militia trainings and run drills without weapons," and thus could not have been based on the perception that such individuals were dangerous, as opposed to merely "unwilling to follow the dictates of the new government." *Id.* (citing An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other Purposes ch. III (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619 281, 281 (William W. Hening ed., 1821)).

In addition to analyzing firearm regulations during these critical historical periods, the Third Circuit also examined the history of deliberations between Federalists and Anti-Federalists over the ratification of the Constitution, *see id.* at *11-12, for evidence of the "fixed" meaning of the Second Amendment "according to the understandings of those who ratified it," *Bruen*, 142 S. Ct. at 2132. For example, the proposal of the minority of the Pennsylvania ratifying convention—a "highly influential" precursor to the Second Amendment, *Range*, 2022 WL 16955670, at *11-12 (quoting *Heller*, 554 U.S. at 604)—would have provided that "no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals," *id.* (quoting 2 BERNARD SCHWARTZ, THE BILL OF RIGHTS: A DOCUMENTARY HISTORY 665 (1971)). As the Third Circuit explained, this proposal reflects that the Founders viewed restrictions on the firearm rights of criminals as within the scope of the preexisting right ultimately codified in the Second Amendment— regardless of whether their crimes were dangerous. *Id.* Otherwise, the phrase "for crimes committed"

would have been redundant, as dangerous criminals already fell under the proposed provision relating to "real danger of public injury."  *See id.* at *12 ("The dissenters distinguished between criminal convictions and dangerousness, and provided that *either* could support disarmament").

Finally, the Third Circuit addressed additional seventeenth-, eighteenth-, and nineteenth-century precedent for the disarmament of non-violent criminals, in particular.  *See id.* at *12-13.  The court noted that non-violent offenses such as larceny, repeated forgery, and false pretenses historically were punishable by death and estate forfeiture.  *Id.* at *12.  It follows, the court reasoned, that "the comparatively lenient consequence of disarmament under 18 U.S.C. § 922(g)(1) is permissible," including for "non-violent" offenses.  *Id.*  The court also surveyed statutes enacted in seven colonies or states between 1652 and 1863 that disarmed perpetrators of non-violent, misdemeanor hunting offenses.[9]

Ultimately, the Third Circuit concluded from this robust historical record that the following propositions are deeply rooted in our nation's history and tradition: legislatures have "both authority and broad discretion" to disarm categories of people whose "status or conduct evince[s] such a threat sufficient to warrant disarmament," and legislatures have traditionally disarmed categories of people whose status or conduct poses a perceived "threat . . . to an orderly society and compliance with its legal norms."  *Id.* at *13.  The court held that Section 922(g)(1) fits comfortably within this tradition, as applied to perpetrators of violent and non-violent felonies and felony-equivalent offenses alike.  *See id.* at *14.

---

[9] *Id.* at *12-13 (citing 1652 N.Y. Laws 138; Act of Apr. 20, ch. III (1745), 23 Acts of the North Carolina General Assembly 218, 219 (1805); 1771 N.J. Laws 19-20; An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805); 1832 Va. Acts 70; 1838 Md. Laws 291-92; 12 Del. Laws 365 (1863).

There is no basis to distinguish *Range* from the instant case.  Although the challenger in *Range* committed a different underlying offense for purposes of Section 922(g)(1) than Williams— specifically, welfare fraud, *see id.* at *1—the Third Circuit's decision did not depend on the nature of the challenger's particular offense.  Instead, the court held categorically that "our Nation's tradition of firearm regulation permits the disarmament of those who committed felony or felony-equivalent offenses," *i.e.*, offenses punishable by at least one year of imprisonment, subject to exclusions not relevant here, "under both federal law and traditional legal principles."  *Id.* at *16 (citations omitted); *cf. Holloway*, 948 F.3d at 177 (holding that an individual who committed the same offense as did Williams was "within the class of 'persons historically excluded from Second Amendment protections'" (quoting *Binderup*, 836 F.3d at 347)).  And the Third Circuit expressly rejected the argument—analogous to the argument that Williams made in his pre-*Range* petition for rehearing en banc in this case—that "only individuals with a dangerous propensity for violence . . . can be disarmed."  *Range*, 2022 WL 16955670, at *3; *compare id.* at *14 (explaining that the Third Circuit's "review of the historical record convince[d]" the court that the Second Amendment does not draw a distinction between dangerous and non-dangerous offenders for purposes of disarming criminals), *with* Pet. for Reh'g *En Banc* at 13-17, *Williams*, No. 19-2694 (July 19, 2022), ECF No. 60 (Williams's argument regarding dangerousness).[10]   *Range* thus requires dismissal of Williams's claim.[11]

---

[10] To the extent that Williams continues to argue for a standard focused on dangerousness, this Court can and should rest its decision on the binding precedent in *Range*.  In any event, Williams's challenge would fail even under that standard.  *See, e.g., Begay v. United States*, 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015); *Holloway*, 948 F.3d at 174 ("[A]ll branches of the federal government agree that DUIs are dangerous . . . ."); *Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2541 (2019) (Sotomayor, J., dissenting) ("[D]runk driving poses significant dangers that . . . States must be able to curb."); *Virginia v. Harris*, 558 U.S. 978, 979-80 (2009) (mem.) (Roberts, C.J., dissenting from denial of writ of certiorari) ("There is no question that drunk driving is a serious and potentially deadly crime . . . .  The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.").

