Joshua Prince, Esq.
Attorney Id No. 306521
Prince Law Offices, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(610) 845-3803, ext 81114 (t)
(610) 845-3903 (f)
Joshua@PrinceLaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD A. WILLIAMS** | : | |
| Plaintiff | : | Civil Action No.  17-CV-2641 |
| | : | |
| **v.** | : | |
| | : | |
| **MERRICK GARLAND,** *et al.* | : | Judge John Milton Younge |
| Defendants | : | |

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS THIRD MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................ 1

II.   PROCEDURAL HISTORY .......................................................... 2

III.  FACTUAL BACKGROUND .......................................................... 3

IV.   STATEMENT OF QUESTIONS INVOLVED .......................... 5

V.    STANDARD OF REVIEW .......................................................... 6

VI.   ARGUMENT ................................................................................ 7

    a.  *The Proper Analysis Post-Bruen* ........................................ 7

       i.  The Purchasing, Possessing, Carrying, and Utilizing of a Firearm is Covered by the Second Amendment ...................................... 9

      ii.  The Government Cannot Establish that Section 922(g)(1), Facially or *As-Applied* to Mr. Williams, is Consistent with the Nation's Tradition of Firearm Regulation .......................................... 9

         1.  DUI is Not a Crime that is Tethered to a "National Tradition" of Keeping Firearms Out of the Hands of Those Likely to Commit Violent Crimes ................................................................ 14

         2.  The Government Does Not Believe Individuals in Mr. Williams' Position (Or Even Those Having Committed For More Egregious Acts) Should be Stripped of Their Right to Keep and Bear Arms in Perpetuity ................................................................ 16

         3.  In the Alternative, Mr. Williams Can Distinguish Himself for his *As-Applied* Challenge ................................................ 23

VII.  CONCLUSION ............................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................. 6

*Begay v. United States*, 553 U.S. 137 (2008) ......................................... 15

*Binderup v. Attorney Gen. United States*, 836 F.3d 336 (3d Cir. 2016) ........... 14, 20

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ................................................. 7, 9

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................... 6

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ............................... 7, 9, 10, 12

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ......................................... 12

*Guidotti v. Legal Helpers Debt Resolution, L.L.C.,* 716 F. 3d 764 (3d Cir. 2013) ................................................................................................................ 6

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ............................ 10

*Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) .................................................................................................................... 12

*Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205 (3d Cir. 2011) ................................................................................................................ 6

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ................................................. 15

*Malloy v. Hogan*, 378 U.S. 1 (1964) .......................................................... 11

*Marks v. United States*, 430 U.S. 188 (1977) ......................................... 14

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ............................................ 11

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) .......... passim

*Ramos v. Louisiana*, 140 S.Ct. 1390 (2020) ........................................... 11

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ............................ 6

*Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162 (3d Cir. 2008) .................................................................................................... 6

*Sprint Communications Co. v. APCC Servs., Inc.,* 554 U.S. 269 ......................... 10

*Timbs v. Indiana*, 139 S.Ct. 682 (2019) ................................................................ 11

*United States v. Doe*, 960 F.2d 221 (1st Cir. 1992) ............................................. 15

*United States v. Duvall*, 740 F.3d 604 (D.C. Cir. 2013) ...................................... 14

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ........................................ 20

## Statutes

18 U.S.C. § 16 ....................................................................................................... 15

18 U.S.C. § 924 ..................................................................................................... 15

18 U.S.C. § 925 ............................................................................................ 16, 19, 20

Pub. L. No. 87-342, 75 Stat. 757 (1961) ............................................................... 13

## Rules

234 Pa. Code Ch 3, Rule 312 .................................................................................. 4

Fed. R. Civ. P. 56 .................................................................................................... 6

Plaintiff Edward A. Williams, by and through his counsel, hereby submits this Brief in Support of his Third Motion for Summary Judgment.

## I.      INTRODUCTION

Plaintiff Edward A. Williams (hereinafter "Mr. Williams" or "Plaintiff") has filed suit, complaining that the Defendants have collectively and individually prohibited a particular class of persons, including himself, from obtaining, possessing, keeping, bearing, or otherwise utilizing firearms and ammunition as a result of a misdemeanor driving under the influence (hereinafter "DUI") conviction, where no one was injured and where no property damage resulted, in violation of his Second Amendment Rights. Mr. Williams only desires to exercise his core, fundamental, individual right to purchase, possess, and utilize a firearm for purposes of self-defense of himself and his family. Statement of Material Facts (hereinafter, "SOMF"), ¶¶ 14, 24.

