## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD A. WILLIAMS** | **:** | |
| Plaintiff | **:** | Civil Action No.  17-CV-2641 |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **MERRICK GARLAND, *et al.*** | **:** | Judge John Milton Younge |
| Defendants. | **:** | |

## JOINT STATUS REPORT

Pursuant to this Court's Order of January 11, 2023, directing the

Parties to provide a status report within twenty days of the Third Circuit's

decision in *Range v. Attorney General United States of America*, 53 F.4th

262, 266 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom.*

*Range v. Attorney General United States of America*, No. 21-2835, 2023 WL

118469 (3d Cir. Jan. 6, 2023), Plaintiff hereby notifies this Court of the

Third Circuit's *en banc* decision today, June 6, 2023, holding that as "the

Government has not shown that our Republic has a longstanding history and

tradition of depriving people like Range of their firearms, § 922(g)(1) cannot

constitutionally strip him of his Second Amendment rights." Op. at 22. A

copy of the decision, including concurring and dissenting opinions is

attached hereto. Accordingly, Mr. Williams respectfully requests that

summary judgment be entered in his favor, consistent with the Third

Circuit's binding authority and arguments made in his Motion for Summary

Judgment and briefing in support.

.

Respectfully Submitted,

_____
Joshua Prince, Esq.
Attorney Id. No. 306521
Joshua@PrinceLaw.com
Prince Law Offices, P.C.
646 Lenape Road
Bechtelsville, PA 19505
610-845-3803
610-845-3903 (fax)
Attorney for Petitioner

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2835
_____

BRYAN DAVID RANGE,
                              Appellant

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA;
REGINA LOMBARDO, Acting Director, Bureau of Alcohol,
Tobacco, Firearms and Explosives

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 5:20-CV-03488)
District Judge: Honorable Gene E.K. Pratter
_____

Argued before Merits Panel on September 19, 2022
Argued En Banc on February 15, 2023
_____

Before: CHAGARES, *Chief Judge*, JORDAN, HARDIMAN,
GREENAWAY, JR., SHWARTZ, KRAUSE, RESTREPO,

BIBAS, PORTER, MATEY, PHIPPS, FREEMAN,
MONTGOMERY-REEVES, ROTH,[*] and AMBRO,[**]
*Circuit Judges.*

(Filed: June 6, 2023)

William V. Bergstrom
Peter A. Patterson [Argued]
David H. Thompson
Cooper & Kirk
1523 New Hampshire Avenue, N.W.
Washington, DC 20036

Michael P. Gottlieb
Vangrossi & Recchuiti
319 Swede Street
Norristown, PA 19401

*Counsel for the Appellant*

Joseph G. S. Greenlee
Firearms Policy Coalition Action
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149

---

[*] Judge Roth is participating as a member of the en banc court pursuant to 3d Cir. I.O.P. 9.6.4.

[**] Judge Ambro assumed senior status on February 6, 2023 and elected to continue participating as a member of the en banc court pursuant to 3d Cir. I.O.P. 9.6.4.

*Counsel for Amici Curiae FPC Action Foundation and Firearms Policy Coalition, Inc. in Support of Appellant*

Lisa B. Freeland
Renee Pietropaolo
Eleni Kousoulis
K. Anthony Thomas
Helen A. Marino
Heidi R. Freese
Matthew Campbell
Office of Federal Public Defender
1001 Liberty Avenue
1500 Liberty Center
Pittsburgh, PA 15222

*Counsel for Amicus Curiae Federal Public & Community Defender Organization of the Third Circuit in Support of Appellant*

Brian M. Boynton
Jacqueline C. Romero
Mark B. Stern
Michael S. Raab
Abby C. Wright
Kevin B. Soter [Argued]
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

*Counsel for the Appellees*

Janet Carter
Everytown Law
450 Lexington Avenue
P.O. Box 4148
New York, NY 10017

> *Counsel for Amicus Curiae Everytown for Gun Safety
> in Support of Appellees*

————————

## OPINION OF THE COURT

————————

HARDIMAN, *Circuit Judge*, with whom CHAGARES, *Chief Judge*, and JORDAN, GREENAWAY, JR., BIBAS, PORTER, MATEY, PHIPPS, and FREEMAN, *Circuit Judges*, join.

Bryan Range appeals the District Court's summary judgment rejecting his claim that the federal "felon-in-possession" law—18 U.S.C. § 922(g)(1)—violates his Second Amendment right to keep and bear arms. We agree with Range that, despite his false statement conviction, he remains among "the people" protected by the Second Amendment. And because the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range, we will reverse and remand.

I

A

The material facts are undisputed. In 1995, Range pleaded guilty in the Court of Common Pleas of Lancaster County to one count of making a false statement to obtain food stamps in violation of Pennsylvania law. *See* 62 Pa. Stat. Ann. § 481(a). In those days, Range was earning between $9.00 and $9.50 an hour as he and his wife struggled to raise three young children on $300 per week. Range's wife prepared an application for food stamps that understated Range's income, which she and Range signed. Though he did not recall reviewing the application, Range accepted full responsibility for the misrepresentation.

Range was sentenced to three years' probation, which he completed without incident. He also paid $2,458 in restitution, $288.29 in costs, and a $100 fine. Other than his 1995 conviction, Range's criminal history is limited to minor traffic and parking infractions and a summary offense for fishing without a license.

When Range pleaded guilty in 1995, his conviction was classified as a Pennsylvania misdemeanor punishable by up to five years' imprisonment. That conviction precludes Range from possessing a firearm because federal law generally makes it "unlawful for any person . . . who has been convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(1). Although state misdemeanors are excluded from that prohibition if they are "punishable by a term of imprisonment of two years or less,"

18 U.S.C. § 921(a)(20)(B), that safe harbor provided no refuge for Range because he faced up to five years' imprisonment.

In 1998, Range tried to buy a firearm but was rejected by Pennsylvania's instant background check system. Range's wife, thinking the rejection a mistake, gifted him a deer-hunting rifle. Years later, Range tried to buy a firearm and was rejected again. After researching the reason for the denial, Range learned he was barred from buying a firearm because of his 1995 conviction. Range then sold his deer-hunting rifle to a firearms dealer.

## B

Range sued in the United States District Court for the Eastern District of Pennsylvania, seeking a declaration that § 922(g)(1) violates the Second Amendment as applied to him. He also requested an injunction prohibiting the law's enforcement against him. Range asserts that but for § 922(g)(1), he would "for sure" purchase another deer-hunting rifle and "maybe a shotgun" for self-defense at home. App. 197–98. Range and the Government cross-moved for summary judgment.

The District Court granted the Government's motion. *Range v. Lombardo*, 557 F. Supp. 3d 609, 611 (E.D. Pa. 2021). Faithfully applying our then-controlling precedents, the Court held that Range's crime was "serious" enough to deprive him of his Second Amendment rights. *Id.* In doing so, the Court noted the two-step framework we established in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010). *Range*, 557 F. Supp. 3d at 613. The Court began—and ended—its analysis at the first step. It considered five factors to determine whether Range's conviction made him an "unvirtuous citizen" of the

6

kind historically barred from possessing a firearm: (1) whether the conviction was classified as a misdemeanor or a felony; (2) whether the elements of the offense involve violence; (3) the sentence imposed; (4) whether there was a cross-jurisdictional consensus as to the seriousness of the crime, *Binderup v. Att'y Gen.*, 836 F.3d 336, 351–52 (3d Cir. 2016) (en banc) (plurality); and (5) the potential for physical harm to others created by the offense, *Holloway v. Att'y Gen.*, 948 F.3d 164, 173 (3d Cir. 2020). *Range*, 557 F. Supp. 3d at 613–14.

The Government conceded that four of the five factors favored Range because he was convicted of a nonviolent, non-dangerous misdemeanor and had not been incarcerated. *Id.* at 614. But the District Court held the "cross-jurisdictional consensus" factor favored the Government because about 40 jurisdictions would have classified his crime as a felony. *Id.* at 614–15. Noting that our decisions in *Holloway*, 948 F.3d at 177, and *Folajtar v. Att'y Gen.*, 980 F.3d 897, 900 (3d Cir. 2020), had rejected as-applied challenges to § 922(g)(1) despite only one of the relevant factors weighing in the Government's favor, the District Court held that the cross-jurisdictional consensus alone sufficed to disarm Range. *Range*, 557 F. Supp. 3d at 615–16. Range timely appealed.

While Range's appeal was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). The parties then submitted supplemental briefing on *Bruen*'s impact. A panel of this Court affirmed the District Court's summary judgment, holding that the Government had met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction "places him outside the class of people traditionally entitled to Second Amendment rights."

7

*Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022) (per curiam).

Range petitioned for rehearing en banc. We granted the petition and vacated the panel opinion. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2022).

## II

The District Court had jurisdiction under 28 U.S.C. § 1331 because Range's complaint raised a federal question: whether the federal felon-in-possession law, 18 U.S.C. § 922(g)(1), violates the Second Amendment as applied to Range. We have jurisdiction under 28 U.S.C. § 1291.

## III

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment guarantees an individual right to keep and bear arms unconnected with militia service. 554 U.S. 570, 583–84 (2008). In view of that right, the Court held unconstitutional a District of Columbia law that banned handguns and required other "firearms in the home be rendered and kept inoperable at all times." *Id.* at 630. It reached that conclusion after scrutinizing the text of the Second Amendment and deducing that it "codified a *pre-existing* right." *Id.* at 592. The *Heller* opinion did not apply intermediate or strict scrutiny. In fact, it did not apply means-end scrutiny at all. But in response to Justice Breyer's dissent, the Court noted in passing that the challenged law would be unconstitutional "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 628–29.

Many courts around the country, including this one, overread that passing comment to require a two-step approach in Second Amendment cases, utilizing means-end scrutiny at the second step. We did so for the first time in *Marzzarella*, 614 F.3d at 97, and we continued down that road for over a decade. *See, e.g.*, *Drake v. Filko*, 724 F.3d 426, 429, 434–40 (3d Cir. 2013); *Binderup*, 836 F.3d at 344–47, 353–56; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106, 117 (3d Cir. 2018); *Beers v. Att'y Gen.*, 927 F.3d 150, 154–55 (3d Cir. 2019), *vacated sub nom. as moot*, *Beers v. Barr*, 140 S. Ct. 2758 (2020); *Holloway*, 948 F.3d at 169–172; *Folajtar*, 980 F.3d at 901.

*Bruen* rejected the two-step approach as "one step too many." 142 S. Ct. at 2127. The Supreme Court declared: "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." *Id*. Instead, those cases teach "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. And "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Applying that standard, *Bruen* held "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Id.* at 2122. But the "where" question decided in *Bruen* is not at issue here. Range's appeal instead requires us to examine *who* is among "the people" protected by the Second Amendment. U.S. Const. amend. II; *see Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully

9

possess a firearm . . . ."); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443 (2009) (distinguishing among "who," "what," "where," "when," and "how" restrictions). Range claims he is one of "the people" entitled to keep and bear arms and that our Nation has no historical tradition of disarming people like him. The Government responds that Range has not been one of "the people" since 1995, when he pleaded guilty in Pennsylvania state court to making a false statement on his food stamp application, and that his disarmament is historically supported.

## IV

Having explained how *Bruen* abrogated our Second Amendment jurisprudence, we now apply the Supreme Court's established method to the facts of Range's case. Both sides agree that we no longer conduct means-end scrutiny. And as the panel wrote: "*Bruen*'s focus on history and tradition," means that "*Binderup*'s multifactored seriousness inquiry no longer applies." *Range*, 53 F.4th at 270 n.9.

After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. 142 S. Ct. at 2134–35. If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

A

We begin with the threshold question: whether Range is one of "the people" who have Second Amendment rights. The Government contends that the Second Amendment does not apply to Range at all because "[t]he right to bear arms has historically extended to the political community of law-abiding, responsible citizens." Gov't En Banc Br. at 2. So Range's 1995 conviction, the Government insists, removed him from "the people" protected by the Second Amendment.

The Supreme Court referred to "law-abiding citizens" in *Heller*. In response to Justice Stevens's dissent, which relied on *United States v. Miller*, 307 U.S. 174 (1939), the Court reasoned that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. In isolation, this language seems to support the Government's argument. But *Heller* said more; it explained that "the people" as used throughout the Constitution "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. So the Second Amendment right, *Heller* said, presumptively "belongs to all Americans." *Id.* at 581. Range cites these statements to argue that "law-abiding citizens" should not be read "as rejecting *Heller*'s interpretation of 'the people.'" Range Pet. for Reh'g at 8. We agree with Range for four reasons.

First, the criminal histories of the plaintiffs in *Heller*, *McDonald*, and *Bruen* were not at issue in those cases. So their references to "law-abiding, responsible citizens" were dicta. And while we heed that phrase, we are careful not to overread it as we and other circuits did with *Heller*'s statement that the District of Columbia firearm law would fail under any form of

11

heightened scrutiny. Second, other Constitutional provisions reference "the people."[1] It mentions "the people" twice with respect to voting for Congress,[2] and "the people" are recognized as having rights to assemble peaceably, to petition the government for redress,[3] and to be protected against unreasonable searches and seizures.[4] Unless the meaning of the phrase "the people" varies from provision to provision—and the Supreme Court in *Heller* suggested it does not—to conclude that Range is not among "the people" for Second Amendment purposes would exclude him from those rights as

---

[1] *See, e.g.*, U.S. Const. pmbl. ("We *the People* of the United States . . . ." (emphasis added)); *id*. amend. IX (recognizing rights "retained by the people"); *id*. amend. X (acknowledging the powers reserved "to the people").

[2] U.S. Const. art. I, § 2 ("The House of Representatives shall be composed of Members chosen every second Year by *the People* of the several States . . . ." (emphasis added)); *id.* amend. XVII ("The Senate of the United States shall be composed of two Senators from each State, elected by *the people* thereof . . . ." (emphasis added)).

[3] U.S. Const. amend. I ("Congress shall make no law respecting . . . the right of *the people* peaceably to assemble, and to petition the Government for a redress of grievances." (emphasis added)).

[4] U.S. Const. amend. IV ("The right of *the people* to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (emphasis added)).

well. *See* 554 U.S. at 580. And we see no reason to adopt an inconsistent reading of "the people."

Third, as the plurality stated in *Binderup*: "That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical." 836 F.3d at 344 (Ambro, J.). That statement tracks then-Judge Barrett's dissenting opinion in *Kanter v. Barr*, in which she persuasively explained that "all people have the right to keep and bear arms," though the legislature may constitutionally "strip certain groups of that right." 919 F.3d 437, 452 (7th Cir. 2019). We agree with that statement in *Binderup* and then-Judge Barrett's reasoning.

Fourth, the phrase "law-abiding, responsible citizens" is as expansive as it is vague. Who are "law-abiding" citizens in this context? Does it exclude those who have committed summary offenses or petty misdemeanors, which typically result in a ticket and a small fine? No. We are confident that the Supreme Court's references to "law-abiding, responsible citizens" do not mean that every American who gets a traffic ticket is no longer among "the people" protected by the Second Amendment. Perhaps, then, the category refers only to those who commit "real crimes" like felonies or felony-equivalents? At English common law, felonies were so serious they were punishable by estate forfeiture and even death. 4 William Blackstone, Commentaries on the Laws of England 54 (1769). But today, felonies include a wide swath of crimes, some of

13

which seem minor.[5] And some misdemeanors seem serious.[6] As the Supreme Court noted recently: "a felon is not always more dangerous than a misdemeanant." *Lange v. California*, 141 S. Ct. 2011, 2020 (2021) (cleaned up). As for the modifier "responsible," it serves only to undermine the Government's argument because it renders the category hopelessly vague. In our Republic of over 330 million people, Americans have widely divergent ideas about what is required for one to be considered a "responsible" citizen.

At root, the Government's claim that only "law-abiding, responsible citizens" are protected by the Second Amendment devolves authority to legislators to decide whom to exclude from "the people." We reject that approach because such "extreme deference gives legislatures unreviewable power to manipulate the Second Amendment by choosing a label." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting). And that deference would contravene *Heller*'s reasoning that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." 554 U.S. at 636; *see also Bruen*,

---

[5] *See, e.g.*, 18 U.S.C. § 1464 (uttering "any obscene, indecent, or profane language by means of radio communication"); Mich. Comp. Laws Ann. § 445.574a(2)(d) (returning out-of-state bottles or cans); 18 Pa. Cons. Stat. Ann. § 3929.1 (third offense of library theft of more than $150); *id.* § 7613 (reading another's email without permission).

[6] *See, e.g.*, 18 Pa. Cons. Stat. Ann. § 2504 (involuntary manslaughter); *id.* § 2707 (propulsion of missiles into an occupied vehicle or onto a roadway); 11 Del. Code § 881 (bribery).

142 S. Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

In sum, we reject the Government's contention that only "law-abiding, responsible citizens" are counted among "the people" protected by the Second Amendment. *Heller* and its progeny lead us to conclude that Bryan Range remains among "the people" despite his 1995 false statement conviction.

Having determined that Range is one of "the people," we turn to the easy question: whether § 922(g)(1) regulates Second Amendment conduct. It does. Range's request—to possess a rifle to hunt and a shotgun to defend himself at home—tracks the constitutional right as defined by *Heller*. 554 U.S. at 582 ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). So "the Second Amendment's plain text covers [Range's] conduct," and "the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

B

Because Range and his proposed conduct are protected by the Second Amendment, we now ask whether the Government can strip him of his right to keep and bear arms. To answer that question, we must determine whether the Government has justified applying § 922(g)(1) to Range "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. We hold that the Government has not carried its burden.

