## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD A. WILLIAMS** | **:** | |
| Plaintiff | **:** | Civil Action No.  17-CV-2641 |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| **MERRICK GARLAND,** *et al.* | **:** | Judge John Milton Younge |
| Defendants | **:** | |

### Exhibit List to Plaintiff's Fourth Motion for Summary Judgment

**Exhibit A**:  Pennsylvania State Police Background Check

**Exhibit B**:  Federal Firearms Act of 1938

**Exhibit C**:  Declaration and Expert Witness Robert Gordon's Report

# Exhibit A
*(PSP Background Check)*

# PENNSYLVANIA STATE POLICE

1800 Elmerton Avenue
Harrisburg, PA 17110

Control #
**R17746166**

# REQUEST FOR CRIMINAL RECORD CHECK

**JOSHUA PRINCE**
**646 LENAPE ROAD**
**BECHTELSVILLE PA 19505**

**TELEPHONE: (610) 845-3803**

**TO WHOM IT MAY CONCERN:**

**THE PENNSYLVANIA STATE POLICE DOES HEREBY CERTIFY THAT:**

**Name:** Williams, Edward
**Date of Birth**
**Social Security #**
**Sex:** M
**Race:** Unknown
**Date of Request:** 3/13/2017 11:00:00 AM
**Purpose of Request:** Other

**Maiden Name and/or Alias (1)**       **(2)**

          **(3)**       **(4)**

**\*\*\* HAS A CRIMINAL RECORD IN PENNSYLVANIA BASED ON A CHECK OF THE ABOVE
IDENTIFIERS - CRIMINAL RECORD FOR SID NO: 184-59-80-9 ATTACHED\*\*\***

THE INFORMATION DISSEMINATED BY THE CENTRAL REPOSITORY IS BASED SOLELY ON THE FOLLOWING
IDENTIFIERS THAT MATCH THOSE FURNISHED BY THE REQUESTER:

[Y] **NAME**      [Y] **SOCIAL SECURITY NUMBER** [N] **MAIDEN / ALIAS NAME**
[Y] **DATE OF BIRTH** [N] **RACE**    [Y] **SEX**

THE RESPONSE IS BASED ON A COMPARISON OF DATA PROVIDED BY THE REQUESTER AGAINST
INFORMATION CONTAINED IN THE FILES OF THE PENNSYLVANIA STATE POLICE CENTRAL REPOSITORY
ONLY. PLEASE CONFIRM IDENTIFIERS PROVIDED. POSITIVE IDENTIFICATION CANNOT BE MADE
WITHOUT FINGERPRINTS. THE PENNSYLVANIA STATE POLICE RESPONSE DOES NOT PRECLUDE THE
EXISTENCE OF CRIMINAL RECORDS, WHICH MIGHT BE CONTAINED IN THE REPOSITORIES OF OTHER
LOCAL, STATE, OR FEDERAL CRIMINAL JUSTICE AGENCIES.

[ ] COMPARISON MADE WITH FINGERPRINTS

ADDITIONAL INFORMATION MAY BE AVAILABLE FROM QUERIES OF OTHER STATE AND FEDERAL DATABASES.

[ ] SEE WEBSITE:http://www.casanet.org/program-management/volunteer-manage/criminal-bkg-check.htm

[ ] PENNSYLVANIA'S MEGAN'S LAW WEBSITE AT:http://pameganslaw.state.pa.us/
QUESTIONS CONCERNING THIS CRIMINAL RECORD CHECK SHOULD BE DIRECTED TO THE PATCH HELP LINE TOLL
FREE AT 1-888-QUERY-PA (1-888-783-7972)

**CERTIFIED BY:**

DISSEMINATED BY:703182
03/22/2017

**Lieutenant Richard O Quinn**
Director, Criminal Records and Identification Division
Pennsylvania State Police

```
                        PENNSYLVANIA STATE POLICE
                           CENTRAL REPOSITORY
                          1800 ELMERTON AVENUE
                      HARRISBURG, PENNSYLVANIA 17110
                            (888) 783-7972
```

=================================================================================
```
    USE OF THE FOLLOWING CRIMINAL HISTORY RECORD *** SID 184-59-80-9 ***
                     REGULATED BY ACT 47, AS AMENDED.
```
=================================================================================

```
                            IDENTIFICATION
NAME: WILLIAMS, EDWARD A
SID: 184-59-80-9                        DOB:                    SOC:
SEX: MALE              RAC: BLACK        HAI: BLACK              EYE: BLACK
HGT: 6'01"            WGT: 230
POB:                 US CITIZEN: YES
COUNTRY OF CITIZENSHIP: UNITED STATES
```
=================================================================================
```
                            CRIMINAL HISTORY
NAME: WILLIAMS, EDWARD                        OTN: N293062-0
ARRESTED: 2004/09/07  PAPEP0000  PHILADELPHIA                    OCA: C0935505
DISPO DATE: 2006/06/15
DISTRICT JUSTICE DOCKET NUMBER: MC 0409-0216
```

```
                          *** COURT DATA ***
OFFENSE
DATE       CHARGE                    COUNT   GRADE DISPOSITION
-------    ------                    -----   ----- -----------
2004/09/07 VC3802 DRIVING UNDER      1             FOUND GUILTY/
           THE INFLUENCE                           COUNTY PRISON/
           OF ALCOHOL OR                           90 DYS - 002 YR-
           CONTROLLED                              S
           SUBSTANCE
```

FOR MORE INFORMATION, CONTACT THE APPROPRIATE COURT OF RECORD
=================================================================================
```
                        PROBATION/PAROLE INFORMATION
                                 START       END                  LIFE
AGENCY                 OCA       DATE        DATE       PAR/PRO    CODE
------                 ---       -----       -----      -------    ------
PA051023G              C0935505  2006/06/15  2008/06/15 PAROLE
PHILADELPHIA
APPLIES TO OTN: N293062-0
```
=================================================================================
```
                        ADDITIONAL IDENTIFIERS
AKAs: WILLIAMS, EDWARD ALS / WILLIAMS, EDWARD ALS JR
DOBs:
SOCs:
MNUs:
```
=================================================================================
```
          F=FELONY, M=MISDEMEANOR, S=SUMMARY AND THE NUMERIC=DEGREE
          ARREST(S) SUPPORTED BY FINGERPRINT CARD(S) ON FILE
```

RESPONSE BASED ON COMPARISON OF REQUESTER FURNISHED INFORMATION AND/OR
FINGERPRINTS AGAINST A NAME INDEX AND/OR FINGERPRINTS CONTAINED IN THE FILES OF
THE PENNSYLVANIA STATE POLICE CENTRAL REPOSITORY ONLY, AND DOES NOT PRECLUDE
THE EXISTENCE OF OTHER CRIMINAL RECORDS WHICH MAY BE CONTAINED IN THE
REPOSITORIES OF OTHER LOCAL, STATE, OR FEDERAL CRIMINAL JUSTICE AGENCIES.

THE PENNSYLVANIA STATE POLICE IS IN THE PROCESS OF SWITCHING FROM SCN CHARGE CODES TO
THE PURDON'S FORMAT. RAP RESPONSES MAY SHOW BOTH SCN AND PURDON'S FORMATTED CHARGES.

***************************** END OF RAP SHEET *****************************

# Exhibit B
## (*Federal Firearms Act of 1938*)

PUBLIC LAWS—CH. 850—JUNE 30, 1938     [52 Stat.

[CHAPTER 850]

## AN ACT

To regulate commerce in firearms.

June 30, 1938
[S. 3]
[Public, No. 785]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That as used in this Act—

Federal Firearms Act.
Definitions.
"Person."

(1) The term "person" includes an individual, partnership, association, or corporation.

"Interstate or foreign commerce."

(2) The term "interstate or foreign commerce" means commerce between any State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession (including the Philippine Islands but not including the Canal Zone), or the District of Columbia, but through any place outside thereof; or within any Territory or possession or the District of Columbia.

"Firearm."

(3) The term "firearm" means any weapon, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosive and a firearm muffler or firearm silencer, or any part or parts of such weapon.

"Manufacturer."

(4) The term "manufacturer" means any person engaged in the manufacture or importation of firearms, or ammunition or cartridge cases, primers, bullets, or propellent powder for purposes of sale or distribution; and the term "licensed manufacturer" means any such person licensed under the provisions of this Act.

"Dealer."

(5) The term "dealer" means any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or fitting special barrels, stocks, trigger mechanisms, or breach [1] mechanisms to firearms, and the term "licensed dealer" means any such person licensed under the provisions of this Act.

"Licensed dealer."

"Crime of violence."

(6) The term "crime of violence" means murder, manslaughter, rape, mayhem, kidnaping, burglary, housebreaking; assault with intent to kill, commit rape, or rob; assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment for more than one year.

"Fugitive from justice."

(7) The term "fugitive from justice" means any person who has fled from any State, Territory, the District of Columbia, or possession of the United States to avoid prosecution for a crime of violence or to avoid giving testimony in any criminal proceeding.

"Ammunition."

(8) The term "ammunition" shall include all pistol or revolver ammunition except .22-caliber rim-fire ammunition.

Unlawful acts.
Transportation, etc., of firearms or *ammunition* without license.

Sec. 2. (a) It shall be unlawful for any manufacturer or dealer, except a manufacturer or dealer having a license issued under the provisions of this Act, to transport, ship, or receive any firearm or ammunition in interstate or foreign commerce.

Knowingly receiving same.

