**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| EDWARD A. WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> MERRICK B. GARLAND et al., <br><br> Defendants.[2] | Civil Action No. 17-CV-2641 |

## DEFENDANTS' SECOND RENEWED MOTION FOR SUMMARY JUDGMENT

Defendants respectfully renew their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Because the history and tradition of the right codified in the Second Amendment permits legislatures to disarm those whose firearm possession would be dangerous to the public safety, among other distrusted groups, 18 U.S.C. § 922(g)(1) is consistent with the Second Amendment as applied to Plaintiff Edward A. Williams, who was convicted of multiple offenses of drunk driving.

Accordingly, for the reasons set forth at greater length in Defendants' filings, the Court should grant summary judgment in favor of Defendants.

Dated: September 21, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

---

[2] Hon. Merrick B. Garland, Steven M. Dettelbach, and Christopher Wray are automatically substituted as Defendants in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* ECF No. 55 at 1 n.1.

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
New York Bar No. 5859137
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-3786
Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDWARD A. WILLIAMS,

   Plaintiff,

  v.

MERRICK B. GARLAND et al.,

   Defendants.[3]

Civil Action No. 17-CV-2641

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
<u>SECOND RENEWED MOTION FOR SUMMARY JUDGMENT</u>**

---

[3] Hon. Merrick B. Garland, Steven M. Dettelbach, and Christopher Wray are automatically substituted as Defendants in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* ECF No. 55 at 1 n.1.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

BACKGROUND .................................................................................................................... 2

I.      Statutory Background ................................................................................................ 2

II.     Factual Background .................................................................................................... 3

III.    Procedural Background .............................................................................................. 5

LEGAL STANDARDS .......................................................................................................... 7

ARGUMENT ......................................................................................................................... 8

I.      Williams's Second Amendment Claim Fails as a Matter of Law .............................. 8

        A.      History Establishes that Legislatures May Disarm Those Whose Possession
                of Firearms Would Be Dangerous, Among Other Distrusted Groups. .................... 10

        B.      History Also Establishes That Legislatures May Impose Regulations To
                Address the Dangerous Combination of Firearms and Alcohol, In Particular. .......... 13

        C.      Consistent With These Historical Principles, Section 922(g)(1) Is
                Constitutional As Applied to Williams. ........................................................ 15

CONCLUSION ...................................................................................................................... 19

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................................8

*Begay v. United States*,
   553 U.S. 137 (2008), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015)..........15

*Binderup v. Attorney General*,
   836 F.3d 336 (3d Cir. 2016), *abrogated by Range*, 69 F.4th 96............................................. 6, 7

*Chiafalo v. Washington*,
   591 U.S. ---, 140 S. Ct. 2316 (2020) ..................................................................................11

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ................................................................................... 8, 10, 14, 17, 18

*Ex parte Grossman*,
   267 U.S. 87 (1925) ................................................................................................................11

*Gamble v. United States*,
   589 U.S. ---, 139 S. Ct. 1960 (2019) ..................................................................................15

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ...........................................................................................17

*Holloway v. Attorney General*,
   948 F.3d 164 (3d Cir. 2020), *abrogated by Range*, 69 F.4th 96.........................................6-7, 15

*Kanter v. Barr*,
   919 F.3d 437 (7th Cir. 2019) ................................................................................... 8, 13, 17

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ................................................................................................................8

*Mitchell v. Wisconsin*,
   588 U.S. ---, 139 S. Ct. 2525 (2019) ..................................................................................15

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   597 U.S. ----, 142 S. Ct. 2111 (2022) ........................................................................*passim*

*Perez v. Wolf*,
   445 F. Supp. 3d 275 (N.D. Cal. 2020) ..................................................................................16

*Range v. Att'y General*,
   53 F.4th 262 (3d Cir. 2022) ...................................................................................................7

*Range v. Att'y General,*
   69 F.4th 96 (3d Cir. 2023) ...........................................................................................*passim*

*Range v. Att'y General,*
   56 F.4th 992 (3d Cir. 2023) ....................................................................................................7

*Saldana v. Kmart Corp.,*
   260 F.3d 228 (3d Cir. 2001) ..................................................................................................8

*State v. Shelby,*
   2 S.W. 468 (Mo. 1886) ........................................................................................................14

*United States v. Ames,*
   No. 23-CR-178, 2023 WL 5538073 (E.D. Pa. Aug. 28, 2023)............................................13

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010), *abrogated by Range,* 69 F.4th 96......................................................6

*United States v. Reichenbach,*
   No. 4:22-CR-00057, 2023 WL 5916467 (M.D. Pa. Sept. 11, 2023) .......................13, 16-17

*Virginia v. Harris,*
   558 U.S. 978 (2009) (Mem.) ...............................................................................................15

*Williams v. Att'y Gen.,*
   No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022) ......................................................7

*Williams v. Att'y Gen,*
   No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022),
   *reh'g granted and opinion vacated,* No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022)..................6

*Williams v. Barr,*
   379 F. Supp. 3d 360 (E.D. Pa. 2019), *aff'd sub nom. Williams v. Att'y Gen.,* No. 19-2694,
   2022 WL 1499279 (3d Cir. May 12, 2022) ...............................................................3, 4, 5, 6

**U.S. Constitution**

U.S. Const. amend. II ..................................................................................................................8

**Statutes**

18 Pa. Cons. Stat. § 106...........................................................................................................4

18 Pa. Cons. Stat. § 1104.........................................................................................................4

75 Pa. Cons. Stat. § 3802.........................................................................................................4

75 Pa. Cons. Stat. § 3803.....................................................................................................3, 4

75 Pa. Cons. Stat. § 3806.....................................................................................................3, 4

5 U.S.C. § 552 .................................................................................................................... 3

18 U.S.C. § 921 .................................................................................................................... 3

18 U.S.C. § 922 ............................................................................................................. *passim*

18 U.S.C. § 3559 .................................................................................................................. 4

An Act to Strengthen the Federal Firearms Act,
    Pub. L. No. 87-342, 75 Stat. 757 (1961) ......................................................................... 2

