Joshua Prince, Esq.
Attorney Id No. 306521

Prince Law Offices, P.C.
646 Lenape Road
Bechtelsville, PA 19505
(888) 313-0416, ext 81114 (t)
(610) 845-3903 (f)
Joshua@PrinceLaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **EDWARD A. WILLIAMS** | : | |
| Plaintiff | : | Civil Action No.  17-CV-2641 |
| | : | |
| **v.** | : | |
| | : | |
| **MERRICK GARLAND,** *et al.* | : | Judge John Milton Younge |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' SECOND RENEWED MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................ 1

II.   PROCEDURAL HISTORY ................................................ 2

III.   FACTUAL BACKGROUND ............................................. 3

IV.   ARGUMENT ...................................................................... 6

    *a.*  *Incorporation* ............................................................. 6

    *b.*  *The proper analysis* ................................................... 7

        **i.**   **The Defendants' fail to provide any analogous laws around the time of Founding** ................ 8

            A.  Alcohol intoxication has been a general societal problem that has persisted since the 18th century ................................... 10

            B.  Even if, arguendo, this Court considers the issue before it an unprecedented societal concern or dramatic technological changes, the Government fails to prove any relevantly similar law to Section 922(g)(1)'s application to Mr. Williams ................ 12

        **ii.**  **An untethered "Dangerousness" inquiry is not part of the relevant analytical framework** ................ 16

        **iii.**  **Even if, *arguendo*, this Court considers dangerousness, the Government has failed to establish that Mr. Williams is likely to act dangerously with a firearm** ................ 20

        **iv.**  **Legislative authority to disarm has been rejected by the Third Circuit** ................ 21

V.   CONCLUSION ................................................................ 22

## TABLE OF AUTHORITIES

**Cases**

*District of Columbia v. Heller,* 554 U.S. 570 (2008) .............................................. 21

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ............................................ 9

*Holloway v. Sessions*, 349 F. Supp. 3d 451 (M.D. Pa. 2018) .................................. 3

*Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) ............. 9

*New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022)........... passim

*Range v. Attorney Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023)...... passim

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ................................... passim

**Statutes**

18 Pa.C.S. § 106 ..................................................................................................... 5

18 Pa.C.S. § 6105 ......................................................................................... 4, 6, 22

18 Pa.C.S. § 6109 .............................................................................................. 4, 5

18 U.S.C. § 921..................................................................................................... 4, 5

18 U.S.C. § 922..................................................................................................... passim

35 P.S. § 780-113................................................................................................... 4

42 Pa.C.S. § 9763 .................................................................................................. 3

42 Pa.C.S. § 9804 .................................................................................................. 3

75 Pa.C.S. § 3813 .................................................................................................. 3

**Other Authorities**

David F. Musto, *The American Experience with Stimulants and Opiates*, 2 PERSPS. ON CRIME & JUST. 51 (1998)...................................................................................... 11

W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION (1981)............................................................................................... 11

**Regulations**

37 Pa. Code § 451.52 .................................................................................................. 3

Plaintiff Edward A. Williams, by and through his counsel, hereby submits this Brief in Opposition to Defendants' Second Renewed Motion for Summary Judgment.

## I.       INTRODUCTION

Throughout American history, laws have regulated the combination of guns and intoxicating substances. But at no point in the 18th or 19th century did the government disarm individuals who used drugs or alcohol at one time from possessing guns at another. A few states banned carrying a weapon while *actively under the influence*, but those statutes did not emerge until well after the Civil War. Section 922(g)(3)—the first federal law of its kind—was not enacted until 1968, nearly two centuries after the Second Amendment was adopted.

In short, our history and tradition may support some limits on *an intoxicated person's* right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past [] usage.

*United States v. Daniels*, 77 F.4th 337, 340 (5th Cir. 2023) (emphasis added).

Plaintiff Edward A. Williams (hereinafter "Mr. Williams" or "Plaintiff") has filed suit, complaining that the Defendants have collectively and individually prohibited a particular class of persons, including himself, from purchasing, owning, possessing, keeping, bearing, or otherwise utilizing firearms and ammunition as a result of a misdemeanor driving under the influence (hereinafter "DUI") conviction, where no one was injured, there was no property damage, and his conduct did not involve a firearm, in violation of his rights as protected by the

Second Amendment. [1] Mr. Williams only desires to exercise his fundamental, individual right to purchase, own, possess, and utilize a firearm for purposes of self-defense of himself and his family. [2]

Consistent with the U.S. Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) and the Third Circuit's *en banc* decision in *Range v. Attorney Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), it is clear that Defendants' enforcement of such a prohibition violates Mr. Williams' fundamental, constitutionally protected right to keep and bear arms as provided for in the Second Amendment. In fact, there can be no dispute, post-*Bruen*, that there is nothing in the Constitution's text nor the Nation's historical tradition of firearm regulation – as elucidated by the *Bruen* and *Range* decisions, as well as, the Fifth Circuit's decision in *Daniels* – that supports the categorical ban that the prior and continuing enforcement of Defendants' law imposes on Mr. Williams and as such, Defendants' law and enforcement thereof violates the Second Amendment.

