**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDWARD A. WILLIAMS,

        Plaintiff,

    v.

MERRICK B. GARLAND et al.,

        Defendants.[1]

Civil Action No. 17-CV-2641

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS'
SECOND RENEWED MOTION FOR SUMMARY JUDGMENT**

---

[1] Hon. Merrick B. Garland, Steven M. Dettelbach, and Christopher Wray are automatically substituted as Defendants in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.  *See* ECF No. 55 at 1 n.1.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT .............................................................................................................................2

I.     Williams Is Mistaken to Suggest That a "Historical Twin" Is Required. ....................................2

II.    Williams Concedes That Drunk Driving Is Dangerous, and His Effort to Argue That He Individually Can Be Trusted To Possess Firearms Safely, Notwithstanding His Criminal History of Recidivist Drunk Driving, Both Invokes the Wrong Legal Standard and Is Unpersuasive on Its Own Terms. .......................................................8

III.    Williams's Objections to the Government's Recitation of the Undisputed Facts Lack Merit. ......................................................................................................................11

CONCLUSION ..........................................................................................................................13

**TABLE OF AUTHORITIES**

**CASES**

*Beech Aircraft Corp. v. Rainey,*
    488 U.S. 153 (1988),
    *aff'd,* 375 F. App'x 185 (3d Cir. 2010) ................................................................11

*Fraternal Ord. of Police, Lodge 1 v. City of Camden,*
    842 F.3d 231 (3d Cir. 2016) .................................................................................11

*Kreider v. Breault,*
    No. CIV.A. 10-3205, 2012 WL 118326 (E.D. Pa. Jan. 13, 2012)........................11

*Lincoln v. Hanshaw,*
    No. CIV.A. 08-4207, 2009 WL 1259099 (E.D. Pa. May 6, 2009)........................11

*Logan v. United States,*
    552 U.S. 23 (2007) .................................................................................................8

*Mosley v. City of Pittsburgh Pub. Sch. Dist.,*
    No. CV 07-1560, 2009 WL 10728611 (W.D. Pa. July 6, 2009) ...........................11

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022)..................................................................................2, 3, 5, 11

*Pontarelli v. U.S. Dep't of the Treasury,*
    285 F.3d 216 (3d Cir. 2002) ...................................................................................9

*Range v. Att'y Gen.,*
    69 F.4th 96 (3d Cir. 2023),
    *petition for cert. docketed,* No. 23-374 (Oct. 10, 2023)....................................5, 7

*United States v. Blackshear,*
    No. CR 23-159, 2023 WL 5985284 (E.D. Pa. Sept. 14, 2023)..............................5

*United States v. Daniels,*
    77 F.4th 337 (5th Cir. 2023),
    *petition for cert. docketed,* No. 23-376 (Oct. 10, 2023)..............................1, 4, 5, 6

*United States v. Davis,*
    No. 3:23-CR-60, 2023 WL 6810249 (M.D. Pa. Oct. 16, 2023) ............................4

*United States v. Espinoza-Melgar,*
    No. 2:21-CR-204-DAK, 2023 WL 5279654 (D. Utah Aug. 16, 2023)..................5

*United States v. Hendricks,*
  No. 3:22-CR-397, 2023 WL 6276681 (M.D. Pa. Sept. 26, 2023) ................................4

*United States v. Irizarry,*
  No. CR 21-202, 2023 WL 6406278 (E.D. Pa. Oct. 2, 2023)......................................5

*United States v. Johnson,*
  No. CR 23-77, 2023 WL 6321767 (E.D. Pa. Sept. 27, 2023)....................................5

*United States v. Lewis,*
  650 F. Supp. 3d 1235 (W.D. Okla. 2023)...................................................................6

*United States v. Minter,*
  No. 3:22-CR-135, 2023 WL 6051265 (M.D. Pa. Sept. 15, 2023) ............................4

*United States v. Morales,*
  No. 3:22-CR-161, 2023 WL 6276672 (M.D. Pa. Sept. 26, 2023) ............................4