[11] Moreover, the Third Circuit's holding in *Range* is consistent with the overwhelming weight of authority.  In at least fifty-eight cases, district courts across the country have rejected claims that

Section 922(g)(1) violates the Second Amendment under *Bruen.  See United States v. Grinage*, No. 21-cr-00399, 2022 WL 17420390 (W.D. Tex. Dec. 5, 2022); *United States v. Wagoner*, No. 20-cr-00018, 2022 WL 17418000, at *5-8 (W.D. Va. Dec. 5, 2022); *United States v. Ford*, No. 21-cr-00179, 2022 WL 17327499 (W.D. Mo. Nov. 29, 2022); *United States v. Jones*, No. 20-cr-00354, 2022 WL 17327498 (W.D. Mo. Nov. 29, 2022); *United States v. Cage*, No. 21-cr-68, 2022 WL 17254319 (S.D. Miss. Nov. 28, 2022); *United States v. Willis*, No. 22-cr-00186, 2022 WL 17177470 (D. Colo. Nov. 23, 2022); *United States v. Teerlink*, No. 22-cr-0024, 2022 WL 17093425 (D. Utah Nov. 21, 2022); *United States v. Nixon*, No. 22-cr-149 (S.D. Cal. Nov. 18, 2022); *United States v. Hill*, No. 22-cr-249, 2022 WL 17069855 (S.D. Tex. Nov. 17, 2022); *United States v. Mitchell*, No. 22-cr-111, ECF No. 43 (S.D. Ala. Nov. 17, 2022); *United States v. Dumont*, No. 22-cr-53 (D.N.H. Nov. 14, 2022); *United States v. Baker*, No. 20-cr-00301, 2022 WL 16855423 (D. Utah Nov. 10, 2022); *United States v. Carpenter*, No. 21-cr-00086-DBB, 2022 WL 16855533, at *4 (D. Utah Nov. 10, 2022); *United States v. Gray*, No. 22-cr-00247, 2022 WL 16855696 (D. Colo. Nov. 10, 2022); *United States v. Moore*, No. 21-cr-121, ECF No. 81 (W.D. Pa. Nov. 9, 2022); *United States v. Reese*, No. 19-cr-257, ECF No. 193 (W.D. Pa. Nov. 8, 2022); *United States v. Young*, No. 22-cr-54, 2022 WL 16829260 (W.D. Pa. Nov. 7, 2022); *United States v. Butts,* No. 22-cr-33, 2022 WL 16553037 (D. Mont. Oct. 31, 2022); *United States v. Burton*, No. 22-cr-362, 2022 WL 16541139 (D.S.C. Oct. 28, 2022); *United States v. Carleson*, No. 22-cr-32, ECF No. 39 (D. Alaska Oct. 28, 2022); *United States v. Grant*, No. 22-cr-161, 2022 WL 16541138 (D.S.C. Oct. 28, 2022); *Walker v. United States*, No. 20-cv-31, 2022 WL 16541183, at *3-4 (S.D. Cal. Oct. 28, 2022); *United States v. Law*, No. 20-cr-341, ECF No. 60 (W.D. Pa. Oct. 27, 2022); *United States v. Borne*, No. 22-cr-83, ECF No. 35 (D. Wyo. Oct. 24, 2022); *United States v. Minter*, No. 22-cr-135, 2022 WL 10662252 (M.D. Pa. Oct. 18, 2022); *United States v. Raheem*, No. 20-cr-61, 2022 WL 10177684, at *1-4 (W.D. Ky. Oct. 17, 2022); *United States v. Ridgeway*, No. 22-cr-175, 2022 WL 10198823 (S.D. Cal. Oct. 17, 2022); *United States v. Trinidad*, No. 21-cr-398, 2022 WL 10067519 (D.P.R. Oct. 17, 2022); *United States v. Carrero*, No. 22-cr-30, --- F. Supp. 3d ----, 2022 WL 9348792 (D. Utah Oct. 14, 2022); *United States v. Ortiz*, No. 21-cr-2503, ECF No. 91 (S.D. Cal. Oct. 14, 2022); *United States v. Riley*, No. 22-cr-163, --- F. Supp. 3d ----, ----, ----, 2022 WL 7610264, at *6-13 (E.D. Va. Oct. 13, 2022); *United States v. Price*, No. 22-cr-97, --- F. Supp. 3d ----, ----, 2022 WL 6968457, at *6-9 (S.D.W. Va. Oct. 12, 2022); *United States v. King*, No. 21-CR-255 (NSR), 2022 WL 5240928, at *4-5 (S.D.N.Y. Oct. 6, 2022); *United States v. Daniels*, No. 3-cr-83, 2022 WL 5027574, at *4 (W.D.N.C. Oct. 4, 2022); *United States v. Charles*, No. 22-cr-154, --- F. Supp. 3d ----, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022); *United States v. Williams*, No. 21-cr-478, ECF No. 76 (S.D. Cal. Sept. 30, 2022); *United States v. Campbell*, No. 22-cr-138, ECF No. 64 (W.D. Okla. Sept. 27, 2022); *United States v. Siddoway*, No. 21-cr-205, 2022 WL 4482739 (D. Idaho Sept. 27, 2022); *United States v. Perez*, No. 21-cr-508, ECF No. 78 (S.D. Cal. Sept. 26, 2022); *United States v. Collette*, No. 22-cr-141, --- F. Supp. 3d ----, 2022 WL 4476790 (W.D. Tex. Sept. 25, 2022); *United States v. Delpriore*, No. 18-cr-136, ECF No. 287 (D. Alaska Sept. 23, 2022); *United States v. Coombes*, No. 22-cr-189, --- F. Supp. 3d ----, ----, 2022 WL 4367056, at *1-11 (N.D. Okla. Sept. 21, 2022); *United States v. Hill*, No. 21-cr-107, --- F. Supp. 3d ----, 2022 WL 4361917 (S.D. Cal. Sept. 20, 2022); *United States v. Rojo*, No. 21-cr-682, ECF No. 50 (S.D. Cal. Sept. 14, 2022); *United States v. Cockerham*, No. 21-cr-6, 2022 WL 4229314 (S.D. Miss. Sept. 13, 2022); *United States v. Jackson*, No. 21-cr-51, 2022 WL 4226229 (D. Minn. Sept. 13, 2022); *United States v. Havins*, No. 21-cr-1515, ECF No. 62 (S.D. Cal. Sept. 12, 2022); *United States v. Patterson*, No. 19-cr-231 (S.D.N.Y. Sept. 9, 2022); *United States v. Doty*, No. 21-cr-21, ECF No. 34 (N.D. W.Va. Sept. 9, 2022); *United States v. Harper*, No. 21-4085, 2022 WL 8288406, at *2 (N.D. Iowa Sept. 9, 2022), *report and recommendation adopted*, No. CR21-4085-LTS, 2022 WL 4595060 (N.D. Iowa Sept. 30, 2022); *United States v. Burrell*, No. 21-cr-20395, 2022 WL 4096865, at *3 (E.D. Mich. Sept. 7, 2022); *United States v. Randle*, No. 22-