Consistent with the U.S. Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), it is clear that the Defendants' enforcement of such a prohibition violates Mr. Williams's fundamental constitutional right to keep and bear arms as provided for in the Second Amendment. In fact, there can be no dispute, post-*Bruen*, that there is nothing in the Constitution's text nor the Nation's historical tradition of firearm regulation –

1

as established by the *Bruen* decision – that supports the categorical ban that the prior and continuing enforcement of Defendant's law imposes on Mr. Williams and as such, Defendants' law is violative of the Second Amendment

## II.     PROCEDURAL HISTORY

Mr. Williams initiated this litigation by filing suit on June 1, 2017. [1] The Government responded by filing a motion to dismiss on September 14, 2017. [2] Thereafter, Plaintiff contemporaneously filed a brief in opposition to the Government's motion to dismiss and the underlying motion for summary judgment on October 13, 2017. [3] This Honorable Court issued two orders on December 1, 2017, denying the Government's motion to dismiss and denying, without prejudice, the Plaintiff's motion for summary judgment as premature. [4] Thereafter, in October of 2018, cross-motions for summary judgment were filed [5] and the Honorable Robert F. Kelly issued an Order and Decision on April 1, 2019, denying Mr. Williams' motion and granting the Governments' motion. [6]

An appeal followed to the Third Circuit, which initially affirmed Judge Kelly's decision; however, after Plaintiff petitioned for reconsideration *en banc*,

---

[1] *See* Doc. 1.
[2] *See* Doc. 5.
[3] *See* Docs. 8 and 9-2.
[4] *See* Docs. 13 and 14.
[5] *See* Docs. 29 and 30.
[6] *See* Docs. 43 and 44.

the Third Circuit vacated both its and this Court's prior decisions and "remanded to the District Court for reconsideration in light of the United States Supreme Court's decision in *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2002)." [7] After a status conference on October 6, 2022, where the Parties agreed that there were no outstanding discovery or other matters and that the matter was ripe for cross-summary judgment motions, this Court entered a briefing order on October 11, 2022. [8]

## III.     FACTUAL BACKGROUND

In 2000, Mr. Williams was pulled over and subsequently arrested and charged with DUI. [9] At the time of Mr. Williams' first DUI, Pennsylvania law made it a crime to operate a vehicle with a blood alcohol content greater than .10. [10] Mr. Williams was successfully entered into Pennsylvania's ARD program, which required him to serve 12 months probation, attend an alcohol class, driver's safety class, and pay all of the associated court costs and fines. [11] After successful completion of the ARD program, Mr. Williams' charge was expunged and his

---

[7] *See* Doc. 53.
[8] *See* Doc. 58.
[9] *See* SOMF at ¶ 1-3.
[10] *Id*. at ¶ 3.
[11] *Id*. at ¶ 4.

driver's license restored. [12] ARD does not result in a conviction, if successfully completed. [13]

On September 7, 2004, Mr. Williams was pulled over by the Philadelphia Police Department and subsequently arrested and charged with DUI. [14] Mr. Williams was found guilty and was sentenced to "passive house arrest until electronic monitor[ing] is available" for 90 days, ordered to pay costs, a fine of $1,500.00, and complete any recommended drug and alcohol treatment. [15]

At no point, in relation to the two instances of DUI, did any property damage or any injury to another occur. [16] Moreover, Mr. Williams has held a job as a construction manager for the past twenty-nine (29) years, where he has managed projects, which include the Curran-Fromhold Correctional Facility, PA Convention Center, Septa Railworks project, the Commodore Barry Bridge, Interstate 95 and the NJ Transportation maintenance facilities. [17] Mr. Williams is tasked with field inspections, project management, cost control, problem solving, developing and

---

[12] *Id.* at ¶ 6. *See also* Mr. Williams's Pennsylvania State Police Background Check, which is attached hereto and incorporated herein as Exhibit A.

[13] *Id.* at ¶ 5. *See also* 234 Pa. Code Ch 3, Rule 312, Note 1 "Although acceptance into an ARD program is not intended to constitute a conviction under these rules, it may be statutorily construed as a conviction *for purposes of computing sentences on subsequent convictions. See e.g.*, 75 Pa.C.S. § 3806(a)." (Emphasis added).

[14] *Id.* at ¶ 7.

[15] *Id.* at ¶ 8. *See also* Doc. 1-1 at 7.

[16] *Id.* at ¶ 9.

[17] *Id.* at ¶ 11-12.

maintaining CPM project schedules for contractors and relaying updates during the construction period. [18]

In or about late December of 2014, Mr. Williams, concerned for the safety of himself and his family, attempted to procure a License to Carry Firearms ("LTCF") and was denied. [19] After challenging the denial, he was only made aware that he was prohibited from obtaining a LTCF. [20] It was not until Mr. Williams spoke with Attorney Joshua Prince on or about November 5, 2015, that for the first time, he was informed that his sole conviction in 2004 for DUI was a federally prohibiting offense, which prevented him from lawfully possessing firearms and ammunition. [21] As a result, Mr. Williams brought the underlying action that is before the Court.

## IV.      STATEMENT OF QUESTIONS INVOLVED

1. Does the Defendants' prohibition on Mr. Williams, and those similarly situated, from obtaining, possessing, keeping, bearing, or otherwise utilizing firearms and ammunition as a result of an isolated misdemeanor DUI conviction violate his Second Amendment rights?

   Suggested Answer in the *Affirmative*

---

[18] *Id*. at ¶ 13.
[19] *Id*. at ¶ 14.
[20] *Id*. at ¶ 15.
[21] *Id*. at ¶ 16.

## V.        STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.,* 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party while not evaluating the credibility or weighing the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.,* 716 F. 3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotations omitted).