To preclude Range from possessing firearms, the Government must show that § 922(g)(1), as applied to him, "is

15

part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. Historical tradition can be established by analogical reasoning, which "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133. To be compatible with the Second Amendment, regulations targeting longstanding problems must be "distinctly similar" to a historical analogue. *Id.* at 2131. But "modern regulations that were unimaginable at the founding" need only be "relevantly similar" to one. *Id.* at 2132. *Bruen* offers two metrics that make historical and modern firearms regulations similar enough: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

In attempting to carry its burden, the Government relies on the Supreme Court's statement in *Heller* that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons." 554 U.S. at 626. A plurality of the Court reiterated that point in *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010). And in his concurring opinion in *Bruen*, Justice Kavanaugh, joined by the Chief Justice, wrote that felon-possession prohibitions are "presumptively lawful" under *Heller* and *McDonald*. 142 S. Ct. at 2162 (quoting *Heller*, 554 U.S. at 626–27 & n.26).[7] Section 922(g)(1) is a straightforward "prohibition[] on the possession of firearms by felons." *Heller*, 554 U.S. at 626. And since 1961 "federal law has generally prohibited individuals convicted of crimes punishable by more than one year of

---

[7] The *Heller*, *McDonald*, and *Bruen* Courts cited no such "longstanding prohibitions," presumably because they did "not undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment." *Heller*, 554 U.S. at 626.

imprisonment from possessing firearms." Gov't En Banc Br. at 1; *see* An Act To Strengthen The Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). But the earliest version of that statute, the Federal Firearms Act of 1938, applied only to *violent* criminals. Pub. L. No. 75-785, §§ 1(6), 2(f), 52 Stat. 1250, 1250–51 (1938). As the First Circuit explained: "the current federal felony firearm ban differs considerably from the [original] version . . . . [T]he law initially covered those convicted of a limited set of violent crimes such as murder, rape, kidnapping, and burglary, but extended to both felons and misdemeanants convicted of qualifying offenses." *United States v. Booker*, 644 F.3d 12, 24 (1st Cir. 2011); *see also United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).

Even if the 1938 Act were "longstanding" enough to warrant *Heller*'s assurance—a dubious proposition given the *Bruen* Court's emphasis on Founding- and Reconstruction-era sources, 142 S. Ct. at 2136, 2150—Range would not have been a prohibited person under that law. Whatever timeframe the Supreme Court might establish in a future case, we are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratification—falls well short of "longstanding" for purposes of demarcating the scope of a constitutional right. So the 1961 iteration of § 922(g)(1) does not satisfy the Government's burden.[8]

---

[8] Nor are we convinced by the slightly older state and local felon-in-possession laws cited by the amicus brief in support of the Government filed by Everytown for Gun Safety. Amicus cites a series of state statutes banning firearm possession by

The Government's attempt to identify older historical analogues also fails.[9] The Government argues that "legislatures traditionally used status-based restrictions" to disarm certain groups of people. Gov't En Banc Br. at 4 (quoting *Range*, 53 F.4th at 282). Apart from the fact that those restrictions based

---

felons passed in the 1920s. But this is still too late: "20th-century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. And the 19th-century local laws cited by Amicus are inapposite because they involved prohibitions on concealed carry, a lesser restriction than the total ban on firearm possession that § 922(g)(1) imposes.

[9] Range argues that because "there is no historical tradition of disarming nonviolent felons," dangerousness is the "touchstone." Range Pet. for Reh'g at 10. In support of that view, Range quotes a concurring opinion of five judges in *Binderup* that focused on dangerousness. 836 F.3d at 369 (Hardiman, J., concurring in part). He also cites Judge Bibas's dissent in *Folajtar*, 980 F.3d at 913–20, and then-Judge Barrett's dissent in *Kanter*: "The historical evidence . . . [shows] that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten the public safety." 919 F.3d at 454. The Government replies that 10 of the 15 judges in *Binderup* and the Court in *Holloway* and *Folajtar* rejected dangerousness or violence as the touchstone. We need not decide this dispute today because the Government did not carry its burden to provide a historical analogue to permanently disarm someone like Range, whether grounded in dangerousness or not.

on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances. That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today. And any such analogy would be "far too broad[ ]." *See Bruen*, 142 S. Ct. at 2134 (noting that historical restrictions on firearms in "sensitive places" do not empower legislatures to designate any place "sensitive" and then ban firearms there).

The Government also points out that "founding-era felons were exposed to far more severe consequences than disarmament." Gov't En Banc Br. at 4. It is true that "founding-era practice" was to punish some "felony offenses with death." *Id*. at 9. For example, the First Congress made forging or counterfeiting a public security punishable by death. *See* An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 115 (1790). States in the early Republic likewise treated nonviolent crimes "such as forgery and horse theft" as capital offenses. *See Folajtar*, 980 F.3d at 904 (citations omitted). Such severe treatment reflects the founding generation's judgment about the gravity of those offenses and the need to expose offenders to the harshest of punishments.

Yet the Government's attempts to analogize those early laws to Range's situation fall short. That Founding-era governments punished some nonviolent crimes with death does not suggest that the *particular* (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition. The greater does not necessarily include the lesser: founding-era governments' execution of some

individuals convicted of certain offenses does not mean the State, then or now, could constitutionally strip a felon of his right to possess arms if he was not executed. As one of our dissenting colleagues notes, a felon could "repurchase arms" after successfully completing his sentence and reintegrating into society. Krause Dissent at 28–29. That aptly describes Range's situation. So the Government's attempt to disarm Range is not "relevantly similar" to earlier statutes allowing for execution and forfeiture. *See Bruen*, 142 S. Ct. at 2132.

Founding-era laws often prescribed the forfeiture of the weapon used to commit a firearms-related offense without affecting the perpetrator's right to keep and bear arms generally. *See, e.g.*, Act of Dec. 21, 1771, ch. 540, N.J. Laws 343–344 ("An Act for the Preservation of Deer, and other Game, and to prevent trespassing with Guns"); Act of Apr. 20, 1745, ch. 3, N.C. Laws 69–70 ("An Act to prevent killing deer at unseasonable times, and for putting a stop to many abuses committed by white persons, under pretence of hunting"). Range's crime, however—making a false statement on an application for food stamps—did not involve a firearm, so there was no criminal instrument to forfeit. And even if there were, government confiscation of the instruments of crime (or a convicted criminal's entire estate) differs from a status-based lifetime ban on firearm possession. The Government has not cited a single statute or case that precludes a convict who has served his sentence from purchasing the same type of object that he used to commit a crime. Nor has the Government cited forfeiture cases in which the convict was prevented from regaining his possessions, including firearms (except where forfeiture preceded execution). That's true whether the object forfeited to the government was a firearm used to hunt out of season, a car used to transport cocaine, or a mobile home used

20

as a methamphetamine lab. And of those three, only firearms are mentioned in the Bill of Rights.[10]

Finally, the Government makes an argument from authority. It points to a decision from a sister circuit court that "look[ed] to tradition and history" in deciding that "those convicted of felonies are not among those entitled to possess arms." Gov't En Banc Br. at 4 (quoting *Medina v. Whitaker*, 913 F.3d 152, 157–61 (D.C. Cir. 2019)). The Government also cites appellate decisions that "have categorically upheld felon-possession prohibitions without relying on means-end scrutiny." *Id*. (citing *United States v. Scroggins*, 599 F.3d 433, 451 (5th Cir. 2010); *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010) (per curiam); *United States v. McCane*, 573 F.3d 1037, 1047 (10th Cir. 2009)). And it cites the more than 80 district court decisions that have addressed § 922(g)(1) and have ruled in favor of the Government. *Id.* at 5 (citing Brief for Fed. Gov't at 17 n.5, *Vincent v. Garland*, No. 21-4121 (10th Cir. Jan. 17, 2023)).

As impressive as these authorities may seem at first blush, they fail to persuade. First, the circuit court opinions were all decided before *Bruen*. Second, the district courts are bound to follow their circuits' precedent. Third, the Government's

---

[10] Even arms used to commit crimes bordering on treason were sometimes returned to the perpetrators during the Founding era. After the Massachusetts militia quelled Shays's Rebellion in 1787, the state required the rebels and those who supported them to "deliver up their arms." 1 Private and Special Statutes of the Commonwealth of Massachusetts from 1780–1805, 145–47 (1805). But those arms were to be returned after three years upon satisfaction of certain conditions. *Id.* at 146–47.

21

contention that "*Bruen* does not meaningfully affect this Court's precedent," Gov't Supp. Br. at 9, is mistaken for the reasons we explained in Section III, *supra*.

For the reasons stated, we hold that the Government has not shown that the Nation's historical tradition of firearms regulation supports depriving Range of his Second Amendment right to possess a firearm. *See Bruen*, 142 S. Ct. at 2126.

\*    \*    \*

Our decision today is a narrow one. Bryan Range challenged the constitutionality of 18 U.S.C. § 922(g)(1) only as applied to him given his violation of 62 Pa. Stat. Ann. § 481(a). Range remains one of "the people" protected by the Second Amendment, and his eligibility to lawfully purchase a rifle and a shotgun is protected by his right to keep and bear arms. Because the Government has not shown that our Republic has a longstanding history and tradition of depriving people like Range of their firearms, § 922(g)(1) cannot constitutionally strip him of his Second Amendment rights. We will reverse the judgment of the District Court and remand so the Court can enter a declaratory judgment in favor of Range, enjoin enforcement of § 922(g)(1) against him, and conduct any further proceedings consistent with this opinion.

PORTER, *Circuit Judge*, concurring.

I join the majority opinion in full. I write separately to highlight one reason why there are no examples of founding, antebellum, or Reconstruction-era federal laws like 18 U.S.C. § 922(g)(1) permanently disarming non-capital criminals.

Until well into the twentieth century, it was settled that Congress lacked the power to abridge anyone's right to keep and bear arms. The *right* declared in the Second Amendment was important, but cumulative. The people's first line of defense was the reservation of a *power* from the national government.[1] As James Wilson explained, "A bill of rights annexed to a constitution is *an enumeration of the powers* reserved." James Wilson, *Remarks in the Pennsylvania Convention to Ratify the Constitution of the United States* (Nov. 28, 1787), reprinted in 1 *Collected Works of James Wilson* 195 (Liberty Fund ed., 2007).

Even without the Second Amendment, the combination of enumerated powers and the Ninth and Tenth Amendments ensured that Congress could not permanently disarm anyone.

---

[1] "The powers delegated by the proposed constitution to the federal government, are few and defined. Those which are to remain in the state governments, are numerous and indefinite. The former will be exercised principally on external objects, as war, peace, negotiation, and foreign commerce; with which last the power of taxation will, for the most part, be connected. The powers reserved to the several states will extend to all the objects, which, in the ordinary course of affairs, concern the lives, liberties, and properties of the people; and the internal order, improvement, and prosperity of the state." The Federalist No. 45, at 241 (Madison) (Liberty Fund ed. 2001).

1

*See* Kurt T. Lash, *The Lost History of the Ninth Amendment* 72–93 (2009) (discussing how the Ninth and Tenth Amendments work in tandem to serve federalist purposes). The adoption of substantive protections in the Bill of Rights, such as the right to keep and bear arms, was another layer of protection reinforcing dual sovereignty.

A founding-era source is illustrative. In his influential constitutional law treatise, William Rawle, a Federalist, grounded the people's right to keep and bear arms in Congress's lack of delegated power. He described the Second Amendment as a backstop to prevent the pursuit of "inordinate power."

> The prohibition is general. No clause in the Constitution could by any rule of construction be conceived to give congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both.

William Rawle, *A View of the Constitution of the United States of America* 125–26 (2d ed. 1829).

At oral argument, counsel for the government hypothesized that the paucity of early American criminal laws resulting in disarmament may be explained by a lack of political demand. That's implausible. As Judge Krause's dissenting opinion shows, states were free to, and did, regulate

gun ownership and use, indicating political demand. The most obvious explanation for a century and a half of congressional inaction is not lack of political will but dual sovereignty and respect for state police power.

A New Deal Era attempt at federal gun control is revealing. In 1934, the Roosevelt Administration proposed the National Firearms Act to address the gangster-style violence of the Prohibition Era by reducing the sale of automatic weapons and machine guns. Stymied by the federal government's lack of police power, Attorney General Homer Cummings urged Congress to regulate guns indirectly through its enumerated taxing power. Nicholas J. Johnson, *The Power Side of the Second Amendment Question: Limited, Enumerated Powers and the Continuing Battle Over the Legitimacy of the Individual Right to Arms*, 70 Hastings L. J. 717, 750–58 (2019). Congress accepted that suggestion, avoiding the acknowledged constitutional problem by imposing a tax—rather than a direct prohibition—on the making and transfer of particular firearms. *See* National Firearms Act, ch. 757, Pub. L. No. 73–474, 48 Stat. 1236 (1934) (current version at 26 U.S.C. § 5801 et seq.).

The landscape changed in 1937, when the Supreme Court adopted an expansive conception of the Commerce Clause. *See NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937). Newly empowered, Congress promptly enacted the Federal Firearms Act of 1938. For the first time, that law disarmed felons convicted of a "crime of violence," which the Act defined as "murder, manslaughter, rape, mayhem, kidnapping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by more than one year." Federal Firearms Act, Pub. L. No. 75–785, 52

Stat. 1250 (1938). In 1961, Congress extended the firearms disqualification to all felons, violent or otherwise. *See* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961); *see also* 18 U.S.C. § 922(g)(1).

As the majority opinion makes plain, these modern laws have no longstanding analogue in our national history and tradition of firearm regulation.[2] Maj. Op. 15–22. That's unsurprising because before the New Deal Revolution, Congress was powerless to regulate gun possession and use. *See United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (Congress lacks power to infringe the right declared by the Second Amendment); *Presser v. People of State of Ill*. 116 U.S. 252, 265 (1886) (same).

Lacking any relevant historical federal data, we may look to state statutes and cases for contemporaneous clues about the people's right to keep and bear arms.[3] By 1803, seven of the seventeen states protected gun possession and use in their own declarations of rights. Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 191, 208–11 (2006). And by 1868, twenty-two of thirty-seven states protected the right in their state constitutions. *Id.* The history and tradition of firearm regulation in those states

---

[2] *Bruen* defines relevant history for these purposes as the period between approximately 1791 and 1868. *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*, 597 U.S. ----, 142 S. Ct. 2111, 2137–50 (2022) (summarizing "antebellum" historical evidence).

[3] *Pace* Judge Shwartz, I do not understand the Supreme Court to require that firearm regulations can be supported only "by a federally enacted analog in existence at the founding[.]" Shwartz Dissent at n.5.

may shed light on the scope of the federal constitutional right, depending on how similar each state's constitutional protection was to the Second Amendment. *See District of Columbia v. Heller*, 554 U.S. 570, 600–03 (2008) (founding-era state constitutions corroborate individual-right interpretation of Second Amendment). After all, state constitutions and their respective bills of rights were "the immediate source from which Madison derived what became the U.S. Bill of Rights." Donald S. Lutz, *The State Constitutional Pedigree of the U.S. Bill of Rights*, 22 Publius 19, 29 (1992).

But precisely because the states—unlike the national government—retained sweeping police powers and weren't originally constrained by the Bill of Rights, they were free to regulate the possession and use of weapons in whatever ways they thought appropriate (subject to state constitutional restrictions that were not uniform). *See Barron ex rel. Tiernan v. Mayor of Baltimore*, 32 U.S. (7 Pet.) 243 (1833). Because of that important difference, it's unclear what many early state laws prove about the contours of the *Second Amendment* right.

For example, Judge Krause's dissent cites founding or antebellum-era disarmament laws from Delaware, Maryland, New Jersey, New York, and Virginia. Krause Dissent at 15-21, 26-28 & nn. 94-96, 98. But Maryland, New Jersey, and New York have never enumerated a Second Amendment analogue. Volokh, *supra*, at 205. Delaware and Virginia did not do so until 1987 and 1971, respectively. *Id*. at 194, 204. So those states' laws provide little insight about the scope of the Second Amendment right.

After *McDonald v. City of Chicago*, 561 U.S. 742 (2010), state gun laws are subject to the Second Amendment because it is incorporated through the Fourteenth Amendment.

The Supreme Court has said that "if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires." *Timbs v. Indiana,* 586 U.S. ----, 139 S. Ct. 682, 687 (2019); *see also Bruen*, 142 S. Ct. at 2137. But unlike *McDonald*, *Timbs*, and *Bruen*, this case doesn't involve application of an incorporated right against a state law; it's a challenge to the constitutionality of a relatively recent federal statute that has no historical analogue in antebellum federal law.

Using state laws indiscriminately to determine the scope of the constitutional right seems incongruous in this context. It seeks effectively to reverse incorporate state law into federal constitutional law. In *Bolling v. Sharpe*, 347 U.S. 497 (1954), the Supreme Court held that Fourteenth Amendment equal-protection principles applicable to the states also bind the federal government through the Fifth Amendment's Due Process Clause because the alternative would be "unthinkable." *Id*. at 500; *but see United States v. Vaello Madero*, 142 S. Ct. 1539, 1544–47 (2022) (Thomas, J., concurring) (criticizing *Bolling*'s rationale). Here, there is no textual basis plausibly supporting reverse incorporation. And *Bolling*'s rule appears to be cabined to equal-protection claims; the Court has only invoked reverse incorporation to redress invidious discrimination. Without an equal-protection or due-process hook, using state law to define a federal constitutional amendment that was fashioned to protect individual rights *and* a reserved power poses a doctrinal conundrum.

A conception of the Second Amendment right that retcons modern commerce power into early American state law is anachronistic and flunks *Bruen*'s history-and-tradition test. Setting the federal floor through a combination of antebellum state police power and Congress's post-New Deal commerce

authority, as the dissents propose, would underprotect the constitutional right to keep and bear arms.