(b) It shall be unlawful for any person to receive any firearm or ammunition transported or shipped in interstate or foreign commerce in violation of subdivision (a) of this section, knowing or having reasonable cause to believe such firearms or ammunition to have been transported or shipped in violation of subdivision (a) of this section.

Transportation, etc, to other than licensed manufacturer or dealer.

(c) It shall be unlawful for any licensed manufacturer or dealer to transport or ship any firearm in interstate or foreign commerce to any person other than a licensed manufacturer or dealer in any State the laws of which require that a license be obtained for the purchase of such firearm, unless such license is exhibited to such manufacturer or dealer by the prospective purchaser.

1 So in original.

(d) It shall be unlawful for any person to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition to any person knowing or having reasonable cause to believe that such person is under indictment or has been convicted in any court of the United States, the several States, Territories, possessions (including the Philippine Islands), or the District of Columbia of a crime of violence or is a fugitive [1] from justice.

Shipment to person under indictment, etc.

(e) It shall be unlawful for any person who is under indictment or who has been convicted of a crime of violence or who is a fugitive [1] from justice to ship, transport, or cause to be shipped or transported in interstate or foreign commerce any firearm or ammunition.

Shipment by person under indictment, etc.

(f) It shall be unlawful for any person who has been convicted of a crime of violence or is a fugitive [1] from justice to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce, and the possession of a firearm or ammunition by any such person shall be presumptive evidence that such firearm or ammunition was shipped or transported or received, as the case may be, by such person in violation of this Act.

Receipt by person convicted of crime of violence, etc.

(g) It shall be unlawful for any person to transport or ship or cause to be transported or shipped in interstate or foreign commerce any stolen firearm or ammunition, knowing, or having reasonable cause to believe, same to have been stolen.

Transportation of stolen firearms, etc.

(h) It shall be unlawful for any person to receive, conceal, store, barter, sell, or dispose of any firearm or ammunition or to pledge or accept as security for a loan any firearm or ammunition moving in or which is a part of interstate or foreign commerce, and which while so moving or constituting such part has been stolen, knowing, or having reasonable cause to believe the same to have been stolen.

Traffic in stolen firearms.

(i) It shall be unlawful for any person to transport, ship, or knowingly receive in interstate or foreign commerce any firearm from which the manufacturer's serial number has been removed, obliterated, or altered, and the possession of any such firearm shall be presumptive evidence that such firearm was transported, shipped, or received, as the case may be, by the possessor in violation of this Act.

Transportation of firearms from which serial number has been removed.

SEC. 3. (a) Any manufacturer or dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce shall make application to the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application. The applicant shall, if a manufacturer, pay a fee of $25 per annum and, if a dealer, shall pay a fee of $1 per annum.

Licenses, application, fee.

(b) Upon payment of the prescribed fee, the Secretary of the Treasury shall issue to such applicant a license which shall entitle the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce unless and until the license is suspended or revoked in accordance with the provisions of this Act: *Provided*, That no license shall be issued to any applicant within two years after the revocation of a previous license.

Issuance.

*Proviso.*
Issuance after revocation.

(c) Whenever any licensee is convicted of a violation of any of the provisions of this Act, it shall be the duty of the clerk of the court to notify the Secretary of the Treasury within forty-eight hours after such conviction and said Secretary shall revoke such license: *Provided*, That in the case of appeal from such conviction the licensee may furnish a bond in the amount of $1,000, and upon receipt of such bond acceptable to the Secretary of the Treasury he may permit the licensee to continue business during the period of the appeal, or should the licensee refuse or neglect to furnish such bond, the Secre-

Revocation on conviction of licensee.

*Proviso.*
Temporary continuance; bond.

---

[1] So in original.

tary of the Treasury shall suspend such license until he is notified by the clerk of the court of last appeal as to the final disposition of the case.

Dealers' records.

(d) Licensed dealers shall maintain such permanent records of importation, shipment, and other disposal of firearms and ammunition as the Secretary of the Treasury shall prescribe.

Exemptions.

SEC. 4. The provisions of this Act shall not apply with respect to the transportation, shipment, receipt, or importation of any firearm,

Federal, State governments, agencies, etc.

or ammunition, sold or shipped to, or issued for the use of, (1) to the United States or any department, independent establishment, or agency thereof; (2) any State, Territory, or possession, or the District of Columbia, or any department, independent establishment, agency, or any political subdivision thereof; (3) any duly commissioned officer or agent of the United States, a State, Territory, or possession, or the District of Columbia, or any political subdivision

Banks, carriers, etc.

thereof; (4) or to any bank, public carrier, express, or armored-truck company organized and operating in good faith for the transporta-

Research laboratories.

tion of money and valuables; (5) or to any research laboratory

*Proviso.*

designated by the Secretary of the Treasury: *Provided*, That such

Exemptions granted by Secretary of Treasury.

bank, public carriers, express, and armored-truck companies are granted exemption by the Secretary of the Treasury; nor to the

Antiques, curios, etc.

transportation, shipment, or receipt of any antique or unserviceable firearms, or ammunition, possessed and held as curios or museum

Shipments to designated institutions or persons.

pieces: *Provided*, That nothing herein contained shall be construed to prevent shipments of firearms and ammunition to institutions, organizations, or persons to whom such firearms and ammunition may be

Military training, etc.

lawfully delivered by the Secretary of War, nor to prevent the transportation of such firearms and ammunition so delivered by their lawful possessors while they are engaged in military training or in competitions.

Penalty provisions.

SEC. 5. Any person violating any of the provisions of this Act or any rules and regulations promulgated hereunder, or who makes any statement in applying for the license or exemption provided for in this Act, knowing such statement to be false, shall, upon conviction thereof, be fined not more than $2,000, or imprisoned for not more than five years, or both.

Effective date.

SEC. 6. This Act shall take effect thirty days after its enactment.

Rules and regulations.

SEC. 7. The Secretary of the Treasury may prescribe such rules and regulations as he deems necessary to carry out the provisions of this Act.

Separability of provisions.

SEC. 8. Should any section or subsection of this Act be declared unconstitutional, the remaining portion of the Act shall remain in full force and effect.

Short title.

SEC. 9. This Act may be cited as the Federal Firearms Act.

Approved, June 30, 1938.

---

[CHAPTER 851]

### AN ACT

June 30, 1938
[S. 1131]
[Public, No. 786]

To amend the part of the Act entitled "An Act making appropriations for the naval service for the fiscal year ending June 30, 1921, and for other purposes", approved June 4, 1920, relating to the conservation, care, custody, protection, and operation of the naval petroleum and oil-shale reserves.

*Be it enacted by the Senate and House of Representatives of the*

Naval petroleum reserves.
41 Stat. 813.
34 U. S. C. § 524.

*United States of America in Congress assembled*, That the part of the Act entitled "An Act making appropriations for the naval service for the fiscal year ending June 30, 1921, and for other purposes", approved June 4, 1920 (41 Stat. 813), relating to the conservation, care, custody, protection, and operation of the naval petroleum and

# Exhibit C
*(Declaration and Expert Witness Robert Gordon's Report)*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD A. WILLIAMS** | : | |
| Plaintiff | : | Civil Action No.  17-CV-2641 |
| | : | |
| **v.** | : | Honorable Robert F. Kelly |
| | : | |
| **JEFFERSON B. SESSIONS III,** *et al.* | : | |
| | : | |
| Defendants | : | |

## DECLARATION OF ROBERT M. GORDON, Ph.D., ABPP

I, Robert M. Gordon, Ph.D., ABPP, am competent to state and declare that I drafted the expert report that has been submitted in this matter as Exhibit J to Plaintiff's Second Motion for Summary Judgment and that, pursuant to the penalty of perjury, everything in that report is true and correct to the best of my information, knowledge and belief.

I further declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge and belief.

DATED: November 14, 2018

Robert Gordon, Ph.D., ABPP

1

**Robert M. Gordon, Ph.D., ABPP**
**Board Certified in Clinical Psychology and in Psychoanalysis**
**Clinical and Forensic Psychology**
**1259 South Cedar Crest Boulevard, Suite #325**
**Allentown, Pennsylvania 18103-6261**
**610.417.0501**
**rmgordonphd@gmail.com  www.mmpi-info.com**

## Psychological Evaluation
## (Confidential)

**Name:** Edward A. Williams
**Age:** 50
**Psychologist:** Robert M. Gordon, Ph.D. ABPP
**Place of Examination:** Office of RMG
**Date of Examination:** August 7, 2018
**Report Date:** 9/10/18

**Referral Issue:** This assessment is to determine if Mr. Williams is fit to be allowed to own, possess, carry, and use a firearm without risk to him or any other person.

**Procedures:**
- Document Review
- Forensic History Form
- Brief Psychiatric Rating Scale
- Montreal Cognitive Assessment (MOCA)
- Minnesota Multiphasic Personality Inventory -2 (MMPI-2);
- Violence Risk Appraisal Guide- Revised (VRAG-R)
- Psychopathic Check List- Revised (PCL-R)
- Psychodiagnostic Chart (PDC-2)

**Informed Consent and Confidentiality waiver:**
The examiner reviewed the meaning of the Informed Consent and Confidentiality waiver. Mr. Williams read it and signed it.