Gun Control Act of 1968,
    Pub. L. No. 90-618, 82 Stat. 1213 ................................................................................... 2

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, 82 Stat. 197 ..................................................................................... 2

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................. 8

**Legislative Materials**

S. Rep. No. 90-1097 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112 ..................................... 2

**Other Authorities**

1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689) ............................................... 10

2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756)..................... 11

3 J. Story, Commentaries on the Constitution of the United States § 1891 (1833) ........... 10

14 Car. 2, c. 3, § 13 (Eng. 1662) ...................................................................................... 11

1777 N.J. Laws 90, ch. 40 § 20 ........................................................................................ 12

1779 Pa. Laws 193 §§ 4-5 ................................................................................................ 12

1878 Miss. Laws 175-76, § 2 ............................................................................................ 14

1883 Mo. Laws 76, § 1 ..................................................................................................... 14

1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 ............. 14

1890 Okla. Sess. Laws 495, art. 47, § 4 ........................................................................... 14

1899 S.C. Acts 97, No. 67, § 1 ......................................................................................... 14

Act XII of March 10, 1655, 1655 Va. Laws 401 .............................................................. 13

iv

An Act for Better Settling and Regulating the Militia of this Colony of New-Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, § 3 (1746), available in *Military Obligation: The American Tradition* 25, pt. 8, New Jersey (1947) ...............................................................14

An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania, § XLV (1780), available in *Military Obligation*: The American Tradition 97, pt. 11, Pennsylvania (1947) .................14

*Calendar of State Papers, Domestic Series, 1670* (May 26, 1670) (Mary Anne Everett Green ed. 1895).....11

*Calendar of State Papers, Domestic Series, May 1,1684-February 5, 1685,* (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds. 1938).............................................11

*Calendar of State Papers, Domestic Series, William III, 1 April, 1700–8 March, 1702,* (Feb. 26, 1701) (Edward Bateson ed. 1937) ..........................................................................11

Ch. 1501, 5 Colonial Laws of New York 244-46 (1894)..........................................................13

Charles C. Branas, *Alcohol Use & Firearm Violence*, 38 EPIDEMIOLOGIC REVS. 32 (2016)....................16

G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737) ..........................................................................11

*Gasoline Explained*, U.S. Energy Info. Admin. (last updated Nov. 17, 2022), https://www.eia.gov/energyexplained/gasoline/history-of-gasoline.php.....................................18

Giles Jacob, *The Modern Justice* 338 (1716)............................................................................11

Kansas Gen. Stat., Crimes & Punishments, § 282 (1868) .........................................................14

Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) ...............................................11

Mark T. Fillmore & Nicholas Van Dyke, *DUI Offenders Display Reduced Perception of Intoxication and Heightened Impulsive Choice in Response to Alcohol*, EXP. CLIN. PSYCHOPHARMACOL., June 2020 .........19

Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) .......11

Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885)..........................................................................11

Randolph Roth, *Why Guns Are and Are Not the Problem, in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019) ........18

Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708)........................................................11

Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers,* 180 J. OF AM. MED. ASS'N: INTERNAL MED. 37 (2019) .....................................................16

Theodore Barlow, *The Justice of Peace* 367 (1745)..................................................................11

*Traffic Safety Facts: 2004 Data*, Nat'l Highway Traffic Safety Ass'n,
https://perma.cc/CM2L-WVT8 ........................................................................................15

W. Nelson, *The Office and Authority of a Justice of Peace* 575 (7th ed. 1721) ...................................................11

# INTRODUCTION

Plaintiff Edward A. Williams is a recidivist offender of Pennsylvania's criminal laws prohibiting driving under the influence ("DUI"). In 2005, as a result of his second DUI conviction—for driving with a blood alcohol content of nearly three times the legal limit—Williams became subject to disarmament by the legislature. *See* 18 U.S.C. § 922(g)(1). Contrary to Williams's claim in this action, that result accords with the "history and tradition" that define the scope of the right to bear arms codified in the Second Amendment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. ----, 142 S. Ct. 2111, 2128 (2022); *Range v. Att'y General*, 69 F.4th 96, 101 (3d Cir. 2023). Both the Founders and their English predecessors disarmed groups whose possession of firearms they deemed dangerous to public safety, among other distrusted groups. Indeed, they expressly justified those laws at least in part by reference to dangerousness. Also relevant here, Americans before, at, and shortly after the Founding enacted regulations to prevent the particular danger that results from the combination of firearms and alcohol.

Williams's disarmament falls squarely within this tradition. It is widely recognized that drunk driving is itself a dangerous crime, and continuing to drive drunk after a first DUI conviction demonstrates heightened disregard for public safety and for the law. Moreover, the possession of firearms by DUI offenders is demonstrably more likely to result in violence and death than possession by their non-DUI offending counterparts. Thus, historical analogues disarming the dangerous, in general, and preventing the deadly effects that can result from combining alcohol and firearms, in particular, establish that Section 922(g)(1) is consistent with the Second Amendment as applied to Williams. *See Bruen*, 142 S. Ct. at 2132.

This conclusion is consistent with the Third Circuit's decision in *Range*, in which the Court of Appeals held "narrow[ly]" that Section 922(g)(1) was unconstitutional as applied to an individual who committed a single count of welfare fraud by signing a food stamp application that understated his

income.  69 F.4th at 106.  As the Third Circuit cautioned, that decision applies only to "people like Range."  *Id.*  Williams is not like Range in any potentially relevant respect.  Among other reasons, Williams's disqualifying offense directly endangered public safety; he continued to offend even after a first conviction; he owned firearms and handled firearms and ammunition on a daily basis for years following his disqualifying conviction; and he made false statements on various government forms regarding his criminal history.  Accordingly, Williams's Second Amendment claim fails as a matter of law.

## BACKGROUND

### I.  Statutory Background

Federal law has long restricted the shipment, transport, possession, and/or receipt of firearms and ammunition by certain categories of individuals.  One such disqualification is 18 U.S.C. § 922(g)(1), which generally prohibits the possession of firearms by any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year."