## II.    PROCEDURAL HISTORY

For brevity, Plaintiff respectfully incorporates the procedural history that he

---

[1] Pltf. Statement of Material Facts (hereinafter, "Pltf. SOMF"), ¶¶ 9, 18.
[2] *Id.* at ¶¶ 15, 18, 25.

provided in his Brief in Support of his Fourth Motion for Summary Judgment. [3]

## III.     FACTUAL BACKGROUND

For brevity, Plaintiff respectfully incorporates the factual background that he provided in his Brief in Support of his Fourth Motion for Summary Judgment. [4]

Furthermore, as set-forth in Plaintiff's Response to Defendants' Statement of Material Facts (hereinafter, "Pltf. Resp. to Defs. SOMF"), Defendants attempt to rely on hearsay and un-authenticated records [5] in their SOMF and brief (Def. Brief at 4), which should not be countenanced by this Court. Moreover, contrary to Defendants' assertion that Mr. Williams would have had to serve time in jail if it had not been for his medical condition (Def. Brief at 4), a sentencing judge retains authority to grant house arrest absent a medical condition [6] and to also grant work release, [7] as was done in relation to Mr. Holloway, in *Holloway v. Sessions*, 349 F. Supp. 3d 451 (M.D. Pa. 2018), rev'd and remanded sub nom. *Holloway v. Attorney Gen. United States*, 948 F.3d 164 (3d Cir. 2020). [8] Additionally, Mr. Williams no

---

[3] *See* Doc. 72-3.
[4] *Id*.
[5] *See* Pltf. Resp. to Defs. SOMF, ¶¶ 7, 12–14.
[6] *See*, 42 Pa.C.S. §§ 9763, 9804; 37 Pa. Code § 451.52.
[7] *See*, 75 Pa.C.S. § 3813. *See also*, *Holloway*, 349 F.Supp.3d at 457  (declaring that a "sentencing judge has discretion to assign an individual convicted of a DUI offense to a daytime work release program")
[8] Plaintiff also notes, as was declared by Chief Judge Conner in *Holloway*, that pursuant to 75 Pa.C.S. § 3804(c)(2)(i), a sentencing judge lacks any discretion in imposing a sentence of less

**(Contd.)**

3

longer consumes alcohol, save for the occasional glass of wine with dinner or champagne at home on New Year's Eve with his family. [9]

In turning to Defendants' disingenuous allegations that Mr. Williams *knowingly* possessed firearms and ammunition after his 2004 conviction (Def. Brief at 4-5, 10), [10] [11] the record in this matter is explicitly clear [12] that: (1) Mr. Williams believed that he had been convicted of a misdemeanor of the second

[9] than 90 days but "[w]ithout discounting the significance of 90 days' imprisonment, Holloway's sentence was relatively minor as compared to both the threshold term of imprisonment of more than one year defined in 18 U.S.C. § 922(g), and the maximum possible punishment of five years' imprisonment he faced under Pennsylvania law." 349 F. Supp. 3d at 457.

[9] *See* Pltf. Resp. to Defs. SOMF, ¶ 18.

[10] To the extent the Defendants are only contending this due to the revocation of Mr. Williams' license to carry firearms, the revocation of a license to carry firearms and the ability to purchase, possess, and utilize firearms and ammunition have no relation, as 18 Pa.C.S. § 6109 contains different criteria for the eligibility to obtain a license to carry than the criteria specified in 18 Pa.C.S. § 6105, which addresses those who are prohibited from purchasing and possessing firearms. In fact, numerous individuals are eligible to purchase, possess, and utilize firearms and ammunition but ineligible for a license to carry firearms. As just one illustration, pursuant to 18 Pa.C.S. § 6109(e)(1)(ii), an individual convicted of *any* offense under The Controlled Substance, Drug, Device and Cosmetic Act is prohibited from obtaining a license to carry; however, for example, a conviction for possession of a minor amount of marijuana for personal use, pursuant to 35 P.S. §§ 780-113(a)(31), (g), would not trigger a prohibition in relation to purchasing, possessing, and utilizing firearms under 18 Pa.C.S. § 6105.

[11] The Defendants also disingenuously attempt to have this Court believe that Mr. Williams knowingly made a false statement during his purchase of a firearm in 2007 (Def. Brief at 2, 5, 10) by playing fast and loose with his testimony on May 8, 2018. Specifically, Mr. Williams was asked by Defense Counsel "Sitting here *today*, it's a false statement; right?" to which Mr. Williams responded "Yes" (Def. Exhibit A, Williams Dep. 82-83)(emphasis added) as his deposition occurred almost three years after his discussion with the undersigned, where he learned – for the first time – that he was prohibited from purchasing, possessing, and utilizing firearms and ammunition, pursuant to Defendants' interpretation of 18 U.S.C. § 921(g)(1). *See*, Pltf. SOMF, ¶¶ 16, 17, 19.