*United States v. Okello,*
  No. 4:22-CR-40096-KES, 2023 WL 5515828 (D.S.D. Aug. 25, 2023) .....................7

*United States v. Santiago,*
  No. 5:23-CR-00148, 2023 WL 7167859 (E.D. Pa. Oct. 31, 2023) ...........................4

*United States v. Watson,*
  815 F. Supp. 827 (E.D. Pa. 1993),
  *aff'd*, 26 F.3d 124 (3d Cir. 1994). ..........................................................................10

## STATUTES

18 Pa. Cons. Stat. § 6105(c)(3) ....................................................................................10

18 U.S.C. § 921(a)(20).................................................................................................10

18 U.S.C. § 922(g)(1).............................................................................................*passim*

18 U.S.C. § 922(g)(3)....................................................................................................6

18 U.S.C. § 925(c) .........................................................................................................8

## LEGISLATIVE HISTORIES

H.R. Rep. No. 183, 104th Cong., 1st Sess. (1996) ........................................................9

S. Rep. No. 353, 102d Cong., 2d Sess. (1992)...............................................................8

## RULES

Fed. R. Evid. 803(8)(C) ..........................................................................................................................11

**REGULATIONS**

27 C.F.R. § 478.144..............................................................................................................................8

**OTHER AUTHORITIES**

Rickie Longfellow, *Stagecoach Accidents*, U.S. Dep't of Transp., Fed. Highway Admin, (June 27, 2017)
    https://perma.cc/J2AE-SV4Y................................................................................................................3

## INTRODUCTION

As explained in the Government's opening brief, history establishes that legislatures may disarm those whose possession of firearms would be dangerous, among other distrusted groups, and that legislatures may make these determinations on a categorical basis. Moreover, regulations addressing the particular danger that results from the combination of alcohol and firearms date back to the Founding era. The disarmament of recidivist DUI offenders such as Williams falls squarely within this historical tradition. Not only is drunk driving itself dangerous conduct, but it also correlates with an increased risk of violence and death in the context of firearm possession. Williams thus cannot establish that 18 U.S.C. § 922(g)(1) is unconstitutional as applied to him. *See generally* Defs.' Opening Br., ECF No. 73.

Williams's only response to the relevant history is to cite a Fifth Circuit decision determining that neither this nation's undisputed history of disarming those whose firearm possession was deemed dangerous, nor historical regulations addressing firearms and alcohol specifically, supported the disarmament of an individual who smoked marijuana several times per month. *See* Pl.'s Resp. Br. at 1-2, 13-19, ECF No. 75; *United States v. Daniels*, 77 F.4th 337, 339 (5th Cir. 2023), *petition for cert. docketed*, No. 23-376 (Oct. 10, 2023). But the Fifth Circuit was mistaken to conclude that the Government may only disarm categories of individuals whose possession of firearms would be dangerous for the identical reasons that groups disarmed at the time of the Founding were considered dangerous. Numerous courts within the Third Circuit have so recognized in rejecting as-applied challenges to Section 922(g)(1) like this one. Moreover, *Daniels* is inapposite even on its own terms, given that Williams was disarmed not solely because of his history of severe intoxication, but rather because he has already demonstrated, on several occasions, his willingness to engage in criminal conduct while intoxicated that directly endangers not only his life, but also the lives of others.

With respect to the dangerousness of Williams's disqualifying criminal offense, Williams concedes "the dangerousness of drunk drivers as a class." Pl.'s Resp. Br. at 17 (emphasis omitted). He contends, however, that he is individually capable of possessing firearms without posing a danger to others, notwithstanding his recidivist DUI history. This contention overlooks the history—cited in the Government's opening brief—demonstrating that legislatures have disarmed on a categorical basis dangerous and other distrusted groups throughout American history. *See* Defs.' Opening Br. at 10, 12. Moreover, Williams's argument fails even on its own terms, as he principally relies on the opinion of a psychologist that he has a "normal personality." Pl.'s Resp. Br. at 21 (quoting Pl.'s Opening Br., Ex. C ("Gordon Rpt."), ECF No. 72-2). As explained in the Government's response to Williams's motion for summary judgment, however, that opinion does nothing to refute the basis for Williams's disarmament, which is not predicated on mental illness but rather on criminal history. *See* Defs.' Resp. Br. at 7-8, ECF No. 76.