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment

and enter final judgment in favor of Defendants.

Dated: December 6, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
New York Bar No. 5859137
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-3786
Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

---

cr-20, ECF No. 34 (S.D. Miss. Sept. 6, 2022); *United States v. Ingram*, No. 18-cr-557, --- F. Supp. 3d ----, 2022 WL 3691350 (D.S.C. Aug. 25, 2022); *United States v. Nevens*, No. 19-cr-774, ECF No. 121 (C.D. Cal. Aug. 15, 2022); *United States v. Farris*, No. 22-cr-149, ECF No. 29 (D. Colo. Aug. 12, 2022); *United States v. Adams*, No. 20-cr-628 (S.D.N.Y. Aug. 10, 2022); *United States v. Ramos*, No. 21-cr-395, ECF No. 31 (C.D. Cal. Aug. 5, 2022); *United States v. Maurice*, No. 22-cr-48 (S.D.N.Y. Jul. 14, 2022); *cf. United States v. Gonzalez*, No. 22-1242, 2022 WL 4376074, at *2 (7th Cir. Sept. 22, 2022) (holding that "it would be frivolous to argue that § 922(g)(1) is unconstitutional as applied to [the plaintiff]").  The Government is not presently aware of any case in which a court has held that Section 922(g)(1) is unconstitutional under *Bruen*.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion for Summary Judgment was filed through the

CM/ECF system, which will provide electronic notice to the following counsel:

    Adam J. Kraut (akraut@civilrightsdefensefirm.com)
    Joshua Prince (Joshua@PrinceLaw.com)

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