If the movant carries its initial burden of showing the basis of its motion, the burden shifts to the non-moving party to go beyond the pleadings and point to "specific facts showing that a genuine issue exists for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

## VI.      ARGUMENT

### a. *The Proper Analysis Post-Bruen*

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. Prior to the Court's recent decision in *Bruen*, it had already explicitly held that the Second Amendment protects one's right to a firearm – especially a handgun – in one's home, to "wear, bear, or carry…upon the person or in the clothing or in a pocket, for the…of being armed and ready for offensive or defensive action" and "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 584, 592 (2008); *see also Caetano v. Massachusetts*, 577 U.S. 411, 413-14 (2016)(Alito J., concurring) (holding that the Second Amendment also protects the right to possess and use stun guns in public). The issue that predominated the federal courts, *pre*-Bruen, was the appropriate analysis or framework a court was to utilize when assessing a Second Amendment challenge.

The Court in *Bruen*, beyond declaring on several occasions that the Second Amendment was the codification of "a pre-existing right" (142 S.Ct. at 2127, 2130, 2135, 2145), explained that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S.Ct. at 2126. To counter this presumptive protection, the government must

"affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. In fact, *Bruen* could not be clearer in its holding that it is *the government* that bears the burden of justifying its firearm regulations. *See id.* at 2130 ("The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."); *id.* at 2135 (explaining "the burden falls on respondents"); *id.* at 2138 (holding that "respondents have failed to meet *their burden* to identify an American tradition" (emphasis added)).

     While the *Bruen* Court eschewed a two-step analysis, several courts, *post-Bruen*, have nevertheless instituted a two-step analysis, whereby, the challenger must first establish that his/her conduct is covered by the Second Amendment and thereafter, once establishing such, requiring the government to prove that its regulation is consistent with the historical tradition. Accordingly, Mr. Williams will proceed under this potential two-step analysis, even though, there cannot be any real dispute that his proposed conduct – purchasing, possessing, carrying, and utilizing firearms for purposes of self-defense – is covered by the Second Amendment, based on the binding precedent from the U.S. Supreme Court.

i.  The Purchasing, Possessing, Carrying, and Utilizing of a
Firearm is Covered by the Second Amendment

As addressed *supra*, the U.S. Supreme Court in *Heller*,[22] *Caetano*, and

*Bruen* has already held that the Second Amendment protects the right of an

individual to have a firearm in his/her home and out in public for purposes of self-

defense. As Mr. Williams only desires to exercise his core, fundamental, individual

right to purchase, possess, and utilize a firearm for purposes of self-defense of

himself and his family (SOMF, ¶¶ 14, 24), there cannot be any dispute that his

desired conduct is covered by the Second Amendment.

ii.  The Government Cannot Establish that Section 922(g)(1),
Facially or *As-Applied* to Mr. Williams, is Consistent with the
Nation's Tradition of Firearm Regulation

As addressed *supra*, *Bruen* could not be clearer in its holding that it is *the*

*government* that bears the burden of justifying that its firearm regulation "is part of

the historical tradition that delimits the outer bounds of the right to keep and bear

arms." 142 S.Ct. at 2127, 2130, 2135, 2138. While the burden is clearly on the

Defendants to establish that their law is consistent with the Nation's historical

tradition of firearm regulation, there is simply no way for them to establish any

historical tradition, as there exist no historical tradition of firearm disarmament

---

[22] As the *Heller* Court declared, "the Second Amendment right is exercised individually and belongs to all Americans." 554 U.S. at 581.

laws relative to being in or on any mode of conveyance – *e.g.* horseback – while intoxicated.

In addressing what constitutes the Nation's historical tradition of firearm regulation, *Bruen* explains that "when it comes to interpreting the Constitution, not all history is created equal." *Id*. at 2136. That is why courts "must . . . guard against giving postenactment history more weight than it can rightly bear." *Id.* "As [the Court] recognized in *Heller* itself, because post-Civil War discussions of the right to keep and bear arms came '75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.'" *Id.* at 2137 (quoting *Heller*, 554 U.S. at 614); *see also Sprint Communications Co. v. APCC Servs., Inc.,* 554 U.S. 269, 312 (Roberts, C.J., dissenting) ("The belated innovations of the mid- to late-19th-century courts come too late to provide insight into the meaning of [the Constitution in 1787]"). In fact, "post-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Bruen*, 142 S. Ct. at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274, n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

*Bruen* thus establishes that this Court must prioritize Founding era evidence, while evidence from around the "mid- to late- 19th century" is at most "secondary." *Id.* at 2137. "19th-century evidence [is] treated as mere confirmation

10

of what the Court thought had *already been established*" in the Founding era. *Id.* (emphasis added). This makes sense because the "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment *have the same scope* as against the Federal Government." *Id.* (citing *Ramos v. Louisiana*, 140 S.Ct. 1390, 1397 (2020); *Timbs v. Indiana*, 139 S.Ct. 682, 686–687 (2019); *Malloy v. Hogan*, 378 U.S. 1, 10–11 (1964)). And regardless of any other debate, there is no dispute that 1791 is when the Bill of Rights limited the Federal Government. Thus, in order to ensure uniformity of incorporated rights with respect to the Federal Government and the States, 1791 is the relevant time to "peg[] . . . the public understanding of the right." *Bruen*, 142 S. Ct. at 2137; *see also McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (noting the Court's "decisive[]" holding "that incorporated Bill of Rights protections 'are all to be enforced against the States . . . according to the same standards that protect those personal rights against federal encroachment'" (quoting *Malloy*, 378 U.S. at 10)).[23]

While the historical tradition need not be a "historical twin," the tradition of a state,[24] around the time of Founding, must, at a minimum, be a historical analogue to be relevant. *Id*. at 2126, 2133. But a single historical analogue around the time of Founding of a state is not a tradition; rather, it is a mere aberration or

---

[23] As the extensive historical analysis of the Reconstruction period in *McDonald* shows, the evidence around Reconstruction is most relevant to determining *whether* a right has been incorporated, 561 U.S. at 777, while the content of that right is the public understanding in 1791.