AMBRO, *Circuit Judge*, concurring, joined by GREENAWAY, JR. and MONTGOMERY-REEVES, *Circuit Judges*.

Bryan Range decades ago made a false statement to obtain food stamps to feed his family. That untrue statement, however, was a misdemeanor in violation of Pennsylvania law. *See* 62 Pa. Stat. Ann. § 481(a). And his conviction barred him from possessing a firearm per 18 U.S.C. § 922(g)(1).

I agree with the well-crafted majority opinion of Judge Hardiman that Range is among "the people" protected by the Second Amendment and that the law is unconstitutional as applied to him. I write separately, however, to explain why the Government's failure to carry its burden in this case does not spell doom for § 922(g)(1). It remains "presumptively lawful." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008)). This is so because it fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society. That Range does not conceivably pose such a threat says nothing about those who do. And I join the majority opinion with the understanding that it speaks only to his situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like.

Section 922(g)(1) is the federal "felon-in-possession" law. It makes it "unlawful for any person . . . who has been convicted in any court . . . of a crime punishable by imprisonment for a term exceeding one year" to possess firearms or ammunition. 18 U.S.C. § 922(g)(1). Although

those convicted of state misdemeanors "punishable by a term of imprisonment of two years or less" are excluded from the prohibition, Range is subject to it because his crime carried a maximum penalty of five years' imprisonment even though he received no prison sentence.  18 U.S.C. § 921(a)(20)(B).

Congress may disarm felons because, as Justice Scalia explained in *Heller*, "[l]ike most rights, the right secured by the Second Amendment is not unlimited." 554 U.S. at 626.  He demonstrated this is so by listing "presumptively lawful" regulations that the ruling should not "be taken to cast doubt on." *Id.* at 626–27 & n.26.  That list included "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626–27.  Just two years later, in *McDonald v. City of Chicago*, the Supreme Court incorporated the Second Amendment against the states.  561 U.S. 742, 767–68 (2010).  In doing so, it assured the public that "incorporation does not imperil every law regulating firearms." *Id.* at 786.  Thus, it stood by its statement "in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons.'" *Id.* (quoting *Heller*, 554 U.S. at 626–27).  *See also United States v. Jackson*, No. 22-2870, --- F.4th ----, 2023 WL 3769242, at *4 (8th Cir. June 2, 2023) (observing the Supreme Court has provided assurances that felon-in-possession laws are constitutional).

In *United States v. Barton*, we held that "*Heller*'s list of 'presumptively lawful' regulations is not dicta." 633 F.3d 168, 171 (3d Cir. 2011).  That aligned us with the Ninth and Eleventh Circuits. *Id.* (citing *United States v. Vogxay*, 594 F.3d 1111, 1115 (9th Cir. 2010), and *United States v. Rozier*, 598 F.3d 768, 771 n.6 (11th Cir. 2010)).  And every other circuit

2

court has looked to the Supreme Court's treatment of "presumptively lawful" prohibitions for guidance.[1]

*New York State Rifle & Pistol Ass'n v. Bruen* reaffirms that felon-in-possession laws are presumed to be lawful. 142 S. Ct. 2111 (2022). Although that case had nothing to do with those laws, three of the six Justices in the majority went out of their way to signal that view. Justice Kavanaugh's concurrence, joined by Chief Justice Roberts, explained that, "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations" before quoting the *Heller* excerpt that casts prohibitions on the possession of firearms by felons as presumptively lawful. *Id*. at 2162 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Justice Alito's concurrence also explained that the Court's opinion has not "disturbed anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns." *Id*. at 2157 (citation omitted).

Of course, we are here for a reason. *Bruen* abrogated the circuit courts' use of means-end analysis and replaced it with a history-driven test:

---

[1]     *See United States v. Booker*, 644 F.3d 12, 23–24 (1st Cir. 2011); *United States v. Jimenez*, 895 F.3d 228, 233 (2d Cir. 2018); *United States v. Chester*, 628 F.3d 673, 679–80 (4th Cir. 2010); *Hollis v. Lynch*, 827 F.3d 436, 446–47 (5th Cir. 2016); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686–87 (6th Cir. 2016) (en banc); *United States v. Skoien*, 614 F.3d 638, 639–40 (7th Cir. 2010); *United States v. Bena*, 664 F.3d 1180, 1182–83 (8th Cir. 2011); *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1124 (10th Cir. 2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011).

3

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126. In the wake of *Bruen*, assessing a gun restriction by balancing a government's interest (safety of citizens) with the burden imposed on an individual's right to bear arms is out. Instead, laws that burden Second Amendment rights must have "a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original). So we must use "analogical reasoning" to determine whether § 922(g)(1) is "relevantly similar" to a law from a period of history that sheds light on the Second Amendment's meaning. *Id.* at 2132.

Given that three Justices in *Bruen*'s majority opinion reminded us that felon-in-possession laws remain presumptively lawful, and the three dissenting Justices echoed that view, *id.* at 2189 (Breyer, J., dissenting) ("Like Justice Kavanaugh, I understand the Court's opinion today to cast no doubt on that aspect of *Heller*'s holding."), a sound basis exists for § 922(g)(1)'s constitutional application in a substantial amount of cases. Any historical inquiry that reaches a contrary

result must be wrong in view of the answer the Supreme Court has already supplied. *See Jackson*, 2023 WL 3769242, at *4.

We begin with a look to firearm regulation in the era of the Second Amendment's ratification. In England, non-Anglican Protestants and Catholics were disarmed during times of tumult. *See Range v. Att'y Gen.*, 53 F.4th 262, 274–76 (3d Cir. 2022), *reh'g en banc granted, opinion vacated*, 56 F.4th 992 (3d Cir. 2023). The American colonies also disarmed religious dissenters. See *id.* at 276–77. And in the Revolutionary War period, British loyalists and those who refused to take loyalty oaths were disarmed by several colonies. *See id.* at 277–79. *See also Jackson*, 2023 WL 3769242, at *5.

True, those laws are, by today's standards, unconstitutional on non-Second Amendment grounds. But at our Founding they were measures driven by the fear of those who, the political majority believed, would threaten the orderly functioning of society if they were armed. From this perspective, it makes sense that § 922(g)(1) is presumptively lawful. Society is protecting itself by disarming, *inter alia*, those who murder, rob, possess child porn, and leak classified national security information. *See id.* at *7. Most felons have broken laws deemed to underpin society's orderly functioning, be their crimes violent or not. Section 922(g)(1) thus disarms them for the same reason we prohibited British loyalists from being armed.

Of course, the relevant period may extend beyond the Founding era. Indeed, the Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights

in 1791 or the Fourteenth Amendment in 1868.  *See Bruen*, 142
S. Ct. at 2162–63 (Barrett., J., concurring).  If the latter, as the
Eleventh Circuit held in *National Rifle Ass'n v. Bondi*, 61 F.4th
1317, 1322–24 (11th Cir. 2023), then Founding-era regulations
remain instructive unless contradicted by something specific in
the Reconstruction-era.  In any event, the more longstanding a
prohibition, the more likely it is to be constitutional.[2]

Certain    regulations    contemporaneous    with    the
Fourteenth Amendment's ratification reaffirm the familiar
desire to keep arms from those perceived to threaten the orderly
functioning of society.  A slew of states prohibited "tramps"
from carrying firearms or dangerous weapons.[3]  Kansas barred
those "not engaged in any legitimate business, any person
under the influence of intoxicating drink, and any person who
has ever borne arms against the government of the United

---

[2]     The Supreme Court did not specify how long it takes for
a law to become "longstanding."
[3]     *See, e.g.,* 1878 N.H. Laws 612, ch. 270 § 2; 1878 Vt.
Laws 30, ch. 14 § 3; 1879 R.I. Laws 110, ch. 806 § 3; 1880
Ohio Rev. St. 1654, ch. 8 § 6995; 1880 Mass. Laws 232,
ch. 257, § 4; 1987 Iowa Laws 1981, ch. 5 § 5135.

Tramps were typically defined along the lines of the
following Pennsylvania statute: "Any person going about from
place to place begging, asking or subsisting upon charity, and
for the purpose of acquiring money or living, and who shall
have no fixed place of residence, or lawful occupation in the
county or city in which he shall be arrested, shall be taken and
deemed to be a tramp."  1 A DIGEST OF THE STATUTE LAW OF
THE STATE OF PENNSYLVANIA FROM THE YEAR 1700 TO 1894,
541 (Frank F. Brightly, 12th ed. 1894).

States" from carrying "a pistol, bowie-knife, dirk or other deadly weapon." 2 General Statutes of the State of Kansas 353 (1897) (passed in 1868).   And Wisconsin prohibited "any person in a state of intoxication to go armed with any pistol or revolver."  1883 Wis. Sess. Laws 290, ch. 329, § 3.  Although these regulations are not felon-in-possession laws, they echo the impetus of the Founding-era laws—a desire to stop firearms from being possessed or carried by those who cannot be trusted with them.

But presumptions aren't rules—they can be rebutted. And so it may be that an individual subject to § 922(g)(1) would not, if armed, plausibly pose a threat to the orderly functioning of society.  Here, the Government has not carried its burden of proving that Range poses such a threat.  Hence, he may not be constitutionally disarmed on the record presented.

Range committed a small-time offense.  He did so with a pen to receive food stamps for his family.  There is nothing that suggests he is a threat to society.  He therefore stands apart from most other individuals subject to § 922(g)(1) whom we fear much like early Americans feared loyalists or Reconstruction-era citizens feared armed tramps.  I therefore concur because there is no historical basis for disarming him.

I close with the observation that the Supreme Court will have to square its history-driven test with its concurrent view that felon gun restrictions are presumptively lawful.  Scholars have scrambled to find historical roots for that presumption. *See, e.g.*, Carlton F.W. Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 1386 (2008) (originalist analysis

"yield[s] partial and incomplete answers" for why the measures *Heller* cited as presumptively lawful enjoy that status. Others conclude that a historical basis only exists for disarming violent felons, *see, e.g.*, Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020), who represent but a small fraction of the felon population, thus leaving out, for example, those who leak national security information, disrupt markets with their fraud, and possess child porn. *See* Brian A. Reaves, U.S. Dep't of Justice, Bureau of Justice Statistics, State Violent Felons in Large Urban Counties, at 1 (2006) ("From 1990 to 2002, 18% of felony convictions in the 75 largest counties were for violent offenses.").

This opinion is one attempt to offer a historical justification for § 922(g)(1), recognizing that history offers no precise analogue. And if that proves unsatisfying to the Court, it may do away with the presumption that disarming felons is lawful. I hope it does not do so. Not just because arming those who pose a threat to the orderly functioning of society will lead to more deaths, but because it would be a dangerous precedent. It is incongruous to believe history displaces means-ends balancing for the Second Amendment only. The Court's approach here will affect our ability to pass any rights-burdening law—whether the right be protected by the First, Second, Fourth, or Sixth Amendment—that lacks a neat historical basis. I trust it will fulfill its promise that *Bruen* imposes no "regulatory straightjacket," 142 S. Ct. at 2133, and permit § 922(g)(1) to apply to those who threaten the orderly functioning of civil society.

SHWARTZ, *Circuit Judge*, dissenting, joined by RESTREPO, *Circuit Judge*.

Today, the Majority of our Court has decided that an individual convicted of fraud cannot be barred from possessing a firearm.  While my colleagues state that their opinion is narrow, the analytical framework they have applied to reach their conclusion renders most, if not all, felon bans unconstitutional.  Because the Supreme Court has made clear that such bans are presumptively lawful, and there is a historical basis for such bans, I respectfully dissent.[1]

In New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 142 S. Ct. 2111 (2022), the Supreme Court set forth a history-based framework for deciding whether a firearm regulation is constitutional under the Second Amendment.  Courts must now examine whether the "regulation [being reviewed] is part of the historical tradition that delimits the outer boundaries of the right to keep and bear arms."  Id. at 2127.  To make this determination, a court must decide whether the challenger or conduct at issue is protected by the Second Amendment and, if so, whether the Government has presented sufficient historical analogues to justify the restriction.  See id. at 2129-30.

---

[1] While I agree with Judge Krause's excellent and comprehensive review of the history as well as her incisive critique of the Majority opinion, I write separately to emphasize both that the history supports banning felons from possessing firearms and that the Majority opinion is far from narrow.

The Majority's analysis is inconsistent with the Supreme Court's jurisprudence and has far-reaching consequences. First, the Majority downplays the Supreme Court's consistent admonishment that felon bans are "longstanding" and "presumptively lawful." District of Columbia v. Heller, 554 U.S. 570, 626-27 & n.26 (2008); McDonald v. City of Chicago, 561 U.S. 742, 786 (2010). In Heller and McDonald, the Supreme Court stated that felon bans are consistent with our historical tradition. Heller, 554 U.S. at 626-27; McDonald, 561 U.S. at 786. More recently, a majority of the Bruen Court reiterated that felon bans are presumptively lawful, and notably did so in the very case that explicitly requires courts to find historical support for every firearm regulation. Bruen, 142 S. Ct. at 2157 (Alito, J., concurring) (explaining that Bruen did not "disturb" anything the Court said in Heller or McDonald); id. at 2162 (Kavanaugh, J., concurring, joined by Roberts, J.) ("Nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons." (quoting Heller, 554 U.S. at 626)); id. at 2189 (Breyer, J., dissenting, joined by Sotomayor, J., & Kagan, J.) ("I understand the Court's opinion today to cast no doubt on . . . Heller's holding [regarding longstanding prohibitions.]"). These statements show that felon bans have historical roots.[2] See United States v. Jackson, No. 22-2870, 2023 WL 3769242, --- F. 4th ----, at *4, *7 n.3 (8th Cir. June 2, 2023) (upholding the constitutionality of the

---

[2] The Supreme Court also recognized that other firearm regulations are "longstanding" and "presumptively lawful." Heller, 554 U.S. at 626-27. Thus, the Majority's willingness to devalue the Supreme Court's observations may have consequences on regulations beyond the status-based ban at issue here.

2

federal felon ban as applied to a non-violent drug offender based, in part, on the Supreme Court's statements).

Second, the Majority incorrectly discounts the importance of the Supreme Court's emphasis on law-abidingness as a limitation on the Second Amendment right. While the Majority dismisses this language as "dicta," Maj. Op. at 11, the Bruen Court's use of the phrase fourteen times highlights the significance that this criterion played in its decision, Bruen, 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 n.9, 2150, 2156; see also Jackson, 2023 WL 3769242, at *6 (noting Bruen's repeated statements about a law-abider's right to possess arms). Indeed, the Bruen court approved of certain gun regulations that included criminal background checks. Bruen, 142 S. Ct. at 2138 n. 9. While the Majority says that the phrase "law abiding" is "expansive" and "vague," Maj. Op. at 13, there is no question that one who has a felony or felony-equivalent conviction is not law abiding. Thus, the Supreme Court's jurisprudence tells us that the right to bear arms is limited to law abiders, and that felon bans are presumptively lawful.

Third, the Majority acknowledges but then disregards important aspects of Bruen. The Bruen Court emphasized that its test should not be a "regulatory straightjacket [sic]" and that courts should look for a "historical analogue" to the challenged regulation, not a "historical twin." 142 S. Ct. at 2133. Despite these instructions, the Majority demands a historical twin by requiring the Government to identify a historical crime, including its punishment, that mirrors Bryan Range's conviction. At the founding, the fraud-based crime of the type Range committed was considered a capital offense, which

obviously carries with it the loss of all possessory rights.[3]
Folajtar v. Att'y Gen., 980 F.3d 897, 904-05 (3d Cir. 2020)
(collecting authorities).  The Majority recognizes that this
severe punishment "reflects the founding generation's
judgment about the gravity of those offenses" and the need for
harsh punishment.  Maj. Op. at 19.  It then, however, rejects
this historical data by stressing that today, a far less severe
punishment results, thereby rendering Range's offense not
"relevantly similar" to founding-era fraud offenses.  Id. at 19-
20 (quoting Bruen, 142 S. Ct. at 2132).  The problem with this
analysis is that it focuses on present-day punishments to
determine whether a founding-era crime is a historical
analogue.  Like it or not, Bruen mandates that we look at the
law as it existed at the founding, and so the fact that the law
has changed, or in this case, the punishment has changed, is
irrelevant.  Put differently, Bruen requires us to don blinders
and look at only whether there is a historical analogue for the
firearm regulation at issue.   When we do so, history
demonstrates that fraudsters could lose their life, and hence
their firearms rights.