### Documents Reviewed in Forming My Opinion

**1. FBI Investigation Report on Mr. Williams 2018/02/27:**
1- Arrest Date 2001-11-22
Charge Literal DUI OF ALCOHOL OR CONTRL SUBST
Charge Description
Statute DUI OF ALCOHOL OR CONTRL SUBST (VC3731
Pennsylvania)
Severity MISDEMEANOR 2
Disposition (Dismissed 2003-03-07; QUASHED/ DISMISSED/ DEMURRER SUSTAINED)
2- Final Disposition Date 2004-09-07

1

Charge Literal DUI OF ALCOHOL OR CONTRL SUBST
Charge Description
Statute DUI OF ALCOHOL OR CONTRL SUBST (VC3802
Pennsylvania)
State Offense Code VC3802
Counts 1
Severity
Inchoate Charge
Disposition (Convicted 2006-06-15; FOUND GUILTY/ COUNTY
PRISON/ 90 DYS - 002 YRS)

## 2. Compressed Transcript of the Testimony of EDWARD A. WILLIAMS, 5/8/18:
"Page 9
Q. How many people have you been
2 married to?
3 A. One.
4 Q. Are you currently married to that
5 person?
6 A. Yes.
7 Q. Who is that person?
8 A. Kimberly Williams.
9 Q. When did you get married to
10 Kimberly Williams?
11 A. 1993.
12 Q. You said you're currently married;
13 right?
14 A. Yes.
15 Q. Do you have any children?
16 A. One child.
17 Q. How old is your kid?
18 A. 13.
19 Q. What's your kid's name?
20 A. Nia, N-I-A.
21 Q. Does Nia live with you?
22 A. Yes.
23 Q. Let's dig into your employment
24 history a little bit more just to make sure I
25 have a clear understanding. Let's start from
Page 10
1 as far back as we can go.
2 Do you recall what your
3 first employment position was?
4 A. At the age of 14?
5 Q. Sure. Let's go for it. This is
6 going to be a long trip down memory lane, but I
7 assure you it should be fun.
8 A. McDonald's in high school.
9 Q. How about after that?
10 A. It would be in college then. It was
11 a diner and a Wendy's.
12 Q. How about after those?

13 A. Then I moved here to Philadelphia
14 and I've been with The Vann Organization ever
15 since.
16 Q. Where did you move to Philadelphia
17 from?
18 A. State college.
19 Q. From college?
20 A. Yes.
21 Q. Were you originally from
22 Philadelphia?
23 A. New York.
24 Q. So whenever you moved to
25 Philadelphia from State College, you started
Page 11
1 working at The Vann Organization; right?
2 A. Yes.
3 Q. What year was that?
4 A. 1992.
5 Q. I understand you have an assortment
6 of positions with The Van Organization, but how
7 has that changed over time since you've worked
8 for them in 1992?
9 A. Just expanded the roles. Taking on
10 more projects that are different
11 responsibilities. I started out as an
12 inspector and then I would be considered a
13 senior construction manager.
14 Q. Did you have any other titles in
15 between those titles, inspector and senior
16 construction manager?
17 A. Consultant basically.
18 Q. How about any other employment
19 since 1992?
20 A. I worked part-time at a firing
21 range and pistol shop…"

"Page 17
7 Q. When did you learn Mr. Williams
8 that you could not own a gun?
9 A. 2014.
10 Q. Do you recall what it was that
11 caused you to learn that?
12 A. I had applied for my license to
13 carry and I got denied. I hired an attorney who
14 wrote some letters for me and the Pennsylvania
15 State Police finally confirmed the decision
16 that I couldn't hold, according to the state
17 laws, hired Joshua Prince and his firm, and
18 after checking, they determined that I
19 shouldn't have anything in my possession…"
"Page 18

3

19 Q. Was your license to carry revoked
20 during your first DUI in 2001 or the 2004 DUI?
21 A. 2004."

"Page 21-22
Q. Me too.
14 Do you have any pending or
15 outstanding criminal charges in any other
16 state?
17 A. No.
18 Q. Do you have any pending or criminal
19 charges in Pennsylvania?
20 A. No.
21 Q. Do you use or are you addicted to
22 any controlled substance alcohol other than
23 alcohol or tobacco?
24 A. No.
25 Q. Have you ever used any elicit
Page 22
1 drugs?
2 A. No.
3 Q. Have you ever used prescription
4 medications, but for a nonmedical purpose?
5 A. No.
6 Q. Do you know whether you're using
7 any controlled substances today?
8 A. No, I'm not."

"Page 23
12 Q. Have you ever had a restraining
13 order against you?
14 A. No.
15 Q. Have you ever been charged with any
16 crime with respect to domestic violence?
17 A. No.
18 Q. Have you ever been investigated for
19 engaging in domestic violence at all?
20 A. No."

"Page 24-25
17 Q. Have you ever been arrested for
18 anything else?
19 A. A retail theft.
20 Q. When was that?
21 A. In the '90s. '89 or '90.
22 Q. How were those charges ultimately
23 handled?
24 A. I had to pay a fine.
25 Q. Were you found guilty of the retail
1 theft?
2 A. I pleaded guilty and paid the fine.

4

3 Q. Do you recall where that was
4 located?
5 A. That was in State College.
6 Q. Can you tell me about what happened
7 that caused you to get charged with retail
8 theft?
9 A. Dumb I guess fraternity stuff that
10 I never ended completely pledging, given a
11 bunch of tasks and I chose the wrong task.
12 Q. More trouble than it's worth?
13 A. Yes. It was a $2.00 thing of some
14 type of hair gel.
15 Q. Did you serve any time for the
16 retail theft?
17 A. No.
18 Q. Have you ever been arrested for any
19 other offense?
20 A. No."

"Page 31
Q. We'll take a look at those later
5 then too.
6 Do you recall what
7 punishment you received for the 2004 DUI?
8 A. Yes, probation, the fines, maybe a
9 year suspension on my driver's license.
10 Q. How about the house arrest?
11 A. Yes, house arrest.
12 Q. Do you recall why you ended up
13 getting house arrest?
14 A. I believe it had something to do
15 with some of my medical history. The things I
16 was going through back then.
17 Q. Do you recall how many days of
18 house arrest it was?
19 A. It was 90."

"Page 33
16 Mr. Williams, have you ever
17 seen a mental health professional?
18 A. No.
19 Q. Have you ever been treated for
20 alcohol or substance abuse?
21 A. No.
22 Q. During this 2001 to 2004 time
23 period, were you having trouble with alcoholism
24 at all?
25 A. No."

"Page 34-36
Q. So starting in 2001 through this

13 2004/2005 time frame, was your usage of alcohol
14 different than it is today?
15 A. Yes.
16 Q. How different was it?
17 A. Then it was social drinker or
18 occasionally.
19 Q. This is from 2001 to 2005?
20 A. Yes.
21 Q. How did that change in 2005?
22 A. Decided to stop. My daughter is
23 now here, and didn't want to run the risk of
24 having another DUI worse than hurting myself or
25 killing myself or somebody else. It got to a
Page 35
1 point where I decided to do other things
2 besides happening out at the bars.
3 Q. It sounds like you still I think
4 you mentioned you still have an occasional
5 drink here and there. Did that start at a
6 particular period of time or did that start in
7 2005 and continue through today?
8 A. No. That might have started a
9 little while later. I decided to get a bottle
10 of champagne for New Year's. If I visit family
11 in North Carolina, like I said, recently there
12 was a death in the family and I hadn't seen a
13 bunch of cousins. We all got together and had a
14 couple of drinks at the house.
15 Q. Outside of those particular
16 circumstances between 2005 and today, has there
17 ever been a time where you've had more alcohol
18 to drink than that?
19 A. No.
20 Q. Have you ever driven under the
21 influence of alcohol since 2005?
22 A. No.
23 Q. Have you ever been pulled over for
24 being under the influence of alcohol since
25 2005?
Page 36
1 A. No.
2 Q. Have you ever driven under the
3 influence of alcohol any other time other than
4 the 2001 and 2004 occasions we've talked about?
5 A. No.
6 Q. Have you ever used your firearms
7 while under the influence of alcohol?
8 A. No.
9 Q. Have you ever gotten into a
10 physical altercation with anyone?
11 A. No.

6

12 Q. Never punched anybody before?
13 A. In high school.
14 Q. After high school?
15 A. No. My last fight was in high
16 school.
17 Q. Ever had any criminal issues with
18 respect to your use of firearms?
19 A. No."

**3. Exhibit List to Petitioners' Motion for Summary Judgment**

Exhibit A: Pennsylvania State Police Background Check
Exhibit B: Certified Sentencing Order *Commonwealth v. Edward Williams*

**4. Dr. Daniel William Webster CV**

**5. Expert Report of Daniel Webster, ScD July 11, 2018**

"In a seminal study using data on over 7,000 individuals from the National Institute of Mental Health's Epidemiologic Catchment Area Surveys in Durham, NC and Los Angeles, CA, Dr. Jeffrey Swanson examined the association between the onset of mental illnesses and alcohol abuse disorders and risks for subsequent violence.xxii The one-year prevalence of committing acts of violence was 15 to 24 percent for those with alcohol abuse disorder alone and 20 to 24 percent among those who abused alcohol and had a major mental illness...Swanson and colleagues used NCS-R data to examine the relationship between the confluence of firearm access and impulsive angry behavior in relation to abuse of alcohol or illicit drugs.xxiii The impulsive behaviors captured in the study included survey respondents' affirmative responses to one or more of the statements: "I have tantrums or angry outbursts," "Sometimes I get so angry that I break or smash things," and "I lose my temper and get into physical fights." Approximately 1.5% of the study sample exhibited one or more of these angry and impulsive behaviors and also either carried a firearm outside the home or keeping firearms in the home. Persons with substance abuse disorders were 2.4 times more likely to have explosive anger and carry a firearm outside the home and 2.7 times more likely to have explosive anger and keep a firearm in the home..."