Section 922(g)(1) reflects Congress's longstanding recognition that the "ease with which" firearms could otherwise be acquired by "criminals . . . and others whose possession of firearms is similarly contrary to the public interest" is "a matter of serious national concern."  S. Rep. No. 90-1097, at 28 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112; *see* An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, § 2, 75 Stat. 757 (1961) (prohibiting individuals who have been convicted of a "crime punishable by imprisonment for a term exceeding one year" from shipping, transporting, or receiving firearms); Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. VII, § 1202(a)(1), 82 Stat. 197, 236 (adding prohibition on possession).  Congress has explained that "it is not the purpose" of this or similar provisions of federal law "to place any undue or unnecessary Federal restrictions or burdens on law-abiding citizens."  Pub. L. No. 90-351, tit. IV, § 901(b), 82 Stat. at 226; Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, § 101, 82 Stat. 1213, 1213-14.

A conviction is not disqualifying for purposes of Section 922(g)(1) if it was for a "State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." 18 U.S.C. § 921(a)(20)(B). Also excluded is "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored." *Id.* § 921(a)(20). And there is an additional exclusion for "Federal or State offenses pertaining to antitrust violations, unfair trade practices, restraints of trade, or other similar offenses relating to the regulation of business practices." *Id.* § 921(a)(20)(A).

## II.    Factual Background

Williams's first known DUI arrest occurred in April 2000 in State College, Pennsylvania. *See* Defs.' Statement of Undisputed Material Facts in Supp. of Defs.' Renewed Mot. for Summ. J. ("SMF") (filed under seal), ¶¶ 2-3; *Williams v. Barr*, 379 F. Supp. 3d 360, 365 (E.D. Pa. 2019), *aff'd sub nom. Williams v. Att'y Gen.*, No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022), *reh'g granted and opinion vacated*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022).[4]   Following that arrest, Williams participated in an Accelerated Rehabilitative Disposition ("ARD") program.  SMF ¶¶ 3-4; *Williams*, 379 F. Supp. 3d at 365.   Under Pennsylvania law, a first DUI offense is generally a misdemeanor punishable by a term of imprisonment of not more than six months in prison and a fine, and acceptance of ARD constitutes a conviction for purposes of computing sentences for subsequent DUI convictions. *See* 75 Pa. Cons. Stat. §§ 3803(a)(1), 3806(a)(1); *Williams*, 379 F. Supp. 3d at 365.

Williams's second known DUI arrest occurred less than two years later, in November 2001, in Philadelphia.  SMF ¶ 5; *Williams*, 379 F. Supp. 3d at 365.   The charges arising from that arrest

---

[4] Pursuant to the Privacy Act of 1974, 5 U.S.C. § 552(a), and the Privacy Stipulation and Order of Confidentiality in this action, ECF No. 23, Defendants' Statement of Undisputed Material Facts was filed under seal.  Because this brief exclusively addresses facts that were included in the Court's prior opinion in this action, *Williams*, 379 F. Supp. 3d 360 (Kelly, J.), all facts described and cited herein are matters of public record.  Accordingly, Defendants file this brief on the public docket.

ultimately were dismissed for reasons unknown to the Government.  SMF ¶ 8; *Williams*, 379 F. Supp. 3d at 365.

Williams's third known DUI arrest—which led to his disqualifying conviction for purposes of Section 922(g)(1)—occurred on September 7, 2004, in Philadelphia.  SMF ¶ 9; *Williams*, 379 F. Supp. 3d at 365.  The evening of the 2004 arrest, Williams's blood alcohol content was at least 0.223%, according to a breathalyzer test that police administered.  SMF ¶¶ 11, 14; *Williams*, 379 F. Supp. 3d at 365.[5]

In 2005, following a trial, Williams was convicted of driving under the influence at the highest rate of intoxication.  SMF ¶ 15 (citing 75 Pa. Cons. Stat. § 3802(c)); *Williams*, 379 F. Supp. 3d at 365. Under Pennsylvania law, that offense is a first-degree misdemeanor punishable by up to five years in prison where the perpetrator has a prior DUI conviction. *see* 18 Pa. Cons. Stat. § 1104; 75 Pa. Cons. Stat. §§ 3802(c), 3803(b)(4), 3806(a).[6]  Williams was sentenced to at least ninety days in prison, among other penalties, although the Court permitted Williams to serve his custodial sentence under house arrest because of a medical condition.  SMF ¶ 16; *Williams*, 379 F. Supp. 3d at 365.  As a result of that conviction, there is no dispute that Williams is prohibited from possessing firearms pursuant to Section 922(g)(1).  *See supra* Section I; *Williams*, 379 F. Supp. 3d at 366.

Williams previously held a license to carry a firearm, which he knew was terminated because of his 2004 DUI conviction.  SMF ¶ 17; *Williams*, 379 F. Supp. 3d at 366.  Nevertheless, following that termination, Williams continued both to own firearms and to work at a gun store and shooting range

---

[5] For context, the legal limit is 0.08%.  75 Pa. Cons. Stat. § 3802(a).

[6] Under Pennsylvania law, a crime punishable by a maximum of five years' imprisonment constitutes a misdemeanor of the first degree. *See* 18 Pa. Cons. Stat. §§ 106(b)(6), 1104(1).  In other jurisdictions— including under the federal criminal code—offenses punishable by incarceration of up to five years are labeled as felonies. *See, e.g.*, 18 U.S.C. § 3559(a)(5) (specifying five-year maximum for class E felonies).

where he had been employed since 1994. SMF ¶¶ 19-22; *Williams*, 379 F. Supp. 3d at 366. In the course of that employment, Williams handled firearms and ammunition daily. SMF ¶¶ 22, 24-25; *Williams*, 379 F. Supp. 3d at 366. He also was responsible for ensuring that customers who attempted to purchase firearms at the gun store were legally permitted to possess firearms. SMF ¶ 27; *Williams*, 379 F. Supp. 3d at 366. Williams continued to work at that gun store and shooting range until 2010; the store ultimately shut down after pleading guilty to falsifying paperwork submitted to the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). SMF ¶¶ 22, 30; *Williams*, 379 F. Supp. 3d at 366 & n.4.