[12] *See* Pltf. Resp. to Defs. SOMF, ¶¶ 19-28. 31-35.

degree, as reflected on his court docket sheet, [13] which would *not* have triggered a

prohibition under 18 U.S.C. § 922(g)(1), as it was a state law misdemeanor crime

that could not have been punished by more than two years in jail; [14] (2) Mr.

Williams was never informed that he was prohibited from purchasing, owning,

possessing, and utilizing firearms and ammunition as a result of his 2004 DUI

conviction until November 5, 2015, when he was informed of such by the

undersigned; [15] (3) an attorney retained by Mr. Williams in February of 2015

advised him that he was not prohibited and thereafter, on February 12, 2015,

submitted a letter to the Pennsylvania State Police advising that Mr. Williams had

only been convicted of non-prohibiting misdemeanor and therefore was not

prohibited; [16] (4) while Mr. Williams was on probation, the Pennsylvania State

---

[13] *See* Def. Exhibit A, Williams Dep., Exhibit 5 (PDF pg. 63, marked MCP-000006) reflecting under Final Disposition "M2" and the print date of "1/16/2018;" thus, reflecting that the Court still had Mr. Williams' conviction listed as an misdemeanor of the second degree on January 16, 2018, when the docket was printed. In fact, still as of today – October 23, 2023 – the Commonwealth of Pennsylvania's records specifies that the grading of his 2004 offense is that of a misdemeanor of the second degree, which is not federally prohibiting. *See* Pltf. Exhibit E (reflecting under Final Disposition "M2")

[14] *See* 18 U.S.C. § 921(a)(20) declaring that the "term 'crime punishable by imprisonment for a term exceeding one year' does not include-- … (B) any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less." Pursuant to 18 Pa.C.S. § 106(b)(7), a misdemeanor of the second degree cannot be punished by more than two years in jail.

[15] *See* Pltf. SOMF, ¶¶ 16, 17, 19.

[16] *See* Def. Exhibit A, Williams Dep., Exhibit 6 (PDF pgs. 126-127), a February 12, 2025, letter from the Law Offices of Andrew G. Gay, Jr., LLC (declaring, *inter alia*, "as the Court designated this offense as an ungraded misdemeanor, punishable by not more than one (1) year…[m]y client's prior conviction [] does not appear to be a disqualifying event under 18 Pa.C.S.A. 61009(e)(iii) or Section 6109(e)(viii). Additionally, based on the enclosed documents, Mr.

**(Contd.)**

Police and Bureau of Alcohol, Tobacco, Firearms and Explosives told him that he could continue to work for a federal firearms licensee, where he sold firearms [17] and approved him for purchases of firearms [18]; and, (5) Mr. Colosimo testified that he inquired of ATF and the City, as to whether Mr. Williams was prohibited and ATF and the City told him that Mr. Williams was fine in continuing in his job duties, including possessing firearms and ammunition, after performing a background check on Mr. Williams. [19] Of importance, after becoming aware that he was prohibited after the undersigned's discussion with him on November 5, 2015, Mr. Williams immediately divested himself of all firearms and ammunition and refrained from acquiring any firearms or ammunition, [20] no different than Mr. Range, when he became aware of his prohibition. [21]

## IV.    ARGUMENT

### a.    Incorporation

For brevity, Plaintiff respectfully incorporates the argument that he provided

---

Williams does not appear to be a prohibited individual pursuant to 18 Pa.C.S.A. 6105(b), or Section 6106(c)(3).")

[17] *See* Def. Exhibit A, Williams Dep. 19.

[18] *See* Def. Exhibit A, Williams Dep. 77, 79.

[19] *See* Pltf. Exhibit F, Colosimo Dep. 30–34.

[20] *See* Pltf. SOMF, ¶¶ 20 – 23; Def. Exhibit A, Williams Dep. 16–17, 19.

[21] *Range*, 69 F.4th at 99 (declaring, "After researching the reason for the denial, Range learned he was barred from buying a firearm because of his 1995 conviction. Range then sold his deer-hunting rifle to a firearms dealer.")

in his Brief in Support of his Fourth Motion for Summary Judgment. [22] Plaintiff

will merely respond to issues raised by Defendants and not previously addressed

by Plaintiff in his Brief in Support of his Fourth Motion for Summary Judgment.

     b.    *The proper analysis*

     Consistent with the Third Circuit's *en banc* decision in *Range*, 69 F.4th at

103, Defendants do not contend that Mr. Williams is not of the People protected by

the Second Amendment nor do they contend that his desired conduct – purchasing,

owning, possessing, and utilizing firearms and ammunition for purposes of self-

defense of himself and his family [23] – falls outside the plain text of the Second

Amendment. Rather, under the guise of their burden to establish that the

prohibition of Mr. Williams is consistent with the "Nations historical tradition of

firearm regulation" – as required by *Bruen*, 142 S. Ct. at 2130 – instead of

providing analogous laws around the time of Founding which establish a historical

analogue for the prohibition of firearm ownership, possession, and utilization by a

person who, like Williams, has been convicted of a misdemeanor DUI, Defendants

seek to add a new criteria – dangerousness – which it argued *against* in *Range* as

mentioned by the court, when it noted that "[t]he Government replies that 10 of the

15 judges in *Binderup* and the Court in *Holloway* and *Folajtar* rejected

---

[22] *See* Doc. 72-3.
[23] *See* Pltf. SOMF, ¶¶ 14, 24.

dangerousness or violence as the touchstone." Range, 69 F.4th at 104 n.9.