For these reasons, the Government is entitled to summary judgment.

## ARGUMENT

### I.   Williams Is Mistaken to Suggest That a "Historical Twin" Is Required.

Turning first to Williams's legal arguments, Williams faults the Government for not providing a "historical analogue for the prohibition of firearm purchase, ownership, possession, and utilization by a person who, like Williams, has been convicted of a misdemeanor DUI." Pl.'s Resp. Br. at 8. This argument fails at every step. First, the type of analogue that Williams describes is precisely the sort of "historical twin" that the Supreme Court held in *Bruen* is not required. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022) (emphasis omitted). Second, Williams offers no response to the Government's showing that *Bruen* requires "a more nuanced approach" to analogical reasoning here,

as a result of changes in both transportation technology and firearm technology since the Founding. *Id.* at 2132; *see* Defs.' Opening Br. at 17-19.

Indeed, Williams's argument regarding alcohol use in the Founding era, including in the context of stagecoach travel, underscores why he is mistaken to contend that the Government must defend Section 922(g)(1), as applied to a twenty-first-century recidivist DUI offender, by reference to a "distinctly similar" historical regulation. *See* Pl.'s Resp. Br. at 10-11. As an initial matter, Williams's contention that the Founding generation consumed large quantities of alcohol in general does nothing to advance his claim. *See* Pl.'s Resp. Br. at 10 & nn.30-31. The basis for Williams's disarmament is his recidivist criminal history of driving while severely intoxicated, not the general quantity of alcohol that he ever consumed. Equally irrelevant are any historical sources suggesting that stagecoach *passengers* sometimes traveled while intoxicated. *See id.* Had Williams merely ridden as a passenger while intoxicated, that conduct would pose no obstacle to his firearm possession. That leaves Williams's citation to a single source suggesting that stagecoach drivers sometimes consumed alcohol during breaks from driving or even while driving. *See id.* But this reference overlooks the significant and obvious differences between stagecoach travel and modern motor vehicle travel. Although driver intoxication may have marginally increased the risk of injury to the driver or to passengers, stagecoach transportation only rarely resulted in fatalities. *See* Rickie Longfellow, *Stagecoach Accidents*, U.S. Dep't of Transp., Fed. Highway Admin, https://perma.cc/J2AE-SV4Y (June 27, 2017). There accordingly is no basis for Williams's suggestion that modern drunk driving, which kills one American approximately every half hour, *see* Defs.' Opening Br. at 15, is "a general societal problem that has persisted since the 18th century," *Bruen*, 142 S. Ct. at 2131.

Williams also fails to dispute that the historical regulations cited in Defendants' opening brief are "relevantly similar" to the modern felon-in-possession ban as applied to him, a recidivist drunk driver. *Bruen*, 142 S. Ct. at 2132. Indeed, Williams fails entirely to engage with the Government's

3

showing in its opening brief that both the Founders and their English predecessors disarmed groups whose possession of firearms they deemed dangerous to public safety, among other distrusted groups. *See* Defs.' Opening Br. at 10-13 (citing, for example, the English Militia Act of 1662; numerous historical examples of its exercise by the Crown and instances in which that practice was memorialized in English justice-of-the-peace manuals; and express evidence that the related early American practice of disarming Loyalists was predicated on the view that their possession of firearms was dangerous). To the extent that he addresses this history at all, Williams invokes—through a pages-long block quotation—the Fifth Circuit's suggestion in *Daniels* that the relevant history supports only disarming those who are deemed dangerous because they are "political traitors," "potential insurrectionists," or "thought [to] threaten[] violent revolt." *See* Pl.'s Resp. Br. at 18 (quoting *Daniels*, 77 F.4th at 354).