[24] *See Bruen*, 142 S. Ct. at 2154-55 (finding the statutes of territories deserving of "little weight" because they were "localized," and "rarely subject to judicial scrutiny").

anomaly, with no followers. [25] Even two or three historical analogues of the states around the time of Founding are at best a trend and not a tradition,[26] especially when short-lived. [27]

And what laws, around the time of Founding, does the Government contend are consistent with the "Nation's historical tradition of firearm regulation"? In relation to their prior briefing, none. In fact, the first federal law – the Federal Firearms Act (hereinafter "FFA") [28] – which barred certain felons from possessing firearms was enacted in 1938, which, as discussed *infra*, the *Bruen* Court declared to be of no value in establishing a historical tradition, as it only came into being in the mid-twentieth century. *Bruen*, 142 S.Ct. at 2137. [29] The FFA specifically made it unlawful for any person who was under indictment or convicted of a crime of violence or a fugitive from justice to shop, transport or receiver a firearm or ammunition. Moreover, the law defined a crime of violence to mean:

---

[25] *See Heller*, 554 U.S. at 632 (2008) ("[W]e would not stake our interpretation of the Second Amendment upon a single law ... that contradicts the overwhelming weight of other evidence.")

[26] *See Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (finding that two historical statutes "falls far short of establishing that [a regulated activity] is wholly outside the Second Amendment as it was understood" in 1791); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014) ("[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[s] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment") (internal quotation marks omitted).

[27] *See Bruen*, 142 S. Ct. at 2155 ("[T]hese territorial restrictions deserve little weight because they were . . . short lived.")

[28] A copy of the Federal Firearms Act of 1938 is attached hereto and incorporated herein as Exhibit B.

[29] Emphasizing this point even more, the Court declared that even early-nineteenth century laws could only be used to confirm what had "already been established" in the Founding area. *Id.*

> murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year. [30]

Notably absent from those who were prohibited from possessing firearms and ammunition were those convicted of non-violent offenses. It was not until 1961 that Congress took action to bar non-violent felons from possessing firearms and ammunition. [31] Thus, approximately 170 years passed from the time the Bill of Rights became effective until the time where individuals who were not violent felons (and misdemeanants) were barred from possessing firearms and ammunition. [32] At the time Mr. Williams was charged with the prohibiting offense, the prohibition against non-violent felons had only been in place for approximately 42 years. [33]  From a historical analysis, even if, *arguendo*, one were to ignore the *Bruen* Court's command not to consider laws enacted after the early-19[th] century, the prohibition that prevents Mr. Williams from possessing firearms or ammunition accounts for a period of time less than 20% of the total period of time in which the right to keep and bear arms was codified in the Bill of Rights. [34] There is simply no way, especially in light of the *Bruen* command, for this to constitute a historical tradition of firearm regulation. Moreover, per the Third Circuit – in a *pre-Bruen*,

---

[30] *Exhibit B* at 1.

[31] *See* Pub. L. No. 87-342, 75 Stat. 757 (1961)

[32] Actual time was 169 years, 9 months and 18 days.

[33] Actual time was 42 years, 11 months and 5 days.

[34] *See Bruen*, 142 S.Ct. at 2127, 2130, 2135, 2145, declaring that the Second Amendment was the mere codification of a "pre-existing right."

limited analysis – historical evidence suggests that the only individuals who were categorically barred from possessing firearms were those who committed violent offenses. [35]

1. DUI is Not a Crime that is Tethered to a "National Tradition" of Keeping Firearms Out of the Hands of Those Likely to Commit Violent Crimes

While *pre-Bruen* and without the *Bruen* mandated historical analysis, the Third Circuit previously explained that "[p]eople who have committed or are likely to commit 'violent offenses'—crimes 'in which violence (actual or attempted) is an element of the offense,' … lack Second Amendment rights.'" [36, 37] While the Government previously set forth a number of arguments for the proposition that Mr. WIlliams' sole DUI conviction was a serious crime, it offers nothing to show that a DUI qualifies as a "violent offense" – a burden, per *Bruen*, it is required to establish, assuming, *arguendo*, that there exists, under a *post-Bruen* historical analysis, that individuals, around the time of Founding, could be stripped of their

---

[35] *Binderup v. Attorney Gen. United States*, 836 F.3d 336, 348 (3d Cir. 2016).

[36] *Id.* (Internal citation omitted).

[37] While it is not clear that this statement is supportable under a *post-Bruen* historical analysis, as the *Binderup* majority and dissent all agree on this point, based upon the "all opinions" approach to identifying the controlling test in split decisions of *Marks v. United States*, 430 U.S. 188 (1977) and *United States v. Duvall*, 740 F.3d 604, 611 (D.C. Cir. 2013) (Kavanaugh, J., concurring), the controlling rule of *Binderup* is that only people who have committed violent offenses lose their Second Amendment rights. As Mr. Williams has never committed a violent offense, he takes no position as to whether an individual can be stripped of a constitutional right if he/she committed a violent offense.