 The Majority also rejects the Government's analogy to
now unconstitutional status-based bans on Native Americans,
Blacks, Catholics, Quakers, loyalists, and others because
Range is not "part of a similar group today."  Maj. Op. at 19.
Whether Range is a member of one of these groups is

---

[3] Even some noncapital offenses resulted in life
imprisonment and the forfeiture of the offender's entire estate,
which contemplates the loss of all property, including
firearms.  Act of Apr. 18, 1786, 2 Laws of the State of New
York 253, 260–61 (1886); Act of Nov. 27, 1700, 2 Statutes at
Large of Pennsylvania 12 (Wm. Stanley Ray ed., 1904).

irrelevant.  Rather, under <u>Bruen</u>, the relevant inquiry is why a given regulation, such as a ban based on one's status, was enacted and how that regulation was implemented.  <u>Bruen</u>, 142 S. Ct. at 2133.  No matter how repugnant and unlawful these bans are under contemporary standards, the founders categorically disarmed the members of these groups because the founders viewed them as disloyal to the sovereign.  <u>Range v. Att'y Gen.</u>, 53 F.4th 262, 273-82 (3d Cir. 2022) (per curiam) (collecting authorities), <u>vacated by</u> 56 F.4th 992 (3d Cir. 2023); <u>see also</u> <u>Jackson</u>, 2023 WL 3769242, at *5 (observing that the founding-era categorical prohibitions are relevant "in determining the historical understanding of the right to keep and bear arms").  The felon designation similarly serves as a proxy for disloyalty and disrespect for the sovereign and its laws.  Such categorization is especially applicable here, where Range's felony involved stealing from the government, a crime that directly undermines the sovereign.  Therefore, the trust and loyalty reasons underlying the status-based bans imposed at the founding show that the bans are an appropriate historical analogue for the present-day prohibition on felon possession.[4]

---

[4]  The Majority also gives no weight to various founding-era statutory violations that led to disarmament, <u>see, e.g.</u>, Act of Dec. 21, 1771, ch. 540, N.J. Laws 343–344; Act of Apr. 20, 1745, ch. 3, N.C. Laws 69–70; <u>see also</u> <u>Range</u>, 53 F.4th at 281 (collecting additional authorities), because it contends that offenders were only disarmed of the firearm they possessed at the time of the violation and not barred from possessing firearms in the future, Maj. Op. at 19-20.  From this, the Majority asserts crime-based bans were not permanent.  <u>Id.</u>  Whether true or not, the federal felon ban under 18 U.S.C. § 922(g) is not permanent.  Congress specifically identified

Finally, the Majority's approach will have far-reaching consequences. Although the Majority states that its holding is "narrow" because it is limited to Range's individual circumstances, Maj. Op. at 22, the only individual circumstance the Majority identifies is that the penalty Range faced differs from the penalty imposed at the founding. As discussed above, that fact is irrelevant under <u>Bruen</u>. Thus, the ruling is not cabined in any way and, in fact, rejects all historical support for disarming any felon.[5]   As a result, the Majority's analytical framework leads to only one conclusion:

---

ways to avoid the ban, such as by securing an expungement, pardon, or having one's civil rights restored.   18 U.S.C. § 921(a)(20).   Additionally, although it is currently unfunded, Congress enacted 18 U.S.C. § 925(c), which allows the Bureau of Alcohol, Tobacco, and Firearms to restore an individual's right to possess a firearm upon consideration of the individual's personal circumstances.   <u>See</u> <u>Logan v. United States</u>, 552 U.S. 23, 28 n.1 (2007).

[5] The Majority also says that it need not decide whether disarmament of violent criminals is supported by the historical evidence, Maj. Op. at 18 n.9, but its view of the history, its requirement of a historical twin, and its explanation that federal felon prohibitions enacted in 1938 and 1961 are too recent to be longstanding, necessarily mean that the Majority would conclude that bans on violent felons cannot be justified.

Moreover, the framework outlined in Judge Porter's concurrence would mean that the federal government would be prohibited from enacting any gun regulation.   In fact, Judge Porter's requirement that a current federal regulation be supported by a federally enacted analog in existence at the founding would call into question the federal government's ability to regulate activities that did not then exist.

there will be no, or virtually no, felony or felony-equivalent crime that will bar an individual from possessing a firearm.[6] This is a broad ruling and, to me, is contrary to both the sentiments of the Supreme Court and our history.

I therefore respectfully dissent.

---

[6] Moreover, and significantly, the Majority provides no way for a felon to know whether his crime of conviction prevents him from possessing a firearm. This, however, is not entirely the Majority's fault. Bruen requires a review of our nation's history during a finite time period to determine whether a felon's particular crime of conviction constitutionally permits disarmament—an inquiry that, under the Majority's test, will vary from crime to crime. Thus, the concerns about due process and notice discussed in Judge Fuentes's dissent in Binderup v. Attorney General, 836 F.3d 336, 409-11 (3d Cir. 2016) (Fuentes, J., dissenting in part and concurring in part), are even more pronounced after Bruen.

KRAUSE, *Circuit Judge*, dissenting.

As Americans, we hold dear the values of individual liberty and freedom from tyranny that galvanized our Founders and are enshrined in the Constitution. So it is not surprising that we often look to history and tradition to inform our constitutional interpretation.[1] But as Alexis de Tocqueville rightly observed of "the philosophical method of the Americans," we "accept tradition only as a means of information, and existing facts only as a lesson to be used in . . . doing better."[2] Thus, when we draw on parallels with the past to assess what is permissible in the present, we typically look to match history in principle, not with precision.

When it comes to permissible regulation of the right to bear arms, it might make good sense to hew precisely to history and tradition in a world where "arms" still meant muskets and

---

[1] In the past few years, the Supreme Court has adopted a "history and tradition" test in a variety of constitutional contexts, breaking from its own history where its precedent diverged from that interpretive method. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022) (interpreting the Due Process Clause and overruling *Roe v. Wade*, 410 U.S. 113 (1973)); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022) (interpreting the Free Exercise Clause and overruling *Lemon v. Kurtzman*, 403 U.S. 602 (1971)); *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) (explaining Article III standing); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019) (interpreting the Establishment Clause).

[2] 2 Alexis de Tocqueville, *Democracy in America* 1 (Francis Bowen ed., Henry Reeve trans., 3d ed. 1863).

flintlock pistols,[3] and where communities were still so small and "close-knit" that "[e]veryone knew everyone else," "word-of-mouth spread quickly," and the population "knew and agreed on what acts were right and wrong, which ones were permitted and forbidden."[4]   But that is not the America of today.   In modern times, arms include assault rifles,[5] high-capacity magazines, and semi-automatic handguns; our population of more than 330 million is mobile, diverse, and, as to social mores, deeply divided; and, tragically, brutal gun deaths and horrific mass shootings—exceeding 260 in just the past five months—are a daily occurrence in our schools, our

---

[3] *See* Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. (forthcoming 2023) (manuscript at 47), https://ssrn.com/abstract=4408228 ("Americans in 1791 generally owned muzzle-loading flintlocks, liable to misfire and incapable of firing multiple shots.  Guns, thus, generally were not kept or carried loaded in 1791[.]" (quotation omitted)); Akhil Reed Amar, *Second Thoughts*, 65 Law & Contemp. Probs. 103, 107 (2002) ("At the Founding . . . [a] person often had to get close to you to kill you, and, in getting close, he typically rendered himself vulnerable to counterattack.  Reloading took time, and thus one person could not ordinarily kill dozens in seconds.").

[4] Stephanos Bibas, *The Machinery of Criminal Justice* 2 (2012).

[5] *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers*, 83 Law & Contemp. Probs. 231, 240 (2020) ("[A]ssault weapons play a disproportionately large role in three types of criminal activity: mass shootings, police killings, and gang activity.").

streets, and our places of worship.[6]   In today's world, the responsibilities that should accompany gun ownership are flouted by those who lack respect for the law.

As debates rage on about the causes of this crisis and the solutions, the people's elected representatives bear the heavy responsibility of enacting legislation that preserves the right to armed self-defense while ensuring public safety. Although they face evolving challenges in pursuing those twin aims, striking that delicate balance has long been a core function of the legislature in our system of separated powers,[7]

---

[6] *See Statement from President Joe Biden on the Shooting in Allen, Texas*, White House (May 7, 2023), https://www.whitehouse.gov/briefing-room/statements-re-leases/2023/05/07/statement-from-president-joe-biden-on-the-shooting-in-allen-texas/; *A Partial List of U.S. Mass Shootings in 2023*, N.Y. Times (May 30, 2023), https://www.ny-times.com/article/mass-shootings-2023.html; *Gun Violence in America*, Everytown for Gun Safety (Feb. 13, 2023), https://everytownresearch.org/report/gun-violence-in-amer-ica/.

[7] *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 715 (2007) ("Achievement of that balance requires highly complex socio-economic calculations regard-ing what kinds of weapons ought to be possessed by individu-als and how to limit access to them by those deemed untrust-worthy or dangerous.  Such complicated multi-factor judg-ments require trade-offs that courts are not institutionally equipped to make.  Legislatures, by contrast, are structured to make precisely those kinds of determinations."); *see also* Lon L. Fuller, *The Forms and Limits of Adjudication*, 92 Harv. L.

and legislatures' authority to disarm those who cannot be trusted to follow the laws has long been crucial to that endeavor.

Section 922(g)(1) of the U.S. Code, Title 18, embodies this delicate equilibrium and comports with traditional principles that have guided centuries of legislative judgments as to who can possess firearms. As Justice Alito has observed, § 922(g) "is no minor provision. It probably does more to combat gun violence than any other federal law."[8] And as a "longstanding"[9] and widely accepted aspect of our national gun culture,[10] the federal felon-possession ban—carefully crafted to respect the laws of the states—is the keystone of our national background check system,[11] and has repeatedly been characterized by the Supreme Court as "presumptively

---

Rev. 353, 371 (1978) (noting the "relative incapacity of adjudication to solve 'polycentric' problems").

[8] *Rehaif v. United States*, 139 S. Ct. 2191, 2201 (2019) (Alito, J., dissenting).

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

[10] *See* Dru Stevenson, *In Defense of Felon-in-Possession Laws*, 43 Cardozo L. Rev. 1573, 1574 (2022) (explaining § 922(g)(1) is "the centerpiece of gun laws in the United States" and "the center of the gun-regulation universe").

[11] *See id.* at 1575 ("The felon prohibitor functions as the cornerstone of the federal background check system for firearm purchases[.]").

lawful."[12]    Where, as here, the legislature has made a reasonable and considered judgment to disarm those who show disrespect for the law, it is not the place of unelected judges to substitute that judgment with their own.

Yet today's majority brushes aside these realities and the seismic effect of its ruling. It is telling that, although it describes itself as limited "to Range's situation,"[13] today's opinion is not designated non-precedential as appropriate for a unique individual case, but has precedential status, necessarily reaching beyond the particular facts presented. It is also telling that it tracks precisely the Fifth Circuit's deeply disturbing opinion in *United States v. Rahimi*, which, finding no precise historical analogue, struck down as unconstitutional the ban on gun possession by domestic abusers.[14] And in the process, the majority creates a circuit split with the Eighth Circuit's recent opinion in *United States v. Jackson*, which rejected the notion of "felony-by-felony litigation" and recognized that "Congress acted within the historical tradition when it enacted § 922(g)(1) and the prohibition on possession of firearms by felons."[15]

In short, for all its assurances to the contrary and its lulling simplicity, the majority opinion commits our Court to a

---

[12] *E.g.*, *Heller*, 554 U.S. at 627 n.26.

[13] Maj. Op. at 19.

[14] 61 F.4th 443 (5th Cir. 2023), *petition for cert. filed* (U.S. Mar. 21, 2023) (No. 22-915).

[15] No. 22-2870, 2023 WL 3769242, at *4, *7 (8th Cir. June 2, 2023).

framework so indefinite as to be void for vagueness and with dire consequences for our case law and citizenry.  I therefore respectfully dissent.

I write here to clarify three points[16]:  First, the historical record demonstrates that, contrary to the majority opinion, legislatures have historically possessed the authority to disarm entire groups, like felons, whose conduct evinces disrespect for the rule of law.  Second, the doctrinal and practical ramifications of the majority's approach, which my colleagues do not even acknowledge, let alone address, are profound and pernicious.  Third, in order to hold § 922(g)(1) inapplicable to Range in a truly narrow opinion, my colleagues did not need to throw out the baby with the bath water; instead, they could have issued a declaratory judgment holding § 922(g)(1) unconstitutional as applied to the petitioner *currently* before the Court—in effect, prospectively restoring his firearm rights. At least that approach would have been more faithful to history and consistent with the rule of law than the majority's sweeping, retroactive pronouncement and the calamity it portends.

I.      The Historical Validity of § 922(g)(1)

We begin our historical inquiry with the benefit of more than a decade of Supreme Court precedent that illuminates the Court's understanding of traditional firearm regulations.  In *Bruen*, the majority characterized the holders of Second

---

[16] I also share the doctrinal and historical concerns raised in Judge Shwartz's cogent dissent, with which I agree in full.

Amendment rights as "law-abiding" citizens fourteen times.[17]
Delimiting the "unqualified command" of the Second Amend-
ment to "law-abiding" individuals was not novel.[18]  In holding
"the right of the people"[19] protected by the Second Amendment
was an "individual right,"[20] Justice Scalia's seminal opinion in
*Heller* specified this meant "the right of law-abiding,

---

[17] *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct.
2111, 2122, 2125, 2131, 2133–34, 2135 n.8, 2138 & n.9, 2150,
2156 (2022).

[18] *Id.* at 2130–31 (quotation omitted).

[19] *Heller*, 554 U.S. at 579.  In the first part of its analysis, the
majority defends its belief that convicted felons remain part of
"the people," so their firearm possession is presumptively pro-
tected and the Government must prove its disarmament regu-
lation comports with historical tradition.  Maj. Op. at 11–15.
Other jurists believe that historical tradition permits the dis-
armament of felons precisely because "the people" historically
meant "law-abiding, responsible citizens."  *Bruen*, 142 S. Ct.
at 2131 (quotation omitted).  But that debate—unlike the test
for what constitutes an adequate "historical analogue," *id.* at
2133 (quoting *Drummond v. Robinson*, 9 F.4th 217, 226 (3d
Cir. 2021))—is largely academic.  As then-Judge Barrett rec-
ognized, the "same body of evidence" can be used to illuminate
who is part of the people or "the scope of the legislature's
power," and either approach "yield[s] the same result."  *Kanter
v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissent-
ing).

[20] *Heller*, 554 U.S. at 592.

responsible citizens" to keep and bear arms,[21] and therefore characterized "prohibitions on the possession of firearms by felons" as both "longstanding" and "presumptively lawful."[22]

In *Bruen*, the Supreme Court clarified who qualifies as a "law-abiding" citizen when it explained that, despite the infirmity of New York's may-issue open-carry licensing regime, "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . [,] which often require applicants to undergo a [criminal] background check" and "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'"[23]

Thus, time and again, the Supreme Court has acknowledged that the deep roots of felon-possession bans in American history impart a presumption of lawfulness to 18 U.S.C. § 922(g)(1). Yet my colleagues persist in disputing it. They

---

[21] *Id.* at 635.

[22] *Id.* at 626–27 & n.26; *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality) ("repeat[ing] those assurances"); *Bruen* 142 S. Ct. at 2157 (Alito, J., concurring) (same), 2162 (Kavanaugh, J., concurring) (same).

[23] 142 S. Ct. at 2138 n.9 (quoting *Heller*, 554 U.S. at 635). Those background checks screen for both violent and non-violent offenses. *See, e.g.*, Wash. Rev. Code Ann. § 9.41.070(1)(a); Colo. Rev. Stat. Ann. § 18-12-203(1)(c); Kan. Stat. Ann. § 75-7c04(a)(2); Miss. Code. Ann. § 45-9-101(2)(d); N.H. Rev. Stat. Ann. § 159:6(I)(a); N.C. Gen. Stat. Ann. § 14-415.12(b)(1).

contend that, as a twentieth-century enactment, § 922(g)(1)
"falls well short of 'longstanding' for purposes of demarcating
the scope of a constitutional right."[24]  But "longstanding" can
mean decades, not centuries,[25] when a practice has become an
accepted part of "our Nation's public traditions,"[26] as the felon-
possession ban has,[27] and, by virtue of that acceptance, it is en-
titled to a "strong presumption of constitutionality."[28]  Moreo-
ver, *Bruen* observed that historical analogies must be more
flexible when a contemporary regulation implicates "unprece-
dented   societal   concerns   or   dramatic   technological
changes[.]"[29]  Section 922(g)(1) is such a regulation, as the le-
thality of today's weaponry, the ubiquity of gun violence, the

---

[24] Maj. Op. at 17.

[25] *Am. Legion*, 139 S. Ct. at 2082.

[26] *Freedom from Religion Found., Inc. v. County of Lehigh*,
933 F.3d 275, 283 (3d Cir. 2019).

[27] *See* Stevenson, *supra* note 10, at 1574.

[28] *Am. Legion*, 139 S. Ct. at 2085.

[29] 142 S. Ct. at 2132 (quotation omitted).  The Eighth Circuit
likewise observed that common sense and flexibility are indis-
pensable in assessing historical analogues because "the Con-
stitution can, and must, apply to circumstances beyond those
the Founders specifically anticipated." *Jackson*, No. 22-2870,
2023 WL 3769242, at *6 (quoting *Bruen*, 142 S. Ct. at 2132).

size and anonymity of the population, and the extent of inter-state travel were unknown at the Founding.[30]

As the Supreme Court has not performed an "exhaustive historical analysis" of the felon-possession ban, much less "the full scope of the Second Amendment,"[31] we must conduct that review to determine whether § 922(g)(1)'s application to felons, including Range, finds support in our national tradition. That analysis confirms it does.

For purposes of this inquiry, "not all history is created equal."[32]   As the right to keep and bear arms was a "*pre-existing* right," we consider "English history dating from the late 1600s, along with American colonial views leading up to the founding."[33]  Post-ratification practices from the late eighteenth and early nineteenth centuries are also highly relevant, while later nineteenth century history is less informative.[34]  If we heed the Supreme Court's admonition to analogize to historical regulations, but not to require a "historical twin,"[35] these

---

[30] Even aside from these modern-day developments, however, the tradition of categorically disarming entire groups whom legislatures did not trust to obey the law dates back to at least the seventeenth century.  *See infra* Section I.A.

[31] *Bruen*, 142 S. Ct. at 2128 (quotation omitted).

[32] *Id.* at 2136.

[33] *Id.* at 2127 (citing *Heller*, 554 U.S. at 595).

[34] *See id.* at 2136–37.