While Dr. Webster presents some valid correlational research on groupings of individuals, it has a relatively small predictive value in generalizing to groups and does not predict the effect of two DUI's from 14-18 years ago, especially where the individual has no history of aggression. As Dr. Webster did not assess Mr. Williams, these generalizations are not relevant to this particular case, as any applicability would require an independent evaluation of the particular person. As set forth in this forensic report, I have assessed Mr. Williams, after reviewing all of the documents, performing a battery of tests and reviewing the results of the test and conclude, to a reasonable degree of psychological certainty, that the research relied upon by Dr. Webster is not applicable to Mr. Williams.

Furthermore, Dr. Webster's report has several additional deficiencies and erroneous conclusions as it relates to Mr. Williams. Those include:

1.  The report is premised on individuals who suffer from alcohol or abuse issues; however, there is no evidence of record that Mr. Williams currently suffers from any alcohol abuse or dependency issues and Dr. Webster does not contend – nor could he in the absence of performing a battery of tests on Mr. Williams – that Mr. Williams has an alcohol abuse or dependency issue.

2.  The report contends that there exists a statistical significance in relation to the reduction of future

violent crime when *those previously convicted of a violent crime* were barred from purchasing a handgun; however, there is no evidence of record that Mr. Williams was ever even charged with, let alone convicted of, a violent crime.

3.  The report contends that only 54% of repeat DUI offenders have alcohol dependency issues, leaving 46% without a dependency issue.

4.  The report fails to support a finding that alcohol-impairment and alcohol abuse are causal to unintentional firearm injuries or deaths, as it acknowledges a lack of data supporting that contention.

5.  The report contends that individuals *previously convicted of a misdemeanor crime of violence* are more likely to commit a violent crime in the future and then attempts to opine that the prohibitions against individuals, like Mr. Williams, prove a public safety benefit, even though Mr. Williams has never been convicted of a crime of violence. Further, one study relied upon by Dr. Webster reflected that "[t]here was no difference between the two groups in their rate of committing nonviolent crimes, suggesting that the difference observed in crimes involving firearms and/or violence…[was] more likely due to violent misdemeanants being prohibited and denied from purchasing a handgun."

6.  The report fails to show any link between preventing individuals convicted of a single DUI, such as Mr. Williams, and "preventing armed mayhem" as required by *Binderup v. U.S. Attorney General*, 836 F.3d 336, 353 (3d Cir. 2016)(*en banc*).

6.  **Complaint:**

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD A. WILLIAMS** | : | |
| Plaintiff | : | |
| | : | |
| **v.** | : | Civil Action No. _____ |
| | : | |
| **JEFF SESSIONS,** | : | |
| Attorney General of the United | : | |
| States | : | |
| | : | |
| **THOMAS E. BRANDON,** | : | |
| Acting Director, Bureau of Alcohol, | : | |
| Tobacco, Firearms, and Explosives | : | |
| | : | |
| **JAMES B. COMEY,** | : | Complaint – Civil Rights |
| Director of the Federal Bureau of | : | |
| Investigation | : | |
| | : | |
| **UNITED STATES OF** | : | |
| **AMERICA,** | : | |
| Defendants | : | |

---

8

"c. Is not under indictment;
d. Has never been convicted of a felony or misdemeanor crime of
domestic violence;
e. Has only once been convicted of a crime punishable by more than one
(1) year;
f. Is not a fugitive from justice;
g. Is not an unlawful user of, or addicted to, any controlled substance;
h. Has not been adjudicated a mental defective or been committed to a
mental institution;
i. Has not been discharged from the Armed Forces under dishonorable
conditions;
j. Has never renounced his citizenship; and,
k. Is not the subject of a restraining order relating to an intimate partner..."

21. As reflected on Mr. Williams's background check, his 2004 DUI is his only
criminal conviction. Id.
22. As a result of his conviction, Mr. Williams was placed under house arrest
with electronic monitoring for 90 days and ordered to pay costs, a fine of
$1,500.00, and complete any recommended drug and alcohol treatment..."

**7.  Declaration of Edward A. Williams 13-10-17, 5-8-18 (Doc. 9-5 and Deposition Exhibit Williams-3)**

**8.  Court and Police Records**

These include the court and police records relating to Mr. Williams, as well as, the convictions and grants
of federal firearms relief of John Kraszewski, 57 Fed. Reg. 6160-02, Kim Blake, 54 Fed. Reg. 33108-02,
and Barry Shoop 42 Fed. Reg. 21156.

### Behavioral Observations

Mr. Williams came early for his assessment. He was pleasant and cooperative. He was well
oriented and performed with consistent effort.

### Forensic Interview

Mr. Williams stated that that he was born in Manhattan N.Y. and was raised in the Bronx by his
mother. He said that he always enjoyed a wonderful relationship with his mother. His parents
divorced when he was 9 years old. He has not been close with his father. His mother remarried
while he was in college. Neither of his parents had mental health, substance abuse or a criminal
history. His mother went to college and is an RN. His father graduated High School. Mr.
Williams is the oldest. He has a half brother and a half sister. His younger brother spent jail time
for bank robbery. Mr. Williams reports no childhood traumas. He liked school and got straight
A's. He was 13 credits short graduating college when he was offered a job he has since been at
for 25 years. He reports no treatment for mental health issues. He reports a kidney disease for
which he must have regular dialysis. Married for 23 years, one child. No domestic abuse issues.
Arrested in about 1988 or 1989 when he was about 19. His college fraternity told him to get some

9

things and he stole some hair gel valued about $3.00 and was caught. He paid a fine. He got a DUI in 2000 at Penn State University visiting friends, and once more in Philadelphia in 2004. He rarely drinks alcoholic beverages since 2005. He is a certified NRA safety instructor since 1996.

## Test Results

- **Minnesota Multiphasic Personality Inventory -2 (MMPI-2);**

The MMPI-2 instrument is the most widely used and widely researched test of adult psychopathology (Ackerman, *et al*.,1997; Archer, *et al*., 2006; Gordon, 2002; Hagen, 2001).

Mr. Williams' validity scales indicated that he took the MMPI-2 honestly with no attempts at biased responding (Lie = T39, F= T55, K= T47; where T45-55 is normal, and >T65 is High). The MMPI-2 clinical scales are all within normal limits. The MMPI-2 MacAndrews Addition Proneness scale is T50, an average score. The MMPI-2 indicates no problems with aggression, good judgment, good impulse control, good reality testing and no addiction problems.

- **The Brief Psychiatric Rating Scale (BPRS)- expanded version;**

The BPRS is a well-researched screen for psychotic disorders (Overall, *et al*.1988; Ventura, *et al*. 2000).

Mr. Williams indicated that he had no current psychiatric symptoms. He is functioning at the healthy level.

- **Montreal Cognitive Assessment Test;**

The Montreal Cognitive Assessment (MoCA) was designed as a screening instrument for cognitive dysfunction. It assesses different cognitive domains: attention and concentration, executive functions, memory, language, visuoconstructional skills, conceptual thinking, calculations, and orientation. The total possible score is 30 points; a score of 26 or above is considered normal (Zahinoor, *et al*.,2010).

Mr. Williams scored 30/30 a perfect score indicating no psychoneurological impairment.

- **Violence Risk Appraisal Guide-R (VRAG-R);**

This instrument contains a 12-item actuarial scale, which has been widely used to predict risk of violence within a specific time frame following release in violent, mentally disordered offenders. Developed at Penetanguishene Mental Health Centre, the tool uses the clinical record, particularly the psycho-social history component, as a basis for scoring as opposed to interview or questionnaires. The Hare PCL-R (Psychopathy Checklist -Revised) score is incorporated into the VRAG calculations of risk (Quinsey, *et al*. 1998). The VRAG-R combines the VRAG and SORAG. The authors wrote "we suggest users can adopt the VRAG-R with considerable confidence that its predictive performance will at least match that of the original VRAG/SORAG system which has yielded large predictive effects for violent recidivism." (Harris, Rice, Quinsey, & Cormier, 2015; Rice, Harris, & Lang, 2013)

10

Mr. Williams scored -25, which is a very low risk of violently acting out (A 9.6% probability of recidivism assuming he was convicted of a violent crime. Thus this measure assumes the worst and Mr. Williams still scored very low.) .

- **Hare Revised Psychopathy Checklist (PCL-R);**

The PCL–R is a 20-item symptom-construct rating scale designed to assess psychopathy. It is an expert-rated tool. The total score reflects the degree to which the individual matches the prototypical psychopath. The highest possible score is 40. Scores 30+ are considered indicative of psychopathy (Hare, *et al.*,1990).

Mr. Williams scored 0/40, which indicates no psychopathic indication.

- **Psychodiagnostic Chart (PDC-2),** (Gordon and Bornstein, 2012; Gordon and Stoffey, 2014, Gordon and Bornstein, 2017). The PDC is a psychodiagnostic chart to help assess personality organization, personality disorders, mental functions and symptoms.