In or around 2007, Williams purchased a Glock-23 firearm. SMF ¶¶ 31, 35; *Williams*, 379 F. Supp. 3d at 366. In connection with that purchase, he falsely checked a box on a Pennsylvania State Police application form indicating that he had never been convicted of "a crime punishable by imprisonment for a term exceeding one year." SMF ¶¶ 32-33; *Williams*, 379 F. Supp. 3d at 366. Williams subsequently made additional false statements regarding his criminal history in a challenge that he submitted to the Pennsylvania State Police regarding his eligibility to carry a firearm. SMF ¶¶ 39-41; *Williams*, 379 F. Supp. 3d at 366.

### III.    Procedural Background

Williams filed this action on June 1, 2017. *See* Compl., ECF No. 1. He brings an as-applied Second Amendment challenge to 18 U.S.C. § 922(g)(1), which prohibits him from possessing firearms as a result of his 2005 DUI conviction. *See id.* ¶¶ 36-37, 53-61. Williams seeks declaratory and injunctive relief exempting him from criminal liability under Section 922(g)(1); "its derivative regulations[;] and all related laws, policies, and procedures that would impede or criminalize [his] exercise of his right to Keep and Bear Arms." *See id.* at 17-18.

On September 14, 2017, Defendants moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Defs.' Mot. to Dismiss the Compl., ECF No. 5. Williams

opposed and cross-moved for summary judgment. *See* Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, ECF No. 8; Pl.'s Mot. for Summ. J., ECF No. 9.  On December 1, 2017, the Court (Kelly, J.) denied both motions, holding that Williams had pleaded a *prima facie* as-applied Second Amendment claim under *Binderup v. Attorney General*, 836 F.3d 336 (3d Cir. 2016), *abrogated by Range*, 69 F.4th 96, and that Defendants were entitled to discovery to oppose Williams's premature motion for summary judgment. Order at 1 n.1, ECF No. 13; Order at 1 n.1, ECF No. 14.

Following discovery, both parties moved for summary judgment on October 26, 2018.  Pl.'s 2d Mot. for Summ J., ECF No. 29; Defs.' Mot. for Summ. J., ECF No. 30.  On April 1, 2019, the Court granted Defendants' motion for summary judgment and denied Williams's.  *Williams*, 379 F. Supp. 3d at 364-65.  It held that, at the first step of the two-step framework established in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), *abrogated by Range*, 69 F.4th 96, Williams's DUI offense "was not serious," and, thus, that he had "distinguished himself from those persons historically excluded from the right to bear arms." *Williams*, 379 F. Supp. 3d at 374.  At the second step of that framework, however, the Court concluded that "§ 922(g)(1) survive[d] intermediate scrutiny" as applied to Williams.  *Id.* at 378.

On appeal, the Third Circuit affirmed the Court's grant of summary judgment to Defendants, but on different grounds.  *See Williams v. Att'y Gen*, No. 19-2694, 2022 WL 1499279 (3d Cir. May 12, 2022), *reh'g granted and opinion vacated*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022). Specifically, the Third Circuit affirmed under *Holloway v. Attorney General*, 948 F.3d 164 (3d Cir. 2020), *abrogated by Range*, 69 F.4th 96, which was issued after the Court's decision on the parties' motions for summary judgment.  *See Williams*, 2022 WL 1499279, at *2.  In *Holloway*, the Third Circuit held that a DUI offense under the identical Pennsylvania criminal provision that Williams was convicted of violating "constitute[d] a serious crime, placing [the challenger] within the class of 'persons historically excluded from Second Amendment protections.'" *Holloway*, 948 F.3d at 177 (quoting *Binderup*, 836

6

F.3d at 347).  Accordingly, the Court held that the challenger's claim failed as a matter of law and had

no occasion to proceed to the second step of the *Marzzarella* framework.  *See id.*

On July 18, 2022, Williams filed a petition for rehearing *en banc* in light of *Bruen*, which the

Supreme Court had decided approximately six weeks after the Third Circuit affirmed the dismissal of

Williams's challenge.  *See* Pet. for Reh'g *En Banc*, *Williams v. Att'y Gen.*, No. 19-2694 (3d Cir. July 18,

2022), ECF No. 60.  The Third Circuit granted panel rehearing, vacated the judgment of this Court

and the opinion and judgment of the Third Circuit, and remanded to district court for reconsideration

in light of *Bruen*.  *See Williams v. Att'y Gen.*, No. 19-2694, 2022 WL 3544391 (3d Cir. Aug. 18, 2022);

Order, ECF No. 53.  The case was then reassigned to this Court.  Order, ECF No. 54.

On remand, the parties proposed and the Court entered a briefing schedule for renewed

motions for summary judgment.  *See* Scheduling Order, ECF No. 58.  While briefing was underway,

a panel of the Third Circuit decided *Range v. Attorney General*, 53 F.4th 262, 270 (3d Cir. 2022), and the

Court of Appeals subsequently granted rehearing *en banc* and vacated the panel opinion, 56 F.4th 992

(3d Cir. 2023).  Williams filed an unopposed motion to stay proceedings pending the outcome of *en*

*banc* proceedings in *Range*, which the Court granted.  *See* Pl.'s Unopposed Mot. to Stay Briefing, or in

the Alternative, for a Two Week Extension, ECF No. 63; Order, ECF No. 64.  Following the Third

Circuit's *en banc* decision in *Range*, *see* 69 F.4th 96, the parties jointly proposed a schedule for briefing

on renewed motions for summary judgment, which the Court entered.  *See* Order, ECF No. 68; Joint

Status Report, ECF No. 70; Am. Scheduling Order, ECF No. 71.