Regardless, for the reasons discussed *infra*, the laws mentioned by the Defendants

are not analogous and have been rejected by several courts across the Nation. Even

if, *arguendo*, this Court were to consider "dangerousness," the Defendants have

failed to establish that Mr. Williams is likely to act dangerously with a firearm –

especially given that he possessed firearms for almost a decade after his

conviction, before he was informed of his prohibited status – and he obtained a

psychological evaluation, which resulted in a finding, *inter alia*, that Mr. Williams

"has a normal personality, without psychopathology and without addition or

violent tendencies" and that "Mr. Williams may possess a firearm without risk to

himself or any other person." [24]

### i.       The Defendants' fail to provide any analogous laws around the time of Founding

It is quite telling that the Defendants' brief is wholly devoid of *any* historical

analogue for the prohibition of firearm purchase, ownership, possession, and

utilization by a person who, like Williams, has been convicted of a misdemeanor

DUI. As Plaintiff acknowledged in his Brief in Support of his Motion for Summary

Judgment (Doc. 72-3), while the historical tradition need not be a "historical twin,"

---

[24] *See* Pltf. Exhibit C at 11-12.

the tradition of a state, [25] around the time of Founding, must, at a minimum, be a historical analogue to be relevant. *Id*. at 2126, 2133. But a single historical analogue around the time of Founding of a state is not a tradition; rather, it is a mere aberration or anomaly, with no followers. [26] Even two or three historical analogues of the states around the time of Founding are at best a trend and not a tradition,[27] especially when short-lived. [28]

As to what constitutes an analogue, the *Bruen* court explained that there are two conceptual pathways. If the modern regulation addresses "a general societal problem that has persisted since the 18th century," then "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131. But if a modern law addresses "unprecedented societal concerns or dramatic technological changes," it calls for a "more nuanced approach." *Id*. at 2132. We must reason by analogy to determine whether older regulations are "relevantly

---

[25] *See Bruen*, 142 S. Ct. at 2154–55 (finding the statutes of territories deserving of "little weight" because they were "localized," and "rarely subject to judicial scrutiny").

[26] *See District of Columbia v. Heller,* 554 U.S. 570, 632 (2008) ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence.")

[27] *See Ezell v. City of Chicago*, 651 F.3d 684, 706 (7th Cir. 2011) (finding that two historical statutes "falls far short of establishing that [a regulated activity] is wholly outside the Second Amendment as it was understood" in 1791); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d 928, 937 (N.D. Ill. 2014) ("[C]itation to a few isolated statutes—even to those from the appropriate time period—fall[s] far short of establishing that gun sales and transfers were historically unprotected by the Second Amendment.") (internal quotation marks omitted).

[28] *See Bruen*, 142 S. Ct. at 2155 ("[T]hese territorial restrictions deserve little weight because they were . . . short lived.")

similar" to the modern law. *Id*. In relation to whether two laws are "relevantly

similar," the *Bruen* court explained that two laws are "relevantly similar" if they

share a common "why" and "how"; they must both address a comparable problem

(the "why") and place a comparable burden on the rightsholder (the "how"). *Id*. at

2132–33.

A.   Alcohol intoxication has been a general societal problem
     that has persisted since the 18th century

As Defendants argue that 18 U.S.C. 922(g)(1) and its inclusion of those who

commit DUI is to protect society (Def. Brief at 15, 17), the proper analysis is for

Defendants to prove "a distinctly similar historical regulation addressing that

problem," around the time of the Founding. However, Defendants' brief is wholly

devoid of any law, around the time of Founding or even prior to the Federal

Firearms Act of 1961, [29] that stripped, in perpetuity, an individual of his right to

keep and bear arms as the result of utilizing a conveyance of any form, while under

the influence of alcohol. Defendants even admit that "alcohol misuse is not a new

phenomenon" (Def. Brief at 18), as they must, since the Founding generation was

extremely familiar with alcohol intoxication. [30, 31] In fact, "[t]hey drank from crack

---

[29] *See* Pub. L. No. 87-342, 75 Stat. 757 (1961).