But *Daniels* is of course not binding on this Court, and the Fifth Circuit was mistaken to interpret history so narrowly. Numerous courts within the Third Circuit have reached that conclusion in rejecting other as-applied challenges to Section 922(g)(1). For example, in *United States v. Santiago*, No. 5:23-CR-00148, 2023 WL 7167859 (E.D. Pa. Oct. 31, 2023), the court held that "there is historical support for restricting the possession of firearms by persons like [the defendant] who previously committed dangerous crimes," reasoning in relevant part that disarming such persons is analogous to disarming "a Loyalist who failed to swear allegiance to the government and therefore threatened to breach the peace or pose a danger to the public if armed." *Id.* at *2-3; *see also, e.g.*, *United States v. Davis*, No. 3:23-CR-60, 2023 WL 6810249, at *8 (M.D. Pa. Oct. 16, 2023) (agreeing with the Government that "there is clear historical support for restricting the possession of firearms by persons who, like [the defendant], previously committed dangerous felonies" (quotation marks and brackets omitted)); *United States v. Hendricks*, No. 3:22-CR-397, 2023 WL 6276681, at *8 (M.D. Pa. Sept. 26, 2023) (same); *United States v. Morales*, No. 3:22-CR-161, 2023 WL 6276672, at *8 (M.D. Pa. Sept. 26, 2023) (same); *United States v. Minter*, No. 3:22-CR-135, 2023 WL 6051265, at *6 (M.D. Pa. Sept. 15, 2023) (same);

*United States v. Blackshear*, No. CR 23-159, 2023 WL 5985284, at \*2-3 (E.D. Pa. Sept. 14, 2023) (holding that history supports the disarmament of individuals whose criminal histories "demonstrate that, if armed, [they] pose[] a danger to society"); *United States v. Irizarry*, No. CR 21-202, 2023 WL 6406278, at \*3 (E.D. Pa. Oct. 2, 2023) (similar); *United States v. Johnson*, No. CR 23-77, 2023 WL 6321767, at \*2 (E.D. Pa. Sept. 27, 2023) (similar).

In all of these cases, the courts implicitly agreed with the Fifth Circuit in *Daniels* that "there is an undeniable throughline in all [of the relevant] historical sources: Founding-era governments took guns away from persons perceived to be dangerous." *Daniels*, 77 F.4th at 352. But they correctly parted company with *Daniels* to the extent the Fifth Circuit suggested in that case that the Government may disarm only those whose possession of firearms would be dangerous specifically because they are potential insurrectionists. *See also United States v. Espinoza-Melgar*, No. 2:21-CR-204-DAK, 2023 WL 5279654, at \*10 (D. Utah Aug. 16, 2023) ("This court is not persuaded by the *Daniels* court's decision because that court sought to find in the historical record not a 'well-established and representative historical analogue' . . . , but rather a 'historical twin'—thereby imposing a 'regulatory straightjacket [sic]' on Congress that vastly exceeds what the Supreme Court requires." (second alteration in original) (quoting *Bruen*, 142 S. Ct. at 2133)). This Court should adopt the same approach.[2]

In its opening brief, the Government explained that historical regulations addressing the particular danger that results from the combination of alcohol and firearms further underscore that the Founding generation would have regarded Williams's disarmament as consistent with the Second Amendment. *See* Defs.' Opening Br. at 13-15. Williams fails to refute that point. Instead, Williams once again attempts to rely solely on the Fifth Circuit's decision in *Daniels*, through another pages-

---

[2] As previously explained, it is entirely consistent with the Third Circuit's decision in *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023), *petition for cert. docketed,* No. 23-374 (Oct. 10, 2023), to hold that—whatever the outer bounds of its constitutional authority—the Government may disarm criminals convicted of dangerous offenses. *See* Defs.' Opening Br. at 12-13; *see also infra* at 7.