Second Amendment rights as a result of a violent offense. Perhaps more importantly, Mr. Williams has never been convicted of a violent offense.

There are several other factors Mr. Williams can point to in order to bolster the claim that a DUI is not a violent offense. First, none of the elements of Pennsylvania's DUI statute involve or makes reference to the use, attempted use, or threatened use of physical force against another. [38] The Supreme Court of the United States proclaimed that a DUI fell outside the scope of the Armed Career Criminal Act's definition of a "violent felony." [39] The Supreme Court also found that DUI was not within the definition of a "crime of violence" as defined by 18 U.S.C. § 16. [40] While the entire gamut of crimes involving violence has not been delineated, there are certain elements such as the use, attempted use, or threatened use of physical force, which are necessary in order to qualify. [41] Clearly, a DUI falls outside the scope of a "violent offense."

Justice Scalia's concurring opinion in *Begay v. United States*, 553 U.S. 137, 153-154 (2008) also sheds some light as to the seriousness of DUI.

> The Government cites the fact that in 2006, 17,062 persons died from alcohol-related car crashes, and that 15,121 of those deaths involved drivers with blood-alcohol concentrations of 0.08 or higher. Drunk

---

[38] *See* 75 Pa.C.S. § 3802
[39] *See Begay v. United States*, 553 U.S. 137, 148 (2008)
[40] *See Leocal v. Ashcroft*, 543 U.S. 1, 10 (2004)
[41] *See also United States v. Doe*, 960 F.2d 221, 225 (1st Cir. 1992) (observing that the term "violent felony" in 18 U.S.C. § 924(e) "calls to mind a tradition of crimes that involve the possibility of more closely related, active violence").

driving is surely a national problem of great concern. *But the fact that it kills many people each year tells us very little about whether a single act of drunk driving "involves conduct that presents a serious potential risk of physical injury to another."* It may well be that an even greater number of deaths occurs annually to pedestrians crossing the street; but that hardly means that crossing the street presents a serious potential risk of injury. Where the issue is "risk," the annual number of injuries from an activity must be compared with the annual incidents of the activity. Otherwise drunk driving could be said to pose a more serious risk of physical harm than murder. In addition, drunk driving is a combination of two activities: (1) drinking and (2) driving. If driving alone results in injury in a certain percentage of cases, it could hardly be said that the entirety of the risk posed by drunk driving can be attributed to the combination. [42]

> 2. The Government Does Not Believe Individuals in Mr. Williams' Position (Or Even Those Having Committed For More Egregious Acts) Should be Stripped of Their Right to Keep and Bear Arms in Perpetuity

Prior to 1993, ATF regularly conducted federal firearms relief determinations as provided for by 18 U.S.C. § 925(c); however, ATF no longer is able to conduct these determinations because Congress has inserted language into the appropriations bill which states "[p]rovided further, That none of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. 925(c)." [43] However,

---

[42] Internal citations omitted. (emphasis added).
[43] https://fas.org/sgp/crs/misc/R44686.pdf at 24. *See also* The Consolidated Appropriations Act, 2018, Pub. L. No. 115–141, 132 Stat. 348.

before Congress prohibited ATF from conducting those determinations, ATF

granted relief to 7,722 individuals from 1968 to 1992 for a multitude of different

crimes,[44] some of which were identical to and some far more egregious than Mr.

Williams' – in fact, some had more than six separate federal prohibitions[45] and