[35] *Id.* at 2133.

sources demonstrate the validity of § 922(g)(1) as applied in this case.

    A.      England's Restoration and Glorious Revolution

During the late seventeenth century, the English government repeatedly disarmed individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates.

Following the tumult of the English Civil War, the restored Stuart monarchs disarmed nonconformist (*i.e.*, non-Anglican) Protestants.[36]   Of course, not all nonconformists were dangerous; to the contrary, many belonged to pacificist denominations like the Quakers.[37]   However, they refused to participate in the Church of England, an institution headed by the King as a matter of English law.[38]   And nonconformists

---

[36] *See* Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 45 (1994) (describing how Charles II "totally disarmed . . . religious dissenters").

[37] *See* Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms: The Common Law Tradition*, 10 Hastings Const. L.Q. 285, 304 n.117 (1983) ("Persons judged to be suspicious by the royal administration were those . . . who belonged to the Protestant sects that refused to remain within the Church of England.  The Quakers were prominent sufferers.").

[38] *See Church of England*, BBC (June 30, 2011), https://www.bbc.co.uk/religion/religions/christianity/cofe/cofe_1.shtml (describing "the Act of Supremacy" enacted during the reign of Henry VIII).

often refused to take mandatory oaths acknowledging the King's sovereign authority over matters of religion.[39]  As a result, Anglicans accused nonconformists of believing their faith exempted them from obedience to the law.[40]

Protestants had their rights restored after the Glorious Revolution of 1688 replaced the Catholic King James II with William of Orange and Mary, James's Protestant daughter.[41] But even then, Parliament enacted the English Bill of Rights, which declared: "Subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and *as allowed by Law*."[42]   This "predecessor to our Second Amendment"[43] reveals that the legislature—Parliament—was

---

[39] *See* Frederick B. Jonassen, "*So Help Me?*": Religious Expression and Artifacts in the Oath of Office and the Courtroom Oath*, 12 Cardozo Pub. L., Pol'y & Ethics J. 303, 322 (2014) (describing Charles II's reinstation of the Oath of Supremacy); Caroline Robbins, *Selden's Pills: State Oaths in England, 1558–1714*, 35 Huntington Lib. Q. 303, 314–15 (1972) (discussing nonconformists' refusal to take such oaths).

[40] *See* Christopher Haigh, *'Theological Wars': 'Socinians' v. 'Antinomians' in Restoration England*, 67 J. Ecclesiastical Hist. 325, 326, 334 (2016).

[41] *See* Alice Ristroph, *The Second Amendment in a Carceral State*, 116 Nw. U. L. Rev. 203, 228 (2021).

[42] 1 W. & M., Sess. 2, ch. 2, § 7 (Eng. 1689) (emphasis added).

[43] *Bruen*, 142 S. Ct. at 2141 (quoting *Heller*, 554 U.S. at 593).

understood to have the authority and discretion to decide who was sufficiently law-abiding to keep and bear arms.[44]

In 1689, the pendulum of distrust swung the other way. Parliament enacted a statute prohibiting Catholics who refused to take an oath renouncing the tenets of their faith from owning firearms, except as necessary for self-defense.[45] As with nonconformists, this prohibition was not based on the notion that every single Catholic was dangerous. Rather, the categorical argument English Protestants made against Catholicism at the time was that Catholics' faith put the dictates of a "foreign power," namely the Vatican, before English law.[46] Official Anglican doctrine—regularly preached throughout England—warned that the Pope taught "that they that are under him are free from all burdens and charges of the commonwealth, and obedience toward their prince[.]"[47]

---

[44] *Cf. Lois G. Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 47–48 (2000) (explaining how the English Bill of Rights preserved Parliament's authority to limit who could bear arms).

[45] An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688); *see* Malcolm, *supra* note 36, at 123.

[46] *See* Diego Lucci, *John Locke on Atheism, Catholicism, Antinomianism, and Deism*, 20 Etica & Politica/Ethics & Pol. 201, 228–29 (2018).

[47] *An Exhortation Concerning Good Order, and Obedience to Rulers and Magistrates*, *in* Sermons or Homilies Appointed to

Accordingly, the disarmament of Catholics in 1689 reflects Protestant fears that Catholics could not be trusted to obey the law.

That restriction could be lifted only prospectively and on an individual basis.  That is, Parliament permitted Catholics who "repeated and subscribed" to the necessary oath before "any two or more Justices of the Peace" to resume keeping arms.[48]  Disavowal of religious tenets hardly demonstrated that the swearing individual no longer had the capacity to commit violence; rather, the oath was a gesture of allegiance to the English government and an assurance of conformity to its laws. The status-based disarmament of Catholics thus again evinces the "historical understanding"[49] that legislatures could categorically disarm a group they viewed as unwilling to obey the law.

B.      Colonial America

The English notion that the government could disarm those not considered law-abiding traveled to the American colonies.  Although some of the earliest firearm laws in colonial America forbid Native Americans and Black persons

---

Be Read in Churches in the Time of Queen Elizabeth of Famous Memory 114, 125 (new ed., Gilbert & Rivington 1839).

[48] 1 W. & M., Sess. 1, ch. 15 (Eng. 1688).

[49] *Bruen*, 142 S. Ct. at 2131.

from owning guns,[50] the colonies also repeatedly disarmed full-fledged members of the political community as it then existed—*i.e.*, free, Christian, white men—whom the authorities believed could not be trusted to obey the law. Those restrictions are telling because they were imposed at a time when, before the advent of the English Bill of Rights, the charters of Virginia and Massachusetts provided unprecedented protections for colonists' firearm rights.[51]

The Virginia Company carried out one of the earliest recorded disarmaments in the American colonies in 1624. For his "opprobrious" and "base and detracting speeches concerning the Governor," the Virginia Council ordered Richard Barnes "disarmed" and "banished" from Jamestown.[52]

---

[50] *See* Clayton E. Cramer, *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* 31, 43 (2006). Today, we emphatically reject these bigoted and unconstitutional laws, as well as their premise that one's race or religion correlates with disrespect for the law. I cite them here only to demonstrate the tradition of categorical, status-based disarmaments. *See* Blocher & Ruben, *supra* note 3, at 63 (urging courts examining historical disarmament laws that would violate the Constitution today to "ask[] *why* earlier generations regulated gun possession more generally, rather than just *who* they disarmed").

[51] *See* Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022).

[52] David Thomas Konig, *"Dale's Laws" and the Non-Common Law Origins of Criminal Justice in Virginia*, 26 Am. J. Legal Hist. 354, 371 (1982).

15

By disrespecting the colonial authorities, Barnes demonstrated that he could no longer be trusted as a law-abiding member of the community and thus forfeited his ability to keep arms.

During the late 1630s, a Boston preacher named Anne Hutchinson challenged the Massachusetts Bay government's authority over spiritual matters by advocating for direct, personal relationships with the divine.[53]   Governor John Winthrop accused Hutchinson and her followers of being Antinomians—those who viewed their salvation as exempting them from the law—and banished her.[54]   The colonial government also disarmed at least fifty-eight of Hutchinson's supporters, not because those supporters had demonstrated a propensity for violence, but rather "to embarrass the offenders" who were forced to personally deliver their arms to the authorities in an act of public submission.[55]  The Massachusetts authorities therefore disarmed Hutchinson's supporters to shame those colonists because the authorities concluded their conduct evinced a willingness to disobey the law.[56]   Again,

---

[53] *See* Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644 (1937).

[54] *Id.* at 648; Ann Fairfax Withington & Jack Schwartz, *The Political Trial of Anne Hutchinson*, 51 New Eng. Q. 226, 226 (1978).

[55] James F. Cooper, Jr., *Anne Hutchinson and the "Lay Rebellion" Against the Clergy*, 61 New Eng. Q. 381, 391 (1988).

[56] *Cf.* John Felipe Acevedo, *Dignity Takings in the Criminal Law of Seventeenth-Century England and the Massachusetts Bay Colony*, 92 Chi.-Kent L. Rev. 743, 761 (2017) (describing

restoration of that right was available, but only prospectively, for individuals who affirmatively sought relief: Hutchinson's followers who renounced her teachings and confessed their sins to the authorities "were welcomed back into the community and able to retain their arms," as they had shown that they could once again be trusted to abide by the law.[57]

Like the Stuart monarchs in England, the Anglican colony of Virginia disarmed nonconformist Protestants in the 1640s due to their rejection of the King's sovereign power over religion. When a group of nonconformist Puritans from Massachusetts resettled in southeastern Virginia,[58] Virginia Governor William Berkeley "acted quickly to silence the Puritan[s]."[59] His concern with any "[o]pposition to the

---

other shaming punishments used at the time, including scarlet letters).

[57] Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020).

[58] Charles Campbell, *History of the Colony and Ancient Dominion of Virginia* 211 (1860).

[59] Kevin Butterfield, The Puritan Experiment in Virginia, 1607–1650, at 21 (June 1999) (M.A. thesis, College of William and Mary) (on file with William and Mary Libraries).

king"[60] led Governor Berkeley to disarm the Puritans before banishing them from the colony.[61]

After the Glorious Revolution, the American colonies also followed England in disarming their Catholic residents. Just three years after designating Anglicanism as the colony's official religion,[62] Governor Benjamin Fletcher of New York disarmed Catholic colonists in 1696.[63] The colonies redoubled their disarmament of Catholics during the Seven Years' War of 1756–1763.[64] Maryland, for example, though founded as a haven for persecuted English Catholics,[65] confiscated firearms from its Catholic residents during the war.[66] Notably, that decision was not in response to violence; indeed, the colony's

---

[60] *Id.*

[61] Campbell, *supra* note 58, at 212.

[62] *See* George J. Lankevich, *New York City: A Short History* 30 (2002).

[63] *See* Shona Helen Johnston, Papists in a Protestant World: The Catholic Anglo-Atlantic in the Seventeenth Century 219–20 (May 11, 2011) (Ph.D. dissertation, Georgetown University) (on file with the Georgetown University Library).

[64] *See* Greenlee, *supra* note 57, at 263.

[65] *See* Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1424 (1990).

[66] *See* Greenlee, *supra* note 57, at 263; Johnson et al., *supra* note 51, at 197.

governor at the time, Horatio Sharpe, observed that "the Papists behave themselves peaceably and as good subjects."[67] Neighboring Virginia likewise disarmed Catholics, but allowed those who demonstrated their willingness to obey the law by swearing an oath of loyalty to the King to retain their weapons.[68]  The colonies therefore continued the English practice of disarming Catholics based on their perceived unwillingness to adhere to the King's sovereign dictates.

Catholics were not the only group of colonists disarmed during the Seven Years' War.  New Jersey confiscated firearms from Moravians, a group of nonconformist Protestants from modern-day Germany.[69]  Like the Quakers, Moravians were— as they are today—committed pacifists who owned weapons for hunting instead of fighting.[70]  Regardless, New Jersey Governor Jonathan Belcher deemed their nonconformist views sufficient evidence that they could not be trusted to obey royal authority, so he ordered their disarmament.[71]

---

[67] Elihu S. Riley, *A History of the General Assembly of Maryland* 224 (1912) (quoting a July 9, 1755 letter from Governor Sharpe).

[68] *See* Johnson et al., *supra* note 51, at 198.

[69] *See id.*

[70] *See id.*

[71] *See id.* (discussing Governor Belcher's view that the Moravians were "Snakes in the Grass and Enemies of King George").

C.        Revolutionary War

As the colonies became independent states, legislatures continued to disarm individuals whose status indicated that they could not be trusted to obey the law. John Locke—a philosopher who profoundly influenced the American revolutionaries[72]—argued that the replacement of individual judgments of what behavior is acceptable with communal norms is an essential characteristic of the social contract.[73] Members of a social compact, he explained, therefore have a civic obligation to comply with communal judgments regarding proper behavior.[74]

Drawing on Locke, state legislatures conditioned their citizens' ability to keep arms on compliance with that civic

---

[72] *See* Thad W. Tate, *The Social Contract in America, 1774–1787: Revolutionary Theory as a Conservative Instrument*, 22 Wm. & Mary Q. 375, 376 (1965); *see also Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) (observing "John Locke [was] one of the thinkers who most influenced the framers").

[73] *See* John Locke, *Two Treatises of Government* § 163 (Thomas I. Cook ed., Hafner Press 1947) (reasoning "there only is political society where every one of the members hath quitted his natural power [to judge transgressions and] resigned it up into the hands of the community").

[74] Locke grounded that duty in the consent of those within a political society; however, he argued that mere presence in a territory constitutes tacit consent to the laws of the reigning sovereign. *See id.* § 119.

obligation, and several states enacted statutes disarming all those who refused to recognize the sovereignty of the new nation.[75]  In Connecticut, for instance, as tensions with England rose, colonists denounced loyalists' dereliction of their duty to the civic community.  The inhabitants of Coventry passed a resolution in 1774 stating loyalists were "unworthy of that friendship and esteem which constitutes the bond of social happiness, and ought to be treated with contempt and total neglect."[76]  "Committees of Inspection" formed across Connecticut and published the names and addresses of suspected loyalists in local newspapers as "persons held up to the public view as enemies to their country."[77]  Concerns that loyalists could not be trusted to uphold their civic duties as members of a new state culminated in a 1775 statute that forbid anyone who defamed resolutions of the Continental Congress from keeping arms, voting, or serving as a public official.[78]

---

[75] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 158 (2007).

[76] G.A. Gilbert, *The Connecticut Loyalists*, 4 Am. Hist. Rev. 273, 280 (1899) (describing this resolution as "a fair sample of most of the others passed at this time").

[77] *Id.* at 280–81.

[78] *See id.* at 282.

Virginia disarmed those viewed as unwilling to abide by the newly sovereign state's legal norms.[79]   Virginia's loyalty oath statute disarmed "all free born male inhabitants of this state, above the age of sixteen years, except imported servants during the time of their service" who refused to swear their "allegiance and fidelity" to the state.[80]   And conversely, it allowed for prospective restoration of rights upon the taking of that oath.[81]

Pennsylvania also disarmed entire groups whose status suggested they could not be trusted to abide by the law.   In 1777, the legislature enacted a statute requiring all white male inhabitants above the age of eighteen to swear to "be faithful and bear true allegiance to the commonwealth of Pennsylvania as a free and independent state,"[82] and providing that those who failed to take the oath "shall be disarmed" by the local

---

[79] An Act to Oblige the Free Male Inhabitants of this State Above a Certain Age to Give Assurance of Allegiances to the Same, and for Other Purposes ch. III (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619 281, 281 (William W. Hening ed., 1821).

[80] *Id.*

[81] *Id.*

[82] Act of June 13, 1777, § 1 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 111 (William Stanley Ray ed., 1903).

authorities.[83]   That statute is especially illuminating because Pennsylvania's 1776 constitution protected the people's right to bear arms.[84]   Yet the disarmament law deprived sizable numbers of pacifists of that right because oath-taking violated the religious convictions of Quakers, Moravians, Mennonites, and other groups.[85]   Those groups were not disarmed because they were dangerous,[86] but rather because their refusal to swear allegiance demonstrated that they would not submit to communal judgments embodied in law when it conflicted with

---

[83] *Id.* § 3, at 112–13.

[84] *See* Saul Cornell, *"Don't Know Much About History": The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 670–71 (2002).

[85] *See* Jim Wedeking, *Quaker State: Pennsylvania's Guide to Reducing the Friction for Religious Outsiders Under the Establishment Clause*, 2 N.Y.U. J.L. & Liberty 28, 51 (2006); *see also* Thomas C. McHugh, Moravian Opposition to the Pennsylvania Test Acts, 1777 to 1789, at 49–50 (Sept. 7, 1965) (M.A. thesis, Lehigh University) (on file with the Lehigh Preserve Institutional Repository).

[86] *See Heller*, 554 U.S. at 590 ("Quakers opposed the use of arms not just for militia service, but for any violent purpose whatsoever . . . ."); Johnson et al., *supra* note 51, at 301 (noting that states disarmed "Quakers and other pacifists; although they were not fighters, they did own guns for hunting").

personal conviction.[87]   Only those presumptively untrustworthy individuals who came forward and established that they were indeed law-abiding by swearing the loyalty oath before state authorities had their firearm rights restored.[88]

D.   Ratification Debates

The Founding generation reiterated the longstanding principle that legislatures could disarm non-law-abiding citizens during the deliberations over whether to ratify the Constitution.

Debates between the Federalists and Anti-Federalists in Pennsylvania "were among the most influential and widely distributed of any essays published during ratification."[89] Those essays included "The Dissent of the Minority," a statement of the Anti-Federalist delegates' views[90] that proved

---

[87] *See* Wedeking, *supra* note 85, at 51–52 (describing how Quakers were "penal[ized] for allegiance to their religious scruples over the new government").

[88] Act of June 13, 1777, § 3 (1777), 9 The Statutes at Large of Pennsylvania from 1652–1801 110, 112 (William Stanley Ray ed., 1903).

[89] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory*, 16 Const. Comment. 221, 227 (1999).

[90] *See id.* at 232–33.

"highly influential" for the Second Amendment.[91]  The Dissent of the Minority proposed an amendment stating:

> [T]he people have a right to bear arms for the defence of themselves and their own State or the United States, or for the purpose of killing game; and no law shall be passed for disarming the people or any of them *unless for crimes committed*, or real danger of public injury from individuals.[92]

While this amendment was not adopted, it is important because, read in the context of traditional Anglo-American firearm laws, it reflects the understanding of the Founding generation—particularly among those who favored enshrining

---

[91] *Heller*, 554 U.S. at 604; *see also* Amul R. Thapar & Joe Masterman, *Fidelity and Construction*, 129 Yale L.J. 774, 797 (2020) ("Although one might question why we should listen to the debate's 'losers,' the Anti-Federalist Papers are relevant for the same reason that the Federalist Papers are: to quote Justice Scalia, 'their writings, like those of other intelligent and informed people of the time, display how the text of the Constitution was originally understood.'  Plus, the Anti-Federalists did not exactly 'lose,' in the same way in which a party who settles a case but gets important concessions does not 'lose' the case." (quoting Antonin Scalia, *A Matter of Interpretation: Federal Courts and the Law* 38 (Amy Gutmann ed., 1997))).