**Healthy Personality-** characterized by mostly 9-10 scores, life problems rarely get out of hand and enough flexibility to accommodate to challenging realities.
**Neurotic Level-** characterized by mainly 6-8 scores, basically a good sense of identity, good reality testing, mostly good intimacies, fair resiliency, fair affect tolerance and regulation, rigidity and limited range of defenses and coping mechanisms, favors defenses such as repression, reaction formation, rationalization, displacement, and undoing.
**Borderline Level-** characterized by mainly 3-5 scores, recurrent relational problems, difficulty with affect tolerance and regulation, poor impulse control, poor sense of identity, poor resiliency, favors defenses such as splitting, projective identification, idealization/devaluation, denial, and acting out.
**Psychotic Level-** characterized by mainly 1-2 scores, delusional thinking, poor reality testing and mood regulation, extreme difficulty functioning in work and relationships favors defenses such as delusional projection, psychotic denial, and psychotic distortion.

**Overall Personality Organization = 7**


**Overall Diagnosis: Normal Personality**

### Summary

Mr. Williams had two DUIs, one in 2000 and another in 2004. The last incident was 14 years ago. There is no predictive value in these events for future behaviors. Mr. Williams has no history of hostile or violent behaviors. He has no continuing pattern of aggressive behaviors, which could be a predictive factor. The studies Dr. Webster cites are based on selected samples that are not necessarily generalizable and are of relatively low correlations. Although the research cited by Dr. Webster sheds light on some predictive factors, the prediction rate is low and cannot be applied to individual cases, including Mr. Williams' case. Dr. Webster is not a psychologist and did not perform a psychological assessment of Mr. Williams' mental status, psycho-neurological assessment, defenses, psychopathology, addiction proneness or behaviors, aggression, judgment or the potential for Mr. Williams to act out. Therefore, his report has no value for this particular case, in the absence of an independent evaluation of Mr. Williams, as I performed.

My psychological assessment of Mr. Williams using a standard psychological battery of tests indicates that he has a normal personality, without psychopathology and without addiction or

11

violent tendencies. Accordingly, the research relied upon by Dr. Webster is not applicable to Mr. Williams.

## Recommendations

I recommend that Mr. Williams be allowed to own, possess, carry, and use a firearm. Mr. Williams may possess a firearm without risk to himself or any other person.

I make all of these conclusions to a reasonable degree of psychological certainty.

Respectfully submitted,

Robert M. Gordon, Ph.D., ABPP
CV can be viewed at www.mmpi-info.com

12

**Fed.R.Civ.P. 26(a)(2)(B)(iv) Statement**

*EDUCATION*

Ph.D., Psychology, Temple University, Philadelphia, PA  1975
B.A., Psychology, Temple University, Philadelphia, PA    1970

*PROFESSIONAL ASSOCIATIONS*

American Psychological Association- Fellow

Elected to the Governing Council of the American Psychological Assoc.
1992 -1995 and again in 2001 - 2003 representing Pennsylvanian psychologists

Fellow and charter member of Division of Psychoanalysis (39), member of sections:
   I. Psychologist-Psychoanalyst Practitioners
  VI. Psychoanalytic Research Society
  VII. Psychoanalysis and Groups
 VIII. Couple and Family Therapy and Psychoanalysis

American Psychology-Law Society of the American Psychological Association

President - Pennsylvania Psychological Association, 1990–1991;
        Pennsylvania Psychological Foundation Board, 1991-2003, 2006-2010;
         President of the Clinical Division, 1987;
        Charter Member of the Colleague Assistance Committee since 1992

President 1980 - 1981 - Lehigh Valley Psychological Association;
        Chair of the Ethics Committee, 1983-1986

Philadelphia Society for Psychoanalytic Psychology, Charter member since 1982

Fellow of the Academy of Clinical Psychology (AClinP) of the American Board of
Professional     Psychology since 1991

Fellow of the Academy of Psychoanalysis of the American Board of Professional
Psychology since 2006

American Psychoanalytic Association Research Associate- charter member

Psychodynamic Psychoanalytic Research Society- charter member

Society for Personality Assessment

Tampa Bay Psychoanalytic Society

13

*CREDENTIALS and AWARDS*

Pennsylvania Psychology License since 1976

Distinguished Service Award from the Pennsylvania Psychological Association 2001

Certificate of Professional Qualification in Psychology by the Association of State and Provincial   Psychology Boards since 2002, #3655

Diplomate of the American Board of Professional Psychology in Clinical Psychology; #3414, since 1982

Diplomate of the American Board of Professional Psychology in Psychoanalysis, #6211, since 2006

National Register of Health Service Providers in Psychology since 1979-2010

American Association for Marriage and Family Therapy since 1976, and Approved Supervisor 1981-2007

An American Psychological Association Approved Sponsor of Continuing Education to Psychologists 1985-2011 (The first in east-central Pennsylvania).

Honorary Membership presented by the American Psychoanalytic Association- 2015

Honorary Editor for Forensic Research & Criminology International Journal- 2015

Honorary Member of the Psychoanalytic Center of Philadelphia- elected 2016

*PRACTICE*

Independent practice specializing in forensic psychology, psychoanalysis, psychodynamic psychotherapy, assessment, teaching and research.

Forensic Psychologist Consultant to the Lehigh County Public Defender's Office since 2010.

Psychodynamic Diagnostic Manual 2 (PDM2) Section co-editor on assessment tools 2014-2016.

*TEACHING and RESEARCH POSITIONS and WORKSHOPS*

14

Academic appointments at: Lehigh University, Temple University, Yeshiva University, and Widener University. Topics include personality assessment, forensic psychology, research, ethics, MMPI-2, Psychodynamic Diagnostic Manual (PDM and PDM2), philosophy of science and methodology, teaching psychodynamic theory and psychodynamic psychotherapy.

Clinical and Forensic Assessment Practicum Supervisor for Chestnut Hill College Doctoral students since 2010.

Presented and led workshops nationally and internationally (ex.: Albania, Belgium, Canada, China, Germany, France, Israel, Italy, Netherlands, Russia, Switzerland, etc.) since 1982 (ex.: International Psychoanalytic Assoc., American Psychoanalytic Assoc., American Psychological Assoc., Society for Personality Assessment, etc.) in: MMPI-2 interpretation, forensic psychology, psychological diagnostic taxonomies, the PDM and PDM2, psychodynamic research, psychoanalysis- theory and technique, couples, family and group therapy, ethics and psychology, and the psychology of love relations. Led yearly ethics workshops for the Penna. Psychological Foundation for 17 years.

China American Psychoanalytic Alliance (CAPA)- instructor of Adult Psychodynamic Psychotherapy and the writings of Sigmund Freud to Chinese professionals via VCON, since 2012.

Chair of Research and Scholarship Grants of the China American Psychoanalytic Alliance 2017.

China American Psychoanalytic Alliance (CAPA)- Board of Directors 2017.

Visiting Professor of Psychology teaching forensic and clinical psychology to masters and doctoral students at Albanian University via VACON 2014.

*FILMS*

39 Scuds (1991). A 30-minute documentary I made about the psychological effects of the potential gas poisoning of civilians in Israel during the Persian Gulf War.

Balance and Integration in Psychoanalytic Group Therapy (2006). Produced by Video Diamond, LLC; a workshop I lead on psychoanalytic group therapy.

TEDx Talk "The Power of Apology" September, 2014

REVIEWER FOR JOURNALS

15

such as: Journal of Consulting and Clinical Psychology and Psychoanalytic Psychology

*PUBLICATIONS - Last 10 years*

Gordon, R.M. & Bornstein, R.F. (2018). Construct Validity of the
Psychodiagnostic Chart:
A Transdiagnostic Measure of Personality Organization, Personality
Syndromes, Mental   Functioning, and Symptomatology. *Psychoanalytic
Psychology,* 35(2),280-288. http://dx.doi.org/10.1037/pap0000142

Gordon, R.M. (2017). A Concurrent Validity Study of the PDM-2 Personality
Syndromes. Current Psychology, DOI: 10.1007/s12144-017-9644-2, pp.1-
7.

Gordon, R.M., Blake, A., Etzi, J., Rothery, C., & Tasso, A.F. (2017). Do
Practitioners Find a Psychodynamic Taxonomy Useful? Journal of
Psychology and Clinical Psychiatry 7(5): 00452. DOI:
10.15406/jpcpy.2017.07.00452

Waldron, S., Gordon, R.M., & Gazzillo, F. (2017). Chapter 15 Assessment within
the PDM-2 Framework, Lingiardi, V. & McWilliams, N.  (Eds),
*Psychodynamic Diagnostic Manual, Version 2 (PDM-2).*  New York:
Guilford Press.

Gordon, R.M. (2017). Personality Disorders and Syndromes Across ICD-10,
DSM5, and PDM2. *Currents, 1,* pp. 10.

Gordon, R.M., & Lan, J. (2017). Assessing Distance Training: How Well Does It
Produce Psychoanalytic Psychotherapists? *Psychodynamic Psychiatry, 45*
(3), *329-341.*

Gordon, R.M. (2017). Assessing Distance Psychoanalytic Treatment:
Perspectives of Therapist and Patient. *The American Psychoanalyst, 51,*2,
15.

Gordon, R.M., Tune, J. and Wang, X. (2016). What are the characteristics and
concerns of high and low raters of psychodynamic treatment to Chinese
students over VCON? *Psychoanalysis and Psychotherapy in China,2,* 86-
96.