## LEGAL STANDARDS

A court shall grant a motion for summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986).  Although the Court must consider the evidence in the light most favorable to the nonmovant, to survive summary judgment, the nonmoving party must produce specific facts to demonstrate that a genuine issue exists for trial.  *See Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001).

## ARGUMENT

### I.    Williams's Second Amendment Claim Fails as a Matter of Law.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Amendment secures an individual right to keep and bear arms for self-defense both within and outside the home.  *Bruen*, 142 S. Ct. at 2135 (citing *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).  This right "is not unlimited," however.  *Heller*, 554 U.S. at 626; *accord Bruen*, 142 S. Ct. at 2128; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010).  Rather, to determine its scope, courts generally must consider the history of the preexisting right that the Amendment secured and the Nation's tradition of firearm regulation.  *See Bruen*, 142 S. Ct. at 2126.  In light of such history and tradition, for example, the Supreme Court has held that that the Second Amendment does not guarantee an unlimited right to possess every kind of weapon or to carry weapons in every kind of place.  Rather, Congress may ban "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, and likewise may ban weapons in "sensitive places," *Bruen*, 142 S. Ct. at 2133.

As the Third Circuit has recognized, history and tradition also establish that Congress may prohibit certain people from possessing or using firearms.  In *Range*, the Third Circuit held that "all people have the right to keep and bear arms" but that "the legislature may constitutionally 'strip certain groups of that right.'"  69 F.4th at 102 (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting)).  In particular, the Third Circuit acknowledged "[t]hat Founding-era governments disarmed groups they distrusted."  *Range*, 69 F.4th at 105.  Thus, to establish that Section 922(g)(1) is constitutional as applied to a particular person, the Third Circuit has held that the

Government must show that the application of the prohibition to that person "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Range*, 69 F.4th at 103 (quoting *Bruen*, 142 S. Ct. at 2127). That standard is readily satisfied here, in light of historical laws disarming individuals whose possession of firearms would be dangerous, among other distrusted groups. *See infra* pp.10-15.

The Court of Appeals went on to hold in *Range* that Section 922(g)(1) was unconstitutional as applied to an individual convicted of one count of welfare fraud, based on a single instance of understating his income on an application for food stamps. 69 F.4th at 98, 106. The Government disagrees with the Third Circuit's conclusion in *Range* and preserves for further review its argument that Section 922(g)(1) is constitutional in all its applications. In any event, however, Williams's Second Amendment claim fails under *Range*.

The Third Circuit emphasized that its decision was "narrow" and applied only to "people like Range." *Id.* at 106. Williams is not "like Range" in any relevant respect. Range had pleaded guilty to one count of making a false statement to obtain food stamps, having signed an application prepared by his wife that understated his actual income of between $9.00 and $9.50 per hour while he and his wife struggled to raise three young children on $300 per week. *Id.* at 98. Although Range did not recall reviewing the food stamp application, he "accepted full responsibility for the misrepresentation." *Id.* Apart from his one welfare fraud conviction, Range had committed no other criminal offenses, excluding minor traffic, parking, and fishing infractions. *Id.* And once Range became aware that he could not legally possess firearms as a result of his welfare fraud conviction, he gave away a deer-hunting rifle that his wife had given him as a gift. *Id.* at 98-99.

By contrast, Williams has repeatedly engaged in dangerous criminal conduct that is demonstrably linked to an increased risk of death and violence in the context of firearms use. *See infra* pp.15-17. Even after being convicted once of a criminal DUI offense, he continued to drive while

severely intoxicated—demonstrating disregard for both public safety and the law—leading to a further DUI conviction for which he received a custodial sentence. *See supra* pp.3-4. Williams's disqualifying offense is thus readily distinguishable from Range's offense. Moreover, Williams knowingly violated the prohibition on his possession and use of firearms, by continuing to own guns and by handling guns and ammunition on a daily basis for years in the course of his employment, and he made false statements regarding his criminal history in an effort to obtain firearms that he was not legally permitted to possess. *See supra* pp.4-5. This conduct further demonstrates Williams's disregard for the law. Thus, to the extent that post-offense conduct may be relevant to determining whether Section 922(g)(1) is constitutional as applied, Williams's post-offense conduct further distinguishes him from Range. In sum, Williams is not among the "narrow" class of offenders that the Third Circuit held in *Range* may not be disarmed by the legislature. 69 F.4th at 106.

### A. History Establishes that Legislatures May Disarm Those Whose Possession of Firearms Would Be Dangerous, Among Other Distrusted Groups.

History establishes that legislatures may disarm those whose possession of firearms would be dangerous, among other distrusted groups, and that legislatures may make these determinations on a categorical basis. (To be clear, the Government does not contend that dangerousness is necessary in this context, but merely that it is sufficient.)

As a starting point, the Second Amendment "codified a right 'inherited from our English ancestors.'" *Bruen*, 142 S. Ct. at 2139 (quoting *Heller*, 554 U.S. at 599). Indeed, the provision of the English Bill of Rights that secured the right of Protestants to "have Arms for their Defence suitable to their Conditions and as allowed by Law," 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441 (1689), has long been "equated" with the Second Amendment, *Heller*, 554 U.S. at 608 (citing 3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1891 (1833)). Accordingly, "the [English] common law and . . . British institutions as they were when the instrument was framed and

adopted" are probative of the Second Amendment's meaning.  *Bruen*, 142 S. Ct. at 2139 (emphasis omitted) (quoting *Ex parte Grossman*, 267 U.S. 87, 108-109 (1925)).

When the English Bill of Rights was adopted, the Militia Act of 1662 authorized local officials to disarm individuals they judged "dangerous to the Peace of the Kingdome."  14 Car. 2, c. 3, § 13 (Eng. 1662).  Consistent with that authority, the Crown periodically instructed local officials to disarm "dangerous" individuals, beginning before and continuing long after the enactment of the English Bill of Rights in 1689.[7]  Similarly, various eighteenth-century English justice-of-the-peace manuals recognized that the Militia Act authorized local officials to disarm those they "judge[d] dangerous."[8]  This "regular course of practice" demonstrates that the right to bear arms that we inherited allows for the disarmament of individuals whose possession of firearms is deemed dangerous.  *Bruen*, 142 S. Ct. at 2136 (quoting *Chiafalo v. Washington*, 591 U.S. ---, 140 S. Ct. 2316, 2326 (2020)).