[30] John Adams claimed that Americans "exceed all other and millions of people in the world in
this degrading, beastly vice of intemperance." Letter from John Adams to William Willis (Feb.
21, 1819), in 10 THE WORKS OF JOHN ADAMS, SECOND PRESIDENT OF THE UNITED STATES 365,
365 (Charles Francis Adams ed., Boston, Little, Brown & Co. 1856); *see also* David F. Musto,

**(Contd.)**

of dawn to crack of dawn…[t]hey drank while working and *while travelling across half a continent*." [32] And as an illustration, "[d]uring one arduous seventeen-hour, sixty-six mile trip across Virginia, the stage stopped ten times, and two of the passengers had drinks at each way station: ten drinks apiece. Such habits led one foreign observer to conclude that 'the American stage coach stops every five miles to water the horses and *brandy the gentlemen!*'" [33] Or perhaps even more illustrative in relation to stage drivers, they would have "a drink whenever he stopped to water the horses at a wayside inn, and often travelled with a whiskey bottle on the seat next to him." [34] And on a trip from Nashville to Alexandria, "one passenger noted that only one driver had not drunk on the road." [35] Yet, the Government fails to point to any distinctly similar law to Section 922(g)(1)'s purported elimination of Mr. Williams' Second Amendment rights as a result of utilizing a conveyance of any form, while intoxicated, even though alcohol misuse has been a general societal problem that has persisted since the 18th century.

---

*The American Experience with Stimulants and Opiates*, 2 PERSPS. ON CRIME & JUST. 51, 52 (1998)(finding that "[i]n the early Republic," there was "an extremely high level of alcohol consumption (chiefly, distilled spirits)").

[31] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION 10 (1981) ("[I]n 1770 the annual per capita intake of alcohol from all sources was 3.5 gallons. In the years following the Revolution the amount declined .... But after 1800, as the quantity of spirits consumed increased, the total quantity of alcohol consumed from all sources increased until it reached a peak of nearly 4 gallons per capita in 1830.").

[32] *Id*. at 21.

[33] *Id*. at 18 (emphasis in original).

[34] *Id*. at 141.

[35] *Id*.

B.   Even if, *arguendo*, this Court considers the issue before it an unprecedented societal concern or dramatic technological changes, the Government fails to prove any relevantly similar law to Section 922(g)(1)'s application to Mr. Williams

While Mr. Williams believes the Court should analyze this matter under the "distinctly similar historical regulation" framework, discussed *supra*, in the event the Court disagrees, the laws cited to by Government are not "relevantly similar" to Section 922(g)(1)'s application to Mr. Williams. As discussed *supra*, if a modern law addresses "unprecedented societal concerns or dramatic technological changes," a court must reason by analogy to determine whether older regulations are "relevantly similar" to the modern law; whereby, two laws are "relevantly similar" if they share a common "why" and "how"; they must both address a comparable problem (the "why") and place a comparable burden on the rightsholder (the "how"). *Bruen*, 142 S. Ct. at 2132–33.

Despite the prevalence of alcohol and alcohol abuse, as discussed *supra*, the Defendants have failed to identify *any* restrictions at or around the time of the Founding that approximate Section 922(g)(1)'s broad sweep and perpetual prohibition. Rather, the Government, in its desire to strip Mr. Williams of his constitutionally protected rights in perpetuity, argues that several laws prohibiting individuals from discharging or purchasing firearms, *while intoxicated*, are

12

somehow relevantly similar (Def. Brief at 13-15); although it takes no time to explain "why" and "how," because if it did, its house of charades would come crashing down. In fact, the same laws cited to by the Defendants were previously offered by Defendants and addressed as being wholly insufficient for establishing relevant similarity by the Fifth Circuit in *Daniels*. As the court declared:

> Founding-era statutes concerning guns and alcohol were few. They were also limited in scope and duration. The laws that did exist had two primary concerns: (1) the misuse of weapons while intoxicated and (2) the discipline of state militias.

> Consider the first group of statutes. In 1656, Virginia banned "shoot[ing] any gunns at drinkeing." But in historical context, that was not a disarming regulation like § 922(g)(3). Virginia was a brand-new colony at the time. The 1656 statute was explicitly passed to conserve gunpowder, which was at a premium, and because ill-timed gunshots might be mistaken for a signal that local Indians were attacking. Not only was the statute enacted for a different purpose, but it did not even ban gun possession or carry—it only prevented the colonists from misusing the guns they did have during bouts of drinking.

> Another law, passed by New York in 1771, prohibited citizens from firing guns from December 31 to January 2 because of the "great Damages" done by those "intoxicated with Liquor" during New Year's celebrations. The statute had a similar purpose as § 922(3) does—preventing public harm by individuals under the influence. Nevertheless, the law was strikingly narrow. It applied on only three days out of the year; it only prevented firing guns (not possessing them); and it applied only to those under the influence, not habitual drinkers.

> Beyond that duet of colonial regulations—separated by over a century—the government identifies no Founding-era law or practice of disarming ordinary citizens for drunkenness, even if that intoxication was routine.
> Instead, the government points to a second group of statutes regulating militia service. For example, a soldier could be "disarm[ed]" if he showed up for militia service in New Jersey "disguised in Liquor." Pennsylvania did

the same in 1780. For related reasons, dram shops were prohibited from selling to local soldiers.