long block quotation.  *See* Pl.'s Resp. Br. at 17-19 (quoting *Daniels*, 77 F.4th at 353-55).  As the Government has explained, however, *Daniels* is inapposite even on its own terms.  *See* Defs.' Resp. Br. at 6.  As noted above, that case addressed the constitutionality of 18 U.S.C. § 922(g)(3)—which disarms unlawful users and addicts of controlled substances—as applied to an individual who smoked marijuana several times per month.  *See Daniels*, 77 F.4th at 339.  Illustrating the distinction, Williams opens his response brief with the following quotation from *Daniels*: "[O]ur history and tradition may support some limits on an intoxicated person's right to carry a weapon, but it does not justify disarming a sober citizen based exclusively on his past . . . usage."  Pl.'s Resp. Br. at 1 (emphasis omitted) (quoting *Daniels*, 77 F.4th at 340).  Even if the Fifth Circuit were correct in that regard, Williams has *not* been disarmed "based exclusively on his past [alcohol] usage."  Rather, he was disarmed for the criminal offense of repeatedly driving while severely intoxicated.  Thus, Williams has already demonstrated, on multiple occasions, his willingness to engage in criminal conduct that directly endangers not only his life, but also the lives of others.[3]

In any event, *Daniels* is an outlier not only in its result, *see* Defs.' Resp. Br. at 6 & n.3 (collecting contrary authority), but also in its restrictive reading of history, to the extent it suggests that those who misuse intoxicating substances may be disarmed only during the specific periods when they are under the influence.  For example, in *United States v. Lewis*, 650 F. Supp. 3d 1235 (W.D. Okla. 2023), the court expressly relied on historical regulations demonstrating that "[c]olonial legislators . . . recognized that guns and alcohol were a bad combination" to uphold the constitutionality of Section 922(g)(3)).  *Id.*

---

[3] Williams has repeatedly emphasized that his DUI offenses did not happen to result in injury or property damage.  *See* Pl.'s Opening Br. at 1, 6, ECF No. 72-3; Pl.'s Resp. Br. at 1.  But he points to nothing in the record that distinguishes his DUI offenses from those that have resulted in such tragic outcomes, apart from sheer happenstance.

at 1242 n.5; *see also, e.g.*, *United States v. Okello*, No. 4:22-CR-40096-KES, 2023 WL 5515828, at *3-5 (D.S.D. Aug. 25, 2023) (canvassing similar history to reach the same result).

Additionally, Williams is wrong to suggest that the Government's position that he may be disarmed consistent with the Second Amendment because he committed a dangerous crime is inconsistent with the Government's position in other cases.  As the Government has maintained throughout this action, "the Second Amendment codified a preexisting right that has always allowed legislatures to disarm those whose possession of firearms has been deemed dangerous," "*among other categories* of distrusted people whom the Court need not address to decide th[ese] motion[s]."  Defs.' Opening Br. at 19 (emphasis added); *accord id.* at 1, 9-12; Defs.' Resp. Br. at 3-5.  Stated differently, the Government has never suggested—and indeed has strenuously disputed—that the Second Amendment permits *only* the disarmament of criminals who committed dangerous offenses.  *See* Defs.' Opening Br. at 10 ("To be clear, the Government does not contend that dangerousness is necessary in this context, but merely that it is sufficient").  Of course, the Court need not decide here to what extent the disarmament of criminals who have *not* committed crimes dangerous to public safety is consistent with the Second Amendment, because there is no dispute as to "the dangerousness of drunk drivers."  Pl.'s Resp. Br. at 17; *see also* Defs.' Opening Br. at 15-19.  For purposes of this action, it suffices that history demonstrates that the Government may constitutionally disarm, *at a minimum*, those whose criminal history demonstrates that they would endanger the public safety if armed.  And that proposition is entirely consistent with the Government's arguments in *Range*.  *See, e.g.*, En Banc Br. for Appellees at 2, *Range*, 69 F.4th 96 (No. 21-2835), ECF No. 93 (disputing the plaintiff's argument "that people convicted of felony and felony-equivalent crimes are constitutionally entitled to carry deadly weapons as long as their disqualifying offenses are not too 'dangerous' or 'violent'").