---

[44] *See,* 34 Fed. Reg. 10006 (June 28, 1969), 34 Fed. Reg. 12229 (July 24, 1969), 36 Fed. Reg. 20449 (Oct. 22, 1971), 36 Fed. Reg. 21364 (Nov. 6, 1971), 36 Fed. Reg. 22321 (Nov. 24, 1971), 36 Fed. Reg. 23731 (Dec. 14, 1971), 37 Fed. Reg. 23 (Jan. 4, 1972), 37 Fed. Reg. 2893 (Feb.9, 1972), 37 Fed. Reg. 4921 (Mar. 7, 1972), 37 Fed. Reg. 6361 (Mar. 28, 1972),  37 Fed. Reg. 6769 (Apr. 4, 1972), 37 Fed. Reg. 7168 (Apr. 11, 1972), 37 Fed. Reg. 8403 (Apr. 26, 1972), 37 Fed. Reg. 10406 (May 20, 1972), 37 Fed. Reg. 11790 (June 14, 1972), 37 Fed. Reg. 13352 (July 7, 1972), 37 Fed. Reg. 15009 (July 27, 1972), 37 Fed. Reg. 16113 (Aug. 10, 1972), 37 Fed. Reg. 18636 (Sept. 14, 1972), 37 Fed. Reg. 23462 (Nov. 3, 1972), 37 Fed. Reg. 26352 (Dec. 9, 1972), 37 Fed. Reg. 28640 (Dec. 28, 1972), 38 Fed. Reg. 1944 (Jan. 19, 1973), 38 Fed. Reg. 3414 (Feb. 6, 1973), 38 Fed. Reg. 4524 (Feb.15, 1973), 38 Fed. Reg. 4583 (Feb. 16, 1973), 38 Fed. Reg. 8071 (Mar. 28, 1973), 38 Fed. Reg. 14299 (May 31, 1973), 39 Fed. Reg. 9212 (Mar. 8, 1974), 41 Fed. Reg. 7550 (Feb. 19, 1976), 41 Fed. Reg. 50368 (Nov. 15, 1976), 42 Fed. Reg. 21156 (Apr. 25, 1977), 43 Fed. Reg. 25755 (June 14, 1978), 43 Fed. Reg. 51736 (Nov. 6, 1978), 44 Fed. Reg. 71492 (Dec. 11, 1979), 45 Fed. Reg. 6878 (Jan. 30, 1980), 45 Fed. Reg. 26868 (Apr. 21, 1980), 45 Fed. Reg. 39998 (June 12, 1980), 45 Fed. Reg. 49733 (July 25, 1980), 45 Fed. Reg. 65393 (Oct. 2, 1980), 45 Fed. Reg. 76838 (Nov. 20, 1980), 46 Fed. Reg. 11751 (Feb. 10, 1981), 46 Fed. Reg. 23646 (Apr. 27, 1981), 46 Fed. Reg. 33410 (June 29, 1981), 46 Fed. Reg. 46456 (Sept. 18, 1981), 46 Fed. Reg. 57812 (Nov. 25, 1981), 47 Fed. Reg. 10132 (Mar. 9, 1982), 47 Fed. Reg. 47714 (Oct. 27, 1982), 48 Fed. Reg. 10508 (Mar. 11, 1983), 48 Fed. Reg. 28385 (June 21, 1983), 48 Fed. Reg. 29650 (June 27, 1983), 48 Fed. Reg. 36720 (Aug. 12, 1983), 48 Fed. Reg. 50977 (Nov. 4, 1983), 49 Fed. Reg. 25060 (June 19, 1984), 49 Fed. Reg. 29503 (July 20, 1984), 49 Fed. Reg. 35707 (Sept. 11, 1984), 49 Fed. Reg. 48252 (Dec. 11, 1984), 50 Fed. Reg. 1026 (Jan. 8, 1985), 50 Fed. Reg. 23374 (June 3, 1985), 54 Fed. Reg. 33108 (Aug. 11, 1989), 54 Fed. Reg. 43378 (Oct. 24, 1989), 55 Fed. Reg. 5939 (Feb. 20, 1990), 55 Fed. Reg. 14549 (Apr. 18, 1990), 55 Fed. Reg. 33208 (Aug. 14, 1990), 55 Fed. Reg. 48951 (Nov. 23, 1990), 56 Fed. Reg. 14971 (Apr.12, 1991), 56 Fed. Reg. 26713 (June 10, 1991), 56 Fed. Reg. 36865 (Aug. 1, 1991), 56 Fed. Reg. 65926 (Dec. 19, 1991), 57 Fed. Reg. 6160 (Feb. 20, 1992).

[45] *See* 36 F.R. 22321 (Morrow, Clyde Franklin), 37 F.R. 18636 (Cook, Judson Vernon. Jr.), 46 F.R. 46456 (Crawford, Cleo J., Metz, Ira G.), 48 F.R. 28385 (Blackburn, Vaughn), 49 F.R. 25060 (Karl, Earl Jerome), 49 F.R. 29503 (Adams, Richard Gerald), and 55 F.R. 14549 (Search, Herman Samuel).

some had been convicted of vehicular homicide while DUI. [46] *See* Federal Register List attached hereto and incorporated herein as Exhibit D.

Unfortunately, the Federal Register publications do not specify the crime, which the individual was convicted of but rather only specify the date of conviction and court where they were convicted for which relief was granted. The Plaintiff sought records from a sampling of several courts to identify the types of crimes individuals had previously been convicted of and were subsequently granted relief in relation to, after ATF determined, pursuant to 27 CFR. 478.144, that that the individual would "not be likely to act in a manner dangerous to public safety, and that the granting of the relief would not be contrary to the public interest." [47] Unfortunately, there is no way – other than contacting the court of conviction relative to each individual's offense(s) and attempting to procure any records that may still exist – for the Plaintiff to identify all the other individuals who were convicted of DUI (such as the offense Mr. Williams was convicted of)

---

[46] *See* the Court records of John Kraszewski, granted relief on February 20, 1992 (57 F.R. 6160-02), from a 1984 Pennsylvania conviction, which included one count of homicide by vehicle, attached hereto and incorporated herein as Exhibit E. *See also* the Court records of Kim Blake, granted relief on August 11, 1989 (54 F.R. 33108), from a 1981 Pennsylvania conviction, which included one count of homicide by vehicle, attached hereto and incorporated herein as Exhibit F.

[47] Noteworthy is the language utilized in the earlier publications of the Federal Register for grants of relief. "Notice is hereby further given that I have considered [name's] application and have found: (1) The conviction was made upon a charge which did not involve the use of a firearm or other weapon or a violation of Chapter 44, Title 18, United States Code, or of the National Firearms Act; and (2) It has been established to my satisfaction that the circumstances regarding the conviction and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety, and that the granting of the requested relief to [name] from disabilities incurred by reason of his conviction, would not be contrary to the public interest." *See* 34 F.R. 12229.

and subsequently granted relief from the information contained in the Federal Register.