[92] 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 665 (1971) (emphasis added).

25

the right to armed self-defense in the Constitution—that "crimes committed," whether dangerous or not, justified disarmament.

E.   Criminal Punishment

The penalties meted out for a variety of offenses between the seventeenth and nineteenth centuries also demonstrate the widespread acceptance of legislatures' authority to disarm felons.

At the Founding, a conviction for a serious crime resulted in the permanent loss of the offender's ability to keep and bear arms.  Those who committed grave felonies—both violent and non-violent—were executed.[93]  *A fortiori*, the ubiquity of the death penalty[94] suggests that the Founding generation would have had no objection to imposing on felons the comparatively lenient penalty of disarmament.  Indeed, under English law, executed felons traditionally forfeited all their firearms, as well as the rest of their estate, to the government.[95]   That practice persisted in the American colonies and the Early Republic.[96]  Even some non-capital

---

[93] *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 904–05 (3d Cir. 2020).

[94] *See Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring).

[95] *See* 4 William Blackstone, *Commentaries* *97–98.

[96] *See Respublica v. Doan*, 1 U.S. 86, 91 (Pa. 1784) ("Doan, besides the forfeiture of his estate, has forfeited his life.").  At

offenses triggered the permanent loss of an offender's estate, including any firearms.  For example, a 1786 New York statute punished those who counterfeited state bills of credit with life imprisonment and the forfeiture of their entire estate.[97]  Again, this drastic punishment indicates that the Founding generation would not have considered the lesser punishment of disarmament beyond a legislature's authority.

Individuals who committed less serious crimes also lost their firearms on a temporary, if not permanent, basis.  Where state legislatures stipulated that certain offenses were not

---

common law, forfeiture also resulted in "corruption of the blood," which prevented the felon's heirs from inheriting or transmitting the offender's property.  Richard E. Finneran & Steven K. Luther, *Criminal Forfeiture and the Sixth Amendment: The Role of the Jury at Common Law*, 35 Cardozo L. Rev. 1, 27 (2013).  In the Early Republic, several states limited the loss of one's property to the lifetime of the offender.  *See* 2 James Kent, *Commentaries on American Law* *387 (1826); *cf.* U.S. Const. art. III, § 3, cl. 2 ("The Congress shall have Power to declare the Punishment of Treason, but no Attainder of Treason shall work Corruption of Blood, or Forfeiture *except during the Life of the Person attainted*." (emphasis added)).  Estate forfeiture ultimately fell into disuse in the 1820s.  *See Com. v. Pennock*, 1817 WL 1789, at *1–2 (Pa. 1817); Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*, 57 Clev. St. L. Rev. 461, 473 (2009).

[97] Act of Apr. 18, 1786, 2 Laws of the State of New York 253, 260–61 (1886); *see also* Act of Nov. 27, 1700, 2 Statutes at Large of Pennsylvania 12 (Wm. Stanley Ray ed., 1904) (punishing arson with life imprisonment and estate forfeiture).

punishable by death or life imprisonment, but rather resulted in forfeiture,[98] the offender was stripped of his then-existing estate, including any firearms,[99] and only upon successfully

---

[98] *See, e.g.*, Act of Apr. 5, 1790, § 2 (1790), 13 Statutes at Large of Pennsylvania 511, 511–12 (Wm. Stanley Ray ed., 1908) (robbery, burglary, sodomy, buggery); Act of Jan. 4, 1787, § 9 (1787), 24 Colonial Records of North Carolina 787, 788 (Walter Clark ed., 1905) (filing a false inventory of property in connection with a procurement fraud investigation); An Act to Prevent Routs, Riots, and Tumultuous Assemblies, § 4 (1786), 3 Compendium and Digest of the Laws of Massachusetts 1132, 1134 (Thomas B. Wait ed., 1810) (rioting); Act of Nov. 26, 1779, § 2 (1779), 10 Statutes at Large of Pennsylvania 12, 15–16 (Wm. Stanley Ray ed., 1904) (counterfeiting); An Act for the Regulation of the Markets in the City of Philadelphia, and for Other Purposes Therein Mentioned, § 1 (1779), 9 Statutes at Large of Pennsylvania 387, 388–89 (Wm. Stanley Ray ed., 1904) (diverting food en route to Philadelphia or attempting to raise the price of food at the city's market three times); An Act for Establishing an Office for the Purpose of Borrowing Money for the Use of the Commonwealth, § 4 (1777), 9 Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature in the Year 1619, at 286, 287 (William W. Hening ed., 1821) (counterfeiting).

[99] *See, e.g.*, Act of Apr. 5, 1790, § 2 (1790), 13 Statutes at Large of Pennsylvania 511, 511–12 (Wm. Stanley Ray ed., 1908) (providing that the offender "shall forfeit to the commonwealth all . . . goods and chattels whereof he or she was seized or possessed at the time the crime was committed and at any time afterwards until conviction").

serving of his sentence and reintegrating into society could he presumably repurchase arms.

Finally, colonial and state legislatures punished minor infractions with partial disarmaments by seizing firearms involved in those offenses. For example, individuals who hunted in certain prohibited areas had to forfeit any weapons used in the course of that violation.[100]

\*       \*       \*

As this survey reflects, and as the Supreme Court observed in *Heller*, restrictions on the ability of felons to possess firearms are indeed "longstanding[.]"[101] Four centuries of Anglo-American history demonstrate that legislatures repeatedly exercised their discretion to impose "status-based restrictions" disarming entire "categories of persons," who were presumed, based on past conduct,

---

[100] *See* 1652 N.Y. Laws 138; Act of Apr. 20, ch. III (1745), 23 Acts of the North Carolina General Assembly 218, 219 (1805); 1771 N.J. Laws 19–20; An Act for the Protection and Security of the Sheep and Other Stock on Tarpaulin Cove Island, Otherwise Called Naushon Island, and on Nennemessett Island, and Several Small Islands Contiguous, Situated in the County of Dukes County § 2 (1790), 1 Private and Special Statutes of the Commonwealth of Massachusetts 258, 259 (Manning & Loring ed., 1805); 1832 Va. Acts 70; 1838 Md. Laws 291–92; 12 Del. Laws 365 (1863).

[101] 554 U.S. at 626.

unwilling to obey the law.[102]  Legislatures did so not because the individuals in these groups were considered dangerous, but because, based on their status, they were deemed non-law-abiding subjects.[103]  The particular groups varied dramatically over time, but the Founding generation understood that felons were one such group.

The length of disarmaments varied too, but the Founding generation recognized that legislatures—in their discretion—could impose permanent, temporary, or indefinite bans that lasted until the individual affirmatively sought relief and made a showing of commitment to abide by the law.  In that case, the showing was not viewed as voiding the ban retroactively, from its inception; rather, it operated prospectively.  Only after the individual had made the requisite showing to a government official—and thus rebutted the presumption that those with his status were not law-abiding—was the individual's right to possess firearms restored.

That is precisely how § 922(g)(1) functions, disarming a group that has demonstrated disregard for the law[104] and allowing for restoration of the right to keep arms upon the

_____

[102] *Jackson*, No. 22-2870, 2023 WL 3769242, at *7.

[103] Even if dangerousness were "the traditional *sine qua non* for dispossession, then history demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons."  *Id.* at *6.

[104] *See* 18 U.S.C. § 922(g)(1).

requisite showing.[105]   Because that statutory scheme is "consistent with this Nation's historical tradition of firearm regulation,"[106] it comports with the Second Amendment.

## II.    Consequences of the Majority Opinion

Instead of respecting legislatures' longstanding authority to disarm groups who pose a threat to the rule of law, the majority usurps that function and enacts its own policy. And instead of heeding the Supreme Court's instruction to take § 922(g)(1) as "longstanding" and "lawful,"[107] the majority nullifies it with an insurmountably rigid view of historical analogues and an approach so standardless as to render it void for vagueness in any application.

My colleagues have adopted and prescribed a methodology by which courts must examine each historical practice in isolation and reject it if it deviates in any respect from the contemporary regulation:   Confronted with legislatures' regular practice at the Founding of imposing the far more severe penalty of death for even non-violent felonies, the majority responds that the permanent loss of *all* rights is not analogous to "the *particular* . . . punishment at issue— lifetime disarmament[.]"[108]   To the longstanding practice of forfeiture, which resulted in a permanent loss of firearms for those felons convicted of capital offenses or sentenced to life

---

[105] *See* 18 U.S.C. § 921(a)(20).

[106] *Bruen*, 142 S. Ct. at 2126.

[107] *Heller*, 554 U.S. at 626–27 & n.26.

[108] Maj. Op. at 19.

imprisonment, the majority avers that forfeiture is entirely distinguishable because other felons—those who committed lesser offenses and thus served temporary rather than life sentences—could repurchase arms upon their release.[109]   To evidence that legislatures repeatedly disarmed entire groups of people based on their distrusted status, the majority dismisses those laws as inconsistent with contemporary understandings of the First and Fourteenth Amendments.[110]   To the historical reality that disarmament was not limited to those considered violent and indeed extended to well-known pacifists like the Quakers, the majority decrees without elaboration that any analogy between § 922(g)(1) and those laws would be "far too broad."[111]     Finally, to the notion that Congress can categorically disarm felons today, just as legislatures once disarmed loyalists, Catholics, and other groups, the majority falls back on its bottom line: *any* analogy will be unlike "Range and his individual circumstances."[112]

The Supreme Court in *Bruen* specifically admonished the judiciary not to place "a regulatory straightjacket" on our

---

[109] *Id.* at 19–20.

[110] *Id.* at 18–19. Strikingly, several of my colleagues once asserted that these same laws justified disarming dangerous felons.  *See Binderup v. Att'y Gen.*, 836 F.3d 336, 368–69 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part); *Folajtar*, 980 F.3d at 914–15 (Bibas, J., dissenting).  Today's majority provides no such assurance.  Maj. Op. at 18 n.9.

[111] *Id.* at 19 (quoting *Bruen*, 142 S. Ct. at 2134).

[112] *Id.*

Government by requiring a "historical *twin*," and explained that "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[113]   Yet, how else would one describe the kind of analogue the majority demands—a Founding-era statute that imposed the "*particular*"[114] restriction for the same length of time on the same group of people as a modern law[115]—if not as a contemporary regulation's "dead ringer" and "historical twin"?[116]

While the majority opinion spurns this instruction from *Bruen* and the Eighth Circuit's conclusion that § 922(g)(1) is constitutional as applied to *any* felon,[117] it fully embraces the Fifth Circuit's reasoning in *United States v. Rahimi*.[118]  In that case, the Fifth Circuit held that 18 U.S.C. § 922(g)(8), which prohibits individuals subject to domestic abuse civil protective orders from possessing firearms, violates the Second Amendment.[119]  After rejecting the Supreme Court's repeated references to "law-abiding citizens" as devolving too much

---

[113] *Bruen*, 142 S. Ct. at 2133.

[114] Maj. Op. at 19.

[115] *See id.*

[116] *Bruen*, 142 S. Ct. at 2133.

[117] *Jackson*, No. 22-2870, 2023 WL 3769242, at *4.

[118] 61 F.4th at 443.

[119] *Id.* at 461.

discretion to the Government,[120] the Fifth Circuit addressed each of the Government's historical analogues in isolation and, paving the way for today's majority, concluded every one was distinguishable from § 922(g)(8):   Statutes disarming distrusted groups were inapt because legislatures believed those groups threatened social and political order generally, whereas domestic abusers threaten identifiable individuals;[121] criminal forfeiture laws seizing arms from those who terrorized the public were insufficient because domestic abuse protective orders derive from civil proceedings.[122]   Like my colleagues, the *Rahimi* Court concluded that *any* difference between a historical law and contemporary regulation defeats an otherwise-compelling analogy.

For all their quibbling, though, neither today's majority nor the Fifth Circuit explain why those differences suggest the Founding generation would have considered § 922(g) beyond the authority of a legislature.   Furthermore, the methodology the majority adopts from *Rahimi* creates a one-way ratchet: My colleagues offer a detailed roadmap for rejecting historical analogues yet refuse to state when, if ever, a historical practice will justify a contemporary regulation.

By confining permissible firearm regulations to the precise measures employed at the Founding, the majority displaces a complex array of interlocking statutes that embody the considered judgments of elected representatives at the federal

---

[120] *Id.* at 453.

[121] *Id.* at 457.

[122] *Id.* at 458–59.

and state level.  For example, in § 922(g)(1), Congress disarmed those who commit felonies or felony-equivalent misdemeanors, but specifically excluded particular offenses it deemed not sufficiently serious: "antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices[.]"[123]  The majority ignores that judgment and rewrites the statute with its own expansive view of excludable offenses.

Section 922(g)(1) also disarms those who commit state felonies out of respect for the historic power of state legislatures to designate which offenses were considered sufficiently serious by the people of that state to be punished as felonies. Underlying the majority's decision to exempt a felon-equivalent "like Range" from § 922(g)(1), however, is an unspoken premise antithetical to federalism and the separation of powers: that federal judges know better than the people's elected representatives what offenses should qualify as serious to the people of that state.

In addition to eviscerating the federal disarmament statute, the vague test adopted by the majority impugns the constitutional application of every state statute that prohibits felons from possessing guns.  Those laws differ significantly across the forty-eight states that restrict offenders' firearm rights—including which offenses trigger restrictions as well as their duration—in keeping with each state's local circumstances and values.[124]  But, under the Supremacy Clause, the majority's

_____

[123] 18 U.S.C. § 921(a)(20)(A).

[124] *See generally Fifty-State Comparison: Loss and Restoration of Civil/Firearms Rights*, Restoration Rts. Project (Nov.

test, indeterminant as it is, necessarily supplants those laws no less than it does § 922(g)(1).

Similarly, out of respect for federalism, Congress exempted from the federal felon-possession ban any offender whose conviction "has been expunged," who "has been pardoned," or who has had his "civil rights restored."[125]  In every single state, the governor or pardon board is authorized to issue a pardon, automatically restoring an offender's firearm rights.[126]  Thirty-six states also offer additional gun rights restoration mechanisms[127]—from automatic restoration after a set term of years,[128] to individualized judicial expungement proceedings.[129]  The divergent "state policy judgments" codified

─────────────────────

2022),            https://ccresourcecenter.org/state-restoration-profiles/chart-1-loss-and-restoration-of-civil-rights-and-firearms-privileges-2/.  None of these statutes appears to disarm individuals who commit pretextual offenses.  I note, however, that history suggests any pretextual disarmament law would violate the Second Amendment.  *See* 1 William Blackstone, *Commentaries* app. *300 (St. George Tucker ed., Birch & Small 1803) (decrying how "[i]n England, the people have been disarmed, generally, under the specious pretext of preserving the game").

[125] 18 U.S.C. § 921(a)(20).

[126] *See Fifty-State Comparison: Loss and Restoration of Civil/Firearms Rights*, *supra* note 124.

[127] *See id.*

[128] *See, e.g.*, Mich. Comp. Laws § 750.224f.

[129] *See, e.g.*, Tenn. Code Ann. § 39-17-1307(c)(1)(C).

in these statutes promote "the benefits of federalism: experimentation, localism, and to some extent, decentralization"[130]—so much so that the Supreme Court itself has acknowledged the significance of Congress's decision "to defer to a State's dispensation relieving an offender from disabling effects of a conviction."[131]  Yet the majority annuls these mechanisms for the restoration of gun rights by declaring that offenders like Range can never be disarmed in the first place.

In place of legislatures' measured judgments, the majority imposes a constitutional framework so standardless as to thwart the lawful application of 18 U.S.C. § 922(g)(1) to *any* offender.  Congress enacted a bright-line rule distinguishing offenders who can possess firearms from those who cannot. By looking to the maximum punishment available for his offense, a felon or state misdemeanant can easily determine if he can possess a gun.[132]  The majority, however, replaces that straightforward test with an opaque inquiry—whether the offender is "like Range."[133]

So what exactly is this new test?  What specifically is it about Range that exempts him—and going forward, those "like [him]"—from § 922(g)(1)'s enforcement?  Regrettably, that is

---

[130] D. Bowie Duncan, Note, *Dynamic Incorporation, Rights Restoration, and 18 U.S.C. § 922(g)(1)*, 15 N.Y.U. J.L. & Liberty 233, 274 (2021).

[131] *Logan v. United States*, 552 U.S. 23, 37 (2007).

[132] *See* 18 U.S.C. § 921(a)(20).

[133] Maj. Op. at 22.

left to conjecture. My colleagues describe Range's individual circumstances in minute detail, appearing to attach significance to such specifics as his hourly wage, his marital status, the number of children he raised, his purported justification for his fraud, the amount he stole, his culpability relative to his wife who was not charged, his employment history, his largely law-abiding life post-conviction, his explanations for his post-conviction attempts to purchase a gun, the circumstances in which his wife then purchased it for him, his intended use of firearms to hunt deer in his spare time, and the timing of his discovery that he was subject to § 922(g)(1).[134] The particulars are plentiful, but the majority never specifies, among these and other descriptors of Range's life pre- and post-conviction, the respects in which an offender must be "like Range" to preclude the application of § 922(g)(1).