Gordon, R.M., Blake, A., Bornstein, R.F., Gazzillo, F., Etzi, J., Lingiardi, V.,
McWilliams, N., Rothery, C. and Tasso, A.F. (2016) What do practitioners
consider the most helpful personality taxa in understanding their patients*?
Division/Review: A Quarterly Psychoanalytic Forum, 16*, 70.

16

Gordon, R.M., Gazzillo, F., Blake, A., Bornstein, R.F., Etzi, J., Lingiardi, V., McWilliams, N., Rothery, C. and Tasso, A.F. (2016) The Relationship Between Theoretical Orientation and Countertransference Awareness: Implications for Ethical Dilemmas and Risk Management, *Clinical Psychology & Psychotherapy, 23, 3,* 236-245; (online published 2015, DOI: 10.1002/cpp.1951)

Gordon, R.M. & Bornstein, R.F. (2015). The Psychodiagnostic Chart-2 v.8.1 (PDC-2),
     DOI: 10.13140/RG.2.1.4147.4647

Ibrahimi, S., & Gordon, R.M. (2015). Post-Traumatic Identity within Social Contexts. *Balkan Journal of Interdisciplinary Research Vol 1,* No 1, 47-51. ISSN 2410-759X, Access online at www.iipccl.org

Ibrahimi, S., Dervishi, E., and Gordon, R.M. (2015). Traumatic behavior deviance of individual within social contexts. *European Psychiatric Congress*, Vienna Austria.

Spektor, V., Luu, L. & Gordon, R.M. (2015) The Relationship between Theoretical Orientation and Accuracy of Countertransference Expectations, *Journal of the American Psychoanalytic Association, 63*(4), NP28-NP32.

Gordon, R.M., Wang, X. and Tune, J. (2015). Comparing Psychodynamic Teaching, Supervision and Psychotherapy Over Video-Conferencing Technology with Chinese Students. *Psychodynamic Psychiatry, 43 (4),* 585-599.

Huprich, S., Lingiardi, V., McWilliams, N., Bornstein, R., Gazzillo, F., and Gordon, R.M., (2015). The *Psychodynamic Diagnostic Manual (PDM)* and the *PDM-2:* Opportunities to Significantly Affect the Profession. *Psychoanalytic Inquiry,* 35: 60-73.

Lingiardi, V., McWilliams, N., Bornstein, R.F., Gazzillo, F. and Gordon, R.M. (2015) The Psychodynamic Diagnostic Manual Version 2 (PDM-2): Assessing Patients for Improved Clinical Practice and Research, *Psychoanalytic Psychology, 32*(1), 94-115. *http://dx.doi.org/10.1037/a0038546*

Gazzillo, F., Lingiardi, V., Del Corno, F., Genova, F., Bornstein, R.F., Gordon, R.M., McWilliams, N. (2015). Clinicians' Emotional Responses and PDM P Axis Personality Disorders: A Clinically Relevant Empirical Investigation. *Psychotherapy, Special Section: Personality and Psychotherapy, 52*(2), 238-246. *http://dx.doi.org/10.1037/a0038799*

Gordon, R.M. and Stoffey, R.W. (2014). Operationalizing the Psychodynamic Diagnostic Manual: a Preliminary Study of the Psychodiagnostic Chart (PDC), *Bulletin of the Menninger Clinic, 78,* 1, 1-15.

Gordon, R.M. and Cosgrove, L., (2013) Ethical Considerations in the Development and Application of Mental and Behavioral Nosologies: Lessons from DSM5, *Psychological Injury and Law*, *6*,4, 330-335, DOI 10.1007/s12207-013-9172-9.

Gordon, R.M. and Stoffey, R.W. and Perkins, B.L. (2013) Comparing the Sensitivity of the MMPI-2 Clinical Scales and the MMPI-RC Scales to Clients Rated as Psychotic, Borderline or Neurotic on the Psychodiagnostic Chart, *Psychology: Special issue on Criminal Investigative Psychology, 4, 9A,* 12-16. doi: 10.4236/psych.2013.49A1003.

Gordon, R.M. (2013). The Pyramid of Love. In The World Book of Love, Ed. Leo Bormans, Lannoo, Publishers, Tielt, Belgium. 60-63.

Gordon, R.M. (2013). Book Review: To Know and to Care: [Review of Psychoanalytic Diagnosis: Understanding Personality Structure in the Clinical Process. Second Edition, by Nancy McWilliams.] Division/Review: A Quarterly Psychoanalytic Forum, Spring, 7, 9-11.

Bornstein, R. F. and Gordon, R. M. (2012). What Do Practitioners Want in a Diagnostic Taxonomy? Comparing the PDM with DSM and ICD. *Division/Review: A Quarterly Psychoanalytic Forum*, Fall, 6, 35.

Gordon, R.M., & Bornstein, R.F. (2012). A practical tool to integrate and operationalize the PDM with the ICD or DSM. http://www.mmpi-info.com/pdm-blog.

Gordon, R.M. (2012). A Psychological Alternative to the Medically Based DSM and ICD, *The National Psychologist May/June, vol. 21, 3,* p. 19

Gordon, R.M. (2011). Repercussions of a Patient's Suicide, *Pennsylvania Psychologist Quarterly, 71,*6, 12-14.

Gordon, R.M., Hoffman, L., and Tjeltveit, A. (2010). Religion and Psychotherapy: Ethical Conflicts and Confluence, *Pennsylvania Psychologist, 70,* 9, 3-4.

Gordon, R.M. (2010). The Scientific Renaissance of Psychodynamic Therapy (PDT), *Pennsylvania Psychologist Quarterly, March, 70,*3, 22-23.

18

Gordon, R.M. (2010). The Psychodynamic Diagnostic Manual (PDM). In I. Weiner and E. Craighead, (Eds.) *Corsini's Encyclopedia of Psychology (4th ed., volume 3,* 1312-1315), Hoboken, NJ: John Wiley and Sons.

Gordon, R.M. (2009 ). Money, Masochism, Narcissism and Indifference, *Pennsylvania Psychologist Quarterly,69,8,*10 and 14.

Gordon, R.M. (2009). The Psychodiagnostic Report for Treatment Recommendations. *The Pennsylvania Psychologist Quarterly, 69,* 3, 17-18.

Gordon, R.M. (2009). Reactions to the Psychodynamic Diagnostic Manual (PDM) by Psychodynamic, CBT and Other Non- Psychodynamic Psychologists. *Issues in Psychoanalytic Psychology, 31,* 1, 55-62.

Gordon, R.M. (2008). Addendum To MMPI/MMPI–2 Changes In Long Term Psychoanalytic Psychotherapy. *Issues in Psychoanalytic Psychology, Issues In Psychoanalytic Psychology Vol. 30, No. 2, p.159.*

Gordon, R.M.  (2008). *An Expert Look at Love, Intimacy and Personal Growth.* Second Edition, IAPT Press, Allentown, Pa.

Gordon, R.M. (2008). Early reactions to the PDM by Psychodynamic, CBT and Other psychologists. *Psychologist-Psychoanalyst, XXVI,* 1, Winter, p.13.

Gordon, R. M. (2008). *I Love You Madly! On Passion, Personality and Personal Growth.* Second Edition, IAPT Press, Allentown, Pa.

Gordon, R. M. (2008). The Two-Minute Check-in at the Beginning of Psychoanalytic Group Therapy Sessions. *Group Analysis,41* (4), 366-372.

Gordon, R.M. and Bottinelli, J. (2008), Ethics and the Difficult Patient: The Psychopath in Film and in Your Office. *The Pennsylvania Psychologist, July/August Issue*, p.10.

Gordon, R. M., Stoffey, R., & Bottinelli, J. (2008). MMPI-2 findings of primitive defenses in alienating parents. *American Journal of Family Therapy, 36* (3): 211–228.

## Fed.R.Civ.P. 26(a)(2)(B)(v) Statement

*Nature of Practice*

Since my license to practice psychology in 1976, I have specialized in clinical and forensic psychodiagnostic assessment (along with psychotherapy, research and teaching).

19

My forensic practice is general in nature, that is, not limiting myself to any particular civil or criminal area or to defense or plaintiff work. The only exception is that since 2010, I work as Lehigh County Public Defender Office's forensic psychologist. About 30% of my professional work is in forensic psychology.

My general forensic assessment practice has included assessments for:
    IMEs and psychological record reviews
    Criminal responsibility
    Mental state
    Competency to stand trial
    Capital mitigation evaluations
    Juvenile matters and transfer evaluations
    Sentencing evaluations
    Malingering and deception
    Testamentary capacity
    PTSD
    Personal injury and emotional distress claims
    Malpractice — plaintiff and defense
    Sexual offender evaluations
    Risk assessment
    Family law: custody, parental competence, parental alienation, adoption
    Employment issues: fitness for duty, discrimination, harassment, wrongful termination.