Founding-era American practice followed in the same tradition of disarming individuals whose possession of firearms was deemed dangerous, such as Loyalists, among other distrusted groups.  For

---

[7] *See, e.g.*, *Calendar of State Papers, Domestic Series, 1670*, at 237 (May 26, 1670) (Mary Anne Everett Green ed. 1895) (instructions to disarm "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, May 1,1684-February 5, 1685*, at 26 (May 20, 1684) (F.H. Blackburne Daniell & Francis Bickley eds. 1938) (instructions to dispose of arms seized from "dangerous and disaffected persons"); *Calendar of State Papers, Domestic Series, William III, 1 April, 1700—8 March, 1702*, at 234 (Feb. 26, 1701) (Edward Bateson ed. 1937) (instructions to disarm "dangerous" persons); Privy Council to the Earl of Carlisle (July 30, 1714), *in* Historical Manuscripts Commission, *Tenth Report, Appendix, Part IV* 343 (1885) (instructions to disarm "Papists and Non-jurors dangerous to the peace of the kingdom"); Lord Lonsdale to Deputy Lieutenants of Cumberland (May 20, 1722), *in* Historical Manuscripts Commission, *Fifteenth Report, Appendix, Part VI* 39-40 (1897) (instructions to disarm "such persons as shall be judged dangerous to the peace of the Kingdom"); Order of Council to Lord Lieutenants (Sept. 5, 1745), *in* Historical Manuscripts Commission, *Report on the Manuscripts of the Marquess of Lothian, Preserved at Blickling Hall, Norfolk* 148 (1905) (instructions to disarm "Papists, non-jurors, or other persons that shall be judged dangerous to the peace of the kingdom").

[8] *See, e.g.*, Robert Gardiner, *The Compleat Constable* 68 (3d ed. 1708); Giles Jacob, *The Modern Justice* 338 (1716); W. Nelson, *The Office and Authority of a Justice of Peace* 575 (7th ed. 1721); G. Jacob, *Lex Constitutionis* 331 (2d ed. 1737); Theodore Barlow, *The Justice of Peace* 367 (1745); 2 Joseph Shaw, *The Practical Justice of Peace, and Parish and Ward-Officer* 231 (6th ed. 1756).

example, New Jersey authorized the disarmament of those "judge[d] [to be] disaffected and dangerous to the present Government." 1777 N.J. Laws 90, ch. 40 § 20. Likewise, Pennsylvania disarmed anyone who refused to take an oath of allegiance, at least in part on the ground that it was "very improper and dangerous that persons disaffected to the liberty and independence of this state" should possess firearms. 1779 Pa. Laws 193 §§ 4-5. Thus, while Founding-era laws disarming Loyalists also stand for a broader principle, at a minimum they reflect that the legislature may constitutionally disarm groups whose possession of firearms the legislature has deemed dangerous.

These English and early American laws establish that regulations consistent with the Second Amendment include (but are not limited to) laws disarming those whose firearm possession is judged to be dangerous. And these historical analogues foreclose any argument that the legislature may disarm only those dangerous individuals with a personal history of violent conduct, which was not a prerequisite for disarmament under either the English Militia Act or early American laws disarming Loyalists.

This understanding of the Second Amendment is consistent with the Third Circuit's decision in *Range*. There, the majority concluded that "the Government [had] not carr[ied] its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range." *Range*, 69 F.4th at 98; *see also id.* at 110 (Ambro, J., concurring) (concluding that, while Section 922(g)(1) on its face "fits within our Nation's history and tradition of disarming those persons who legislatures believed would, if armed, pose a threat to the orderly functioning of society," Range "[did] not conceivably pose such a threat").

Although the plaintiff-appellant in *Range* had argued that "dangerousness is the 'touchstone,'" *i.e.*, that dangerousness is *necessary* to establish the constitutionality of Section 922(g)(1) as applied to any particular individual, the Third Circuit expressly declined to adopt that standard. *Range*, 69 F.4th at 104 n.9 (citation omitted). The Government also does not suggest here that dangerousness is

required.  But nothing in the Third Circuit's opinion casts doubt on the conclusion that legislatures may, at a minimum, constitutionally disarm dangerous persons such as Williams.  And that conclusion is well supported by history, for the reasons explained above.

Indeed, since *Range* was decided, other courts in this Circuit have reasoned that Founding-era disarmament laws "were targeted at groups that lawmakers deemed dangerous and disruptive, and the laws sought to protect the public from violence and disorder."  *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *8 (M.D. Pa. Sept. 11, 2023); *see also, e.g.*, *United States v. Ames*, No. 23-CR-178, 2023 WL 5538073, at *3 (E.D. Pa. Aug. 28, 2023) (concluding that "[f]irearm regulation in the era of the Second Amendment's ratification disarmed individuals who posed a potential danger to others" (citation omitted)).  As these courts have correctly concluded, it follows that modern legislatures may, at a minimum, disarm groups that modern legislatures have reasonably decided "are dangerous and disruptive to society."  *Reichenbach*, 2023 WL 5916467, at *8 (affirming the constitutionality of Section 922(g)(1) as applied to a drug trafficker); *see also Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) ("[T]he state can take the right to bear arms away from a category of people that it deems dangerous. . . . And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety.").

### B.  History Also Establishes That Legislatures May Impose Regulations to Address the Dangerous Combination of Firearms and Alcohol, In Particular.

Moreover, American legislatures have long enacted laws to mitigate the particular danger that arises when those who misuse or overconsume alcohol are entrusted with firearms.  In 1655, for example, Virginia prohibited "shoot[ing] any gunns at drinkeing (marriages and ffuneralls onely excepted,)."  Act XII of March 10, 1655, 1655 Va. Laws 401, 401-02.  In 1771, New York prohibited firing guns during the New Year's holiday, a restriction that "was aimed at preventing the 'great Damages . . . frequently done on [those days] by persons . . . being often intoxicated with Liquor.'"  *Heller*, 554 U.S. at 632 (quoting Ch. 1501, 5 Colonial Laws of New York 244-46 (1894)).