Those laws, however, are even less probative. For one thing, their purpose is different. They exist to ensure a competent military—a service-member cannot perform his duties if he is impaired. Furthermore, the limitations applied only to the militia; none of the laws spoke to the ability of militiamen to carry outside of their military service. At the Founding, as today, restrictions on the liberties of servicemen tell us little about the limits acceptable for the general public.

Given the prevalence of drinking at the Founding, that handful of laws puts the government on shaky footing. The government has failed to identify any relevant tradition at the Founding of disarming ordinary citizens who consumed alcohol.

77 F.4th at 345–46.

And the court, in relation to the Reconstruction Era evidence offered by the

Defendants, declared:

The government's Reconstruction-era evidence, though stronger, still falls short of the history and tradition that could validate § 922(g)(3).

Between 1868 and 1883, three states prohibited carrying firearms while intoxicated: Kansas, Missouri, and Wisconsin. Missouri's law was challenged under the state constitution but was upheld by the Missouri Supreme Court. *State v. Shelby*, 90 Mo. 302, 2 S.W. 468 (1886). The opinion acknowledged that the state constitution "secure[d] to the citizen the right to bear arms in the defense of his home, person, and property." *Id.* at 469. But the court reasoned that if the state could regulate the "manner in which arms may be borne," there is "no good reason ... why the legislature may not do the same thing with reference to the condition of the person who carries such weapons." *Id.* The ban on intoxicated carry was therefore "in perfect harmony with the constitution." *Id.*

Those laws come closer to supporting § 922(g)(3), but they are notably few. The *Bruen* Court doubted that three colonial-era laws could suffice to show

a tradition, let alone three laws passed eighty to ninety years after the Second Amendment was ratified. *See* 142 S. Ct. at 2142.

More fatally, § 922(g)(3) is substantially broader than the postbellum intoxication laws. On *Bruen*'s two axes of relevant similarity, the postbellum laws and § 922(g)(3) share a common "why": preventing public harm by individuals who lack self-control and carry deadly weapons. But the "how" is different. At most, the postbellum statutes support the banning the carry of firearms *while under the influence*. Section 922(g)(3) bans all possession, and it does so for an undefined set of "user[s]," even if they are not under the influence.

As applied to Daniels, § 922(g)(3) is a significantly greater restriction of his rights than were any of the 19th-century laws…Indeed, under the government's reasoning, Congress could ban gun possession by anyone who has multiple alcoholic drinks a week from possessing guns based on the postbellum intoxicated carry laws. The analogical reasoning *Bruen* prescribed cannot stretch that far.

A further problem with the Reconstruction-era statutes is precisely that they emerged during and after Reconstruction. *Bruen* did not discount the relevance of late-19th-century history, but it insisted that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it." *Bruen*, 142 S. Ct. at 2132. A tradition cannot inform the original meaning of the Bill of Rights if it emerges one hundred years later. *Id*.; see also id. at 2162–63 (Barrett, J., concurring). When 19th-century practice is inconsistent with the categorical protection of the Second Amendment, the "text controls." *Id*. at 2137 (emphasis added).

…

And even if late-century practice sheds some dim light on Founding-era understandings, the most the Reconstruction-era regulations support is a ban on gun possession *while an individual is presently under the influence*.

77 F.4th at 346-48 (emphasis added).

Thus, as acknowledged by the Fifth Circuit, while there *may* be sufficient

historical tradition for the Government to establish a prohibition on individuals

while currently under the influence, in no instance have the Defendants provided any historical tradition for precluding an individual, in perpetuity, from purchasing, owning, possessing, and utilizing firearm as a result of a two-decade old alcohol-related offense. Or stated slightly differently, the "why" and "how" of the laws cited to by the Defendants lack any relevant similarity, as none prohibited the ownership of firearms and the supermajority of the Defendants' cited laws merely prohibited the discharge or carrying of a firearm, while currently intoxicated. Thus, Section 922(g)(1) sweeps FAR more broadly than the laws cited to by the Defendants, as it prohibits Mr. Williams from purchasing, owning, possessing, and utilizing a firearm in every manner and in perpetuity.

### ii. An untethered "Dangerousness" inquiry is not part of the relevant analytical framework

It is quite interesting that although the Government acknowledges that "the Third Circuit expressly declined to adopt [the dangerousness standard]" (Def. Brief at 12), and it was the Government that argued *against* a dangerousness standard in *Range*, [36] it now seemingly contends that a dangerousness standard is appropriate. Regardless, to the extent this Court elects to consider a dangerousness standard, the

---

[36] *See*, 69 F.4th at 104 n.9. (declaring that "[t]he Government replies that 10 of the 15 judges in *Binderup* and the Court in *Holloway* and *Folajtar* rejected dangerousness or violence as the touchstone.")

Defendants' arguments are unavailing, as the dangerousness of drunk drivers *as a class* does not address the relevant inquiry required by *Bruen*: whether permanently prohibiting Mr. Williams is "consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130.