**II.    Williams Concedes That Drunk Driving Is Dangerous, and His Effort to Argue That He Individually Can Be Trusted to Possess Firearms Safely, Notwithstanding His Criminal History of Recidivist Drunk Driving, Both Invokes the Wrong Legal Standard and Is Unpersuasive on Its Own Terms.**

As the Government has shown, recidivist drunk driving at the highest level of intoxication not only is itself an indisputably dangerous crime, but it also correlates with an increased risk of violence and death in the context of firearm possession. *See* Defs.' Opening Br. at 15-19. Williams does not argue otherwise. To the contrary, as noted, he concedes "the dangerousness of drunk drivers as a class." Pl.'s Resp. Br. at 17 (emphasis omitted). Williams goes on to contend that he individually may be trusted to possess firearms safely, notwithstanding his criminal history of DUI recidivism. *See id.* at 19-21. But that contention fails on multiple levels.

As an initial matter, Williams fails to refute the Government's showing in its opening brief that legislatures may disarm, on a categorical basis, groups whose possession of firearms would be dangerous. *See* Defs.' Opening Br. at 10, 12. For example, Williams does not contest that Founding-era legislatures disarmed Loyalists as a class, without inquiring whether each individual Loyalist had a history of dangerousness or violence. As previously explained, that history forecloses any argument that the Government must make individualized findings to support the disarmament of each person whose firearm possession is barred pursuant to Section 922(g)(1). *See id.* at 11-12.[4]

Williams also is wholly mistaken to suggest that the Government "contend[s] that . . . legislators can categorically disarm whomever they want." Pl.'s Resp. Br. at 21. To the contrary, the

---

[4] Moreover, the individualized standard for which Williams advocates would be fundamentally unworkable and unreliable. Congress previously allowed an individual to obtain relief from Section 922(g)(1) by demonstrating to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") that "the circumstances regarding the disability, and [his] record and reputation, are such that [he] will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest." 18 U.S.C. § 925(c); see *id.* (granting authority to the Attorney General); 27 C.F.R. § 478.144 (delegating authority to the Director of ATF). But in 1992, Congress found that program unworkable and abandoned it, by prohibiting the use of federal funds to process applications for relief. *See Logan v. United States*, 552 U.S. 23, 28 n.1 (2007); *see also, e.g.*, S. Rep. No.

legislature may categorically disarm groups to the extent consistent with the original meaning of the Second Amendment—including, as relevant here, individuals who have committed criminal offenses that endanger public safety, for all of the reasons set forth above and in the Government's prior briefing.

In any event, Williams fails to distinguish himself as an individual from the class of recidivist drunk drivers whose firearm possession he concedes is dangerous.  On that score, Williams relies principally on the 2018 opinion of a psychologist, Dr. Robert Gordon.  *See* Pl.'s Resp. Br. at 20-21 (quoting Gordon Rpt.).  That argument is unpersuasive for reasons the Government has already explained at length, including that Williams was not disarmed on the basis of mental illness, and Dr. Gordon does not and cannot dispute Williams's dangerous criminal history.  *See* Defs.' Resp. Br. at 7-8.  Williams also suggests in a footnote that he can safely possess firearms because he did so— illegally—"for almost a decade after his conviction."  Pl.'s Resp. Br. at 19 n.37.  This Court should decline to countenance the absurd argument that a person may rely on his longstanding violation of the law to establish that the law does not legitimately apply to him.  No more persuasive is Williams's suggestion that academic research showing that DUI offenders who possess firearms pose an increased risk of violence and death does not apply to Williams to the extent that he did not personally