### A. John Kraszewski and Kim Blake

Mr. Kraszewski was granted federal firearms relief on February 20, 1992 from a 1984 Pennsylvania conviction. [48] The court records show that Mr. Kraszewski had been charged with and pled guilty to one count of driving under the influence and *one count of homicide by vehicle*. [49] Likewise, Kim Blake was granted relief from a conviction in 1981 of homicide by vehicle and DUI.[50]

While the previously Government contended that individuals, like Mr. Williams, should not be allowed to exercise their Second Amendment rights, it finds itself in an untenable position having granted relief to at least two individuals who not only were convicted of DUI but also homicide by vehicle, where the court records establish that homicide by vehicle was the result of their driving under the influence. 18 U.S.C. § 925(c) required ATF to find the individual would not be "likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." Even though Mr. Kraszewski was responsible for the loss of life through his actions, ATF determined that he should be granted relief and that such was not contrary to the public interest.

---

[48] 57 F.R. 6160-02.
[49] *See* Exhibit E. *See also* Exhibit D (57 FR 6160).
[50] *See* Exhibit F. *See also* Exhibit D (54 FR 33108).

While Plaintiff acknowledges that § 925(c) does not control this challenge, the Defendants are unable to show that Mr. Williams is likely to act in a manner dangerous to public safety as there is no evidence of record to support such a proposition and in fact, as discussed *infra*, there is evidence of record – the psychological evaluation of Mr. Williams by Psychologist Robert Gordon – that Mr. Williams is *not* likely to act in a manner dangerous to public safety. Moreover, the Third Circuit has stated that the intended purpose of § 922(g)(1) is to "promot[e] public safety by 'preventing armed mayhem'" [51] and there is no evidence of record that Mr. Williams is likely to act in manner causing armed mayhem.

### B. Barry Shoop

Mr. Shoop was granted federal firearms relief on April 11, 1977 from a 1975 Pennsylvania driving under the influence conviction, which was prohibiting like Mr. Williams'. [52] A copy of the records obtained from the court in relation to Mr. Shoop are attached hereto and incorporated herein as Exhibit G.

Here, again, is another example of an individual who was convicted of DUI, who was later granted relief by ATF, finding that Mr. Shoop would not be "likely

---

[51] *Binderup,* 836 F.3d at 353. (quoting *United States v. Skoien*, 614 F.3d 638, 642 (7th Cir. 2010)).
[52] 42 F.R. 21156.

to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest."

## C. Carl Fareri [53]

Mr. Fareri was granted federal firearms relief on November 23, 1990 from a 1984 conviction. [54] The court records show that Mr. Fareri was convicted of felonious burglary twice, felonious conspiracy, theft by unlawful taking or disposition and receiving stolen property. A copy of the records obtained from the court in relation to Mr. Fareli are attached hereto and incorporated herein as Exhibit H.

While Mr. Fareri's crimes are not directly related to DUI, it does show that even when an individual committed a crime that is considered to be felonious in nature and deprives an individual of his/her property, that the grant of relief was not considered contrary to the public safety or interest. [55]

## D. Charles Spangler

Mr. Spangler was granted federal firearms relief on June 10, 1991 from five

---

[53] The court records reflect a spelling of "Fareli" and "Fareri," but it is believed that the proper spelling is "Fareri".

[54] 55 F.R. 48951-03 (spelled "Fareri" in the publication).

[55] Plaintiff also obtained records for Ronald Sahara Brown, who was convicted of felonious larceny from a person in 1973, felonious possession of heroin in 1975 and felonious larceny in a building in 1977 and William White, who was convicted of felonious larceny of a truck in 1965 and a prior felonious juvenile burglary.

convictions in 1963, 1965, and 1985. [56] Mr. Spangler had been convicted of adultery, statutory rape, contributing to the delinquency of a minor, possession of a firearm and resisting an officer. A copy of the records obtained from the court in relation to Mr. Spangler are attached hereto and incorporated herein as Exhibit I.

Mr. Spangler's multiple convictions show that not only did his crimes cover a broad spectrum, but that ATF considered an individual who had five convictions ranging from statutory rape to resisting an officer to be of such little threat to society that the restoration of his right to own and possess firearms and ammunition would not be contrary to the public safety or interest. Most interesting is that Mr. Spangler's last conviction was a mere six (6) years prior to him being granted relief and it was for the possession of a firearm and resisting an officer.

Mr. Spangler is not the only individual who had multiple prohibiting convictions and who was granted relief by ATF. The Federal Register denotes numerous instances where an individual who had multiple prohibiting convictions was granted federal firearms relief. [57]