If it is that Range's offense was not "violent," that standard is unworkable and leads to perverse results. Federal courts' prior attempts to define "violent felony," *e.g.*, for purposes of the Armed Career Criminal Act, yielded "repeated attempts and repeated failures to craft a principled and objective standard [for that term,] confirm[ing] its hopeless indeterminacy."[135] Accordingly, the Supreme Court in *Johnson v. United States* held that the "violent felony" provision "denie[d] fair notice to defendants and invite[d] arbitrary enforcement by judges," thus violating due process.[136] So does the "like Range" test relegate us to the widely disparaged "categorical

---

[134] *Id.* at 5–6.

[135] *Johnson v. United States*, 576 U.S. 591, 598 (2015).

[136] *Id.* at 597.

approach," excluding all offenses that lack an element of the "use of force"?[137]  Of what relevance is the conduct underlying a given crime?  Will courts be limited to considering *Shepard* documents?[138]  What about crimes that lack an element of force but are undeniably associated with violence, like drug trafficking, human trafficking, drunk driving, and treason?[139]

If it is Range's largely law-abiding life in the nearly 30 years since his conviction, that standard is even more confounding.  My colleagues hold that Range's disarmament was invalid *ab initio*, meaning he could have prevailed on a Second Amendment challenge to § 922(g)(1) had he raised one at the time of his conviction (as will myriad felons after today's decision).[140]  Yet judges are not soothsayers.  Post-conviction conduct would be relevant if my colleagues were holding

---

[137] *United States v. Scott*, 14 F.4th 190, 195 (3d Cir. 2021).

[138] Those documents include the "charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented."  *Shepard v. United States*, 544 U.S. 13, 16 (2005).

[139] As Range's counsel candidly conceded at argument, under a "violence" test, offenses like possession of child pornography, money laundering, and drunk driving would not support disarmament.  Oral Arg. at 19:51–20:20, 24:00–24:26.

[140] *See* Maj. Op. at 4 ("[Range] remains among 'the people' protected by the Second Amendment.  And . . . the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range[.]").

39

narrowly that Range's firearm rights should be restored going forward. But how can they possibly hold that he should not have lost them upon conviction, *based on post-conviction conduct*?

This retrospective mode of analysis defies not just logic, but also the Due Process Clause. Due process guarantees that a "person of ordinary intelligence [must have] a reasonable opportunity to know what is prohibited, so he may act accordingly."[141] Under the majority's "like Range" test, however, offenders cannot possibly know in advance of a court's retroactive declaration whether possessing a firearm post-conviction is a constitutional entitlement or a federal felony. As interpreted today by the majority, § 922(g)(1) is rendered so vague as to be facially unconstitutional.

On the enforcement side, the majority opinion makes the statute's *mens rea* impossible to establish. In *Rehaif*, the Supreme Court held that to convict a defendant under § 922(g) the Government must prove the defendant not only knew that he possessed a firearm, but also knew that "he had the relevant status when he possessed [the firearm.]"[142] The Court then clarified in *Greer* that a *Rehaif* error is not a basis for relief under the plain-error standard unless the defendant can make a sufficient argument on appeal that, but for the error, he could have established he did not know he was a felon.[143] That would be a difficult argument to make, the Court observed, because

---

[141] *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

[142] *Rehaif*, 139 S. Ct. at 2194.

[143] *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021).

"as common sense suggests, individuals who are convicted felons ordinarily know that they are convicted felons [for purposes of § 922(g)(1).]"[144]

But, today, the majority displaces *Rehaif*'s clear and ascertainable standard with an incoherent one: the Government must prove the defendant knew he was not "like Range" when he possessed firearms.  And in lieu of *Greer*'s high threshold for plain-error relief, the majority hands defendants a ready-made argument for appeal: that they could not know at the time they possessed a firearm—indeed, at any time before a court made a "like Range" determination—whether their status was subject to or exempt from § 922(g)(1).  In short, the floodgates the Supreme Court attempted to close on *Rehaif* errors in *Greer*, my colleagues throw wide open:  Today's opinion will strain the federal courts with a deluge of *Rehaif* challenges,[145] compelling us to vacate countless § 922(g)(1) convictions on

---

[144] *Id.* at 2095.

[145] As explained above, courts will struggle to apply the majority's "like Range" test, which apparently extends to offenders' post-conviction conduct.  For example, how should a court rule when a felon committed a murder thirty years ago, but has since become deeply religious and a model prisoner?  What about someone with Range's employment history and family ties who has amassed a lengthy rap sheet of nonviolent misdemeanors in the decades since his welfare fraud conviction?  Or someone otherwise like Range who knew he was subject to § 922(g)(1) as understood before today, yet deliberately engaged his spouse as a straw purchaser to circumvent that statute?  There is no reason for the federal judiciary to hurl itself into this morass.

direct appeal and compelling our district court colleagues to dismiss countless indictments.

Today's decision will also undermine law enforcement in three critical respects.  First, it will cripple the FBI's National Instant Criminal Background Check System (NICS).  Currently, NICS includes over five million felony conviction records,[146] and that number continues to grow as additional agencies contribute records to the NICS database.[147]  Prior felony convictions are by far the most common reason individuals fail NICS background checks[148]—the very background checks the Supreme Court endorsed in *Bruen* as ensuring individuals bearing firearms are "law-abiding" citizens.[149]  Yet the majority's indeterminant and post-hoc test for which felons fall outside § 922(g)(1) and under what circumstances renders NICS a dead letter.

If the police receive a tip that an ex-offender is toting an assault rifle, it is no longer sufficient for probable cause to simply confirm a prior felony conviction in NICS.  How will officers—or prosecutors for that matter—know whether that felon is sufficiently "like Range" to justify his arrest as a felon-

---

[146] *Active Records in the NICS Indices*, FBI (Jan. 31, 2023), https://www.fbi.gov/file-repository/active_records_in_the_nics-indices.pdf/view.

[147] *See* Stevenson, *supra* note 10, at 1597.

[148] *Federal Denials*, FBI (Jan. 31, 2023), https://www.fbi.gov/file-repository/federal_denials.pdf/view.

[149] *See* 142 S. Ct. at 2138 n.9.

in-possession, or whether they are instead bringing liability on themselves for violating the felon's civil rights?  Must they research the suspect's post-conviction conduct?  Should they consider relevant conduct underlying the original violation?  How could they possibly determine that conduct in the case of guilty pleas entered decades earlier?

Second, without a functional background check system, how will federal firearms licensees (FFLs) comply with federal law?  FFLs who discover that a potential customer was convicted of a felony will have no way of knowing whether the individual's crime and post-conviction conduct are sufficiently similar to Range's to preclude the application of § 922(g)(1).[150]  Of particular concern, any assessments based on the majority opinion's "vague criteria are vulnerable to biases" along race, class, gender, and other lines, resulting in disparities between which groups retain gun rights and which do not.[151]

Third, until today, the prohibition on possessing a firearm was a well-accepted "standard condition" of bail,

---

[150] The penalty for incorrectly concluding a felon can purchase a weapon without an exhaustive inspection of the felon's crime, conduct, and personal circumstances will be stiff: a single error will result in the loss of the FFL's license, barring the FFL from the industry.  *See Simpson v. Att'y Gen.*, 913 F.3d 110, 114 (3d Cir. 2019) (holding a single violation in which "the licensee knew of his legal obligation and purposefully disregarded or was plainly indifferent to the requirements" is grounds for revocation).

[151] Ryan T. Sakoda, *The Architecture of Discretion: Implications of the Structure of Sanctions for Racial Disparities,*

supervised release, probation, and parole.[152]  But under my colleagues' reasoning, the inclusion of that condition among state or federal conditions of release now appears to be unconstitutional as to any number of defendants, depending on whether the judge at the bail or sentencing hearing views them as "like Range."  That means disarmament on release will be anything but "standard," leaving scores of non-incarcerated criminal defendants armed and subjecting not just the public, but also probation and parole officers to significant risk of harm.

In sum, the majority opinion casts aside the admonitions that  § 922(g)(1)  is  "longstanding,"[153]  "presumptively lawful,"[154] and "does more to combat gun violence than any other federal law."[155]  Instead, it abandons judicial restraint, jettisons  principles  of  federalism,  unsettles  countless indictments and convictions, debilitates law enforcement, and vitiates our background check system—all in the name of re-

-----

*Severity, and Net Widening*, 117 Nw. U. L. Rev. 1213, 1227 (2023); *cf.* Joseph Blocher & Reva B. Siegel, *Race and Guns, Courts and Democracy*, 135 Harv. L. Rev. F. 449, 449 (2022) (arguing "racial justice concerns [with firearm laws] should be addressed in democratic politics rather than in the federal courts").

[152] U.S.S.G. § 5D1.3(c)(10).

[153] *Heller*, 554 U.S. at 626.

[154] *Id.* at 627 n.26.

[155] *Rehaif*, 139 S. Ct. at 2201 (Alito, J., dissenting).

arming convicted felons. There is a narrower and less hazardous path they could have chosen.

## III.     The Narrow Road Not Taken

My colleagues object that § 922(g)(1) can impose a "permanent[]," [156] "lifetime ban on firearm possession," [157] but their retroactive holding—that the Government could not constitutionally disarm Range when he was convicted—is far broader than necessary to address their concern. Had they heeded judicial restraint when granting Range relief, the majority would have issued a purely prospective declaratory judgment, restoring Range's gun rights going forward. That approach would have prevented the most grievous consequences of the majority's decision today. And should the Supreme Court agree with my colleagues that the statutory exclusions to § 922(g)(1) are constitutionally inadequate, that approach also offers an administrable alternative worthy of consideration. How could the majority have resolved this case narrowly?

First, the only question the Court had to answer is whether § 922(g)(1) is unconstitutional as applied to the individual petitioning the Court *today*, accounting for his present circumstances and potentially entitling him to bear arms on a forward-looking basis. After all, Range did not challenge the loss of his firearm rights at the time of his conviction or at any time until he initiated the underlying suit here, and all he now seeks is declaratory relief enabling him to

---

[156] Maj. Op. at 18 n.9.

[157] *Id.* at 20.

purchase and possess firearms *in the future*. The majority, however, reaches out to answer a different question: whether Range's disarmament was *ever* consistent with the Second Amendment.[158]   Needlessly invalidating Range's initial disarmament violates "the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied."[159]

Second, providing prospective declaratory relief in this case and similar as-applied challenges would resolve my colleagues' permanency concern.   I appreciate that their opposition to imposing a permanent ban or putting the onus on the offender to seek relief finds some historical support for certain lesser offenses.   That is, the subset of felons who were not sentenced to death or lifetime imprisonment only forfeited their firearms temporarily and did not need to petition to regain their firearm rights; they could simply repurchase arms after completing their sentences.   But times have changed.   Gone are the days of "close-knit" communities in which "everyone knew everyone else,"[160] and with the extreme mobility and relative

---

[158] *See* Maj. Op. at 19 (asserting that the "punishment at issue—lifetime disarmament—is [not] rooted in our Nation's history and tradition"); *id.* at 22 (framing the issue presented as "the constitutionality of 18 U.S.C. § 922(g)(1) [] as applied to [Range] given his violation of 62 Pa. Stat. Ann. § 481(a)").

[159] *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 450 (2008) (quotations omitted).

[160] Bibas, *supra* note 4, at 1.

anonymity of today's society and the magnitude of harm that can be inflicted by a single assault rifle,[161] automatic restoration of the right to bear arms upon completion of a sentence would jeopardize public safety and the utility of background checks.  In any event, it is not the case that legislatures historically imposed only bans that expired of their own accord:  They sometimes exercised their authority—just as Congress did in § 922(g)(1)—to categorically disarm a group presumed, based on status, to be non-law-abiding and to place the burden on individuals in that group to petition for relief and prove, through oaths or similar gestures of allegiance, that they could be trusted to obey the law.[162]

Section 922(g)(1) is sufficiently analogous to that model to meet the history-and-tradition test, as it already allows felons to petition for relief by seeking an expungement, pardon, or restoration of rights under state law.  True, Congress provided another avenue for relief in § 925(c) that it has not

---

[161] *See* Terry Spencer, *Florida School Shooter's AR-15 Shown to His Jurors*, AP (July 25, 2022), https://apnews.com/article/education-florida-fort-lauderdale-parkland-school-shooting-60791bdf38785f494400c43b90a97c39 (describing the AR-15 rifle "used to murder 17 students and staff members . . . at Parkland's Marjory Stoneman Douglas High School").

[162] Historical examples include Parliament's disarmament of Catholics in 1689, Massachusetts's disarmament of Anne Hutchinson's followers, Virginia's disarmament of Catholics during the Seven Years' War, and the loyalty oath laws of Pennsylvania and Virginia during the Revolution.  *See supra* notes 45–49, 53–57, 68, 82–88 and accompanying text.

funded in recent years,[163] but § 921(a)(20) ensures the felon-possession ban fits comfortably in the history of our nation's traditional firearm regulations. And if those avenues are deemed inadequate, that purported infirmity would be cured by a prospective declaratory judgment finding that a convicted felon no longer poses a threat to the rule of law and therefore can once again possess firearms.

Third, such declaratory judgment proceedings would give effect to the purportedly rebuttable presumption to which the Supreme Court referred in describing felon-possession bans as "presumptively lawful,"[164] as well as its admonition that the Government bears the burden at the outset to "demonstrate that the regulation is consistent with this

---

[163] Section 925(c) permitted the Bureau of Alcohol, Tobacco, Firearms and Explosives to conduct individualized reviews and make an administrative determination that the applicant could keep arms prospectively, but that mechanism proved so costly for the country that it was disbanded and has not been funded since 1992. *See Logan*, 552 U.S. at 28 n.1; S. Rep. No. 102-353 (1992).

[164] *Heller*, 554 U.S. at 626–27 & n.26; *see McDonald*, 561 U.S. at 786; *see also Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *id.* at 2157 (Alito, J., concurring). Like the Eighth Circuit, I believe the premise that the Supreme Court used the phrase "presumptively lawful" to establish "a presumption of constitutionality that could be rebutted on a case-by-case basis" is dubious. *Jackson*, No. 22-2870, 2023 WL 3769242, at *7 n.2. Rather, the Court most likely "termed the conclusion presumptive because the specific regulations were not at issue in *Heller*." *Id.*

Nation's historical tradition of firearm regulation[.]"[165]  That is because once the Government establishes that an offender committed a felony, it has necessarily satisfied its burden consistent with the historical practice of disarming felons upon conviction.  The burden at that point, like the taking of oaths or swearing of allegiance, would fall on the felon to rebut the ban's presumptive lawfulness by establishing he is presently a "law-abiding, responsible" citizen.[166]

Fourth, limiting relief in as-applied § 922(g)(1) challenges to prospective declaratory judgments would eliminate the intractable due process problems with the majority's approach.  Any felon who possessed a firearm without first securing a favorable declaratory judgment would remain subject to prosecution pursuant to § 922(g)(1), and those granted relief would have their rights restored prospectively.  In contrast to the "like Range" test, that clear rule would provide felons with constitutionally adequate notice as to whether and when they regained their right to bear arms and thus would allow § 922(g)(1) to withstand void-for-vagueness challenges.  Prospective declaratory judgments likewise would avoid opening the floodgates to *mens rea* challenges to § 922(g)(1)

---

[165] *Bruen*, 142 S. Ct. at 2126.

[166] *Id.* at 2131.  This approach would not result in repetitive actions because a felon who brings an unsuccessful declaratory judgment suit must provide "newly discovered evidence that, with reasonable diligence, could not have been discovered" to prevail in a subsequent as-applied challenge to § 922(g)(1). Fed. R. Civ. P. 60(b)(2).

prosecutions, and the high threshold *Greer* set for defendants to overturn § 922(g)(1) convictions would endure.[167]

Fifth, this use of declaratory judgments would respect both the separation of powers and federalism.  Other than for felons who received favorable declaratory judgments, Congress's decision to disarm those who commit felonies or comparable state misdemeanors would remain intact.  Likewise, state statutes restricting the ability of felons to possess firearms would be generally enforceable, ensuring local communities' priorities continue to shape when felons are permitted to possess firearms under state law.  The states' rights-restoration regimes would also continue to perform an important function, serving as alternatives to federal declaratory judgments.

Finally, prospective relief would avoid the debilitating effect of today's decision on law enforcement, U.S. Attorney's Offices, and our background check system.  Currently, those previously convicted of a felony can submit documentation to the FBI through a voluntary appeal file application, including "information regarding an expungement, restoration of firearm rights, pardon, etc."[168]  Successful applicants receive a unique personal identification number to prevent future background check denials.[169]   A felon who secures a prospective

---

[167] *See* 141 S. Ct. at 2097.

[168] *Types of Documents Requested Based on Prohibitor*, FBI (Sept. 14, 2018), https://www.fbi.gov/file-repository/nics-appeal-documents-requested.pdf/view.

[169] *Firearm-Related Challenge (Appeal) and Voluntary Appeal File (VAF)*, FBI (last accessed Mar. 3, 2023),

declaratory judgment could simply submit that judgment to the FBI to prevent false positives on his background check when next purchasing firearms.  Thus, just as they do today, law enforcement and prosecutors could depend on NICS for data when deciding whom to charge with violating § 922(g)(1); courts could rely on existing jury instructions, the standard conditions of supervised release or parole, and the plain-error test set out in *Greer*; and firearm dealers could ascertain from a background check whether a convicted felon is entitled to purchase weapons.