*Expert Testimony at Trial or by Deposition*

2018
None

2017
Fontanez competency to stand trial - Lehigh County Defense
*Estepan v. Ferguson* for the plaintiff in a MVA

2016
*Gabrieli v. Easton Hospital, et al.* for the defense
*Green vs. Lehigh Valley Hospital* for the defense
*Deanne and Toby Snyder h/w vs. Estate of Geoffrey K Sherman, M.A. et al.* for the defense
*Shugars, Leonard* state of mind - Lehigh County Defense
*Blahosky, Carolyn* for the plaintiff PTSD from MVA Lehigh county

2015
*Diggs, Jhainee Nateequa*, decertification hearing - Lehigh County Defense
*Hausknecht, Barbara* for the plaintiff PTSD from MVA Lehigh county
*Zimmerman, Joseph* state of mind - Lehigh County Defense
*Figueroa-Velez, Axel* decertification hearing - Lehigh County Defense

20

*Melendez, Juan* competency to stand trial - Lehigh County Defense

2014
*Scardetto v. Scardetto* - Custody - Bucks County- request of Father's Atty.
*Commonwealth v. Jean-Pierre* - Lehigh County Defense
*Commonwealth v. Heminitz* - Lehigh County Defense
*Commonwealth v. Rivera-Oyola* - Lehigh County Defense
*Commonwealth v. Rodriguez* - Lehigh County Defense
*Commonwealth v. Lehigh County* - Defense
Shoen v. Shoen Deposition Custody- Berks County - request of Mother's Atty.

## Fed.R.Civ.P. 26(a)(2)(B)(vi) Statement

The fee for all time and services by Dr. Robert Gordon is $250 an hour including preparation and travel time. There is a one-day charge ($2800) for depositions and court testimony, in addition to any preparation and travel time. I charge a minimum non-refundable retainer of $1500 for forensic reports. The total amount charged for this evaluation and forensic report was $3,000.

**Fed.R.Civ.P. 26(a)(2)(B)(iv) Statement**

*EDUCATION*

Ph.D., Psychology, Temple University, Philadelphia, PA  1975
B.A., Psychology, Temple University, Philadelphia, PA    1970


*PROFESSIONAL ASSOCIATIONS*

American Psychological Association- Fellow

Elected to the Governing Council of the American Psychological Assoc.
1992 -1995 and again in 2001 - 2003 representing Pennsylvanian psychologists

Fellow and charter member of Division of Psychoanalysis (39), member of sections:
    I. Psychologist-Psychoanalyst Practitioners
   VI. Psychoanalytic Research Society
   VII. Psychoanalysis and Groups
 VIII. Couple and Family Therapy and Psychoanalysis

American Psychology-Law Society of the American Psychological Association

President - Pennsylvania Psychological Association, 1990–1991;
        Pennsylvania Psychological Foundation Board, 1991-2003, 2006-2010;
         President of the Clinical Division, 1987;
        Charter Member of the Colleague Assistance Committee since 1992

President 1980 - 1981 - Lehigh Valley Psychological Association;
        Chair of the Ethics Committee, 1983-1986

Philadelphia Society for Psychoanalytic Psychology, Charter member since 1982

Fellow of the Academy of Clinical Psychology (AClinP) of the American Board of
Professional      Psychology since 1991

Fellow of the Academy of Psychoanalysis of the American Board of Professional
Psychology since 2006

American Psychoanalytic Association Research Associate- charter member

Psychodynamic Psychoanalytic Research Society- charter member

Society for Personality Assessment

Tampa Bay Psychoanalytic Society

13

*CREDENTIALS and AWARDS*

Pennsylvania Psychology License since 1976

Distinguished Service Award from the Pennsylvania Psychological Association 2001

Certificate of Professional Qualification in Psychology by the Association of State and Provincial   Psychology Boards since 2002, #3655

Diplomate of the American Board of Professional Psychology in Clinical Psychology; #3414, since 1982

Diplomate of the American Board of Professional Psychology in Psychoanalysis, #6211, since 2006

National Register of Health Service Providers in Psychology since 1979-2010

American Association for Marriage and Family Therapy since 1976, and Approved Supervisor 1981-2007

An American Psychological Association Approved Sponsor of Continuing Education to Psychologists 1985-2011 (The first in east-central Pennsylvania).

Honorary Membership presented by the American Psychoanalytic Association- 2015

Honorary Editor for Forensic Research & Criminology International Journal- 2015

Honorary Member of the Psychoanalytic Center of Philadelphia- elected 2016

*PRACTICE*

Independent practice specializing in forensic psychology, psychoanalysis, psychodynamic psychotherapy, assessment, teaching and research.

Forensic Psychologist Consultant to the Lehigh County Public Defender's Office since 2010.

Psychodynamic Diagnostic Manual 2 (PDM2) Section co-editor on assessment tools 2014-2016.

*TEACHING and RESEARCH POSITIONS and WORKSHOPS*

14

Academic appointments at: Lehigh University, Temple University, Yeshiva University, and Widener University. Topics include personality assessment, forensic psychology, research, ethics, MMPI-2, Psychodynamic Diagnostic Manual (PDM and PDM2), philosophy of science and methodology, teaching psychodynamic theory and psychodynamic psychotherapy.

Clinical and Forensic Assessment Practicum Supervisor for Chestnut Hill College Doctoral students since 2010.

Presented and led workshops nationally and internationally (ex.: Albania, Belgium, Canada, China, Germany, France, Israel, Italy, Netherlands, Russia, Switzerland, etc.) since 1982 (ex.: International Psychoanalytic Assoc., American Psychoanalytic Assoc., American Psychological Assoc., Society for Personality Assessment, etc.) in: MMPI-2 interpretation, forensic psychology, psychological diagnostic taxonomies, the PDM and PDM2, psychodynamic research, psychoanalysis- theory and technique, couples, family and group therapy, ethics and psychology, and the psychology of love relations. Led yearly ethics workshops for the Penna. Psychological Foundation for 17 years.

China American Psychoanalytic Alliance (CAPA)- instructor of Adult Psychodynamic Psychotherapy and the writings of Sigmund Freud to Chinese professionals via VCON, since 2012.

Chair of Research and Scholarship Grants of the China American Psychoanalytic Alliance 2017.

China American Psychoanalytic Alliance (CAPA)- Board of Directors 2017.

Visiting Professor of Psychology teaching forensic and clinical psychology to masters and doctoral students at Albanian University via VACON 2014.

*FILMS*

39 Scuds (1991). A 30-minute documentary I made about the psychological effects of the potential gas poisoning of civilians in Israel during the Persian Gulf War.

Balance and Integration in Psychoanalytic Group Therapy (2006). Produced by Video Diamond, LLC; a workshop I lead on psychoanalytic group therapy.

TEDx Talk "The Power of Apology" September, 2014

REVIEWER FOR JOURNALS

15

such as: Journal of Consulting and Clinical Psychology and Psychoanalytic Psychology

*PUBLICATIONS - Last 10 years*

Gordon, R.M. & Bornstein, R.F. (2018). Construct Validity of the
    Psychodiagnostic Chart:
    A Transdiagnostic Measure of Personality Organization, Personality
    Syndromes, Mental    Functioning, and Symptomatology. *Psychoanalytic
    Psychology,* 35(2),280-288. http://dx.doi.org/10.1037/pap0000142

Gordon, R.M. (2017). A Concurrent Validity Study of the PDM-2 Personality
    Syndromes. Current Psychology, DOI: 10.1007/s12144-017-9644-2, pp.1-
    7.

Gordon, R.M., Blake, A., Etzi, J., Rothery, C., & Tasso, A.F. (2017). Do
    Practitioners Find a Psychodynamic Taxonomy Useful? Journal of
    Psychology and Clinical Psychiatry 7(5): 00452. DOI:
    10.15406/jpcpy.2017.07.00452

Waldron, S., Gordon, R.M., & Gazzillo, F. (2017). Chapter 15 Assessment within
    the PDM-2 Framework, Lingiardi, V. & McWilliams, N.  (Eds),
    *Psychodynamic Diagnostic Manual, Version 2 (PDM-2).*  New York:
    Guilford Press.

Gordon, R.M. (2017). Personality Disorders and Syndromes Across ICD-10,
    DSM5, and PDM2. *Currents, 1,* pp. 10.

Gordon, R.M., & Lan, J. (2017). Assessing Distance Training: How Well Does It
    Produce Psychoanalytic Psychotherapists? *Psychodynamic Psychiatry, 45*
    (3), *329-341.*

Gordon, R.M. (2017). Assessing Distance Psychoanalytic Treatment:
    Perspectives of Therapist and Patient. *The American Psychoanalyst, 51,*2,
    15.

Gordon, R.M., Tune, J. and Wang, X. (2016). What are the characteristics and
    concerns of high and low raters of psychodynamic treatment to Chinese
    students over VCON? *Psychoanalysis and Psychotherapy in China,2,* 86-
    96.

Gordon, R.M., Blake, A., Bornstein, R.F., Gazzillo, F., Etzi, J., Lingiardi, V.,
    McWilliams, N., Rothery, C. and Tasso, A.F. (2016) What do practitioners
    consider the most helpful personality taxa in understanding their patients?
    *Division/Review: A Quarterly Psychoanalytic Forum, 16*, 70.

16

Gordon, R.M., Gazzillo, F., Blake, A., Bornstein, R.F., Etzi, J., Lingiardi, V., McWilliams, N., Rothery, C. and Tasso, A.F. (2016) The Relationship Between Theoretical Orientation and Countertransference Awareness: Implications for Ethical Dilemmas and Risk Management, *Clinical Psychology & Psychotherapy, 23, 3,* 236-245; (online  published 2015, DOI: 10.1002/cpp.1951)

Gordon, R.M. & Bornstein, R.F. (2015). The Psychodiagnostic Chart-2 v.8.1 (PDC-2),
    DOI: 10.13140/RG.2.1.4147.4647

Ibrahimi, S., & Gordon, R.M. (2015). Post-Traumatic Identity within Social Contexts. *Balkan Journal of Interdisciplinary Research Vol 1,* No 1, 47-51. ISSN 2410-759X, Access online at www.iipccl.org

Ibrahimi, S., Dervishi, E., and Gordon, R.M. (2015). Traumatic behavior deviance of individual within social contexts. *European Psychiatric Congress*, Vienna Austria.