During the American Revolution, at least two States enacted laws providing for the removal of arms from intoxicated soldiers.  *See* An Act for Better Settling and Regulating the Militia of This Colony of New-Jersey, for the Repelling Invasions, and Suppressing Insurrections and Rebellions, § 3 (1746), available in *Military Obligation: The American Tradition* 25, pt. 8, New Jersey (1947) ("[I]f any Soldier shall . . . appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer to disarm such Soldier . . . ."); An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania, § XLV (1780), available in *Military Obligation: The American Tradition* 97, pt. 11, Pennsylvania (1947) ("[I]f any non-commissioned officer or private shall, on any occasion of parading the company to which he belongs . . . be found drunk . . . he shall be disarmed . . . .").

And in the nineteenth century, certain States forbade intoxicated persons from buying or carrying guns.  *See* Kansas Gen. Stat., Crimes & Punishments, § 282 (1867) (prohibiting "any person under the influence of intoxicating drink" from "carrying on his person a pistol . . . or other deadly weapon"); 1878 Miss. Laws 175-76, § 2 (prohibiting the sale of pistols and certain knives to a "person intoxicated"); 1883 Mo. Laws 76, § 1 (prohibiting carrying a dangerous weapon "when intoxicated"); 1883 Wis. Sess. Laws 290, Offenses Against Lives and Persons of Individuals, ch. 329 § 3 (providing that "[i]t shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver"); 1890 Okla. Sess. Laws 495, art. 47, § 4 (prohibiting officers from "carrying . . . arms while under the influence of intoxicating drinks"); 1899 S.C. Acts 97, No. 67, § 1 (prohibiting "boisterous conduct" while "under the influence of intoxicating liquors," including "discharg[ing] any gun" near a public road); *see also State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding Missouri statute as "a reasonable regulation of the use of such arms").  These nineteenth-century laws confirm that regulations designed to prevent the combination of firearms and alcohol from turning lethal are consistent with the Second Amendment.  *See, e.g.*, *Bruen*, 142 S. Ct. at 2137 (explaining that nineteenth-

century history can "confirm[]" the original meaning of the Second Amendment (quoting *Gamble v. United States*, 589 U.S. ---, 139 S. Ct. 1960, 1975 (2019))).

### C. Consistent With These Historical Principles, Section 922(g)(1) Is Constitutional as Applied to Williams.

As applied to Williams, a recidivist DUI offender, Section 922(g)(1) fits comfortably within the longstanding Anglo-American tradition described above. As noted, that tradition includes both: (1) disarming those whose possession of firearms would be dangerous generally; and (2) enacting regulations to address the acute danger that results from the combination of alcohol and firearms, specifically. As an initial matter, drunk driving is itself an unquestionably dangerous crime. The Supreme Court and the Third Circuit have so held, and several individual Justices have amplified that conclusion in separate writings. *See, e.g.*, *Begay v. United States*, 553 U.S. 137, 141 (2008) ("Drunk driving is an extremely dangerous crime."), *abrogated on other grounds by Johnson v. United States*, 576 U.S. 591 (2015); *Holloway*, 948 F.3d at 174 ("[A]ll branches of the federal government agree that DUIs are dangerous . . . ."); *Mitchell v. Wisconsin*, 588 U.S. ---, 139 S. Ct. 2525, 2541 (2019) (Sotomayor, J., dissenting) ("[D]runk driving poses significant dangers that . . . States must be able to curb."); *Virginia v. Harris*, 558 U.S. 978 (2009) (Mem.) (Roberts, C.J., dissenting from denial of writ of certiorari) ("There is no question that drunk driving is a serious and potentially deadly crime . . . . The imminence of the danger posed by drunk drivers exceeds that at issue in other types of cases.").

In 2004, for example, when Williams committed the DUI offense that resulted in his disarmament, 16,649 people died in alcohol-related motor vehicle crashes in the United States. *Traffic Safety Facts: 2004 Data*, Nat'l Highway Traffic Safety Ass'n, https://perma.cc/CM2L-WVT8. That amounts to an average of one death every 31 minutes. *Id.* Moreover, Williams did not stop driving drunk after his first DUI conviction. Rather, he was convicted of a second DUI several years later, demonstrating continued disregard for both public safety and the law even after a first criminal

conviction.  *See supra* pp.3-4.[9]  And Williams's second DUI conviction resulted from driving at a level of intoxication nearly three times the legal limit—conduct even more dangerous than a baseline DUI offense.  *See supra* p.4.  Put simply, Williams did not exhibit a one-time lapse in judgment and get behind the wheel after drinking slightly too much alcohol.  He engaged in a pattern of driving drunk, even continuing to drive severely drunk after his first criminal conviction.

That pattern of conduct easily supports the legislative determination that Williams's possession of a firearm would be dangerous to public safety.  Not only is drunk driving itself dangerous conduct, as explained above, but it also correlates to an increased risk of violence and death in the context of firearm possession.  Common sense dictates that a person who repeatedly drives drunk cannot be trusted to safely handle another piece of potentially lethal machinery—namely, a firearm.  Empirical evidence confirms this conclusion.  Indeed, a systematic review and meta-analysis found that more than one-third of firearm homicide perpetrators and more than one-quarter of firearm suicide victims were acutely intoxicated at the time of the homicide or suicide.  Charles C. Branas, *Alcohol Use & Firearm Violence*, 38 EPIDEMIOLOGIC REVS. 32, 36-37 (2016).  Relatedly, DUI offenders are significantly more likely than average to commit a violent crime in the future, even controlling for other criminal history.  A longitudinal study of California handgun purchasers found that purchasers with at least one prior DUI conviction and no other criminal history were more than twice as likely to be arrested for a violent crime within twelve years after the handgun purchase, compared to purchasers with no criminal record at all.  Rose M. C. Kagawa et al., *Association of Prior Convictions for Driving Under the Influence with Risk of Subsequent Arrest for Violent Crimes Among Handgun Purchasers*, 180 J. OF AM. MED. ASS'N: INTERNAL MED. 37, 38 (2019); *cf. Reichenbach*, 2023 WL 5916467, at *8 (relying in part on the

---

[9] Multiple DUI convictions are particularly indicative of a pattern of behavior, given the infrequency with which the crime is detected in the first instance.  *See, e.g., Perez v. Wolf*, 445 F. Supp. 3d 275, 282 (N.D. Cal. 2020) (citing evidence that "less than 1% of DUI offenses are even detected").