As the *Daniels'* Court declared on this exact issue and in relation to the same examples,

> Indeed, any ability to implement a "dangerousness principle" is fenced in by at least two strictures in the applicable caselaw. On the one hand, the legislature cannot have unchecked power to designate a group of persons as "dangerous" and thereby disarm them. Congress could claim that immigrants, the indigent, or the politically unpopular were presumptively "dangerous" and eliminate their Second Amendment rights without judicial review. That would have "no true limiting principle," *Rahimi*, 61 F.4th at 454, and would render the Second Amendment a dead letter.

> On the other hand, we cannot inspect a legislature's judgment of dangerousness using traditional standards of scrutiny. *Bruen* forbids us from balancing a law's justifications against the burden it places on rightsholders. 142 S. Ct. at 2127, 2129. Imagine, for example, that a state legislature disarms all men, citing statistics that men commit more violent crimes than do women. Before *Bruen*, we would have considered whether the evidence supporting male dangerousness was substantial enough—and whether the law was sufficiently tailored—to justify such a categorical restriction on gun rights. But *Bruen* forswears that kind of review. *Bruen*, 142 S. Ct. at 2129. Similarly, imagine that the government bars all convicted cybercriminals from owning guns, referencing the "dangerousness" of cybercrime. Cybercrime is assuredly dangerous, but in a different way than is violent crime. Applying a standard of scrutiny, we might have interrogated whether Congress had adequately demonstrated that someone who spreads ransomware or pirates television shows is likely to be dangerous with a firearm. Again, *Bruen* heads that analysis off at the pass. *Id*.

> How, then, do we square the post-*Bruen* circle? To remain faithful to *Bruen*, the solution is to analogize to particular regulatory traditions instead of a

general notion of "dangerousness." The government must show that a historical danger-based disarmament is analogous to the challenged regulation. We must use *Bruen*'s "why" and "how" analysis to assess whether the Founding-era restriction is relevantly similar to the modern one. We must ask: Why was the group considered dangerous at the Founding and therefore disarmed? And why does the modern law classify a person as presumptively dangerous? Is the comparison supported by the record? Furthermore, how did the historical regulation limit the rights of the dangerous class? And how does the modern regulation do so?

Applying *Bruen*'s framework to the proffered analogues, *it follows that the government's theory of danger-based disarmament falls apart*. The government identifies no class of persons at the Founding (or even at Reconstruction) who were "dangerous" for reasons comparable to marihuana users. Marihuana users are not a class of political traitors, as British Loyalists were perceived to be. Nor are they like Catholics and other religious dissenters who were seen as potential insurrectionists. And even if we consider the racially discriminatory laws at the Founding, Daniels is not like the minorities who the Founders thought threatened violent revolt.

The government suggests that, in the spirit of the drafts of the Second Amendment and the Militia Act, marihuana users threaten the public "peace." But at the time of the Founding, that notion referred specifically to violence or rebellion, not generalized public harm. And § 922(g)(3) is not limited to those with a history of violent behavior—not all members of the set of "drug users" are violent. As applied in this case, the government has not shown how Daniels's marihuana use predisposes him to armed conflict or that he has a history of drug-related violence.

Furthermore, even as the Founders were disarming Catholics and politically disaffected citizens, *they left ordinary drunkards unregulated. The government has no meaningful response to the fact that neither Congress nor the states disarmed alcoholics*, the group most closely analogous to marihuana users in the 18th and 19th centuries. As with the government's analogy to mental illness, we must ask: Which are marihuana users more like: British Loyalists during the Revolution? Or repeat alcohol users? The answer is surely the latter.

The government asks us to set aside the particulars of the historical record and defer to Congress's modern-day judgment that Daniels is presumptively

dangerous because he smokes marihuana multiple times a month. But that is the kind of toothless rational basis review that *Bruen* proscribes. Absent a comparable regulatory tradition in either the 18th or 19th century, § 922(g)(3) fails constitutional muster under the Second Amendment.

77 F.4th at 353-55

And such is no different than in this matter, as the Defendants have failed to show a historical danger-based disarmament that is analogous to Section 922(g)(1) and its application to Mr. Williams. As applied in this case, the Government has not shown how Williams' two-decades old DUI conviction predisposes him to armed conflict [37] or that he has a history of alcohol-related violence, or any violence at all. All of the Government's cited studies and propositions (Def. Brief at 15-19), under the "why" and "how" analysis, support – *at most* – a temporary ban on individuals who are *currently* under the influence, not perpetual bans, as imposed by Section 922(g)(1), for individuals who previously committed an alcohol-related offense and whom are currently sober.

---

[37] While the Government attempts to contend that a California study reflects that handgun "purchasers with at least one prior DUI conviction and no other criminal history were more than twice as likely to be arrested for a violent crime within twelve years after the handgun purchase" (Def. Brief at 16), beyond the fact that we are almost two decades from Mr. Williams' DUI conviction, this study has no bearing on Mr. Williams, as he was not part of the study and, as discussed *supra* and *infra*, he underwent a psychological evaluation, where he was found *not* to be a threat to himself or others in possession of a firearm.

As this is an *as-applied* challenge, in the event the Court considers the Government's dangerous standard, the Government has the burden to establish that Mr. Williams – not other DUI convicts – would be likely to act in a manner dangerous to society. And in that vein, the Government has failed to provide *any* such evidence and to the contrary, as the Government continually points out, for almost a decade after his conviction, before becoming aware of his prohibition, Mr. Williams possessed firearms and ammunition without incident.

### iii.  Even if, *arguendo*, this Court considers dangerousness, the Government has failed to establish that Mr. Williams is likely to act dangerously with a firearm

Even if, *arguendo*, this Court were to consider the dangerousness standard and believe that there exists some support for stripping individuals, such as Mr. Williams, of their right to keep and bear arms as a result of a DUI conviction, Mr. Williams has distinguished himself from that group, as he has been found not to be dangerous in possession of a firearm.

Specifically, on August 7, 2018, Robert Gordon, Ph.D., ABPP, a Board certified clinical psychologist, conducted an examination of Mr. Williams, which consisted of an interview, a battery of psychological tests, and rating Mr. Williams on a psychodiagnostic chart, for the purposes of determining whether Mr. Williams "is fit to be allowed to own, possess, carry, and use a firearm *without risk to him or any other person*." [38] In forming his opinion, Mr. Gordon reviewed a number of documents and performed numerous types of testing. [39]

Psychologist Gordon's report summarizes that (1) Mr. Williams' "MMPI-2 indicates no problems with aggression, good judgment, good impulse control, good reality testing and no addiction problems;" (2) Mr. Williams has "no current psychiatric symptoms. He is functioning at the healthy level;" (3) Mr. Williams has

---

[38] *See* Pltf. Exhibit C (emphasis added).
[39] *Id.*

"no psychoneurological impairment;" (4) Mr. Williams has "a very low risk of

violently acting out;" (5) Mr. Williams has "no psychopathic indication;" and (6)

specifies an overall diagnosis of "Normal Personality". [40] Perhaps most

importantly, it also finds that Mr. Williams has "no history of hostile or violent

behaviors nor a continuing pattern of aggressive behaviors, which could be a

predictive factor," [41] and concludes that Mr. Williams "has a normal personality,

*without psychopathology and without addition or violent tendencies*" and that "Mr.

Williams may possess a firearm without risk to himself or any other person." [42]

> iv.   **Legislative authority to disarm has been rejected by the**
> **Third Circuit**

While Defendants spend a decent portion of its brief contending that, in

essence, legislators can categorically disarm whomever they want, such was

explicitly rejected by the *Range* Court. Specifically, the Third Circuit declared:

> At root, the Government's claim that only "law-abiding, responsible
> citizens" are protected by the Second Amendment devolves authority
> to legislators to decide whom to exclude from "the people." We reject
> that approach because such "extreme deference gives legislatures
> unreviewable power to manipulate the Second Amendment by
> choosing a label." *Folajtar*, 980 F.3d at 912 (Bibas, J., dissenting).
> And that deference would contravene *Heller*'s reasoning that "the
> enshrinement of constitutional rights necessarily takes certain policy

---

[40] *Id.* at 7-10.
[41] *Id*. at 11.
[42] *Id*. at 11–12 (emphasis added).

choices off the table." 554 U.S. at 636, 128 S. Ct. 2783; see also *Bruen*, 142 S. Ct. at 2131 (warning against "judicial deference to legislative interest balancing").

69 F.4th 102–03.

But even if, *arguendo*, this Court were to consider permitting legislators to usurp our constitutionally protected rights, the Government finds itself in an untenable position, where the Pennsylvania General Assembly has found that only individuals, who "on three or more separate occasions within a five-year period" should be precluded from *purchasing* firearms and, even then, the purchasing-disability has an automatic ten-year expiration date. [43]

## V.      CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment should be denied and Plaintiff's Motion for Summary Judgment be granted.

Respectfully Submitted,

Dated: October 23, 2023

_____
Joshua Prince, Esq.

---

[43] *See* 18 Pa.C.S. § 6105 (c)(3). It also bears noting that if an individual were convicted of three DUIs in a six-year period, the individual would not be under any state disability. In fact, an individual could have ten or more DUIs and still not be prohibited under state law, unless three of the DUIs occurred in a five-year period and if so, the individual would still be permitted to retain possession of the firearms he owned but would simply be prohibited from purchasing new firearms.

Attorney Id. No. 306521
Joshua@PrinceLaw.com

Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
888-313-0416
610-845-3903 (fax)

Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing

Brief, Response to Defendants Statement of Material Facts, and Exhibits were filed

electronically through the Eastern District of Pennsylvania Electronic Filing

System. Notice of this filing will be sent by operation of the Court's Electronic

Filing System to all registered users in this case.

Joshua Prince, Esq.
Attorney Id. No. 306521
Prince Law Offices, P.C.
646 Lenape Rd
Bechtelsville, PA 19505
888-313-0416
610-845-3903 (fax)

Attorney for Plaintiff