---

353, 102d Cong., 2d Sess. 19, 20 (1992) (explaining that that judging whether applicants posed "a danger to public safety" was "a very difficult and subjective task" that "could have devastating consequences for innocent citizens if the wrong decision is made"); H.R. Rep. No. 183, 104th Cong., 1st Sess. 15 (1996) (explaining that "too many . . . felons whose gun ownership rights were restored went on to commit crimes with firearms").  And a regime of individualized determinations by courts of the constitutionality of Section 922(g)(1) as applied to every convicted criminal would be even less administrable.  Unlike administrative agencies, courts "possess neither the resources to conduct the requisite investigations nor the expertise to predict accurately which felons may carry guns without threatening the public's safety."  *Pontarelli v. U.S. Dep't of the Treasury*, 285 F.3d 216, 231 (3d Cir. 2002) (en banc).

participate in the underlying studies.  *See id.* ("[T]his study has no bearing on Mr. Williams, as he was not part of the study . . . .").

Finally, Williams argues that Section 922(g)(1) is unconstitutional as applied to him because the Pennsylvania legislature has enacted a statute that prohibits individuals convicted of driving under the influence at least three times within five years from purchasing or transferring a firearm, and provides for restoration of such a person's firearm rights under Pennsylvania law at least ten years after the most recent disqualifying conviction.  *See id.* at 22 (citing 18 Pa. Cons. Stat. § 6105(c)(3)). This argument does not withstand scrutiny.  Williams cites no authority for the proposition that a State's decision to regulate conduct less stringently than does Congress suggests, much less establishes, that the federal law at issue is unconstitutional.  To the contrary, legislatures at both the federal and state levels routinely legislate to less than the full extent of their constitutional authority.  *See, e.g.*, *United States v. Watson*, 815 F. Supp. 827, 834 (E.D. Pa. 1993) ("[I]t is axiomatic that Congress need not legislate to the full extent of its constitutional authority whenever it enacts a statute."), *aff'd*, 26 F.3d 124 (3d Cir. 1994).  Moreover, to the extent that Pennsylvania were inclined, as a policy matter, to restore Williams's firearm rights under federal law, the Gun Control Act provides several mechanisms for States to effect such restoration.  *See* 18 U.S.C. § 921(a)(20) (exempting from Section 922(g)(1)'s prohibitions one whose "conviction which has been expunged, or set aside or for which [the] person has been pardoned or has had civil rights restored . . . unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms"). But as a constitutional matter, just as a state legislature today cannot expand the scope of the

10

Government's authority in a manner inconsistent with the original meaning of the Second Amendment, *see Bruen*, 142 S. Ct. at 2137, it likewise cannot contract the scope of that authority.

### III.   Williams's Objections to the Government's Recitation of the Undisputed Facts Lack Merit.

At the outset of his response brief, Williams objects in several respects to the Government's recitation of the undisputed facts of this case.  His objections lack merit.  First, Williams contends that the Government's citation to police records of Williams's 2001 and 2004 DUI offenses, *see* Defs.' SMF, Ex. C-D, ECF No. 74, at 152-195, is improper because the records constitute "hearsay and un-authenticated records," Pl.'s Resp. Br. at 3 (citing Pl.'s Resp. to Defs.' SMF ¶¶ 7, 12-14, ECF No. 75-1).  But it is well established that the Court may consider hearsay and unauthenticated documents at summary judgment, provided they are capable of authentication and admission at trial.  *See, e.g.*, *Fraternal Ord. of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (hearsay); *Mosley v. City of Pittsburgh Pub. Sch. Dist.*, No. CV 07-1560, 2009 WL 10728611, at *3 n.4 (W.D. Pa. July 6, 2009) (unauthenticated records).  As relevant here, a police officer's documentation of his or her own firsthand observations of a defendant's conduct in an arrest record is admissible under the public records exception to the evidentiary rule against hearsay.  *Lincoln v. Hanshaw*, No. CIV.A. 08-4207, 2009 WL 1259099, at *1 n.2 (E.D. Pa. May 6, 2009) (citing Fed. R. Evid. 803(8)(C); *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169-170 (1988)), *aff'd*, 375 F. App'x 185 (3d Cir. 2010); *accord Kreider v. Breault*, No. CIV.A. 10-3205, 2012 WL 118326, at *1 n.2 (E.D. Pa. Jan. 13, 2012).  In any event, the Court need not consider the specifics of Williams's conduct at the time of his arrest to conclude that he committed a dangerous crime by virtue of his undisputed recidivist conviction for driving under the influence at the highest level of intoxication.  *See* Defs.' SMF ¶ 15, ECF No. 77; Pl.'s Resp. to Defs.' SMF ¶¶ 15-17.

Williams also fails to meaningfully dispute that he "would have had to serve time in jail if it had not been for his medical condition."  Pl.'s Resp. Br. at 3 (citing Defs.' Resp. Br. at 4).  It is no

doubt true, as a general statement of law, that "a sentencing judge retains authority to grant house arrest absent a medical condition." *Id.* But that does nothing to counter the undisputed fact that Williams was permitted to serve his custodial sentence under house arrest solely because of a medical condition. In his response to Defendants' Statement of Material Facts Not in Dispute, Williams expressly concedes that "[t]he [sentencing] judge permitted Williams to serve the detention on house arrest due to a medical condition" and that Williams "would have served [90 days] in prison but for his medical condition." Defs.' SMF ¶ 16, ECF No. 74; *see* Pl.'s Resp. to Defs. SMF ¶¶ 15-17 ("Undisputed."); *see also* Defs.' SMF, Ex. A ("Williams Dep."), at 33:4-7, ECF No. 74, at 25 ("Q. So is it your understanding you would have served time in prison instead of [sic] had it not been for your kidney condition? A. Yeah, like 90 days.").[5]

Next, despite repeating that he "no longer consumes alcohol, save for the occasional glass of wine with dinner or champagne at home on New Year's Eve with his family," Pl.'s Resp. Br. at 3-4, Williams makes no effort to square that assertion with his own admission at his deposition that he recently consumed several alcoholic beverages on a single occasion, *see* Defs.' Resp. to Pl.'s SMF ¶ 10, ECF No. 77.

Williams also argues that he did not know that he was prohibited from possessing firearms until 2015 and thus did not knowingly violate federal law by possessing approximately twenty firearms through 2015 and working at a firearm store and shooting range through 2010, during which period he handled firearms and ammunition daily. *See* Pl.'s Resp. Br. at 5-6; *see also* Defs.' SMF ¶¶ 19-20, 24-25; Pl.'s Resp. to Defs.' SMF ¶¶ 19-28. That contention defies credulity given the undisputed evidence of Williams's daily professional responsibility for ensuring that customers attempting to purchase firearms were legally eligible to do so and for understanding the paperwork that was required to

---

[5] It likewise is true but irrelevant that, as a general matter, a sentencing judge retains authority to grant work release, *see* Pl.'s Resp. Br. at 3, given that Williams was not granted work release.

complete such a purchase.  *See* Defs.' SMF ¶¶ 27-28; Pl.'s Resp. to Defs.' SMF ¶¶ 19-28.  In any event,

however, any dispute about this fact is immaterial.  Even if it were true that Williams was unaware of

his federal firearm prohibition until 2015, he nevertheless is not "like Range" for all of the other

reasons the Government has explained—most significantly, his history of dangerous criminal conduct.

*See* Defs.' Opening Br. at 9-10.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for summary judgment,

grant Defendants' motion for summary judgment, and enter final judgment in favor of Defendants.

Dated: November 13, 2023                    Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

LESLEY FARBY
Assistant Branch Director

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE
New York Bar No. 5859137
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 514-3786
Fax: (202) 616-8470
Email: Taisa.M.Goodnature@usdoj.gov

*Counsel for Defendants*

13

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Reply in Support of Defendant's Second Renewed Motion for Summary Judgment was filed through the CM/ECF system, which will provide electronic notice to the following counsel:

Adam J. Kraut (akraut@civilrightsdefensefirm.com)
Joshua Prince (Joshua@PrinceLaw.com)

*/s/ Taisa M. Goodnature*
TAISA M. GOODNATURE