---

[56] 56 F.R. 26713-02.
[57] *See* 36 F.R. 20449, 36 F.R. 22321, 36 F.R. 23731, 37 F.R. 10406, 37 F.R. 11790, 37 F.R. 13352, 37 F.R. 15009, 37 F.R. 16113, 37 F.R. 18636, 37 F.R. 23, 37 F.R. 23642, 37 F.R. 26352, 37 F.R. 28640, 37 F.R. 2893, 37 F.R. 4921, 37 F.R. 6361, 37 F.R. 6769, 37 F.R. 7168, 37 F.R. 8403, 38 F.R. 14299, 38 F.R. 1944, 38 F.R. 3414, 38 F.R. 4524, 38 F.R. 4583, 38 F.R. 8071, 39 F.R. 9212, 41 F.R. 50368, 41 F.R. 7550, 42 F.R. 21156, 43 F.R. 25755, 43 F.R. 51736, 44 F.R. 71492, 45 F.R. 26868, 45 F.R. 39998, 45 F.R. 49733, 45 F.R. 65393, 45 F.R. 6878, 45 F.R. 76838, 46 F.R. 11751, 46 F.R. 23646, 46 F.R. 33410, 46 F.R. 46456, 46 F.R. 57812, 47 F.R. 10132, 47 F.R. 47714, 47 F.R. 47714, 48 F.R. 10508, 48 F.R. 28385, 48 F.R. 29650, 48 F.R. 36720, 48 F.R. 50977, 49 F.R. 25060, 49 F.R. 29503, 49 F.R. 35707, 49 F.R. 48252, 50 F.R.

3.  In the Alternative, Mr. Williams Can Distinguish Himself
    for his *As-Applied* Challenge

In the event, *arguendo*, that this Court finds a historical tradition of firearm

regulation that precludes Mr. Williams' facial challenge, he can distinguish himself

from that historical tradition. Specifically, on August 7, 2018, Robert Gordon,

Ph.D., ABPP, a Board certified clinical psychologist, conducted an examination of

Mr. Williams, which consisted of an interview, a battery of psychological tests,

and rating Mr. Williams on a psychodiagnostic chart, for the purposes of

determining whether Mr. Williams "is fit to be allowed to own, possess, carry, and

use a firearm *without risk to him or any other person*."[58] In forming his opinion, in

additional to the tests performed, Mr. Gordon reviewed a number of documents,

including the Defendants' Expert Report.

The report generated by Mr. Gordon identifies numerous deficiencies with

the previous Expert Report for the Defendants prepared by Dr. Webster, ScD.

Particularly that

> While Dr. Webster presents some valid correlation research groupings
> of individuals *it has a relatively small predictive value* in generalizing
> to groups and *does not predict* the effect of two DUI's from 14-18
> years ago, *especially when the individual has no history of aggression*.
> As Dr. Webster *did not assess Mr. Williams, these generalizations are
> not relevant to this particular case*, as any applicability would require

---

1026, 50 F.R. 23374, 54 F.R. 33108, 54 F.R. 43378, 55 F.R. 14549, 55 F.R. 33208, 55 F.R.
48951, 55 F.R. 5939, 56 F.R. 14791, 56 F.R. 26713, 56 F.R. 36865, 56 F.R. 65926, and 57 F.R.
6160.
[58] *See* Exhibit C. (Emphasis added).

an independent evaluation of the particular person. As set forth in this forensic report…the research relied upon by Dr. Webster is not applicable to Mr. Williams. [59]

Further, Mr. Gordon also identified that Dr. Webster's report:

1. Is premised on individuals who suffer from alcohol or abuse issues; and there is no evidence that Mr. Williams currently suffers from any alcohol or dependency issues;

2. Contends there exists a statistical significance in relation to reduction of future violent crime when *those previously convicted of a <u>violent crime</u>* were barred from purchasing a handgun; however, there is no evidence Mr. Williams has been charged with, let alone, convicted of a violent crime;

3. Contends that 54% of repeat DUI offenders have an alcohol dependency issue, which leaves 46% without a dependency issue;

4. Fails to support a finding that alcohol-impairment and/or abuse are *causal* to unintentional firearm injuries or deaths and acknowledges a lack of data supporting that proposition;

5. Contends that individuals *previously convicted of a misdemeanor crime of <u>violence</u>* are more likely to commit crime in the future and then opines that

---

[59] *Id*. at 7. (Emphasis added).

prohibitions against individuals like Mr. Williams prove a public safety

benefit, even though Mr. Williams was never convicted of such an offense.[60]

Mr. Gordon's report summarizes that Mr. Williams has "no history of hostile or

violent behaviors nor a continuing pattern of aggressive behaviors, which could be

a predictive factor." [61] The summarization also concludes that "[a]lthough the

research cited by Dr. Webster sheds light on some predictive factors, *the prediction

is low*...Dr. Webster is not a psychologist and did not perform a psychological

assessment of Mr. Williams' mental status…Therefore, his report has *no value for

this particular case*, in the absence of an independent evaluation of Mr.

Williams…" [62] Mr. Gordon's report concludes that Mr. Williams "has a normal

personality, *without psychopathology and without addition or violent

tendencies*." [63]

\*          \*          \*          \*

Accordingly, consistent with *Bruen*, as the Government is unable to

establish any historical tradition of firearm disarmament laws relative to being in

or on any mode of conveyance while intoxicated or even more broadly for non-

---

[60] *Id*. at 7-8.
[61] *Id*. at 11.
[62] *Id*.
[63] *Id*. at 11-12.

violent behavior, Mr. Williams, and those similarly situated, are being unconstitutionally denied their right to keep and bear arms and are entitled to declaratory and injunctive relief.

## VII.      CONCLUSION

For the foregoing reasons, the Mr. Williams' Motion for Summary Judgment should be granted.

Dated: December 6, 2022

Respectfully Submitted,

Joshua Prince, Esq.
Attorney Id. No. 306521
Joshua@PrinceLaw.com
Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
610-845-3803
610-845-3903 (fax)

Attorney for Plaintiff

26