The majority has taken a far more radical approach, creating a stark circuit split and holding § 922(g)(1) is unconstitutional *ab initio* based on a seemingly random sampling of observations about the pre- and post-conviction conduct of this Appellant.  Our district courts are left without any intelligible standard, and our citizenry will be left reeling from the consequences: a flood of motions to dismiss indictments, appeals, and reversals of § 922(g)(1) convictions; more armed felons and gun violence on our streets; less faith in elected representatives stymied in their efforts to protect the public; and less trust in a judiciary mired in formalism and the usurpation of legislative function.  The sooner the Supreme Court takes up this issue, the safer our republic will be.

IV.    Conclusion

For the foregoing reasons, I respectfully dissent.

---

https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/national-instant-criminal-background-check-system-nics-appeals-vaf.

ROTH, *Circuit Judge*, dissenting

     I agree with the Majority's well-reasoned conclusions that (1) *New York State Rifle & Pistol Association, Inc. v. Bruen*[1] abrogated the use of means-end scrutiny to assess Second Amendment challenges and (2) Bryan Range is among "the people" protected by the Second Amendment.  I part with my colleagues, however, over their determination that the government failed to show that 18 U.S.C. § 922(g)(1), as applied to Range, is consistent with our nation's historical tradition of firearms regulation.

     In *Bruen*, the Supreme Court considered whether a regulation issued by a *state* government was a facially constitutional exercise of its traditional police power.  Range presents a distinguishable question:  Whether a *federal* statute, which the Supreme Court has upheld as a valid exercise of Congress's authority under the Commerce Clause,[2] is constitutional as applied to him.  The parties and the Majority conflate these spheres of authority and fail to address binding precedents affirming Congress's power to regulate the possession of firearms in interstate commerce.  Because Range lacks standing under the applicable Commerce Clause jurisprudence, I respectfully dissent.

I.

     As the Majority explains, the Supreme Court in *Bruen* invalidated the means-end component test that we have, in

---

[1] 142 S. Ct. 2111 (2022).
[2] U.S. Const. art. 1, § 8, cl. 3 (authorizing Congress "to regulate commerce with foreign nations, and among the several states, and with the Indian tribes").

1

recent years, applied to Second Amendment challenges.[3] The Supreme Court held: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."[4]

While I agree with the Majority's assessment of the government's burden, I read *Bruen* to articulate a structured framework for the government's comparative analysis. This framework is useful because it clarifies both what the government must compare and how close the match must be.

As I read *Bruen*, the government must begin by identifying the societal problem addressed by the challenged regulation.[5] The government must demonstrate whether the problem is (1) persistent ("has persisted since the 18th century") or (2) modern (involves "unprecedented societal concerns or dramatic technological changes").[6]

If the problem is persistent, the government must demonstrate that its modern regulation is "distinctly similar" to a historical forebear, showing that early and recent legislatures approached the problem in basically the same way.[7] Here, "lack of a distinctly similar historical regulation addressing that problem" or evidence that "earlier generations addressed

---

[3] *Bruen*, 142 S. Ct. at 2127.
[4] *Id.* at 2126.
[5] *Id.* at 2131–32.
[6] *Id.* at 2131.
[7] *Id.* at 2132.

2

the societal problem . . . through materially different means" are "relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[8]

In contrast, for modern problems that early legislatures did not confront, *Bruen* allows for a more extended comparison. Here, the government must show by analogical reasoning that its regulation is "relevantly similar" to a historical firearm regulation.[9] Under this prong, the government must show that the "modern and historical regulations impose a comparable burden on the right of armed self-defense and . . . that the burden is comparably justified."[10] In other words, the government need not identify a "historical twin," but only show that the regulations are aligned as to "*how* and *why* [they] burden a law-abiding citizen's right to armed self-defense."[11]

II.

This framework helps to illuminate my substantive disagreement with the Majority opinion, which begins with its characterization of the societal problem addressed by § 922(g)(1). The Majority asserts that "§ 922(g)(1) is a straightforward 'prohibition[] on the possession of firearms by felons.'"[12] This is overbroad.

---

[8] *Id.*

[9] *Id.*

[10] *Id.* at 2133.

[11] *Id.* (emphasis added).

[12] Op. 16 (quoting *Heller*, 554 U.S. at 626).

To identify the problem Congress intended to address, "we look to the text, structure, and purpose of the statute and the surrounding statutory framework."[13]   Section 922(g)(1) makes it unlawful for a person "convicted in any court, of a crime punishable by imprisonment for a term exceeding one year" to "possess *in or affecting commerce*, any firearm or ammunition."[14]   This jurisdictional language is essential.  In other contexts, such as for the purposes of categorical analysis or meeting the requirement of scienter, the Supreme Court has distinguished "substantive" from "jurisdictional" elements.[15] In § 922(g)(1), however, "far from being token, [the] 'conventional jurisdictional element[]' serve[s] to narrow the kinds of crimes that can be prosecuted."[16]   Here, the jurisdictional element constrains Congress's reach "to a discrete set of firearm possessions that additionally have an explicit connection with or effect on interstate commerce."[17]

The Supreme Court reached this exact conclusion in analyzing § 922(g)(1)'s predecessor, "conclud[ing] that the commerce requirement . . . must be read as part of the 'possesses' and 'receives' offenses."[18]   Otherwise, the Court concluded, the statute would "dramatically intrude[] upon

---

[13] *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 419 (3d Cir. 2016) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)).

[14] 18 U.S.C. § 922(g)(1) (emphasis added).

[15] *See Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019); *Torres v. Lynch*, 578 U.S. 452, 457 (2016).

[16] *Torres*, 578 U.S. at 486 (dissent, J. Sotomayor, with Thomas, J. and Breyer, J.).

[17] *United States v. Lopez*, 514 U.S. 549, 562 (1995).

[18] *United States v. Bass*, 404 U.S. 336, 350 (1971).

traditional state criminal jurisdiction."[19]  The line of Supreme Court decisions concerning § 922(g)(1) and its predecessor statute[20] deal squarely with the Commerce Clause,[21] considering Congress's authority to regulate firearms in interstate commerce in light of those "modern-era precedents" that, within strict limits, expanded Congress's authority to address "great changes that had occurred in the way business was carried on in this country."[22]  Our Court, with our sisters, expressly upheld the constitutionality of § 922(g)(1) because "by its very terms, [it] only regulates those weapons affecting interstate commerce *by being the subject of interstate trade.  It addresses items sent in interstate commerce and the channels of commerce themselves, delineating that the latter be kept clear of firearms.*"[23]    Accordingly, the societal problem

---

[19] *Id.*

[20] Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C.App. § 1202(a).

[21] *Lopez*, 514 U.S. at 556 (favorably contrasting § 922(g)(1) with § 922(q), which the Court deemed unconstitutional for lack of a nexus to interstate commerce); *Scarborough v. United States*, 431 U.S. 563 (1977) (holding § 922(g)(1)'s predecessor statute constitutional); *Bass*, 404 U.S. 336 (same).

[22] *Lopez*, 514 at 556.

[23] *United States v. Singletary*, 268 F.3d 196, 204 (2001); *United States v. Gateward*, 84 F.3d 670, 672 (3d Cir. 1996) ("Congress drafted § 922(g) to include a jurisdictional element, one which requires a defendant felon to have possessed a firearm 'in or affecting commerce.'"); *accord U.S. v. Wallace*, 889 F.2d 580 (5th Cir. 1989) ("[S]ection 922(g) reaches only those firearms that traveled in interstate or foreign commerce and is thus constitutional); *United States v. Dupree*, 258 F.3d 1258, 1259 (2001); *United States v. Stuckey*, 255 F.3d 528,

addressed by § 922(g)(1) is the possession of firearms *in interstate commerce* by particular "channels of commerce"— those channels under the language of § 922(g)(1) being individuals with certain criminal convictions.[24]

The Majority concludes, and I agree, that *Bruen* "abrogated our Second Amendment jurisprudence,"[25] meaning the line of cases from *Marzzarella*,[26] through *Binderup*,[27] to *Holloway* and *Folajtar*.[28] Yet the Majority does not assert that *Bruen* abrogated our Commerce Clause jurisprudence or that of the Supreme Court.[29] Rightly so. We must "leave to the

---

529-30 (8th Cir. 2001); *United States v. Gallimore*, 247 F.3d 134, 137–38 (4th Cir. 2001); *United States v. Davis*, 242 F.3d 1162, 1162–63 (9th Cir. 2001); *United States v. Santiago*, 238 F.3d 213, 216-17 (2d Cir. 2001); *United States v. Dorris*, 236 F.3d 582, 584–86 (10th Cir. 2000); *United States v. Napier*, 233 F.3d 394, 399–402 (6th Cir. 2000); *United States v. Wesela*, 223 F.3d 656, 659–60 (7th Cir. 2000).

[24] Notably, § 921(a)(20)(A) makes clear that § 922(g)(1) does not apply uniformly to individuals convicted of any felony offense, expressly excluding individuals convicted of serious "Federal and State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses." Accordingly, to describe the statute as a ban on possession by "felons" overstates its reach.

[25] Op. 10.

[26] *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).

[27] *Binderup v. Att'y Gen.*, 836 F.3d 336 (3d Cir. 2016) (en banc) (plurality).

[28] *Holloway v. Att'y Gen.*, 948 F.3d 164 (3d Cir. 2020); *Folajtar v. Att'y Gen.*, 980 F.3d (1)

[29] *Lopez*, 514 U.S. at 556; *Scarborough*, 431 U.S. at 566–67 (holding proof the firearm petitioner possessed had previously

[Supreme] Court itself 'the prerogative of overruling its own decision[s].'"[30]  The Court did not, in *Bruen*, overrule its decisions upholding Congress's power to regulate the possession of firearms in interstate commerce.[31]  These decisions remain good law.

Under the constitutionally mandated Commerce Clause jurisprudence that continues to bind us, Range lacks standing. "It is well established that plaintiffs bear the burden of demonstrating that they have standing in the action that they

---

traveled in interstate commerce sufficient to meet the nexus requirement); *Bass*, 404 U.S. at 350 (holding § 922(g)(1)'s predecessor constitutional in light of the jurisdictional element); *accord Greer v. United States*, 141 S. Ct. 2090, 2095 (2021) (citing *Rehaif*, 139 S. Ct. at 2194 (clarifying the mens rea requirement under § 922(g)(1)); *Logan v. United States*, 552 U.S. 23, 37 (2007) (clarifying the scope of § 921(a)(20)). *See also Small v. United States*, 544 U.S. 385, 394 (2005) (Thomas, J., dissenting) (calling for § 922(g)(1) to apply to a *wider* category of individuals, specifically those convicted in foreign courts).

[30] *Singletary*, 268 F.3d at 205.

[31] As the Majority acknowledges, Op. 16, Justice Kavanaugh's concurrence in *Bruen*, joined by the Chief Justice, asserted that felon-possession prohibitions remain "presumptively lawful" under *Heller* and *McDonald*. 142 S. Ct. at 2162 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626–27 & n.26 (2008) (citing *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)).

have brought."[32]   To meet this burden, they must demonstrate "(1) the invasion of a concrete and particularized legally protected interest and resulting [actual or imminent] injury. . . . (2) a causal connection between the injury and the conduct complained of . . . and [3] that the injury will be redressed by a favorable decision."[33]

Before the District Court, Range alleged that "he suffers the on-going harm of being unable to obtain firearms from licensed federal firearms dealers."[34]   While the District of Columbia Court of Appeals has recognized a cognizable injury where "the federal regulatory scheme thwarts [a challenger's] continuing desire to purchase a firearm," it did so in cases where the regulation's facial constitutionality was at issue.[35]

---

[32] *Blunt v. Lower Merion Sch. Dist.,* 767 F.3d 247, 278 (3d Cir. 2014) (citing *Danvers Motor Co. v. Ford Motor Co.,* 432 F.3d 286, 291 (3d Cir. 2005)).

[33] *Id*. at 278 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[34] Appx026.

[35] *Dearth v. Holder*, 641 F.3d 499, 503 (D.C. Cir. 2011) (affirming that the petitioner suffered a cognizable injury where "the federal regulatory scheme thwarts his continuing desire to purchase a firearm"); *see Parker v. District of Columbia,* 478 F.3d 370, 376 (D.C. Cir. 2007) ("The formal process of application and denial, however routine, makes the injury to [the petitioner's] alleged constitutional interest concrete and particular."), *aff'd sub nom. District of Columbia v. Heller*, 554 U.S. 570 (2008); see *United States v. Salerno,* 481 U.S. 739, 745 (1987) ("A party asserting a facial challenge 'must establish that no set of circumstances exists under which the Act would be valid.").

Here, Range brought only an as-applied challenge.[36]
Moreover, he has identified no specific firearm that he has been
prohibited from possessing.  To sustain a conviction under §
922(g)(1), the government must prove beyond a reasonable
doubt that the specific firearm possessed by the individual
moved through interstate commerce.[37]  The reason is that while
the nexus need only be minimal,[38] § 922(g)(1) simply does not

---

[36] *See United States v. Marcavage,* 609 F.3d 264, 273 (3d Cir.
2010) ("An as-applied attack . . . does not contend that a law is
unconstitutional as written but that its application to a
particular person under particular circumstances deprived that
person of a constitutional right.").

[37] *See Singletary,* 268 F.3d at 200; *accord United States v.
Shambry*, 392 F.3d 631, 632 (3d Cir. 2004); *United States v.
Leuschen*, 395 F.3d 155, 160 (3d Cir. 2005).

[38] *See Shambry*, 392 F. 3d at 635 (citing *United States v.
Corey,* 207 F.3d 84, 88 (1st Cir.2000) ("[T]he 'interstate
nexus' element was met provided the government
demonstrated that [the defendant] possessed the shotgun in a
state other than the one in which it was manufactured.");
*United States v. Lawson,*173 F.3d 666, 670 (8th Cir. 1999)
(finding that the stipulation that the guns were manufactured
outside of the state where the defendant possessed them
satisfied "'the minimal nexus that the firearms have been, at
some time, in interstate commerce,' that is, that the firearms at
some point prior to [the defendant's] possession . . . crossed a
state line" (quoting *United States v. Shelton,* 66 F.3d 991, 992
(8th Cir. 1995) (per curiam))); *United States v. Pierson,* 139
F.3d 501, 504 (5th Cir. 1998) ("[E]vidence that a gun was
manufactured in one state and possessed in another state is
sufficient to establish a past connection between the firearm
and interstate commerce."); *United States v. Crump,* 120 F.3d

criminalize possession of firearms *out* of interstate commerce. Here, Range has not asserted that this constitutionally reviewed regulation of commerce intrudes on any Second Amendment rights by establishing in § 922(g)(1) a prohibition on certain channels of commerce, *i.e.*, felons, possessing firearms that have circulated in interstate commerce.[39]

---

462, 466 & n. 2 (4th Cir. 1997) ("[It] is our view that the movement of a firearm beyond the boundaries of its state of manufacture 'substantially affects' interstate commerce. . . ."); *United States v. Lewis,* 100 F.3d 49, 50 (7th Cir. 1996) ("[P]roof of a gun's manufacture outside of the state in which it was allegedly possessed is sufficient to support the factual finding that the firearm was 'in or affecting commerce.'" (quoting *United States v. Lowe,* 860 F.2d 1370, 1374 (7th Cir. 1988))); *United States v. Farnsworth,* 92 F.3d 1001, 1006 (10th Cir. 1996) (finding expert testimony that the defendant's gun had been manufactured in a different state from that in which it was found was sufficient nexus to interstate commerce); *United States v. Sanders,* 35 F.3d 61, 62 (2d Cir. 1994) (finding fact that gun was manufactured in a state different from that in which it was possessed was sufficient nexus to interstate commerce); *United States v. Morris,* 904 F.2d 518, 519 (9th Cir. 1990) (same); *United States v. Singleton,* 902 F.2d 471, 473 (6th Cir. 1990) ("[T]he mere fact that the firearm was manufactured in a different state established a sufficient nexus with interstate commerce.")).

[39] The Eighth Circuit recently rejected a similar as-applied challenge to § 922(g)(1). The decision underscored Congress' recognition that "only through adequate Federal control over interstate and foreign commerce in these weapons" could the "grave problem" of lawlessness and violent crime in the United States be dealt with, as it arose from the "widespread

In short, the harm that Range has asserted is not constitutional. He has failed to set forth the necessary interstate commerce connections to allow federal jurisdiction of his complaint. He has merely established that a thoroughly reviewed statute has had its intended effect by preventing him from possessing a firearm in interstate commerce because of his particular criminal conviction, which falls within the statute's clearly defined ambit.

This jurisdictional deficiency has put Range's claims beyond our reach. It is not unlikely, however, that a future challenge to the prohibition of § 922(g)(1) will come before us in which federal jurisdiction has been properly established. In such a case, I would share the concern expressed today by my dissenting colleagues[40] about the extent to which this precedential opinion may reverberate beyond the circumstances presented in this as-applied challenge. Certainly, such an analysis would be crucial for us should a future, similar challenge arise within our jurisdiction, particularly on a facial basis.

---

traffic in firearms moving in or otherwise affecting interstate or foreign commerce" and "the ease with which any person can acquire firearms other than a rifle or shotgun." *United States v. Jackson*, No. 22-2870, 2023 WL 3769242, *8 (8th Cir. June 2, 2023). Although the court thus tacitly and, in my view, appropriately acknowledged that Congress' authority to regulate here was under the Commerce Clause, it unfortunately did not address whether Jackson had established standing accordingly for his as-applied challenge.

[40] *See generally* Shwartz Dissent; Krause Dissent 4–5.

For the above reasons, I respectfully dissent.

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the

Joint Status Report was filed electronically through the Eastern District of

Pennsylvania Electronic Filing System. Notice of these filing will be sent by

operation of the Court's Electronic Filing System to all registered users in

this case.

_____
Joshua Prince, Esq.