Spektor, V., Luu, L. & Gordon, R.M. (2015) The Relationship between Theoretical Orientation and Accuracy of Countertransference Expectations, *Journal of the American Psychoanalytic Association, 63*(4), NP28-NP32.

Gordon, R.M., Wang, X. and Tune, J. (2015). Comparing Psychodynamic Teaching, Supervision and Psychotherapy Over Video-Conferencing Technology with Chinese Students. *Psychodynamic Psychiatry, 43 (4),* 585-599.

Huprich, S., Lingiardi, V., McWilliams, N., Bornstein, R., Gazzillo, F., and Gordon, R.M., (2015). The *Psychodynamic Diagnostic Manual (PDM)* and the *PDM-2:* Opportunities to Significantly Affect the Profession. *Psychoanalytic Inquiry,* 35: 60-73.

Lingiardi, V., McWilliams, N., Bornstein, R.F., Gazzillo, F. and Gordon, R.M. (2015) The Psychodynamic Diagnostic Manual Version 2 (PDM-2): Assessing Patients for Improved Clinical Practice and Research, *Psychoanalytic Psychology, 32*(1), 94-115. *http://dx.doi.org/10.1037/a0038546*

Gazzillo, F., Lingiardi, V., Del Corno, F., Genova, F., Bornstein, R.F., Gordon, R.M., McWilliams,  N. (2015). Clinicians' Emotional Responses and PDM P Axis Personality Disorders: A Clinically Relevant Empirical Investigation. *Psychotherapy, Special Section: Personality and Psychotherapy, 52*(2), 238-246. *http://dx.doi.org/10.1037/a0038799*

Gordon, R.M. and Stoffey, R.W. (2014). Operationalizing the Psychodynamic Diagnostic Manual: a Preliminary Study of the Psychodiagnostic Chart (PDC), *Bulletin of the Menninger Clinic, 78,* 1, 1-15.

Gordon, R.M. and Cosgrove, L., (2013) Ethical Considerations in the Development and Application of Mental and Behavioral Nosologies: Lessons from DSM5, *Psychological Injury and Law*, *6*,4, 330-335, DOI 10.1007/s12207-013-9172-9.

Gordon, R.M. and Stoffey, R.W. and Perkins, B.L. (2013) Comparing the Sensitivity of the MMPI-2 Clinical Scales and the MMPI-RC Scales to Clients Rated as Psychotic, Borderline or Neurotic on the Psychodiagnostic Chart, *Psychology: Special issue on Criminal Investigative Psychology, 4, 9A,* 12-16. doi: 10.4236/psych.2013.49A1003.

Gordon, R.M. (2013). The Pyramid of Love. In The World Book of Love, Ed. Leo Bormans, Lannoo, Publishers, Tielt, Belgium. 60-63.

Gordon, R.M. (2013). Book Review: To Know and to Care: [Review of Psychoanalytic Diagnosis: Understanding Personality Structure in the Clinical Process. Second Edition, by Nancy McWilliams.] Division/Review: A Quarterly Psychoanalytic Forum, Spring, 7, 9-11.

Bornstein, R. F. and Gordon, R. M. (2012). What Do Practitioners Want in a Diagnostic Taxonomy? Comparing the PDM with DSM and ICD. *Division/Review: A Quarterly Psychoanalytic Forum*, Fall, 6, 35.

Gordon, R.M., & Bornstein, R.F. (2012). A practical tool to integrate and operationalize the PDM with the ICD or DSM. http://www.mmpi-info.com/pdm-blog.

Gordon, R.M. (2012). A Psychological Alternative to the Medically Based DSM and ICD, *The National Psychologist May/June, vol. 21, 3,* p. 19

Gordon, R.M. (2011). Repercussions of a Patient's Suicide, *Pennsylvania Psychologist Quarterly, 71,*6, 12-14.

Gordon, R.M., Hoffman, L., and Tjeltveit, A. (2010). Religion and Psychotherapy: Ethical Conflicts and Confluence, *Pennsylvania Psychologist, 70,* 9, 3-4.

Gordon, R.M. (2010). The Scientific Renaissance of Psychodynamic Therapy (PDT), *Pennsylvania Psychologist Quarterly, March, 70,*3, 22-23.

18

Gordon, R.M. (2010). The Psychodynamic Diagnostic Manual (PDM). In I. Weiner and E. Craighead, (Eds.) *Corsini's Encyclopedia of Psychology (4th ed., volume 3,* 1312-1315), Hoboken, NJ: John Wiley and Sons.

Gordon, R.M. (2009 ). Money, Masochism, Narcissism and Indifference, *Pennsylvania Psychologist Quarterly,69,8,*10 and 14.

Gordon, R.M. (2009). The Psychodiagnostic Report for Treatment Recommendations. *The Pennsylvania Psychologist Quarterly, 69*, 3, 17-18.

Gordon, R.M. (2009). Reactions to the Psychodynamic Diagnostic Manual (PDM) by Psychodynamic, CBT and Other Non- Psychodynamic Psychologists. *Issues in Psychoanalytic Psychology, 31,* 1, 55-62.

Gordon, R.M. (2008). Addendum To MMPI/MMPI–2 Changes In Long Term Psychoanalytic Psychotherapy. *Issues in Psychoanalytic Psychology, Issues In Psychoanalytic Psychology Vol. 30, No. 2, p.159.*

Gordon, R.M.  (2008). *An Expert Look at Love, Intimacy and Personal Growth.* Second Edition, IAPT Press, Allentown, Pa.

Gordon, R.M. (2008). Early reactions to the PDM by Psychodynamic, CBT and Other psychologists. *Psychologist-Psychoanalyst, XXVI,* 1, Winter, p.13.

Gordon, R. M. (2008). *I Love You Madly! On Passion, Personality and Personal Growth.* Second Edition, IAPT Press, Allentown, Pa.

Gordon, R. M. (2008). The Two-Minute Check-in at the Beginning of Psychoanalytic Group Therapy Sessions. *Group Analysis,41* (4), 366-372.

Gordon, R.M. and Bottinelli, J. (2008), Ethics and the Difficult Patient: The Psychopath in Film and in Your Office. *The Pennsylvania Psychologist, July/August Issue*, p.10.

Gordon, R. M., Stoffey, R., & Bottinelli, J. (2008). MMPI-2 findings of primitive defenses in alienating parents. *American Journal of Family Therapy, 36* (3): 211–228.

## Fed.R.Civ.P. 26(a)(2)(B)(v) Statement

*Nature of Practice*

Since my license to practice psychology in 1976, I have specialized in clinical and forensic psychodiagnostic assessment (along with psychotherapy, research and teaching).

My forensic practice is general in nature, that is, not limiting myself to any particular civil or criminal area or to defense or plaintiff work. The only exception is that since 2010, I work as Lehigh County Public Defender Office's forensic psychologist. About 30% of my professional work is in forensic psychology.

My general forensic assessment practice has included assessments for:
IMEs and psychological record reviews
Criminal responsibility
Mental state
Competency to stand trial
Capital mitigation evaluations
Juvenile matters and transfer evaluations
Sentencing evaluations
Malingering and deception
Testamentary capacity
PTSD
Personal injury and emotional distress claims
Malpractice — plaintiff and defense
Sexual offender evaluations
Risk assessment
Family law: custody, parental competence, parental alienation, adoption
Employment issues: fitness for duty, discrimination, harassment, wrongful termination.

*Expert Testimony at Trial or by Deposition*

2018
None

2017
Fontanez competency to stand trial - Lehigh County Defense
*Estepan v. Ferguson* for the plaintiff in a MVA

2016
*Gabrieli v. Easton Hospital, et al.* for the defense
*Green vs. Lehigh Valley Hospital* for the defense
*Deanne and Toby Snyder h/w vs. Estate of Geoffrey K Sherman, M.A. et al.* for the defense
*Shugars, Leonard* state of mind - Lehigh County Defense
*Blahosky, Carolyn* for the plaintiff PTSD from MVA Lehigh county

2015
*Diggs, Jhainee Nateequa*, decertification hearing - Lehigh County Defense
*Hausknecht, Barbara* for the plaintiff PTSD from MVA Lehigh county
*Zimmerman, Joseph* state of mind - Lehigh County Defense
*Figueroa-Velez, Axel* decertification hearing - Lehigh County Defense

*Melendez, Juan* competency to stand trial - Lehigh County Defense

2014
*Scardetto v. Scardetto* - Custody - Bucks County- request of Father's Atty.
*Commonwealth v. Jean-Pierre* - Lehigh County Defense
*Commonwealth v. Heminitz* - Lehigh County Defense
*Commonwealth v. Rivera-Oyola* - Lehigh County Defense
*Commonwealth v. Rodriguez* - Lehigh County Defense
*Commonwealth v. Lehigh County* - Defense
Shoen v. Shoen Deposition Custody- Berks County - request of Mother's Atty.

## Fed.R.Civ.P. 26(a)(2)(B)(vi) Statement

The fee for all time and services by Dr. Robert Gordon is $250 an hour including
preparation and travel time. There is a one-day charge ($2800) for depositions and court
testimony, in addition to any preparation and travel time. I charge a minimum non-
refundable retainer of $1500 for forensic reports. The total amount charged for this
evaluation and forensic report was $3,000.