"well understood" and "dangerous" "connection between drugs, firearms, and deadly violence" to conclude that "lawmakers have made a reasoned decision that drug traffickers are dangerous and disruptive to society" and thus may be disarmed to protect public safety).

Because drunk driving is itself dangerous and also correlates to a heightened risk of violence and death when a DUI offender has access to a firearm, Section 922(g)(1), as applied to Williams, is "relevantly similar" to the historical laws summarized above. *Bruen*, 142 S. Ct. at 2132; *cf.* Tr. of Oral Arg. at 77:18-22, *Heller*, 554 U.S. 570 (No. 07-290) (Roberts, C.J.: "[W]e are talking about lineal descendants of the arms but presumably there are lineal descendants of the restrictions as well."); *accord Kanter*, 919 F.3d at 465 (Barrett, J., dissenting); *Heller v. District of Columbia*, 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting). The early Anglo-American practice of disarming those whose possession of firearms was judged to be dangerous and Section 922(g)(1), as applied to Williams, both strip certain individuals of their rights to keep and bear arms because their possession of firearms is reasonably judged to be excessively dangerous. The tightness of that analogical fit as to Williams is underscored by early American laws before, at, and shortly after the Founding that prohibited, for example, the use of firearms while intoxicated. *See supra* p.13-15. Such laws demonstrate that the Founders were well aware of the dangers of intoxication in the context of firearms and that the Second Amendment was adopted against the background understanding that legislatures could enact regulations to mitigate that risk.

To the extent that Williams argues that his disarmament is inconsistent with the Second Amendment because the Founders did not disarm DUI offenders specifically, that contention does not withstand scrutiny. As an initial matter, the Supreme Court emphasized in *Bruen* that in analogizing between modern and historical firearm regulations, only "a well-established and representative historical *analogue*" is required, "not a historical *twin*." 142 S. Ct. at 2133. Further, as the Supreme Court also explained in *Bruen*, "a more nuanced approach" to analogical reasoning is required in "cases

implicating . . . dramatic technological changes" and, by extension, "circumstances beyond those the Founders specifically anticipated." *Id.* at 2132; *cf. Heller*, 554 U.S. at 582 (dismissing as "bordering on the frivolous" the argument that the Second Amendment protects "only those arms in existence in the 18th century").

Although alcohol misuse is not a new phenomenon, the motor vehicle was invented only the late nineteenth century. *Gasoline Explained*, U.S. Energy Info. Admin. (last updated Nov. 17, 2022), https://www.eia.gov/energyexplained/gasoline/history-of-gasoline.php. Accordingly, there is no basis to draw a negative inference from the absence of a Founding-era law disarming DUI offenders, as the criminalization of drunk driving—and with it, the loss of firearm rights as a consequence of certain DUI offenses—responded to advances in transportation technology that the Founders could not have anticipated.

Relatedly, advances in firearm technology since the Founding have exacerbated the danger that results when alcohol and firearms combine. The muzzle-loading firearms available at the Founding generally fired only one shot before they needed to be reloaded, and they often misfired. *See* Randolph Roth, *Why Guns Are and Are Not the Problem*, *in* Jennifer Tucker et al. eds., *A Right to Bear Arms?: The Contested Role of History in Contemporary Debates on the Second Amendment* 117 (2019). Moreover, these firearms took at least one minute to load, assuming the weapon was already cleaned and all supplies were readily at hand, and they could not be stored loaded. *Id.* As a result of these limitations, muzzle-loading firearms could be used impulsively only if they were already loaded for some other purpose. *Id.* By contrast, modern, breech-loading firearms, which were introduced in the mid-nineteenth century, can fire multiple rounds, can be kept loaded, and fire more reliably than muzzle-loading firearms. *Id.* at 121. In short, they are "the ideal weapons for killing in the heat of the moment," unlike the firearms that existed at the Founding. *Id.* These technological advances are particularly significant here, given that DUI offenders display greater impulsivity and less inhibition

18

when under the influence of alcohol than non-DUI offenders who have consumed the same volume of alcohol.  *See generally* Mark T. Fillmore & Nicholas Van Dyke, *DUI Offenders Display Reduced Perception of Intoxication and Heightened Impulsive Choice in Response to Alcohol*, EXP. CLIN. PSYCHOPHARMACOL., June 2020, at 337-347.

In sum, the Second Amendment codified a preexisting right that has always allowed legislatures to disarm those whose possession of firearms has been deemed dangerous (among other categories of distrusted people whom the Court need not address to decide this motion).  By virtue of his multiple DUI convictions, including at nearly three times the legal limit of intoxication, Williams falls squarely within that category.  Nothing in the Third Circuit's *en banc* decision in *Range* suggests otherwise.

Because the Government has satisfied its burden to establish that Section 922(g)(1) is constitutional under *Bruen* and *Range* as applied to Williams, Defendants are entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and enter final judgment in favor of Defendants.

Dated: September 21, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
New York Bar No. 5859137
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.

Washington, D.C. 20005
Telephone: (202) 514-3786
Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Motion for Summary Judgment was filed through the

CM/ECF system, which will provide electronic notice to the following counsel:

Adam J. Kraut (akraut@civilrightsdefensefirm.com)
Joshua Prince (Joshua@PrinceLaw.com)

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE